AMBIKA KUMAR[*]
  ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 622-3150

ADAM S. SIEFF[*]
  adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, CA 90017
Telephone: (213) 633-6800

DAVID M. GOSSETT[*]
  davidgossett@dwt.com
CHELSEA T. KELLY[*]
  chelseakelly@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE[*]
  bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473  ext. 209

KELLEY BREGENZER[*]
  Kelley.Bregenzer@thefire.org
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
510 Walnut St. Suite 900
Philadelphia, PA 19106
(215) 717-3473  ext. 281

JEROME H. MOONEY (Utah Bar #2303)
  jerrym@mooneylaw.com
WESTON, GARROU & MOONEY
50 West Broadway, Suite 300
Salt Lake City, UT 84101
Telephone: (801) 364-5635

*Attorneys for Plaintiffs*

[*] *pro hac vice application forthcoming*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| HANNAH PAISLEY ZOULEK, a Utah resident; JESSICA CHRISTENSEN, a Utah resident; LU ANN COOPER, a Utah resident; and VAL SNOW, a Utah resident,<br><br>    Plaintiffs,<br><br>v.<br><br>KATIE HASS, in her official capacity as Director of the Utah Dept of Commerce Division of Consumer Protection; SEAN REYES, in his official capacity as Utah Attorney General,<br><br>    Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. _____ |

# I.  PRELIMINARY STATEMENT

1.     The effect of social media use on young people has become an important issue of our time, and for good reason. A 2023 advisory by the United States Surgeon General identifies not only potential negative effects, but also benefits, as social media "provid[es] positive community and connection with others who share identities, abilities, and interests" and "can provide access to important information and create a space for self-expression."[1]  It is impossible to generalize the effects, the advisory explains, due to major gaps in research, and because "different children and adolescents are affected by social media in different ways, based on their individual strengths and vulnerabilities, and based on cultural, historical, and socio-economic factors."  The American Psychological Association, too, has observed that "[u]sing social media is not inherently beneficial or harmful to young people,"[2] finding that "youths' psychological development may benefit from this type of online social interaction, particularly during periods of social isolation, when experiencing stress, when seeking connection to peers with similar developmental and/or health conditions, and perhaps especially for youth who experience adversity or isolation in offline environments."[3]

2.     The idea that *some* types of social media use by *some* minors under *certain* conditions can adversely affect *some* segment of this cohort is no basis for imposing state restrictions on *all* social media use by *all* minors—just as the State does not (and cannot) keep all books under lock and key because some are inappropriate for some children.  But such overreach typifies how lawmakers historically have sought to regulate new media forms in the name of protecting the young.  Whether dime novels or "penny dreadfuls" in the nineteenth century, moving pictures in the early twentieth century, comic books in the 1950s, or video games at the dawn of the twenty-first century, the response to these successive moral panics has been largely

---

[1]  Dep't of Health & Hum. Servs., Social Media and Youth Mental Health 6 (2023) http://tinyurl.com/4wycrcpm.

[2]  Am. Psych. Ass'n, Health Advisory on Social Media Use in Adolescence 3 (May 2023), http://tinyurl.com/4brm85e6.

[3] *Id*. at 3-4.

1

the same: legislatures pass vague and broadly worded speech restrictions that infringe basic First Amendment rights. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797-98 (2011). In fact, such laws have generated much of modern First Amendment jurisprudence. *See*, *e.g.*, *Winters v. New York*, 333 U.S. 507 (1948); *Jos. Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952); *Butler v. Michigan*, 352 U.S. 380 (1957); *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676 (1968); *Reno v. ACLU*, 521 U.S. 844 (1997); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000). The upshot of these cases is that state authority "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

3.     The Utah Social Media Regulation Act is the latest in this pantheon of well-intentioned but misguided laws. The Act would require minors to obtain parental consent to access social media, treating older teens the same as six-year-olds. Its reach is not limited to minors, however. The law subjects *all* Utahns to intrusive and imperfect age-verification mandates before they can access vast numbers of interactive services that permit the sharing of expression, compromising their privacy and chilling speech, and it bars any person under the age of eighteen access to social media without the affirmative consent of the parent. Although the Act purports to aid parental authority, it imposes "what the State thinks parents *ought* to want," *id.* at 804, while ignoring the ways parents can already regulate their children's access to and use of social media. The Act imposes an elaborate surveillance regime and mandates censorship, irrespective of parents' views. And it creates a vague and virtually unlimited form of "addiction" liability (where harm is presumed) that will vastly curtail the available online spaces for teens.

4.     Plaintiffs are Utah residents whose ability to communicate using social media will be disrupted by the Act: a high school student who uses social media to communicate, express themself, associate with peers, and learn; adults who escaped abusive homes and now use social media to aid young people in similar circumstances; and mothers with teens who use social media. They are acutely aware of the ways social media enable young people to obtain information and find community, particularly for those who are isolated or otherwise marginalized. Through their personal experiences, Plaintiffs know how minors' access to social media can literally be

lifesaving and are concerned that the Legislature chose to throw out the baby with the bathwater. If the law takes effect, each of them will be deprived of basic constitutional rights. More broadly, if not enjoined, the Act will isolate young adults from their communities, trap some of them in abusive environments, and stunt their development as free and independent citizens.

5.    The Social Media Act on its face violates the First Amendment, the Due Process Clause of the Fourteenth Amendment, and the Commerce Clause of the United States Constitution. It is also preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230. Plaintiffs accordingly seek an order declaring the Act invalid and enjoining its enforcement.

## II.    PARTIES

6.    Plaintiff Hannah Paisley Zoulek is a minor high school student living in Utah. They use social media for educational purposes, such as learning and communicating with their school's robotics club. They also use it to connect with friends and with other communities to which they would not otherwise have access. Zoulek, who plans to attend college and later law school, testified before the Utah House Judiciary Committee in opposition to the Social Media Act—citing their concerns about the law's infringement on teens' speech and ability to discuss important issues such as mental health.

7.    Plaintiff Jessica Christensen escaped from a powerful and abusive polygamous family at age fifteen and lives in Utah with her husband and three children. She works as a social worker in an emergency room, where she counsels patients—including many at-risk youths—in states of crisis and refers them to resources. Christensen has become a prominent advocate for former members of the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS), and many FLDS teens and adults contact her through social media for support or other help. She has been in touch with approximately thirty minors and helped about ten of them escape abusive homes after they contacted her using social media. Christensen and her husband allow their two oldest children to use social media under their guidance.

8.    Plaintiff Lu Ann Cooper, a resident of Roy, Utah, is the co-founder and president of the organization Hope After Polygamy, which helps individuals (including teens) who are in or

have left polygamist communities by connecting them to resources, including educational scholarships. Hope After Polygamy maintains several social media accounts that educate teens and adults about the resources it offers and notifies them of events such as free health screenings and financial literacy classes. FLDS teens and adults have contacted Hope After Polygamy and Cooper to seek help and support. Cooper and her husband are parents to eight children, including several teenagers who use social media under their guidance.

9. Plaintiff Val Snow lives in Midvale, Utah. He produces a YouTube channel that covers topics such as mental health, resilience, and LGBTQ perspectives. Both teens and adults watch Snow's YouTube channel and have contacted him to engage in community or seek support. Snow, who grew up without access to the Internet or social media and experienced an assault at a young age, is passionate about protecting at-risk youths' access to information.

10. Defendant Katie Hass, Director of the Utah Department of Commerce's Division of Consumer Protection, is charged with enforcing the Social Media Act. *See* Utah Code § 13-63-202(1).

11. Defendant Sean Reyes, the Utah Attorney General, is charged with representing the Division of Consumer Protection in actions to enforce the Social Media Act. *See* Utah Code § 13-63-202(2).

### III.    JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over this action under 28 U.S.C §§ 1331 and 1343(a) because Plaintiffs' claims arise under the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

13. This Court has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to decide this dispute and award relief because it presents an actual case or controversy within the Court's jurisdiction.

14. Venue is proper in this District because Defendants reside in this District, 28 U.S.C. § 1391(b)(1), and because substantial events material to Plaintiffs' claims occurred in this District, 28 U.S.C. § 1391(b)(2).

# IV. FACTUAL ALLEGATIONS

## A. Social Media Provides a Forum for Expression and Association

15.    Social media services provide forums for communication, expression, education, and association.  The content on social media, like other online speech, is as "diverse as human thought." *Reno*, 521 U.S. at 870.  Ninety-seven percent of American teens are online daily, and approximately ninety percent between ages thirteen and seventeen have at least one social media account.[4]  Social media is integral to modern life, for both teens and adults, across human activity.

16.    ***Political expression and communication.***  Social media provides an essential outlet for political expression.  Youth-led movements have used social media to bring issues not adequately covered in traditional media to the forefront of public consciousness.  For example, the "hashtag" device has helped fuel national conversations on racial inequality.[5]  Students at Marjory Stoneman Douglas High School in Parkland, Florida, have used social media to advocate for gun control after a school shooting killed seventeen people.[6]  Members of Utah Youth Environmental Solutions used social media to organize a rally to bring attention to climate change.[7]  As the United Nations Committee on the Rights of the Child has recognized, "the digital environment enables children, including children human rights defenders, as well as children in vulnerable situations, to communicate with each other, advocate for their rights and form associations."[8]

17.    Politicians and lawmakers use social media to communicate with voters, including

---

[4] Susan Laborde, *Teenage Social Media Usage Statistics in 2023*, TECHREP. (Oct. 13, 2023), http://tinyurl.com/5727nuv8.

[5] *See, e.g.*, Janell Ross, *How Black Lives Matter Moved from a Hashtag to a Real Political Force*, WASH. POST (Aug. 19, 2015), http://tinyurl.com/kxr5h92t.

[6] Jonah E. Bromwich, *How the Parkland Students Got So Good at Social Media*, N.Y. TIMES (Mar. 7, 2018), http://tinyurl.com/msyuwnae.

[7] *See* Leia Larsen, *Utah youths hold 'die-in' for Great Salt Lake, challenge elected leaders to take bolder action*, SALT LAKE TRIB. (Sept. 4, 2022), http://tinyurl.com/bdhxvc7s; @UtahYES, Instagram (Sept. 2, 2022), https://www.instagram.com/p/CiBb1EYOru5/.

[8] [8] U.N. Hum. Rts. Off. of the High Comm'r, General comment No. 25 (2021) on children's rights in relation to the digital environments, U.N. Doc. CRC/C/GC/25 (Mar. 2, 2021), http://tinyurl.com/ysepy8ys.

teens approaching voting age.[9]  Social media is "near ubiquitous among members of Congress."[10]  In 2021 alone, congressional representatives published more than 477,000 Twitter (now "X") and 395,000 Facebook posts.[11]  Senator Mitt Romney regularly posts on social media, including on "X" (1.9 million followers), Facebook (8 million followers), and Instagram (80,200 followers).  Senator Mike Lee likewise uses his "X" account (700,000 followers), Facebook (377,000 followers), and Instagram (29,900 followers) to discuss policy and legislation.  And the Utah Senate routinely posts about its activity and other state news on all three services.  Utah Governor Spencer Cox—"one of the most prolific users of Twitter [X] in Utah's political sphere"[12]—has even used social media to promote the Social Media Act.[13]  And his senior advisor and Director of the Office of Families, Aimee Winder Newton, has used social media to communicate with high schoolers.[14]

18.  ***Education.***  Educators use social media to promote learning and share knowledge.  Teachers use social media to "enhance interactions between students, between students and teachers, and with people and resources outside the classroom," interactions essential to students'

---

[9] Maria Petrova et al., *Social Media and Political Contributions: The Impact of New Technology on Political Competition*, MGMT. SCI. (May 14, 2020), http://bit.ly/3FTs3eY.

[10] Patrick Van Kessel et al., *The congressional social media landscape*, PEW RSCH. CTR. (July 16, 2020), http://tinyurl.com/5byur542.

[11] Stacy Jo Dixon, *Total number of posts per platform by U.S. Congress members 2021*, STATISTA (June 21, 2022), http://tinyurl.com/yx632peu.

[12] Bryan Schott, *Utah first state to pass social media regulations aimed at protecting minors*, SALT LAKE CITY TRIB. (Mar. 23, 2023), http://tinyurl.com/ysppswkz.

[13] *See, e.g.*, Spencer J. Cox (@GovCox), Twitter (Mar. 14, 2023, 1:06 PM), https://twitter.com/govcox/status/1635734261604155392; @GovCox, Twitter (Mar. 23, 2023, 1:58 PM), https://twitter.com/govcox/status/1639008762987159554; @GovCox, Twitter (Mar. 23, 2023, 5:20 PM), https://twitter.com/govcox/status/1639059485569486850; @GovCox, Twitter (Mar. 27, 2023, 9:26 AM), https://twitter.com/govcox/status/1640389818151759874; @GovCox, Twitter (Jul. 12, 2023, 7:43 AM), https://twitter.com/govcox/status/1679139299017539584; @GovCox, Twitter (Aug. 3, 2023, 7:57 AM), https://twitter.com/govcox/status/1687115529516146688; @GovCox, Twitter (Aug. 3, 2023, 8:25 AM), https://twitter.com/govcox/status/1687122642032324608.

[14] Aimee Winder Newton (@AWinderNewton), Twitter (Apr. 24, 2023, 7:13 AM), https://twitter.com/awindernewton/status/1650503355779764233.

"sense of belonging in an educational community."[15]  Teachers also use social media to educate adolescents in engaging ways.  For example, Phillip Cook (@chemteacherphil) shares chemistry lessons with his 3.9 million TikTok followers.  "Ms. James" (@iamthatenglishteacher) posts English grammar and vocabulary lessons on her TikTok account, which has 5.8 million followers. And "Mrs. Kelly" (@the_mrskelly) shares elementary-school-level math lessons with her 1.4 million followers.

19.    Zoulek uses social media to learn.  For example, they sometimes consult YouTube to help understand a particularly challenging math concept.  And their high school robotics team uses Discord to coordinate plans and assignments.  Likewise, Snow discovered a vocational rehabilitation service through Facebook, which he used to connect with Job Corp and obtain a trade certification for culinary arts.  And Cooper's organization, Hope After Polygamy, promotes its educational scholarship program and other resources on social media.

20.    ***News and information.***  Social media is a principal source of news for most Americans.[16]  More than half of teens access news on social media at least a few times per week, including on Instagram, Facebook, and "X."[17]  Christensen and Cooper follow the news on Instagram and "X," respectively.  Zoulek sometimes hears about news through Tumblr and then seeks additional information elsewhere.  Discussion or "Q&A"-based sites such as Reddit and Quora provide content about topics ranging from "How-To" videos for home projects to personal finance tips.[18]  Zoulek, who sometimes uses a cane to walk, consulted Reddit before a family trip to Disneyland to learn more about disability access there.

[15]  Kim Ward, *social media to improve learning this fall*, MICH. STATE UNIV., http://tinyurl.com/2j3k734f (last visited Jan. 11, 2024).

[16]  Jeffrey Gottfried & Elisa Shearer, *News Use Across Social Media Platforms 2016*, PEW RSCH. CTR. (May 26, 2016), http://tinyurl.com/3ny9xb83.

[17]  Common Sense Media,  *New Survey Reveals Teens Get Their News From Social Media and YouTube* (Aug. 12, 2019), http://tinyurl.com/2dcxx9jj; *see also* Michael Boulter & Lizz Bolaji, *In the age of memes, how are young people getting their news?*, PBS NEWS HOUR (Jan. 23, 2020), http://tinyurl.com/36mdm2c4.

[18]  Reddit, r/DIY, https://www.reddit.com/r/DIY/ (last visited Jan. 11, 2024) (DIY Reddit has 23M members); Reddit, r/personalfinance, https://www.reddit.com/r/personalfinance/ (last visited Jan. 22, 2024) (Personal Finance Reddit has 18M members).

21.	***Community and belonging.***	Social media enables young people to find opportunities for purpose and belonging.[19]  Research shows most young adults have been inspired to take on at least one new hobby after viewing clips on social media, with an estimated four in ten using social media to share their own hobbies.[20] Communities centered around common interests in particular hobbies or skills have also formed on social media.  Zoulek, for example, uses fan fiction forums to connect with queer youth and read stories reflecting that community's experiences.  Reddit subgroups for craft projects, yoga, meditation, running, and baking all have more than 1.8 million members,[21] and groups for gardening and woodworking each have more than five million members.[22]  This role of social media in fostering community and connection— what some researchers have called the development of one's "social, religious, cultural, ethnic, sexual and political identities"—is thus one of social media's most profound contributions.[23] Especially since the onset of the COVID-19 pandemic, teens have increasingly relied on social media to connect with peers, access news and information about their communities, express themselves, and share their pursuits and lived experience.[24]  Teens report that online spaces have "provided them with valued opportunities to meet, exchange and deliberate with peers, decision makers and others who shared their interests."[25]

---

[19] Findmehobby.com, *Hobbyist Take Over Social Media: The Power of Sharing Your Passion Online* (Apr. 4, 2023), http://tinyurl.com/2s4ajuk9.

[20] Press Release, Samsung Mobile Press, Social Media Fuels Rise in Alternatively Awesome Hobbies, as Gen Z Embrace Their Creativity Online (May 23, 2022), http://tinyurl.com/2vjmx4px.

[21] Reddit, r/crafts, https://www.reddit.com/r/crafts/ (last visited Jan. 11, 2024); Reddit, r/yoga, https://www.reddit.com/r/yoga/ (last visited Jan. 11, 2024); Reddit, r/Meditation, https://www.reddit.com/r/Meditation/ (last visited Jan. 11, 2024); Reddit, r/Baking, https://www.reddit.com/r/Baking/ (last visited Jan. 11 , 2024); Reddit, r/running, https://www.reddit.com/r/running/ (last visited Jan. 11, 2024).

[22] Reddit, r/gardening, https://www.reddit.com/r/gardening/ (last visited Jan. 11, 2024); Reddit, r/woodworking, https://www.reddit.com/r/woodworking/ (last visited Jan. 11, 2024).

[23] U.N. Hum. Rts. Off. of the High Comm'r, *supra* note 8, at 11.

[24] Jessica L. Hamilton et al., *Re-examining adolescent social media use and socioemotional well-being through the lens of the COVID-19 pandemic: A theoretical review and directions for future research*, PERSPECT PSYCHOL SCI. (May 9, 2022), http://tinyurl.com/5a2hsyk6.

[25] U.N. Hum. Rts. Off. of the High Comm'r, *supra* note 8 at 11.

22.     In this respect, social media is an "important venue for interaction and conversation among" American teenagers, and "plays a critical role in connecting teens to new friends" by "allowing teens to learn more about new friends and get to know them better."[26]  Zoulek, for example, uses Tumblr to connect with individuals who are disabled, neurodivergent, or queer—communities that they are not always able to access in person.

23.     In another recent study, teenagers who use social media reported that they feel more connected to their friends (80%); had somewhere to express their creativity (71%); had a support network in challenging times (67%); and were more accepted (58%).[27]  Overall, U.S. teenagers are more likely to report that social media has positive rather than negative effects on their lives.[28] In fact, some research suggests that the isolation that results from disconnecting teens from social media may be more harmful to their self-esteem and wellbeing than is heavy use of social media.[29]

24.     One key to these positive effects is the practice of recommending content and friends based on a user's interests.  This commonly appears in curated "newsfeed," "for you," or "discovery" functions, which use algorithms and machine learning to recommend content.

**B.     Social Media Provides Particular Benefits to Marginalized and At-Risk Youth**

25.     The profound support provided by social media is well-documented.[30]  One study by the Pew Research Center revealed that "nearly seven-in-ten teens receive support from friends

---

[26] Amanda Lenhart, *Chapter 4: Social Media and Friendships*, PEW RSCH. CTR. (Aug. 6, 2015), http://tinyurl.com/mukytfhk.

[27] Emily A. Vogels & Risa Gelles-Watnick, *Teens and social media: Key findings from Pew Research Center surveys*, PEW RSCH. CTR. (Apr. 24, 2023), http://tinyurl.com/235k9za7.

[28] *Id.*

[29] Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, SOC. SCI. COMP. REV. (Aug. 5, 2022), http://tinyurl.com/2t8kcm73; *see also* Sarah Coyne et al., *Teaching By Example: Media and Parenting Practices that are – and are not – Related to Adolescent Mental Health*, THE WHEATLEY INST. (2022), http://tinyurl.com/4nhcyj9e.

[30] *See generally* John A. Naslund et al., *Social Media and Mental Health: Benefits, Risks, and Opportunities for Research and Practice*, J. TECH. BEHAV. SCI. (Apr. 20, 2020), http://tinyurl.com/562f7s33.

through social media during tough times."[31]

26.     Many teens from abusive homes have used social media to seek support and, if necessary, escape to relatives, friends, or shelters.  Teens have used social media to identify and locate domestic violence shelters and send messages to relatives or friends to seek help.

27.     In certain FLDS communities, minors have used social media to escape homes where they were being forced into polygamous marriages, or labor, or endured other forms of abuse.  Social media has not only given these minors a lifeline to contact the outside world, but also has shown them that relatives and friends who have fled the community are living healthy and productive lives—in contrast to the community's messaging that those who leave are condemned to lives of poverty and suffering.

28.     Minors seeking to escape abusive homes have contacted Christensen using Facebook or Instagram, without their parents' knowledge.  For example, Christensen's half-sister, Allison Eames, contacted her on Facebook when she was sixteen to seek help fleeing a planned forced marriage and her abusive father.  With Christensen's help, Eames was able to leave.  Similarly, Christensen's cousin, Michelle Michaels, messaged her on Facebook for a few months seeking support and information in deciding whether to leave the same community, where she was experiencing abuse and anticipating a forced underage marriage.  When Michaels decided, at age seventeen, that she wanted to leave the community, Christensen helped her become emancipated.

29.     Christensen has spoken with other teens on social media who ultimately decided not to leave their community but benefited from her moral support, knowledge, and understanding.  Likewise, Cooper has counseled teens and adults seeking assistance and information, sometimes after finding Hope After Polygamy's social media accounts.

30.     Some individuals who flee at-risk homes change their identities to prevent their abusers from locating them.  Some of them were not given access to their birth certificates, government identification, or social security numbers.  Many would be unable to provide a

---

[31] Lenhart, *supra* note 26.

government ID to create an age-verified social media account, either because they do not have such an ID or because disclosing their identity could allow their abusers to find them.

31.     Social media has many benefits for teens in the LGBTQ community. Researchers at Brigham Young University have found that transgender and non-binary teens who use social media are substantially less likely to report emotional problems than those who do not.[32] Other researchers exploring "the benefits of social media and forms of coping for LGBTQ+ youth" found that social media "helps stigmatized youth maintain critical access to emotional support, develop their identities, [and] find important information."[33] Recognizing this potential, The Trevor Project, a non-profit organization dedicated to combatting LGBTQ youth suicide, has developed TrevorSpace, "the world's largest safe space social networking site for LGBTQ youth." [34]

32.     Snow, who grew up in an insular community without consistent access to the internet until age eighteen, was taught that being gay is evil and was deprived of information regarding sexual orientation or safe sexual experiences. As a result, when Snow experienced a sexual assault at a young age, he did not have the language or knowledge to report it. Today, he uses YouTube to provide teens and adults information and perspective he never had growing up—including his experiences as a gay man—as well as commentary on mental health, positivity, and resilience.

33.     Some studies suggest that "many young people who are experiencing depression—whatever the cause—are purposely and proactively using social media and other digital tools to protect and promote their own well-being."[35] Many mental health experts have embraced these aspects of social media, and digital and social networking services are increasingly being

---

[32] Coyne, *supra* note 29.

[33] Shelley L. Craig et al., *Can Social Media Participation Enhance LGBTQ+ Youth Well-Being? Development of the Social Media Benefits Scale*, Soc. Media + Soc'y 7:1 (Jan.-Mar. 2021), http://tinyurl.com/2bk5m28a.

[34] *See* The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People*, at 31, http://tinyurl.com/ymj5vjr4 (last visited Jan. 11, 2024).

[35] Victoria Rideout et al., *Coping With Covid-19: How Young People Use Digital Media to Manage Their Mental Health*, Common Sense 11 (2021), http://tinyurl.com/4edefct5.

harnessed to identify and treat mental health problems among adolescents.[36]  In their testimony against the Act, Zoulek noted their concern that preventing teens from talking about mental health issues using social media would itself negatively affect their mental health.  And Christensen, who works as a social worker in an emergency room, has witnessed situations in which minors' posts on social media have signaled that the minor is struggling and prompted wellness checks.

34.     Adolescents' use of social media cannot be treated or regulated monolithically. Research confirms that children and adolescents are affected by social media in different ways, based on their strengths, vulnerabilities, and predispositions, and on cultural, historical, and socio-economic factors.[37]  The "use and effects of social media depend on a number of factors specific to individual teens," including "age, gender, race, ethnicity, personalities, and pre-existing emotional or mental health difficulties," as well as a teen's "familial rules/structure around social media, peer group dynamics, [and] parental and peer relationships," and "larger societal and cultural influences."[38]

35.     To account for these differences, parents have access to tools that allow them to monitor and control their children's social media use.  Meta, for example, enables parents to set time limits, restrict use to particular times or days, view their child's friends or followers, and receive notifications when the minor reports an account or post.[39]  Snapchat publishes a guide for parents to promote safe social media use and provides tools that allow parents to set content controls and see with whom their children are communicating.[40]  Parents can also download

---

[36] Chris Hollis et al., *Editorial: The role of digital technology in children and young people's mental health – a triple-edged sword?*, 61 J. OF CHILD PSYCH. & PSYCHIATRY 837, 837-41 (2020), http://tinyurl.com/bdhmxtaw.

[37] Ine Beyens et al., *The effect of social media on well-being differs from adolescent to adolescent*, 10:10763 SCI. REPS. (2020), http://tinyurl.com/3fsn3mvz.

[38] Hamilton, *supra* note 24.

[39] Meta, Supporting safer and more positive experiences for your family, https://familycenter.meta.com/ (last visited Jan. 11, 2024).

[40] Snapchat, Tools and Resources for Parents, https://parents.snapchat.com/parental-controls (last visited Jan. 11, 2024).

applications, such as Aura, Bark, Qustodio, and FamilyKeeper, that link to their children's devices and enable them to limit screen time; see their messages on social media; filter, block, and monitor access to certain sites or applications; set location alerts; and pause internet access.[41]  And phone manufacturers like Apple and Google offer "Screen Time" and "Family Sharing" controls that permit parents to manage a child's online activities, including their use of particular applications.[42]

36.     For example, Cooper allows her eleven- and thirteen-year-old children to use "Messenger Kids" accounts, which are designed for kids to connect with family and friends under supervision.  And Christensen has her children use a curfew app on their phones, requiring them to power down at a certain hour, which she can extend.

### C.     Utah Enacts the Utah Social Media Regulation Act of 2023

37.     On March 23, 2023, Utah Governor Spencer Cox signed SB 152 and HB 311, which together form the Social Media Act.  The law takes effect March 1, 2024.  Its requirements are enforceable through administrative or civil actions by the Division of Consumer Protection and through private actions.  *See* Utah Code §§ 13-63-201, 202, 301, 401(1)(a).

38.     ***Scope.***  The Act applies to any "social media company" that is an "interactive computer service," such as a "website" or "web application," and provides "a social media platform that has at least 5,000,000 account holders worldwide."  Utah Code § 13-63-101(6), (9).  A "social media platform," in turn, is "an online forum" where "an account holder" can "create a profile," "upload posts," "view the posts of other account holders," and "interact with other account holders or users."  *Id.* § 13-63-101(10)(a).  "Posts" include any "content that an account holder makes available on a social media platform for other account holders or users to view," including private messages.  *Id.* § 13-63-101(8).

---

[41] Aura, Protection for Kids. Peace of Mind for Parents, http://tinyurl.com/33sfh2e8 (last visited Jan. 11, 2024); Family Keeper, Keep Your Kids Safe With Parental Controls, http://tinyurl.com/yc48vr8z (last visited Jan. 11, 2024); Bark, Parental controls reimagined, http://tinyurl.com/3x97y582 (last visited Jan. 11, 2024).

[42] Apple, Use Screen Time on your iPhone, iPad, or iPod touch, http://tinyurl.com/5c2zffww (last visited Jan. 11, 2024); Google, Manage your child's screen time, http://tinyurl.com/bdfhztwp (last visited Jan. 11, 2024).

39.     If allowed to take effect, the Act would restrict or burden access to most websites and apps designed to foster connection among users through posting content and sharing ideas. This definition, for example, sweeps in smaller services that may not have the resources to comply with the Act's age-verification requirements.  Covered services may also include those designed for sharing educational and cultural content, like Allrecipes (for sharing recipes), Goodreads (book recommendations), and Letterboxd (film reviews).  The law even extends to forums like Quora and Reddit, which primarily offer bulletin-board style information on a variety of educational topics and allow users to ask any question and receive responses.

40.     Certain services that would fall within the definition of "social media company"— including email providers, direct messaging services, traditional media websites with "preselected" content, and interactive gaming services—are expressly excluded.  *Id.* § 13-63-101(10)(b).  The Utah Legislature cited no evidence that the asserted adverse effects of social media are the result of using only or even primarily non-exempt services.

41.     ***Age-verification requirement.***    Section 13-63-102(3) requires social media services to "verify the age of an existing or new Utah account holder," defined as "a person who is a Utah resident" and "has, or opens, an account or profile to use a social media company's platform."  Utah Code §§ 13-63-102(3), 101(1), (12).  "If a Utah account holder fails to meet the verification requirements of this section," either upon opening an account or within fourteen days of trying to access an existing account, "the social media company shall deny access to the account."  *Id.* § 13-63-102(3). This means that, after the law's effective date, *all* Utah residents will be required to "show their credentials" to use social media.

42.     Age verification technologies are inherently unreliable,[43] and there are "straightforward workarounds" for users determined to bypass the rules.[44]

---

[43] French Nat'l Comm'n on Info. & Liberties, *Online Age Verification: Balancing Privacy and the Protection of Minors* (Sept. 22, 2022), https://tinyurl.com/yzv7ynem.

[44] Jackie Snow, *Why Age Verification Is So Difficult for Websites*, WALL ST. J. (Feb. 27, 2022), http://tinyurl.com/ymbvvzar.

43.     Age verification, to the extent it can ever be effective, typically requires collecting sensitive personal information, such as a government-issued ID, credit card information, or biometric data.  On October 15, 2023, the Division of Consumer Protection proposed a rule to implement the Social Media Act, which would require companies to use one of several prescribed age-verification methods and ensure that the chosen method "accurately" identifies whether each user is a minor.  Utah Bull., Vol. 23, No. 20 at 18 (Oct. 15, 2023) (R152-63-3 & R152-63-4).  The proposed methods include "using facial characterization or analysis"; "matching a [user's] verified government-issued identification" to the user's face; and "checking a [user's] social security number's last four digits against a third-party database of personal information."  *Id.* (R152-63-3).

44.     This information ties users' social media accounts to their identities, thus limiting anonymity online.  Age-verification methods that involve submitting official documents or social security numbers also increase the risk that those documents could be stolen or leaked.[45]  Other proposed age-verification methods—such as artificial intelligence, facial analysis, or facial recognition—pose their own transparency, security, and privacy concerns.[46]  The requirement may even conflict with other states' privacy laws regarding the collection of data.

45.     Despite the law's intended application only to Utah residents, the age-gating requirement will likely affect social media users everywhere.  Geolocation information from a user's IP address simply shows a user's location at a given time, so relying on it would sweep in residents of other states who happen to be visiting Utah, and would miss Utah users who are traveling or who use a VPN service.[47]  Thus, to comply with the Act's requirements and minimize the risk of liability, companies will likely need to collect personal information from *all* users.

46.     By requiring age-verifying (and residence-verifying) information to access social media, the Act forces users—including adults—either to give up their anonymity and privacy or

<hr />

[45] *Id.*

[46] *See* David McCabe, *Anonymity No More? Age Checks Come to the Web*, N.Y. Times (Oct. 27, 2021), https://nyti.ms/3S6U2ME.

[47] *Id.*

to forego speaking. Cooper is so troubled by this provision that she intends to give up social media entirely if the law takes effect. Christensen also has concerns about the effect of this provision on the communities that she serves as a social worker, such as undocumented immigrants and at-risk youths who do not have access to a government ID.

47.     ***Parental consent and surveillance requirements.*** Section 13-63-102(1) requires covered services to prohibit "a Utah resident who is a minor," anyone under eighteen, from having or opening an account on a "social media platform unless the [minor] has the express consent of a parent or guardian." Utah Code §§ 13-63-101(7), 102(1). This definition encompasses teenagers old enough to marry, drive, attend college, enlist in the military, preregister to vote, and who might be just days shy of the right to vote, buy and sell property, and serve on a jury.

48.     Section 13-63-102(3) mandates that, if an "existing or new account holder is a minor" (i.e., under eighteen), covered services must "confirm" the user has obtained "the express consent of a parent or guardian," to use a given social media service. Utah Code § 13-63-102(1), (3). Consent is not defined. But under the Division of Consumer Protection's proposed rule, demonstrating consent requires both a parent giving permission, such as by providing a consent form or verbally confirming consent, and submitting "a written attestation from the parent or guardian that they are the minor's legal guardian." Utah Bull., Vol. 23, No 20 at 18 (R152-63-6(1)).

49.     The Act thus imposes an across-the-board barrier to accessing information on minors unless they can obtain parental consent. It preemptively bars these individuals from access to what the Supreme Court has called "the most important places … for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Its purpose and effect are to deprive minors of their right to express themselves and communicate with other individuals.

50.     Obtaining consent is not feasible for many young people—including, for example, teens in abusive homes or fundamentalist communities whose parents would not provide them access to a forum where they could speak about it; LGBTQ+ youth whose parents do not condone their search for a supportive community; homeless youth; and even adolescents whose parents

work multiple jobs.[48]  Irrespective of whether any given teenager's parents ultimately do (or would) provide consent, any mandate that conditions access to speech on seeking such consent in and of itself impermissibly violates minors' free speech rights.  *Brown*, 564 U.S. at 795 & n.3.

51.     Section 13-63-104 also requires services to give the consenting parent or guardian "a password or other means" to "access the [minor's] account," enabling this adult to surveil "all posts the Utah minor account holder makes" and to supervise "all responses and messages sent to or by the Utah minor account holder."  Thus, even a teenager whose parents agree to provide the teenager with access to social media and forswear supervising the teenager's communications may forego social media to avoid even the possibility of unwanted surveillance.  Teens who do choose to use social media will censor their speech, particularly on sensitive or controversial topics—like religion, politics, or sexuality—where their parents may hold different views.  And just as some parents prefer not to join their teenager on dates, at political rallies, or hanging out with their friends, some parents, like Cooper and Christensen, prefer that their children not think there is even the possibility of parental surveillance, which they may believe would limit their children's choices and stunt their development.

52.     By limiting all minors' access to information and by subjecting their communication to constant surveillance, the Social Media Act ignores that children have First Amendment rights, and that those rights are more robust for older teens.  *See Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 576-77 (7th Cir. 2001) (Posner, J.). These constitutional protections are based on the understanding that "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble," and that shielding minors right up to the age of eighteen from exposure to any potentially upsetting or "harmful" speech "would leave them unequipped to cope with the world as we know it." *Id*.

53.     Christensen, for example, sees social media and internet use as a necessary part of

---

[48] Kate Murphy, *Utah is the 1st state to limit kids' access to social media. Experts break down FAQs about new law*, (Mar. 30, 2023), http://tinyurl.com/5yv224ab; *see also* Trevor Project Report, *supra* note 34.

her children's development, as they are growing up in a digital world. She wants them to learn how to use these technologies in a healthy and productive manner, under her guidance, so they are not overwhelmed as adults when they suddenly find themselves with unrestricted access.

54. The Social Media Act also imposes a "curfew" requirement for minors' use of social media. Section 13-63-105(1) requires social media services to "prohibit a Utah minor account holder from having access" to the service from "10:30 p.m. to 6:30 a.m." by default, even if a parent would not impose such a restriction. Only the parent or guardian with access to the minor's account may change these restrictions. Utah Code § 13-63-105(1), (3)-(4). The mandate applies only to regulated social media services—not many other sites and interactive services that young people use.

55. The ineffectiveness of such measures as a way of protecting children from potentially harmful information has long been recognized. As journalist Heywood Broun wrote in 1927, "It would be just as reasonable for me to call Al Smith by long distance telephone and say, 'Dear Governor, my boy won't go to bed, please send an officer of the law to make him do it.'" Heywood Broun and Margaret Leech, *Anthony Comstock: Roundsman of the Lord*, at 272 (Albert & Charles Boni, 1927). *Compare, e.g.*, *Playboy Ent. Grp.*, 529 U.S. at 806-07 (invalidating "time channeling" requirement).

56. Far from empowering parents to choose how to regulate their household's internet use, the Social Media Act's consent and surveillance mandates interpose parents into their teenagers' communication decisions, limiting parents' discretion to calibrate a different balance.

57. ***Mandatory content restrictions.*** The Act also imposes a series of mandates that restrict the content teenagers may share and receive through social media, and with whom they may communicate, even where a parent or guardian would consent.

58. Section 13-63-103(1) requires social media companies to "prohibit direct messaging" between any "account held by a Utah minor" and "any other user that is not linked to the account through friending." Utah Code § 13-63-103(1). This provision hinders minors' ability to find support and make connections with people outside their existing circle, a key feature of

18

social media—particularly for vulnerable youth. For example, a student who witnesses bullying of a new classmate would not be able to use social media to message that classmate and offer support. Similarly, before the student could even send the new classmate a message, they would need to "friend" that person, granting the new classmate greater access to the young person's posts and personal information and thus potentially deterring the young person from communicating at all.

59. Section 13-63-103(2) prohibits social media companies from showing a Utah minor's "account in any search results for any user that is not linked to the account through friending." Utah Code § 13-63-103(2). This restriction would similarly prevent persons under eighteen from meeting new friends, or even finding out whether someone has a social media account. For example, a teen wishing to connect with other teens who share their interest in hiking would no longer be able to find those peers in a search for hiking-related posts. The search-result restriction would also significantly limit the audience for users under eighteen. For example, the posts of a teen who wishes to speak out on gun control or climate change would not come up in search results on that topic for anyone outside the teen's existing friend group.

60. Section 13-63-103(3) requires social media companies to "prohibit the display of any advertising in the account" of a Utah minor. Utah Code § 13-63-103(3). This blanket prohibition likely would not only bar trailers for popular movies and ads for local museums, but also forbid services from displaying user posts promoting a student-run bake sale, tickets to the annual school play, opportunities to participate in charity or religious missions, free mental health services, or health screenings (such as those advertised by Hope After Polygamy). To comply, services would need to review millions of user posts to screen out any content that could be construed as "advertising"—a gargantuan task that could lead companies "to severely restrict the number and type of messages posted." *Zeran v. AOL*, 129 F.3d 327, 331 (4th Cir. 1997).

61. Section 13-63-103(5) requires companies to "prohibit the use of targeted or suggested groups, services, products, posts, accounts, or users in the account" of a Utah minor. Utah Code § 13-63-103(5). Apart from "post" and "user," these terms are undefined, leaving one

to guess whose "use" is proscribed and what might constitute "targeted" or "suggested" content. This broad restriction appears to bar displaying almost any content to a young user that is not sent to them directly. Services would need to either drastically redesign their offerings or shut out Utah minors completely. The threat of liability for user posts "would have an obvious chilling effect" on the content that services share with users. *Zeran*, 129 F.3d at 331. This provision would also limit minors' ability to discover new friends with similar interests or experiences because it bars companies from using information gleaned from a minor's activity to suggest those new connections.

62. Neither minors nor their parents and guardians may modify or override these restrictions, regardless of whether they consider them harmful, benign, or beneficial. The law bans the very features that make social media a valuable tool for communication and civic engagement. In doing so, it suppresses a vast amount of speech and may cause companies to exclude Utah minors from their services altogether.

63. ***Duty to prevent "addictive" design and harm.*** Section 13-63-401(2) prohibits any social media service from "us[ing] a practice, design, or feature" that it "knows, or which by the exercise of reasonable care should know, causes a Utah minor account holder to have an addiction to the social media platform." Utah Code § 13-63-401(2). The law defines "addiction" as "use of a social media platform that … indicates the user's substantial preoccupation or obsession with, or the user's substantial difficulty to cease or reduce use of, the social media platform" and which "causes physical, mental, emotional, developmental, or material harms" to the user. *Id.* § 13-63-101(2).

64. The law does not define the terms "practice," "design," or "feature," which could cover any choice a social media company makes in developing and maintaining its offerings. A "practice, design, or feature" may include all the ways a social media company chooses to publish, display, and facilitate speech, including choosing to enable communication among users. Simply publishing, promoting, or moderating content is a "practice." The ability to "like," "comment," and "react" are "features" that allow users to communicate with and respond to what others share.

65.     Nor does the law define the phrases "substantial preoccupation or obsession" or "substantial difficulty to cease or reduce use," leaving services to guess as to what behavior crosses the line. Does a teenager who spends time rehearsing before posting a video on social media exhibit "substantial preoccupation or obsession"? Does a teenager who resists putting their phone away during dinner exhibit "substantial difficulty to cease or reduce use"? Nobody knows.

66.     The law also fails to define what constitutes "physical, mental, emotional, developmental, or material harms," or what degree of harm gives rise to liability. Under the plain language, "physical harm" could mean a headache or hand cramps; "emotional harm" could mean being upset that friends did not "like" a "selfie"; and "material harms" could reach *any* type of asserted harm that the State deems sufficient to impose liability.

67.     Section 13-63-401(3)(a) imposes crushing civil penalties for each practice, design, or feature found to cause "addiction," and "for each Utah minor account holder who is shown to have been exposed to" it. Utah Code § 13-63-401(3)(a). The law does not define the phrase "exposed to" and provides no guidance as to what level of engagement could trigger liability. Although a social media service may try to avoid liability by conducting audits to "detect practices, designs, or features that have the potential to cause or contribute to the addiction" of a minor, and correcting any that pose "more than a de minimis risk of" "caus[ing] or contribut[ing] to the addiction of a minor user," *id.* § 13-63-401(3)(b), the services would not know what to look for without definitions of the key statutory terms, including what the State considers "a de minimis risk." A service's only way to avoid far-reaching liability would be to censor its users' speech and access to information based on these mandatory "audits." *Id.*

68.     This provision's ambiguity makes it nearly impossible for social media services to anticipate what aspects of their publishing activity might trigger liability. They must guess whether each piece of content and each published recommendation is one they "should know" could cause a minor to develop some kind of "addiction," hoping they have predicted correctly and thus avoid heavy fines and burdensome litigation. The vagueness means state officials (and even private plaintiffs, *see infra* ¶¶ 71-72) possess unlimited subjective discretion to decide

whether a provider's content publication practices cross the line.

69.    In response to these provisions, the "predictable tendency" is that services will "steer wide of the unlawful zone" and "swallow [their] words" by censoring their users rather than risk "mistaking whether" some content is addicting, whether "the legal system" will disagree, and whether it is even worth risking "legal costs" to defend its judgment. *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (citation & internal quotation marks omitted).[49]  That is precisely what services told the Legislature and Governor Cox when they opposed the legislation and requested a veto.[50]  The law will restrict the availability of information for users of all ages, and stifle important resources, particularly for vulnerable youth who rely on the internet for lifesaving information.

70.    ***Penalties for violations.***  Failing to comply with Sections 13-63-102 through 13-63-105 can subject a company to a $2,500 per-violation penalty and damages.  Utah Code § 13-63-202(3)(b).  Companies are also subject to a $250,000 penalty for "each practice, design, or feature shown to have caused addiction," plus an additional penalty of up to $2,500 for each Utah minor "exposed to" it and the minor's actual damages.  *Id.* § 13-63-401(3)(a).  The Division is also entitled to its attorneys' fees if it prevails.  *Id.* §§ 13-63-202(5), 301(3)(a), 401(5).

71.    ***Private right of action and presumption of liability.***  The chilling effects imposed by the Social Media Act's censorship and surveillance mandates are amplified by the creation of private rights of action and the presumption of liability.  Section 13-63-301 permits any individual to sue a social media company for not complying with the Act's restrictions in Sections 13-63-102 through 13-63-105 and to recover $2,500 per "incident of violation" or actual damages, plus attorneys' fees.  Utah Code § 13-63-301.  Section 13-63-501(1) permits individual lawsuits against social media companies "for any addiction, financial, physical, or emotional harm suffered as a

---

[49] *See, e.g.*, Prof. Eric Goldman, *Is the California Legislature Addicted to Performative Election-Year Stunts That Threaten the Internet?* (Comments on AB 2408), Tech. & Mktg. L. Blog (Aug. 2, 2022), http://tinyurl.com/ypncfn3t.

[50] *See* Letter from Dylan Hoffman, Exec. Dir. of TechNet, to Spencer Cox, Governor of Utah (Mar. 3, 2023), http://tinyurl.com/ms6rvvxu.

consequence of using or having an account" on a social media service, not limited to those associated with "addiction" under Section 13-63-401. The law creates a presumption of liability in actions that involve teenagers under sixteen. *Id.* § 13-63-501(4). In actions under Section 13-63-501, private plaintiffs may also recover $2,500 per "incident of harm" as well as their attorneys' fees. *Id.* § 13-63-501(3)(b).

72. These provisions are designed to force social media services to censor teenage users. Asked how the State intends to prove social media addiction under the Act, Governor Cox stated: "We don't have to … we gave a private right of action to parents and families … to sue these companies if there's harm done to their child. And harm is presumed."[51]

\* \* \* \* \*

73. The wellbeing of children is undisputedly of immense significance. But whether legally it is a "compelling [interest]—or even an important one—may turn on how the government chooses to frame that interest going forward." *NetChoice, LLC v. Yost*, __ F. Supp. 3d __, 2024 WL 104336, at \*8 (S.D. Ohio, Jan. 9, 2024) (entering TRO to block enforcement of Ohio social media age-verification law). Even where the government's interest is framed as "helping parents to be the guardians of their children's well-being," the First Amendment does not permit "an unbridled license to governments to regulate what minors read and view." *Interactive Dig. Software Ass'n v. St. Louis Cty., Mo*., 329 F.3d 954, 959-60 (8th Cir. 2003). The Social Media Act substitutes the judgment of government censors for parental discretion. Far from protecting children, the evidence indicates that limiting young people's access to social media will harm them and deprive them of fundamental rights.

## V. CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS
### (FREEDOM OF SPEECH)

74. Plaintiffs incorporate all prior paragraphs of this Complaint.

---

[51] *Meet the Press*, NBC NEWS (Mar. 26, 2023), http://tinyurl.com/brrvuvc8.

75.     The Social Media Act violates Plaintiffs' rights guaranteed by the First and Fourteenth Amendments to the U.S. Constitution. The Act is "a compendium of traditional First Amendment infirmities." *Washington Post v. McManus*, 944 F.3d 506, 513, 515 (4th Cir. 2019). It imposes state regulation over a global communications medium and forces social media companies to redesign their services, limiting the information and resources users may access; imposes preconditions on delivering and accessing protected speech, thus imposing a prior restraint; directly contravenes minors' First Amendment rights to access constitutionally protected content, regardless of whether the speech is potentially harmful; restricts adults' access to protected speech, forcing them to sacrifice anonymity to exercise their First Amendment rights; imposes vague, overbroad, content- and speaker-based restrictions on speech, and imposes liability for the publication of third-party speech. The Act's provisions, both as a whole and in their individual manifestations, impose significant restrictions that cannot survive any level of First Amendment scrutiny.

76.     ***Prior restraint***.  The Social Media Act imposes statutory preconditions on access to social media services, thus limiting all Utahns' ability to access important sources of information and social interaction. *Packingham*, 582 U.S. at 107. The Act imposes a series of prior restraints that "forbid[] certain communications" before they "occur," *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis omitted) (cleaned up), by restricting how social media services are designed and by imposing preconditions on accessing the services. It forces companies to age-verify all users, presumptively bar persons under eighteen, restrict when and with whom minors may communicate, and categorically prohibit minors from receiving information to which they are constitutionally entitled. Any law that imposes a prior restraint on expression, even if designed to promote "juvenile morality," carries "a heavy presumption against its constitutional validity," and the Social Media Act's "capacity for suppression" of protected speech "is far in excess of the typical licensing scheme held constitutionally invalid by this [c]ourt." *Bantam Books v. Sullivan*, 372 U.S. 58, 70-71 (1963).

77.     **Overbreadth.**  The Act is also constitutionally overbroad.  The Constitution "gives

significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 244 (2002). A law is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation & internal quotation marks omitted). Without even pretending to regulate speech only in the narrowly defined categories of unprotected speech, the Act deprives all minors of access to a powerful medium of communication without regard to their informational needs or level of maturity, merely because (the State believes) access to *some* information by *some* minors may be detrimental. Also, restricting adults' access to a communications medium as a means of protecting minors is inherently overbroad.

78. Many of the specific restrictions in the Social Media Act are also overbroad. The Act restricts the content teenagers may share, access, and receive through social media, and with whom they may communicate, even where a parent or guardian has provided consent. Section 13-63-103(1) requires social media companies to "prohibit direct messaging" between any "account held by a Utah minor" and "any other user that is not linked to the account through friending." Utah Code § 13-63-103(1). Section 13-63-103(2) prohibits social media companies from showing a Utah minor's "account in any search results for any user that is not linked to the account through friending." *Id*. § 13-63-103(2). And Section 13-63-103(3) requires social media companies to "prohibit the display of any advertising in the account" of a Utah minor. *Id*. § 13-63-103(3). These content restrictions, which cannot be altered by minors or parents, handicap teenagers' ability to find a community of peers, access information, and reach out for help. The Act's parental consent, surveillance, and curfew requirements, *id.* §§ 13-63-102(1), 103, 105(1), also unconstitutionally restrict minors' protected speech.

79. ***Underinclusiveness***. The Social Media Act is both overinclusive and underinclusive. Although the law broadly applies to "social media," it excepts a long list of services that might possibly contribute to the problems the state is seeking to address. It expressly excludes websites that predominately feature "news, sports, entertainment, or other content that is

preselected by the provider" as well as "any chat comment, or interactive functionality" related to that preselected content. Utah Code § 13-63-101(10)(b). It does not apply to gaming services, online shopping or e-commerce sites, photo editing services, and career networking services. *Id.* Yet the State has made no effort to demonstrate that services regulated under the Act are more of less harmful than those excluded. "The consequence is that its regulation is wildly underinclusive when judged against its asserted justification, which … is alone enough to defeat it." *Brown*, 564 U.S. at 802.

80.     ***Anonymous speech.*** By imposing age-verification as a condition of access to social media services, the Social Media Act violates the First Amendment rights of all Utahns, minors and adults alike. Many Utahns who do not wish to share their personal information to use social media will have to choose between open access to information and relinquishing privacy. The Supreme Court and other courts have repeatedly struck down similar identification requirements as unconstitutional. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 667, 673 (2004); *ACLU v. Mukasey*, 534 F.3d 181, 196-98 (3d Cir. 2008).

81.     ***Strict scrutiny.*** Content-based regulations of speech are presumed unconstitutional and are subject to strict scrutiny. To satisfy this level of First Amendment review, the government must demonstrate that the law is narrowly tailored to address a compelling interest and uses the least restrictive means of doing so. *Playboy Ent. Grp.*, 529 U.S. at 813.

82.     The Social Media Act must satisfy strict scrutiny because it imposes a series of content-, viewpoint-, and speaker-based restrictions on speech. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed[,]" if it targets the "message" of "particular subject matter," if it regulates speech "by its function or purpose," or if it "discriminat[es] among viewpoints." *Reed v. Town of Gilbert,* 576 U.S. 155, 163-64, 168-69 (2015). Even a facially neutral law is content-based if it "cannot be justified without reference to the content of the regulated speech." *Id.* at 164 (citation & internal quotation marks omitted).

83.     The Act is content-based because it applies only to specific types of content and

discriminates among speakers. The law restricts certain social media services while excluding others based on their content. For instance, the Act excludes websites that predominately feature "news, sports, entertainment, or other content that is preselected by the provider" and "any chat comment, or interactive functionality" related to that preselected content. Utah Code § 13-63-101(10)(b). Thus, the Act inexplicably restricts minors from freely expressing themselves on Instagram, for example, but allows them to do so in the comment section of an article on ESPN.com. The Act does not apply to social media companies with fewer than 5 million users, *id.* § 13-63-101(9), or to email providers or messaging services, *id.* § 13-63-101(10)(b). Similarly, the law selectively burdens social media users (*id.* § 13-63-102(3)), minors (*id.* §§ 13-63-102(3), 103(1)-(2), 104, and 105), and persons not linked to an account through "friending" (*id.* § 13-63-103(1)-(2)). These restrictions seek to prevent—and cannot be justified without reference to— supposed content-based harms from "the direct impact of [this] speech on its audience" (*id.* §§ 13-63-401, 501). *Boos v. Barry*, 485 U.S. 312, 321 (1988).

84.     The Act fails strict scrutiny because Utah has failed to establish a compelling interest to justify these broad restrictions on speech. It is the state's burden to demonstrate that the harms it seeks to address are not merely plausible, but compelling. *Playboy Ent. Grp.*, 529 U.S. at 816-17. It has not done so. While the Act was adopted based on generalized claims about the harms of social media, "[t]he First Amendment requires a mcoore careful assessment and characterization of an evil in order to justify a regulation as sweeping as this." *Id.* at 819.

85.     The Act also fails strict scrutiny because it is not the least restrictive means of addressing the asserted interest. In adopting the Social Media Act, the Legislature ignored the wealth of tools already available to help parents protect their children online; less restrictive policies that enable or encourage users (or their parents) to control their own access to information, whether through user-installed devices and filters or requests to third-party companies; and laws requiring media safety education.

86.     ***Intermediate scrutiny.***  The Act would be unconstitutional even if subjected to intermediate scrutiny. Under intermediate scrutiny, a law must be "narrowly tailored to serve a

significant governmental interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989) (citation & internal quotation marks omitted). Although not as rigorous as strict scrutiny, intermediate scrutiny still requires the government to establish that the recited harms are real, that the law at issue will address them in a direct and material way, and that the law restricts no more speech than necessary. *Rubin v. Coors Brewing Co*., 514 U.S. 476, 487, 491 (1995). With the Social Media Act, however, Utah has done nothing to demonstrate either the magnitude of harm purportedly caused by the services it has chosen to regulate, or that its chosen solution will help. The Act's broad speech restrictions are the opposite of narrow tailoring—restricting all speech on social media on the theory that some speech for some people is potentially harmful.

87.     ***Scienter requirement.*** The Social Media Act also violates the First Amendment because it imposes liability for publishing third-party content, even where the service lacks actual "knowledge … of the contents" of that speech. *Smith v. California*, 361 U.S. 147, 149 (1959). The vague duties in Sections 13-63-401 and -501 to prevent publication of "addictive" content, or content that may cause a virtually unlimited array of unspecified "physical, mental, emotional, developmental, or material harms," would permit liability based upon what a jury determines a service "should" have known about the supposedly injurious content it carries. Utah Code §§ 13-63-401, 501. Services have testified that this exposure would cause them to restrict the speech Plaintiffs are able to send and receive—and thus this requirement is forbidden by *Smith* and its progeny.

88.     ***Penalties.*** The chilling effects of the Act's requirements are amplified by the creation of private rights of action with specified damages for violations and the presumption of liability. The Act permits any individual to sue a social media company for not complying with the Act's restrictions, specifies damages for "each incident of harm," and creates a presumption of liability in actions that involve teenagers under sixteen. *Id.* § 13-63-501. Presumed damages for speech violate the First Amendment, and the chilling effect of these provisions will force social media companies to curtail services available to the Plaintiffs.

## COUNT TWO

## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT AND THE FIRST AMENDMENT
## (VOID FOR VAGUENESS)

89.     Plaintiffs incorporate all prior paragraphs of the Complaint.

90.     The Social Media Act fails to provide ordinary persons with fair notice of the proscribed conduct.  The Act is so dependent on inherently subjective, undefined standards that it practically mandates arbitrary or discriminatory enforcement against disfavored content, viewpoints, and speakers. "It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Circuit*, 390 U.S. at 686, 689 (citation & internal quotation marks omitted) (striking down city ordinance making it a misdemeanor to show films "unsuitable" for minors as impermissibly vague). Vagueness in a law that regulates expression "raise[s] special First Amendment concerns because of its obvious chilling effect on free speech." *Brown*, 564 U.S. at 807 (quoting *Reno*, 521 U.S. at 871-72).

91.     The Act fails to define multiple terms and phrases underpinning its central requirements and penalties and leaves regulators with unbridled discretion to impose massive penalties on social media companies.  Section 13-63-103(3) does not define what counts as "advertising"; Section 13-63-103(5) does not define "use" or what might constitute "targeted" or "suggested" content; Section 13-63-401(2) offers no definition of the terms "practice," "design," or "feature"; Section 13-63-101(2) purports to define "addiction" but offers no definition of the phrases "substantial preoccupation," "substantial difficulty," or "physical, mental, emotional, developmental, or material harms"; Section 13-16-401(3)(a) fails to define the term "exposed to"; and Section 13-63-501 does not define "financial, physical, or emotional harm" and leaves unresolved whether liability exists for any such harms absent indication of "addiction."

92.     The Act's affirmative defenses underscore its vagueness. Although a service may try to avoid liability by conducting regular audits to "detect practices, designs, or features that have the potential to cause or contribute to the addiction" of a minor user, and correcting any that pose "more than a de minimis risk of" "caus[ing] or contribut[ing] to the addiction of a minor user," Utah Code § 13-63-401(3)(b), the services would not know what to look for without definitions of the key statutory terms, including what the State considers "a de minimis risk."

93.     The law fails to provide constitutionally sufficient notice, and invites arbitrary and discriminatory enforcement against disfavored content, viewpoints, and speakers.

## COUNT THREE

## VIOLATION OF THE COMMERCE CLAUSE

94.     Plaintiffs incorporate all prior paragraphs of the Complaint.

95.     Article I, Section 8 of the U.S. Constitution vests Congress with the power "[t]o regulate Commerce … among the several States." U.S. Const., art. I, § 8, cl. 3. The Commerce Clause bars state laws that unduly restrict interstate commerce—a restriction on state action referred to as the "Dormant Commerce Clause."

96.     Under the Dormant Commerce Clause, even laws that regulate evenhandedly and do not purport to discriminate against other states are unconstitutional if they impose burdens on interstate commerce that are clearly excessive in relation to the putative local benefits. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Dormant Commerce Clause's prohibition on undue restrictions of interstate commerce applies to restrictions on speech transmitted online just as it does to physical goods. *See ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999). It likewise prohibits states from "directly" regulating activity, including speech, that occurs "wholly outside" the regulating state's jurisdiction. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 641-43 (1982)).

97.     The Social Media Act violates the Commerce Clause because the law seeks to impose an unreasonable and undue burden on channels of interstate commerce that would impede the flow of information and online services across state lines in clear excess of any local benefit

conferred on the State of Utah. By impeding minors in Utah from accessing an instrument of interstate commerce and communication (i.e., social media), and by limiting the types of content they may engage with through that instrument (including advertising), the Act restricts the distribution of information, including commercial information across state lines.

98. The Act further violates the Commerce Clause because it directly regulates speech and internet communications "wholly outside" Utah's borders. *Ross*, 598 U.S. at 376 n.1. Because the internet is accessible globally, a state cannot block internet content from its own citizens without affecting citizens of other states. *See Johnson*, 194 F.3d at 1162. The Social Media Act also restricts the speech of any person who is a Utah resident, as a legal category, whether or not they are physically located in Utah.

99. The Utah Legislature has not identified any local interest (as opposed to an abstract interest in the wellbeing of minors generally) sufficient to justify these onerous impositions on interstate commerce.

100. Unless declared invalid and enjoined, the Social Media Act will unconstitutionally burden interstate commerce in violation of the Commerce Clause.

**COUNT FOUR**

**SECTION 230 PREEMPTION, 47 U.S.C. § 230**

101. Plaintiffs incorporate all prior paragraphs of the Complaint.

102. Congress adopted Section 230 of the Communications Decency Act to preserve and reinforce First Amendment protections for online services in light of the unique challenges of the medium. Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). An "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server[.]" *Id.* § 230(f)(2). The "provider" of such a service includes those who own or operate websites and therefore includes the social media services that are subject to the Act.

103.    With limited exceptions, Section 230(c)(1) bars the imposition of liability on a website for claims stemming from the publication of information provided by a third party. Publication includes not just determining whether to publish, continue to publish, or withdraw third-party content, but also reviewing, editing, and prioritizing such content. Section 230 expressly preempts inconsistent state laws. 47 U.S.C. § 230(e)(3).

104.    Section 230(c)(1) preempts Sections 13-63-103(1), 13-63-103(2), 13-63-103(3), 13-63-103(5), 13-63-401(2), and 13-63-501 because they treat social media services as the publishers or speakers of information provided by other information content providers. Section 13-63-103(1) would hold social media services liable for publishing direct messages; Section 13-63-103(2) for publishing profiles in search results; Section 13-63-103(3) for publishing third-party advertising; Section 13-63-103(5) for publishing any kind of "suggested" or "targeted" content; and Sections 13-63-401(2) and 13-63-501 for publishing any kind of content that causes any minor to develop "an addiction" to their services or otherwise causes "harm."

105.    Plaintiffs suffer injuries from these Social Media Act provisions because the provisions compel social media companies to block (collaterally censor) Plaintiffs' speech and access to speech, the precise evil Congress sought to avert by enacting Section 230. Sections 13-63-103(1), 13-63-103(2), 13-63-103(3), 13-63-103(5), 13-63-401(2), and 13-63-501 are thus inconsistent with and preempted by Section 230. *See* 47 U.S.C. § 230(e)(3).

## VI.    PRAYER FOR RELIEF

106.    WHEREFORE, Plaintiffs respectfully request that the Court:

      a.    Declare that Utah Code §§ 13-63-101, 13-63-102, 13-63-103, 13-63-104, 13-63-105, 13-63-202, 13-63-301, 13-63-401, and 13-63-501 are unconstitutional under the First and Fourteenth Amendments of the United States Constitution, and otherwise preempted by federal law, including Section 230 of the Communications Decency Act;

      b.    Declare that Utah Code §§ 13-63-101 to -701 are void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution;

c. Declare that Utah Code §§ 13-63-103(1), 13-63-103(2), 13-63-103(3), 13-63-103(5), 13-63-401(2), and 13-63-501 are preempted by the Commerce Clause of the U.S. Constitution.

d. Preliminarily and permanently enjoin Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to enforce the Social Media Act;

e. Enter judgment in favor of Plaintiffs;

f. Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action, under 42 U.S.C. § 1988; and

g. Award Plaintiffs all other relief as the Court deems just and proper.

Dated: January 12, 2024

/s/ *Jerome H. Mooney*
Jerome H. Mooney (Utah Bar #2303)
WESTON, GARROU & MOONEY
50 West Broadway, Suite 300
Salt Lake City, Utah 84101

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003

Kelley Bregenzer
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
510 Walnut St. Suite 900
Philadelphia, PA 19106

Ambika Kumar
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104

Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017

David M. Gossett
Chelsea T. Kelly
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005

*Attorneys for Plaintiffs*