AMBIKA KUMAR*
  ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA  98104
Telephone: (206) 622-3150

ADAM S. SIEFF*
  adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, CA  90017
Telephone: (213) 633-6800

DAVID M. GOSSETT*
  davidgossett@dwt.com
CHELSEA T. KELLY*
  chelseakelly@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC  20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE*
  bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473  Ext. 209

DAVID RUBIN*
  David.Rubin@thefire.org
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
(215) 717-3473  Ext. 283

JEROME H. MOONEY (Utah Bar #2303)
  jerrym@mooneylaw.com
WESTON, GARROU & MOONEY
50 West Broadway, Suite 300
Salt Lake City, UT 84101
Telephone: (310) 442-0072

*Attorneys for Plaintiffs*
*Admitted Pro hac vice*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| HANNAH PAISLEY ZOULEK, a Utah resident; JESSICA CHRISTENSEN, a Utah resident; LU ANN COOPER, a Utah resident; M.C., a Utah resident, by and through her parent, LU ANN COOPER; VAL SNOW, a Utah resident; and UTAH YOUTH ENVIRONMENTAL SOLUTIONS, a Utah association,<br><br>          Plaintiffs,<br><br>v.<br><br>KATIE HASS, in her official capacity as Director of the Utah Division of Consumer Protection; SEAN REYES, in his official capacity as Utah Attorney General,<br><br>          Defendants. | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. 2:24-cv-00031-DAK-DAO<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Daphne A. Oberg |

# I.    PRELIMINARY STATEMENT

1.    This case concerns Utah's attempt to restrict minors' ability to engage in protected speech online.  After two lawsuits exposed the manifest constitutional flaws in the State's first effort to restrict online speech, the State repealed and replaced that law with two statutes that are equally (and in some respects, more) problematic.  Plaintiffs file this First Amended Complaint to obtain declaratory and injunctive relief from one of those laws: the Utah Minor Protection in Social Media Act.[1]  Like its predecessor, the Act purports to aid parental authority, but substitutes that authority with "what the State thinks parents *ought* to want."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804 (2011). And like other legislation enacted throughout our nation's history to protect the sensibilities of young people, the Act erects a prior restraint and imposes a vague and overbroad content-based speech restriction, none of which survives constitutional scrutiny. Unless enjoined, the Act will isolate young adults from their communities, trap some of them in abusive environments, and stunt their development as free and independent citizens.

2.    The broader context of this pre-enforcement challenge has not changed. The effects of social networks on young people remains an important issue of our time, and for good reason. A 2023 advisory by the United States Surgeon General identifies some potential negative effects, but it also finds that social media "provid[es] positive community and connection with others who share identities, abilities, and interests" and "can provide access to important information and create a space for self-expression."[2]  It is impossible to generalize the effects, the advisory explains, due to major gaps in research, and because "different children and adolescents are affected by

---

[1] The other statute—HB 464—repackages the prior law's facially unconstitutional "addiction liability" regime into a private right of action designed to elude pre-enforcement review.  *See* Utah Code § 78B-3-1101 *et seq*. Although Plaintiffs do not challenge it here, the First Amendment would bar any private suit to impose such speech-chilling liability, particularly where, as here, damages are presumed.  *See Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011); *cf. Gertz v. Robert Welch*, 418 U.S. 323, 347-48 (1974); *see also e.g.*, *Watters v. TSR, Inc.*, 715 F. Supp. 819, 822 (W.D. Ky. 1989), *aff'd*, 904 F.2d 378 (6th Cir. 1990); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 169-71 (D. Conn. 2002); *Zamora v. CBS*, 480 F. Supp. 199, 204-06 (S.D. Fla. 1979).

[2] Dep't of Health & Hum. Servs., Social Media and Youth Mental Health 6 (2023) http://tinyurl.com/4wycrcpm.

social media in different ways, based on their individual strengths and vulnerabilities, and based on cultural, historical, and socio-economic factors." The American Psychological Association, too, has observed that "[u]sing social media is not inherently beneficial or harmful to young people,"[3] finding that "youths' psychological development may benefit from this type of online social interaction, particularly during periods of social isolation, when experiencing stress, when seeking connection to peers with similar developmental and/or health conditions, and perhaps especially for youth who experience adversity or isolation in offline environments."[4]

3. The idea that *some* types of social network use by *some* minors under certain conditions can adversely affect *some* segment of this cohort is no basis for imposing state restrictions on *all* social network use by *all* minors—just as the State does not (and cannot) keep all books under lock and key because some may be inappropriate for some children. But such overreach typifies how lawmakers historically have sought to regulate new media forms in the name of protecting the young. Whether dime novels or "penny dreadfuls" in the nineteenth century, moving pictures in the early twentieth century, comic books in the 1950s, or video games at the dawn of the twenty-first century, the response to these successive moral panics has been largely the same: legislatures pass vague and broadly worded speech restrictions that infringe basic First Amendment rights. *Brown*, 564 U.S. at 797-98. In fact, such laws have generated much of modern First Amendment jurisprudence. *See*, *e.g*., *Winters v. New York*, 333 U.S. 507 (1948); *Jos. Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952); *Butler v. Michigan*, 352 U.S. 380 (1957); *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676 (1968); *Reno v. ACLU*, 521 U.S. 844 (1997); *United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803 (2000). The upshot of these cases is that state authority "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

4. The Act is the latest addition to this pantheon of well-intentioned but misguided

---

[3] Am. Psych. Ass'n, Health Advisory on Social Media Use in Adolescence 3 (May 2023), http://tinyurl.com/4brm85e6.

[4] *Id*. at 3-4.

speech restrictions. It would require age verification for all social platform users in Utah, subjecting *all* of them—not just minors—to intrusive and imperfect age-verification mandates before they can access services that permit the sharing of expression, compromising their privacy and chilling speech. The Act then limits how and with whom minors may communicate and receive content.  Any user determined to be under the age of 18—or who declines to submit to age verification—is denied access to recommended content through autoplay and push notification features. These restrictions apply *even if* a parent objects. Under other provisions, minors are restricted from communicating with all but a subset of persons already "connected" to them (or "connected" with their connections), cutting them off from information and communities. The Constitution forbids this sort of uninvited exercise of state control subject only to an unworkable parental veto. *Brown*, 564 U.S. at 795 n.3.

5.     Plaintiffs are Utahns and a Utah-based association whose abilities to communicate and access information the Act will restrict. They include a current high school student and a soon-to-be college student who use social networks to communicate, express themselves, associate with peers, and learn; adults who escaped abusive homes and use social networks to help young people in similar circumstances; mothers with teens who use social networks; and a non-profit organization that uses social networks to teach teens about environmental science and advocacy. Plaintiffs are acutely aware of the ways social networks enable young people to obtain information and find community, particularly for those who are isolated or otherwise marginalized. Through their personal experiences, Plaintiffs know how minors' access to social networks can be literally lifesaving and are concerned that the Legislature chose to throw out the baby with the bathwater. If the law takes effect, each of them will be deprived of basic constitutional rights.

6.     The Act on its face violates the First Amendment, the Due Process Clause of the Fourteenth Amendment, and the Commerce Clause of the United States Constitution. It is also preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230. Plaintiffs accordingly seek an order declaring the Act invalid and enjoining its enforcement.

## II.    PARTIES

7.    Plaintiff Hannah Paisley Zoulek is a soon-to-be college student living in Utah.[5] They have used social networks for educational purposes, such as learning and communicating with their high school's robotics club. They also use these networks to connect with friends and with other communities to which they would not otherwise have access, and to express themselves through creative writing. Zoulek, who plans to attend law school after college, testified before the Utah House Judiciary Committee against the Act's repealed predecessor—citing concerns about the law's infringement on teens' speech and ability to discuss issues such as mental health.

8.    Plaintiff Jessica Christensen escaped from a powerful and abusive polygamous family at age fifteen and lives in Utah with her husband and three children. She works as a community social worker, where she counsels patients—including many at-risk youths—in states of crisis and refers them to resources. Christensen has become a prominent advocate for former members of polygamous groups, and many such teens and adults contact her through social networks for support or other help.  She has been in touch with approximately thirty minors and helped about ten of them escape abusive homes after they contacted her using social networks. Christensen and her husband allow their two oldest children to use social networks under their guidance.

9.    Plaintiff Lu Ann Cooper, a resident of Roy, Utah, is the co-founder and president of the organization Hope After Polygamy, which helps individuals (including teens) who are in or have left polygamist communities by connecting them to resources, including educational scholarships. Hope After Polygamy maintains several social networking accounts that educate teens and adults about the resources it offers and notifies them of events such as free health screenings and financial literacy classes.  Teens and adults in polygamous communities have contacted Hope After Polygamy and Cooper to seek help and support. Cooper and her husband are parents to eight children, including several teenagers who use social networks under their

---

[5] Zoulek uses "they/them" pronouns.

guidance.

10.    Plaintiff M.C. is the daughter of Plaintiff Lu Ann Cooper, who pursues this claim on her behalf.  M.C. is a high school student who uses social networks to connect with her friends, explore her creative endeavors, and obtain news about current events, history, science, and popular culture.  She also uses apps such as Instagram to build community with her dance and debate teams, and fundraise to support these groups.  M.C. is particularly passionate about music and dance, and curates her social networking feeds to serve as artistic spaces and connect with other creators.

11.    Plaintiff Val Snow lives in Midvale, Utah. He produces a YouTube channel that covers topics such as mental health, resilience, and LGBTQ perspectives. Both teens and adults watch Snow's YouTube channel and have contacted him to engage in community or seek support. Snow, who grew up without access to the Internet or social networks and experienced an assault at a young age, is passionate about protecting at-risk youths' access to information.

12.    Plaintiff Utah Youth Environmental Solutions (UYES) is a youth-led grassroots organization that seeks to educate young people in Utah regarding climate change and environmental advocacy. Its mission is to normalize participation in the political process, as well as pragmatically address local environmental issues.  UYES operates a program for 14-17 year-olds every summer to educate teenagers about environmental justice and protecting Utah's natural resources while working alongside community partners such as indigenous leaders.  It also educates teenagers about practical leadership skills and how to further protect the environment through legislative advocacy and other actions.  UYES advertises these opportunities, as well as other resources and information, through social networks, and also communicates with teenagers who are interested in the organization through these channels.

13.    Defendant Katie Hass, Director of the Utah Department of Commerce's Division of Consumer Protection, is charged with enforcing the Act.  *See* Utah Code § 13-71-301(1), (3).

14.    Defendant Sean Reyes, the Utah Attorney General, is charged with representing the Division of Consumer Protection in actions to enforce the Act.  *See* Utah Code § 13-71-301(2).

### III.    JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this action under 28 U.S.C §§ 1331 and 1343(a) because Plaintiffs' claims arise under the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

16.    This Court has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to decide this dispute and award relief because it presents an actual case or controversy within the Court's jurisdiction.

17.    Venue is proper in this District because all Defendants reside in this District, 28 U.S.C. § 1391(b)(1), and because substantial events material to Plaintiffs' claims occurred in this District, 28 U.S.C. § 1391(b)(2).

### IV.    FACTUAL ALLEGATIONS

**A.    Social Networks Provide a Forum for Expression and Association**

18.    Social networks provide forums for communication, expression, education, and association. The content on these networks, like other online speech, is as "diverse as human thought." *Reno*, 521 U.S. at 870.  Approximately 90 percent of kids between ages 13-17 have at least one social network account.[6]  Social networks are integral to modern life, for both teens and adults, across human activity.

19.    ***Political expression and communication.*** Social networks provide an essential outlet for political expression. Youth-led movements have used it to bring issues not adequately covered in traditional media to the forefront of public consciousness. For example, the "hashtag" device has helped fuel national conversations on racial inequality.[7]  Students at Marjory Stoneman Douglas High School in Parkland, Florida, have used social networks to advocate for gun control

---

[6] Susan Laborde, *Teenage Social Media Usage Statistics in 2023*, TECHREPORT (Oct. 13, 2023), http://tinyurl.com/5727nuv8.

[7] *See, e.g.*, Janell Ross, *How Black Lives Matter Moved from a Hashtag to a Real Political Force*, WASH. POST (Aug. 19, 2015), http://tinyurl.com/kxr5h92t.

after a school shooting killed seventeen people.[8] Members of UYES used social networks to organize a rally to bring attention to climate change.[9] And Zoulek consulted Tumblr shortly after the U.S. Supreme Court reversed the *Roe v. Wade* decision to better understand the impact of the ruling. As the United Nations Committee on the Rights of the Child has recognized, "the digital environment enables children, including children human rights defenders, as well as children in vulnerable situations, to communicate with each other, advocate for their rights and form associations."[10]

20. Politicians and lawmakers use social networks to communicate with voters, including teens approaching voting age.[11] Social media is "near ubiquitous among members of Congress."[12] In 2021 alone, congressional representatives published more than 477,000 Twitter (now "X") and 395,000 Facebook posts.[13] Senator Mitt Romney regularly posts on social networks, including on "X" (1.9 million followers), Facebook (8 million followers), and Instagram (80,200 followers). Senator Mike Lee likewise uses his "X" account (700,000 followers), Facebook (377,000 followers), and Instagram (29,900 followers) to discuss policy and legislation. And the Utah Senate routinely posts about its activity and other state news on all three services. Utah Governor Spencer Cox—"one of the most prolific users of Twitter [X] in Utah's political

---

[8] Jonah E. Bromwich, *How the Parkland Students Got So Good at Social Media*, N.Y. TIMES (Mar. 7, 2018), http://tinyurl.com/msyuwnae.

[9] *See* Leia Larsen, *Utah youths hold 'die-in' for Great Salt Lake, challenge elected leaders to take bolder action*, SALT LAKE TRIB. (Sept. 4, 2022), http://tinyurl.com/bdhxvc7s; @UtahYES, Instagram (Sept. 2, 2022), https://www.instagram.com/p/CiBb1EYOru5/.

[10] U.N. Hum. Rts. Off. of the High Comm'r, General comment No. 25 (2021) on children's rights in relation to the digital environments, U.N. Doc. CRC/C/GC/25 (Mar. 2, 2021), http://tinyurl.com/ysepy8ys.

[11] Maria Petrova et al., *Social Media and Political Contributions: The Impact of New Technology on Political Competition*, MGMT. SCI. (May 14, 2020), http://bit.ly/3FTs3eY.

[12] Patrick Van Kessel et al., *The congressional social media landscape*, PEW RSCH. CTR. (July 16, 2020), http://tinyurl.com/5byur542.

[13] Stacy Jo Dixon, *Total number of posts per platform by U.S. Congress members 2021*, STATISTA (June 21, 2022), http://tinyurl.com/yx632peu.

sphere"[14]—used social networks to promote the Act's repealed predecessor.[15] And his senior advisor and Director of the Office of Families, Aimee Winder Newton, has used social networks to communicate with high schoolers.[16]

21.    ***Education.*** Educators use social networks to promote learning and share knowledge, including to "enhance interactions between students, between students and teachers, and with people and resources outside the classroom," interactions essential to students' "sense of belonging in an educational community."[17] Teachers also use social networks to educate adolescents in engaging ways. For example, Phillip Cook (@chemteacherphil) shares chemistry lessons with his 3.9 million TikTok followers. "Ms. James" (@iamthatenglishteacher) posts English grammar and vocabulary lessons on her TikTok account, which has 5.8 million followers. And "Mrs. Kelly" (@the_mrskelly) shares elementary-school-level math lessons with her 1.4 million followers.

22.    M.C. uses Instagram to help prepare and refine arguments for her high school debate class by researching opinions and ideas that would appeal to an audience. When Zoulek was in high school, they consulted YouTube to better understand particularly challenging math concepts. And their high school robotics team used Discord, a popular messaging app, to coordinate plans and assignments. Likewise, Snow discovered a vocational rehabilitation service

---

[14] Bryan Schott, *Utah first state to pass social media regulations aimed at protecting minors*, SALT LAKE CITY TRIB. (Mar. 23, 2023), http://tinyurl.com/ysppswkz.

[15] *See, e.g.*, Spencer J. Cox (@GovCox), X (Mar. 14, 2023, 1:06 PM), https://twitter.com/govcox/status/1635734261604155392; @GovCox, X (Mar. 23, 2023, 1:58 PM), https://twitter.com/govcox/status/1639008762987159554; @GovCox, X (Mar. 23, 2023, 5:20 PM), https://twitter.com/govcox/status/1639059485569486850; @GovCox, X (Mar. 27, 2023, 9:26 AM), https://twitter.com/govcox/status/1640389818151759874; @GovCox, X (Jul. 12, 2023, 7:43 AM), https://twitter.com/govcox/status/1679139299017539584; @GovCox, X (Aug. 3, 2023, 7:57 AM), https://twitter.com/govcox/status/1687115529516146688; @GovCox, X (Aug. 3, 2023, 8:25 AM), https://twitter.com/govcox/status/1687122642032324608.

[16] Aimee Winder Newton (@AWinderNewton), X (Apr. 24, 2023, 7:13 AM), https://twitter.com/awindernewton/status/1650503355779764233.

[17] Kim Ward, *How teachers can use social media to improve learning this fall*, MICH. STATE UNIV., http://tinyurl.com/2j3k734f (last visited May 29, 2024).

through Facebook, which he used to connect with Job Corp and obtain a trade certification for culinary arts. And Cooper's organization, Hope After Polygamy, promotes its educational scholarship program and other resources on social networks.

23.    ***News and information.*** Social networks are a principal source of news for most Americans.[18] More than half of teens access news in this manner at least a few times per week, including on Instagram, Facebook, and "X."[19] Christensen and Cooper follow the news on Instagram and X, respectively. Zoulek sometimes hears about news through Tumblr and then seeks additional information elsewhere.  UYES uses social networks to share news about climate change and environmental issues in the Great Salt Lake.  M.C. uses Instagram as her main source of news about current events, as she prefers not to watch traditional news on television.  She also receives timely public alerts regarding safety incidents at or near her school—alerts that her school sometimes does not post until the incidents at hand have concluded.  Similarly, Christensen recently relied on warnings she saw on Facebook regarding a suspicious van in the neighborhood to tell her children to stay alert until the suspect was apprehended.

24.    Discussion or "Q&A"-based social networks such as Reddit, Quora, and Goodreads provide content about topics ranging from "How-To" videos for home projects to personal finance tips to book reviews.[20] Zoulek, who sometimes uses a cane to walk, has consulted Reddit to learn about disability access on college campuses and before a family trip to Disneyland.  M.C. uses Goodreads to learn about new books and share her thoughts on books she is reading.

25.    ***Community and belonging.*** Social networks enable young people to find

---

[18] Jeffrey Gottfried & Elisa Shearer, *News Use Across Social Media Platforms 2016*, Pew Rsch. Ctr. (May 26, 2016), http://tinyurl.com/3ny9xb83.

[19] Common Sense Media, *New Survey Reveals Teens Get Their News From Social Media and YouTube* (Aug. 12, 2019), http://tinyurl.com/2dcxx9jj; *see also* Michael Boulter & Lizz Bolaji, *In the age of memes, how are young people getting their news?*, PBS News Hour (Jan. 23, 2020), http://tinyurl.com/36mdm2c4.

[20] Reddit, r/DIY, https://www.reddit.com/r/DIY/ (last visited May 28, 2024) (DIY Reddit has 24M members); Reddit, r/personalfinance, https://www.reddit.com/r/personalfinance/ (last visited May 28, 2024) (Personal Finance Reddit has 19M members).

opportunities for purpose and belonging. Research shows most young adults have been inspired to take on at least one new hobby after viewing clips on social networks, with an estimated four in ten using them to share their own hobbies.[21] Communities centered around common interests in particular hobbies or skills have also formed on social networks. M.C., for example, uses social networks to connect with and gain inspiration from other dancers, musicians, and artists. Zoulek, meanwhile, uses fan fiction forums to connect with queer youth and read stories reflecting that community's experiences. Reddit subgroups for craft projects, yoga, meditation, baking, and running all have more than 1.8 million members,[22] and groups for gardening and woodworking each have more than five million members.[23] This role of social networks in fostering community and connection—what some researchers have called the development of one's "social, religious, cultural, ethnic, sexual and political identities"—is thus one of their most profound contributions.[24] Especially since the COVID-19 pandemic, teens increasingly have relied on social networks to connect with peers, access news and information about their communities, express themselves, and share their pursuits and lived experience.[25] Teens report that online spaces have "provided them with valued opportunities to meet, exchange and deliberate with peers, decision makers and others who shared their interests."[26]

---

[21] Press Release, Samsung Mobile Press, Social Media Fuels Rise in Alternatively Awesome Hobbies, as Gen Z Embrace Their Creativity Online (May 23, 2022), http://tinyurl.com/2vjmx4px.

[22] Reddit, r/crafts, https://www.reddit.com/r/crafts/ (last visited May 28, 2024); Reddit, r/yoga, https://www.reddit.com/r/yoga/ (last visited May 28, 2024); Reddit, r/Meditation, https://www.reddit.com/r/Meditation/ (last visited May 28, 2024); Reddit, r/Baking, https://www.reddit.com/r/Baking/ (last visited May 28, 2024); Reddit, r/running, https://www.reddit.com/r/running/ (last visited May 28, 2024).

[23] Reddit, r/gardening, https://www.reddit.com/r/gardening/ (last visited May 28, 2024); Reddit, r/woodworking, https://www.reddit.com/r/woodworking/ (last visited May 28, 2024).

[24] U.N. Hum. Rts. Off. of the High Comm'r, *supra* note 10, at 11.

[25] Jessica L. Hamilton et al., *Re-examining adolescent social media use and socioemotional well-being through the lens of the COVID-19 pandemic: A theoretical review and directions for future research*, PERSPECT PSYCHOL SCI. (May 9, 2022), http://tinyurl.com/5a2hsyk6.

[26] U.N. Hum. Rts. Off. of the High Comm'r, *supra* note 10, at 11.

26.     In this respect, social networks are an "important venue for interaction and conversation among" American teenagers, and "plays a critical role in connecting teens to new friends" by "allowing teens to learn more about new friends and get to know them better."[27] Zoulek, for example, uses Tumblr to connect with individuals who are disabled, neurodivergent, or queer—communities that they are not always able to access in person.  M.C. uses Instagram to ask for music-making advice from fellow creators.

27.     One recent study found teenagers who use social networks reported that they feel more connected to their friends (80%); had somewhere to express their creativity (71%); had a support network in challenging times (67%); and were more accepted (58%).[28]  Overall, U.S. teenagers are more likely to report that social networks have positive rather than negative effects on their lives.[29] In fact, some research suggests that the isolation that results from disconnecting teens from social networks may be more harmful to their self-esteem and wellbeing than is heavy use of the medium.[30]

28.     One key to these positive effects is the practice of recommending content and friends based on a user's interests. Such recommendations commonly appear in curated "newsfeed," "for you," or "discovery" functions, which use algorithms, machine learning, and/or search engine indexing to recommend content.

---

[27] Amanda Lenhart, *Chapter 4: Social Media and Friendships*, PEW RSCH. CTR. (Aug. 6, 2015), http://tinyurl.com/mukytfhk.

[28] Emily A. Vogels & Risa Gelles-Watnick, *Teens and social media: Key findings from Pew Research Center surveys*, PEW RSCH. CTR. (Apr. 24, 2023), http://tinyurl.com/235k9za7.

[29] *Id.*

[30] Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, SOC. SCI. COMP. REV. (Aug. 5, 2022), http://tinyurl.com/2t8kcm73; *see also* Sarah Coyne et al., *Teaching By Example: Media and Parenting Practices that are – and are not – Related to Adolescent Mental Health*, WHEATLEY INST. (2022), http://tinyurl.com/4nhcyj9e.

**B.    Social Networks Provide Particular Benefits to Marginalized and At-Risk Youth**

29.    The profound support provided by social networks is well-documented.[31] A study by the Pew Research Center revealed that "nearly seven-in-ten teens receive support from friends through social media during tough times."[32]

30.    Many teens from abusive homes have used social networks to seek support and, if necessary, escape to relatives, friends, or shelters. Teens have used social networks to identify and locate domestic violence shelters and send messages to relatives or friends to seek help.

31.    In certain polygamous communities, minors have used social networks to escape homes where they were being forced into polygamous marriages, or labor, or endured other forms of abuse. These networks have not only given these minors a lifeline to contact the outside world, but also has shown them that relatives and friends who have fled the community are living healthy and productive lives—in contrast to the community's messaging that those who leave are condemned to lives of poverty and suffering.

32.    Minors seeking to escape abusive homes have contacted Christensen using Facebook or Instagram, without their parents' knowledge. For example, Christensen's half-sister, Allison Eames, contacted her on Facebook when she was sixteen to seek help fleeing a planned forced marriage and her abusive father. With Christensen's help, Eames was able to leave. Similarly, Christensen's cousin, Michelle Michaels, messaged her on Facebook for a few months seeking support and information in deciding whether to leave the same community, where she was experiencing abuse and anticipating a forced underage marriage. When Michaels decided, at age seventeen, that she wanted to leave the community, Christensen helped her become emancipated.

33.    Christensen has spoken with other teens on social networks who ultimately decided not to leave their community but benefited from her moral support, knowledge, and understanding.

---

[31] *See generally* John A. Naslund et al., *Social Media and Mental Health: Benefits, Risks, and Opportunities for Research and Practice*, J. TECH. BEHAV. SCI. (Apr. 20, 2020), http://tinyurl.com/562f7s33.

[32] Lenhart, *supra* note 27.

Likewise, Cooper has counseled teens and adults seeking assistance and information, sometimes after finding Hope After Polygamy online. The individuals who contact Christensen on social networks while still inside the polygamous community rarely, if ever, "friend" or "follow" her on the platforms, out of fear that their family members or others in the community will suspect them of trying to leave. Thus, for many of them, their only way to contact Christensen is to direct message her through the platform, without a prior connection—which the Act prohibits unless you have an over 18-verified account.

34.    Some individuals who flee at-risk homes change their identities to prevent their abusers from locating them. Some were not given access to their birth certificates, government identification, or social security numbers. Many would be unable to provide a government ID to create an age-verified social network account, either because they do not have such an ID or because disclosing their identity could allow their abusers to find them.

35.    Social networks have many benefits for teens in the LGBTQ community. Researchers at Brigham Young University found that transgender and non-binary teens who use social networks are substantially less likely to report emotional problems than those who do not.[33] Other researchers exploring "the benefits of social media and forms of coping for LGBTQ+ youth" found that social media "helps stigmatized youth maintain critical access to emotional support, develop their identities, [and] find important information."[34] Recognizing this potential, The Trevor Project, a non-profit organization dedicated to combatting LGBTQ youth suicide, has developed TrevorSpace, "the world's largest safe space social networking site for LGBTQ youth."[35]

36.    Snow, who grew up in an insular community without consistent access to the

---

[33] Coyne, *supra* note 30.

[34] Shelley L. Craig et al., *Can Social Media Participation Enhance LGBTQ+ Youth Well-Being? Development of the Social Media Benefits Scale*, SOC. MEDIA + SOC'Y 7:1 (Jan.-Mar. 2021), http://tinyurl.com/2bk5m28a.

[35] *See* The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People*, at 31, http://tinyurl.com/ymj5vjr4 (last visited May 29, 2024).

internet until age eighteen, was taught that being gay is evil and was deprived of information regarding sexual orientation or safe sexual experiences. As a result, when Snow experienced a sexual assault at a young age, he did not have the language or knowledge to report it. Today, he uses YouTube to provide teens and adults information and perspective he never had growing up—including his experiences as a gay man—as well as commentary on mental health, positivity, and resilience. Snow posts videos about life in his former community, knowing that individuals still trapped in that community watch his content and might benefit from his new perspectives.

37.     Some studies suggest that "many young people who are experiencing depression—whatever the cause—are purposely and proactively using social networks and other digital tools to protect and promote their own well-being."[36] Many mental health experts have embraced these aspects of social media, and digital and social networking services are increasingly being harnessed to identify and treat mental health problems among adolescents.[37]  In particular, the Act's ID-verification provision and requirement that minors must be connected to accounts to direct message them, could impair minors seeking mental health resources and assistance. Zoulek believes that their peers would not reach out to mental health organizations or hotlines over social networks if they were required to publicly "friend" or "follow" them first.  In testimony against the Act's repealed predecessor, Zoulek also noted their concern that preventing teens from talking about mental health issues using social networks would itself negatively affect their mental health. And Christensen, who works as a social worker, has witnessed situations in which minors' posts have signaled that the minor is struggling and prompted wellness checks—and agrees that anonymity is sometimes key to these initial communications.

38.     Adolescents' use of social networks cannot be treated or regulated monolithically. Research confirms that children and adolescents are affected by social networks in different ways,

---

[36] Victoria Rideout et al., *Coping With Covid-19: How Young People Use Digital Media to Manage Their Mental Health*, COMMON SENSE 11 (2021), http://tinyurl.com/4edefct5.

[37] Chris Hollis et al., *Editorial: The role of digital technology in children and young people's mental health – a triple-edged sword?*, 61 J. OF CHILD PSYCH. & PSYCHIATRY 837, 837-41 (2020), http://tinyurl.com/bdhmxtaw.

based on their strengths, vulnerabilities, and predispositions, and on cultural, historical, and socio-economic factors.[38] The "use and effects of social media depend on a number of factors specific to individual teens," including "age, gender, race, ethnicity, personalities, and pre-existing emotional or mental health difficulties," as well as a teen's "familial rules/structure around social media, peer group dynamics, [and] parental and peer relationships," and "larger societal and cultural influences."[39] M.C. has found that many of her peers responsibly self-regulate their use of social networks, by taking breaks from the apps if they realize they are spending too much time on them. She and her mother believe it is an important part of teenage development to learn how to use these tools appropriately without state intervention.

39. To account for the differences among minors, parents have access to tools that allow them to monitor and control their children's social networking use. Meta, for example, enables parents to set time limits, restrict use to particular times or days, view their child's friends or followers, and receive notifications when the minor reports an account or post.[40] Snapchat publishes a guide for parents to promote safe social network use and provides tools that allow parents to set content controls and see with whom their children are communicating.[41] Parents can also download applications, such as Aura, Bark, Qustodio, and FamilyKeeper, that link to their children's devices and enable them to limit screen time; see their messages; filter, block, and monitor access to certain sites or applications; set location alerts; and pause internet access.[42] And phone manufacturers like Apple and Google offer "Screen Time" and "Family Sharing" controls

---

[38] Ine Beyens et al., *The effect of social media on well-being differs from adolescent to adolescent*, 10:10763 SCI. REPS. (2020), http://tinyurl.com/3fsn3mvz.

[39] Hamilton, *supra* note 25.

[40] Meta, Supporting safer and more positive experiences for your family, https://familycenter.meta.com/ (last visited May 29, 2024).

[41] Snapchat, Tools and Resources for Parents, https://parents.snapchat.com/parental-controls (last visited May 29, 2024).

[42] Aura, Protection for Kids. Peace of Mind for Parents, http://tinyurl.com/33sfh2e8 (last visited May 29, 2024); Family Keeper, Keep Your Kids Safe With Parental Controls, http://tinyurl.com/yc48vr8z (last visited May 29, 2024); Bark, Parental controls reimagined, http://tinyurl.com/3x97y582 (last visited May 29, 2024).

that permit parents to manage a child's online activities, including their use of particular applications.[43]

40.    For example, Cooper allows her eleven- and thirteen-year-old children to use "Messenger Kids" accounts, which are designed for kids to connect with family and friends under supervision. When M.C. first got an Instagram account, Cooper imposed certain restrictions, but eventually lifted them when she saw that M.C. was able to use the platform responsibly and safely on her own.  Christensen has her children use a curfew app on their phones, requiring them to power down at a certain hour, which she can extend.

### C.    Utah Enacts and Then Repeals the Utah Social Media Regulation Act of 2023.

41.    On March 23, 2023, Utah Governor Spencer Cox signed SB 152 and HB 311, which together formed the Social Media Act. The law was scheduled to take effect March 1, 2024.  The Social Media Act included sweeping restrictions, including but not limited to: (1) requiring age verification for all Utahns in order to create a social media account; (2) requiring parental consent for Utah minors to create a social media account; (3) requiring social media companies to provide parents with access to minors' content on social media including all of their posts and messages; (4) imposing a curfew on minors' use of social media; (5) prohibiting direct messaging between minors and non-connected accounts; (6) prohibiting social media companies from showing minors' accounts in search results for non-connected accounts; and (7) prohibiting the display of any advertising or "targeted or suggested" content to minors' accounts.  *See* Utah Code § 13-63-101, *et seq*. The Social Media Act also prohibited social media companies from using a "practice, design, or feature" that it knew or should have known would cause a Utah minor "to have an addiction to the social media platform."  *Id.* § 13-63-201(2).

---

[43] Apple, Use Screen Time on your iPhone or iPad, http://tinyurl.com/5c2zffww (last visited May 29, 2024); Google, Manage your child's screen time, http://tinyurl.com/bdfhztwp (last visited May 29, 2024).

42.    Zoulek, Cooper, Christensen, and Snow filed this lawsuit challenging the Social Media Act as unconstitutional on January 12, 2024.  NetChoice, LLC, a trade organization, also filed a lawsuit similarly challenging the law on behalf of social network companies.  *See NetChoice, LLC v. Reyes*, Case 2:23-cv-00911 (D. Utah 2023).  Rather than defend the statute it enacted, the Utah Legislature repealed the Social Media Act and started working on alternative legislation to avoid "run[ning] into ... legal challenges in implementing this bill."[44]

### D.    Utah Enacts the Utah Minor Protection in Social Media Act to Replace the Social Media Act.

43.    On March 13, 2024, Utah Governor Spencer Cox signed into law the Utah Minor Protection in Social Media Act as a replacement to the Social Media Act. The law takes effect October 1, 2024, when it will become enforceable through administrative or civil actions by the Division of Consumer Protection.  *See* Utah Code § 13-71-301.

44.    ***Scope.*** The Act applies to far more services than are traditionally considered "social media," even though the Act uses the term "social media."  Specifically, the law applies to any "social media company" that "owns or operates a social media service."  Utah Code § 13-71-101(13).  A "social media service" is any "public website or application" of *any size* that: (1) "displays content that is primarily generated by" users and not the social media company; (2) "permits an individual to register as an account holder and create a profile that is made visible to the general public" or a set of users; (3) "connects account holders to allow users to interact socially … within the website or application"; (4) "makes available to each account holder a list or lists of other account holders with whom the account holder shares a connection within the system"; and (5) "allows account holders to post content viewable by other users." *Id.* § 13-71-101(14)(a). "Content" includes "any information, visual depictions, tools, features, links, software, or other materials that appear on or are available or enabled through a social media service," which seemingly includes private messages.  *Id.* § 13-71-101(4).  The Act's definition of "social media

---

[44] Ex. 1 at 2 (Transcript of Feb. 26, 2024 Utah Senate Economic Development and Workforce Services Committee HB 464 Hearing).

company" is even broader than the original definition in the 2023 Social Media Act, which limited the scope to companies with more than five million users.

45.     If allowed to take effect, the Act would restrict or burden access to a wide range of websites and apps that enable Utahns to communicate information, post content, and share ideas. Though it is unclear what qualifies as "primarily" displaying user-generated content, the Act would at minimum sweep in, for instance, a host of smaller websites that may lack resources to comply with the Act's requirements. Covered entities may include services designed for sharing educational and cultural content, like Allrecipes (for sharing recipes), Goodreads (book recommendations), and Letterboxd (film reviews). The law even extends to forums like Quora and Reddit, which primarily offer bulletin-board style information on a variety of educational topics and allow users to ask any question and receive responses. The law even appears to extend to text-messaging apps such as WhatsApp, Discord, and Signal—which members use to communicate and collaborate with groups of all sizes, from all over the world.

46.     Email, cloud storage, and document collaboration websites are specifically excluded from the definition of "social media service." *Id.* § 13-71-101(14)(b). The Utah Legislature cited no evidence distinguishing the effects of using email from, for example, the effects of text messaging over WhatsApp. *See id.* § 13-71-102(2). The only discernable distinction is that the exemption facially carves out certain services based on the kinds of content they publish, and the types of users they have.

47.     ***Age-verification requirement.*** Section 13-71-201 requires covered companies to "implement an age-assurance system" that is "reasonably calculated to enable a social media company to identify whether a current or prospective Utah account holder is a minor with an accuracy rate of at least 95%." *Id.* §§ 13-71-201(1), 13-71-101(2).

48.     Age verification technologies are inherently unreliable[45] and there are

---

[45] French Nat'l Comm'n on Info. & Liberties, *Online Age Verification: Balancing Privacy and the Protection of Minors* (Sept. 22, 2022), https://tinyurl.com/yzv7ynem.

"straightforward workarounds" for users determined to bypass the rules.[46] Without any guaranteed efficacy, age verification technologies typically require collecting sensitive personal information, such as a government-issued ID, credit card information, or biometric data. For example, to implement the comparable age-verification requirement proposed in the State's now-repealed predecessor statute, the State promulgated proposed regulations requiring companies to use one of several prescribed age-verification methods including "facial characterization or analysis," "matching a [user's] verified government-issued identification" to the user's face, and "checking a [user's] social security number's last four digits against a third-party database of personal information."[47]

49.    Age-verification methods that involve submitting official documents or social security numbers also increase the risk that those documents could be stolen or leaked.[48] Other proposed age-verification methods—such as artificial intelligence, facial analysis, or facial recognition—pose their own transparency, security, and privacy concerns.[49] The requirement may even conflict with other states' privacy laws regarding the collection of data.

50.    Despite the law's intended application only to Utah residents, the age-gating requirement will likely affect internet users everywhere. Geolocation information from a user's IP address simply shows a user's location at a given time, so relying on it would sweep in residents of other states who happen to be visiting Utah, and would miss Utah users who are traveling or who use a VPN service.[50] Thus, to comply with the Act's requirements and minimize the risk of liability, companies will likely need to collect personal information from *all* users.

---

[46] Jackie Snow, *Why Age Verification Is So Difficult for Websites*, WALL ST. J. (Feb. 27, 2022), http://tinyurl.com/ymbvvzar.

[47] Utah Bull., Vol. 23, No. 20 at 18 (Oct. 15, 2023) (R152-63-3 & R152-63-4), https://tinyurl.com/yujpc7kv.

[48] *Id.*

[49] *See* David McCabe, *Anonymity No More? Age Checks Come to the Web*, N.Y. TIMES (Oct. 27, 2021), https://nyti.ms/3S6U2ME.

[50] *Id.*

51.     By requiring age-verifying (and residence-verifying) information to access unrestricted social networking accounts, the Act forces users—including adults—either to give up their anonymity and privacy or to endure restrictions on the ability to communicate in this manner. Zoulek believes this provision will harm LGBTQ individuals such as themselves, for many of whom anonymity and not being "outed" is of the utmost importance.  UYES also has concerns about the effect of this provision on undocumented immigrants and at-risk youths who do not have access to a government ID, and thus may be less likely to receive UYES's information or reach out to them.  Likewise, Snow, Cooper, and Christensen know from experience that some families in strict communities, such as polygamous groups, withhold government IDs from minors and even adults as a form of control—thus preventing those individuals from accessing unrestricted accounts under the Act.

52.     For Zoulek, Snow, and Cooper, the risk of potential data breaches provides yet another reason they intend to abstain from age-verifying their accounts, even if the Act takes effect. The fact that these plaintiffs, all of whom are over the age of 18, would prefer to accept restricted and stripped-down versions of social networking services (or not use them at all) instead of providing their government ID and/or biometric data to technology companies, indicates the Act's sweeping reach even far beyond its claimed intended audience.

53.     ***Content restrictions.*** The Act imposes a series of restrictions limiting how and with whom minors may communicate on social networks. **Section 13-71-202(1)(a)-(b)** restricts the visibility of a Utah minor account holder's account to only connected accounts, and limits the ability of the minor to share "content" only to connected accounts.  Accordingly, under these provisions, no one would be able to see content posted by a Utah minor (or non-age-verified individual) except for those who are already connected to them, or who are connected to their connections.  This would dramatically restrict the ability of Utah minors (and those who cannot or refuse to age-verify their accounts) to communicate with the outside world.  This is especially true for social network services like TikTok and Tumblr, which rely almost exclusively on presenting to new and interesting content from non-connected accounts—as opposed to only engaging with

one's "followers" or "friends." For example, under the Act, a 17-year-old Utahn could never "go viral" on TikTok because no one except their followers would be able to view their content.

54. These vague and sweeping restrictions would thus erect unprecedented hurdles to young people connecting and engaging in protected speech. Zoulek has used social networks to share her creative writing, particularly through Tumblr and fan fiction websites. Even though they are now over 18, they do not intend to age-verify their account because of the requirement to provide invasive personal data, and thus, if the Act takes effect, no one will be able to read their works except those individuals with "connected" accounts. Likewise, Zoulek will not be able to read or view content created by other Utah minors to whom they or one of their connections is not connected. Zoulek has found that the ability to post their writing to a large audience anonymously helped build confidence in their work and gave them the opportunity to receive feedback and engagement from members of the public, including other writers. Like Zoulek, Snow does not intend to age-verify his social networking accounts out of concern for his data privacy and anonymity. Accordingly, if the Act takes effect, no one will be able to view his YouTube videos except for his subscribers. This would be devastating to Snow, who finds great fulfillment in his ability to share hope, positivity, and information with the public over YouTube.

55. Additionally, the provision of the Act that restricts the visibility of a Utah minor's account to only certain accounts appears to prohibit non-connected accounts from locating a Utah minor's account via search results for purposes of connecting with them. Zoulek and M.C. worry that this would greatly affect their ability to "friend" or "follow" other Utah teenagers whom they meet in real life and want to connect with over social networks.

56. **Section 13-71-202(1)(d)** requires social media companies to "disable search engine indexing of Utah minor account holder profiles." This restriction would similarly prevent minors from meeting new friends or even finding out whether that person has an account. For example, a teen wishing to connect with other teens who share their interest in hiking would no longer be able to find those peers in a search for hiking-related posts. The search-result restriction would also significantly limit the audience for users under eighteen. For example, the posts of a teen who

21

wishes to speak out on gun control or climate change would not come up in search results on that topic for anyone outside the teen's existing friend group. This provision would be very problematic for UYES, which heavily relies on Instagram posts, "stories," and "reels" to convey information and opportunities for engagement with Utah youths interested in environmental science.

57.    **Section 13-71-202(1)(e)** requires social media companies by default to "restrict a Utah minor account holder's direct messaging capability to only allow direct messaging to connected accounts." This provision hinders minors' ability to find support and make connections with people outside their existing circle, a key feature of social networks—particularly for vulnerable youth. For example, minors (or adults with non-age-verified accounts) in polygamous communities would be unable to direct message Christensen or Cooper to seek information or resources in potentially leaving abusive homes or obtaining education or employment—without publicly "friending" or "following" them on social networks.  Many of these individuals would be highly unlikely to "friend" or "follow" Christensen or Cooper, as doing so would indicate to other community members that they are considering leaving the polygamous community.

58.    This provision also prevents minors (or adults with non-age-verified accounts) from direct messaging UYES to express interest in education, training, or advocacy-related opportunities.  UYES, like a number of other organizations, has an internal policy of not "following" minor accounts, although it allows minors to follow the UYES account—primarily out of concern for protecting the minors' privacy.  And Utah minors may be hesitant to publicly friend or follow UYES on social networks, especially if their family members or communities have different beliefs on environmental science.  Accordingly, such minors would be unable to communicate with UYES over Instagram's direct message feature—the most common means by which high-school students interested in environmental advocacy interact with UYES.

59.    This provision also makes little sense for text-messaging applications such as WhatsApp, Discord, and Signal.  Zoulek noted that while many school groups and school teachers/administrators use these applications to coordinate projects, assignments, and events, a minor may not want to "friend" or "follow" everyone in the group (and thus potentially share

personal information) in order to simply receive the information necessary for the school project.

60.    Finally, **Section 13-71-202(5)** of the Act limits the way content may be recommended, promoted, or presented to minors by barring autoplay functions, scroll or pagination features "that load[] additional content as long as the user continues scrolling," and push notifications.  The restriction on push notifications—even if defined clearly (which it is not)—would at minimum prevent Utah minors from receiving time-sensitive updates that can be crucial to their safety or development.  For example, when UYES is organizing a protest or other environmental advocacy event, they use Instagram posts and stories (which send push notifications when enabled on the platform) to alert their high school student members of any emergency information such as location changes or supply needs.  UYES also uses such notifications to remind their high school student members of time-sensitive information, such as the deadline for applying for their annual Environmental Justice Training Program.  Cooper and M.C. likewise rely on social networks to receive school-related safety alerts.  For example, there were recently several gun-related incidents at M.C.'s high school, and she turned to Instagram to receive timely information on what had transpired.  Under the Act, this restriction would apply even if a parent preferred to override it, such as to ensure their children would see their own direct messages sent by push notification, or obtain important updates from school groups, sports teams, or other organizations that use social networks to communicate.

61.    The provisions that prohibit autoplay, scrolling, and pagination features would require certain social networks to either bar minors (and non-age-verified users) altogether or create an entirely different version of the application for these users.  The most popular social applications such as Instagram, TikTok, Facebook, X, and YouTube all largely rely on at least one if not all three of these features.  M.C. and Zoulek rely on the ability to scroll through Instagram and Tumblr, respectively, to gain exposure to new ideas and explore their creativity. Likewise, the leaders at UYES have found that many of their high-school trainees and volunteers learned about their organization after seeing one of UYES's posts, stories, or reels on Instagram. On Instagram, posts are viewable via continuous scrolling and pagination while stories and reels are viewable via

autoplay.  If Utah minors were prohibited from using these features, it would effectively prevent them from learning about UYES and other educational opportunities.  In fact, it would mean their digital world would be restricted to solely engaging with their limited circle of known friends and viewing their content in a yet-to-be-determined stilted fashion that systematically precludes the opportunity for additional exploration.

62.     In all of these respects, the Act all but bans the very features that make social networks a valuable tool for communication and civic engagement. In doing so, it suppresses a vast amount of speech and may cause companies to exclude Utah minors from their services altogether.

63.     ***Parental consent requirements.***  Except for the mandates contained in Section 13-71-202(5) that cannot be altered *at all*, the Act requires "verifiable parental consent" to change any of the Act's other content restrictions. Utah Code § 13-71-204(1). "Verifiable parental consent" is "authorization from a parent … that complies with the following":  "(a) the social media service shall provide advance notice to the parent describing information practices related to the minor account holder's information; and (b) the social media service shall receive confirmation that the parent received the notice[.]" *Id.* § 13-71-101(18). It is unclear how a covered company is supposed to identify a user's parents, or what constitutes sufficient notice. Nor is it clear what action if any the parent must take upon receipt of the notice to provide consent. Under the Division of Consumer Protection's prior proposed rule, demonstrating consent required both a parent giving permission, such as by providing a consent form or verbally confirming consent, and submitting "a written attestation from the parent or guardian that they are the minor's legal guardian."[51]

64.     This is a sweeping State-ordered preclearance regime. The Act bars teenagers old enough to marry, drive, attend college, enlist in the military, preregister to vote—and who might be just days shy of the right to vote, buy and sell property, and serve on a jury, *see* Utah Code § 13-

---

[51] Utah Bull., *supra* note 47, at 18 (R152-63-6(1)).

71-101(8)—from engaging in protected speech across a class of essential communication media unless they not only obtain but establish through vague standards and Byzantine methods their parent's prior consent. The Act thus preemptively bars these individuals from full access to what the Supreme Court has called "the most important places … for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Its purpose and effect are to limit minors' rights to express themselves and communicate with other individuals.

65.    The effects of such restrictions are significant.  Obtaining consent is not feasible for many young people—including, for example, teens in abusive homes or fundamentalist communities whose parents would not provide them access to a forum where they could speak about it; LGBTQ+ youth whose parents do not condone their search for a supportive community; homeless or undocumented youth; and even adolescents whose parents work multiple jobs.[52] And irrespective of whether any given teenager's parents ultimately do (or would) provide consent, any mandate that conditions access to speech on seeking such consent inherently violates minors' speech rights. *Brown*, 564 U.S. at 795 & n.3. For example, UYES works with some teens whose parents hold different views about environmental science—such as regarding climate change— and who may withhold consent to prevent their children from seeking related information. Christensen sees social networking and internet use as a necessary part of her children's development, as they are growing up in a digital world. She wants them to learn how to use these technologies in a healthy and productive manner, under her guidance, so they are not overwhelmed as adults when they suddenly find themselves with unrestricted access. But the Act imposes certain restrictions regardless of her consent (barring autoplay, scrolling, pagination, and push notifications) and trains her children that the exercise of their fundamental rights is contingent on the approval of others—a form of conditioning that Christensen has seen give rise to abusive power dynamics in the past.

---

[52] Kate Murphy, *Utah is the 1st state to limit kids' access to social media. Experts break down FAQs about new law*, (Mar. 30, 2023), http://tinyurl.com/5yv224ab; *see also* Trevor Project Report, *supra* note 35.

66.     Far from empowering parents to choose how to regulate their household's internet use, the Act's consent requirement is too vague even to comply with. And it restricts parents' ability to allow certain content types at all.

67.     ***Penalties for violations.*** The Act imposes "an administrative fine of up to $2,500 for each violation"; a "civil penalty of up to $2,500 for each violation"; and mandatory fees and costs for the latter. Utah Code § 13-71-301(3)(a)(i), (b)(v), (c). Companies can also be liable for disgorgement, actual damages, and declaratory and injunctive relief. *Id.* § 13-71-301(b). Violating an administrative or court order regarding a prior violation may result in a civil penalty of up to $5,000 per violation. *Id.* § 13-71-301(4)(a).

*   *   *   *   *

68.     The wellbeing of children is undisputedly of immense significance. But whether legally it is a "compelling [interest]—or even an important one—may turn on how the government chooses to frame that interest going forward." *NetChoice, LLC v. Yost*, -- F. Supp. 3d --, 2024 WL 104336, at *8 (S.D. Ohio 2024) (entering TRO to block enforcement of Ohio social media age-verification law). Even where the government's interest is framed as "helping parents to be the guardians of their children's well-being," the First Amendment does not permit "an unbridled license to governments to regulate what minors read and view." *Interactive Dig. Software Ass'n v. St. Louis Cty., Mo*., 329 F.3d 954, 959-60 (8th Cir. 2003). The Act substitutes the judgment of government censors for parental discretion. Far from protecting children, the evidence indicates that limiting young people's access to social networks will harm them and deprive them of fundamental rights.

## V.    CLAIMS FOR RELIEF

69.     Utah's first attempt to restrict access to social network services via the Social Media Act suffered from obvious constitutional flaws and was quickly repealed once challenged. Not only did the law condition access by all Utahns to a vital communications medium, it ignored the fact that "[m]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of

protected materials to them." *Brown*, 564 U.S. at 794 (citation omitted). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (citation omitted). But the Social Media Act was based on the erroneous premise that the state has "free-floating power to restrict the ideas to which children may be exposed"—a concept the Supreme Court has flatly rejected. *Id.* at 794. When it comes to minors' First Amendment rights, courts recognize that "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble," and that shielding minors right up to the age of eighteen from exposure to any potentially upsetting or "harmful" speech "would leave them unequipped to cope with the world as we know it." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 576-77 (7th Cir. 2001) (Posner, J.). Unfortunately, Utah replaced its original law with the Utah Minor Protection in Social Media Act, which suffers the same flaws.

**COUNT ONE**

**VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS (FREEDOM OF SPEECH)**

70.     Plaintiffs incorporate all prior paragraphs of this First Amended Complaint.

71.     The Act violates Plaintiffs' rights guaranteed by the First and Fourteenth Amendments to the U.S. Constitution, presenting "a compendium of traditional First Amendment infirmities." *Washington Post v. McManus*, 944 F.3d 506, 513, 515 (4th Cir. 2019). It imposes state regulation over a global medium and forces covered companies to redesign their services, limiting the information and resources users may access; imposes preconditions on delivering and accessing protected speech, thus imposing a prior restraint; directly contravenes minors' First Amendment rights to access constitutionally protected content, regardless of whether the speech is potentially harmful; restricts adults' access to protected speech, forcing them to sacrifice anonymity to exercise their First Amendment rights; imposes vague, overbroad, content- and speaker-based restrictions on speech, and imposes liability for the publication of third-party

speech. The Act's provisions, both as a whole and in their individual manifestations, impose significant restrictions that cannot survive any level of First Amendment scrutiny.

72.     ***Prior restraint***. The Act imposes statutory preconditions on access to social networks, thus limiting all Utahn's ability to access important sources of information and social interaction. *Packingham*, 582 U.S. at 107. The Act imposes a series of prior restraints that "forbid[] certain communications" before they "occur," *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis omitted) (cleaned up), by restricting how services are designed and by imposing preconditions on accessing them. It matters not that the Act describes its requirement as "age assurance" compared to "age verification," as the bottom line is the same: In response to the Act's requirement of an "accuracy rate of at least 95%," Utah Code § 13-71-101(2), many if not most covered websites will request users' proof of age. The Act *de facto* obligates companies to age-verify all users, presumptively bar persons under eighteen from using certain features, restrict when and with whom minors may communicate, and categorically prohibit minors from receiving information to which they are constitutionally entitled. Any law that imposes a prior restraint on expression, even if designed to promote "juvenile morality," carries "a heavy presumption against its constitutional validity," and the Act's "capacity for suppression" of protected speech "is far in excess of the typical licensing scheme held constitutionally invalid by this [c]ourt." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70-71 (1963); *see also NetChoice, LLC v. Bonta*, -- F. Supp. 3d --, 2023 WL 6135551, at *8 (N.D. Cal. 2023) (recognizing that "age assurance methods create time delays and other barriers to entry that studies show cause users to navigate away from pages"), *appeal filed*, No. 23-2969 (9th Cir. Oct. 23, 2023).

73.     The Act creates a prior restraint on Plaintiffs' speech. As a minor, M.C. will lose the ability to share any content—including creative videos showcasing her musical and dance talent—outside of her immediate community of followers, stifling her creativity and potential to seek feedback and inspiration. Likewise, because Zoulek, Cooper, and Snow refuse to share their government ID or biometric data with technology companies, they too will be unable to share any content outside the close circle of their followers. Additionally, all of the Plaintiffs will lose the

ability to communicate with minor or non-age-verified Utahns over direct message if they are not already connected—and may also lose the ability to search for such Utahns in order to connect with them. And UYES's ability to share its information and educational resources with high-school students will be severely hampered by the Act's prohibition of features like auto-play, scrolling, and pagination.

74.  **Overbreadth.** The Act is also unconstitutionally overbroad. The Constitution "gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 244 (2002). A law is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted). Without even pretending to regulate narrowly defined categories of unprotected speech, the Act limits access by all minors and non-age-verified persons to a powerful medium of communication without regard to their informational needs or level of maturity, merely because (the State believes) access to *some* information by *some* minors may be detrimental. The Act restricts speech in numerous egregious ways—for example, a minor would not be able to comment on non-"connected" public officials' posts. Also, restricting adults' access to a communications medium as a means of protecting minors is inherently overbroad.

75.  The Act is overbroad because it imposes across-the-board restrictions on access to social networks for both adults and minors. Minors and non-age-verified persons will be barred from sharing *any* content—comments, posts, videos, audio, "likes" or other reactions—beyond a narrow category of "connected" accounts without first obtaining "verifiable parental consent." Utah Code § 13-71-202(1)(e), 204(1). All Plaintiffs will be unable to direct message Utah minors they are not connected to. And Cooper and Christensen—both mothers of Utah minors—are aware of and use parental controls, but the Act coopts their choices by dictating which features will be disabled for their children regardless of their preferences.

76.  Many of the Act's specific restrictions are also individually overbroad. For example, the prohibitions against autoplay, scrolling features that display additional content, and

push notifications, *see id.* § 13-71-202(5), deprive individuals of their ability to choose how to engage in and display expression. Websites may use autoplay when expression lends itself to being viewed sequentially, such as episodes of a travel log or dance choreography. Seamless pagination is an effective—often the most effective—way of displaying and viewing the enormous amounts of content on many "social media websites" under the Act.

77.    And notifications inform users about things they may wish to know or opt into, such as announcements or suspicious login attempts. In these ways, the Act restricts *without exception*—including parental consent—the content teenagers may share, access, and receive through social networks, and with whom they may communicate. The Act's blanket restrictions against communication, messaging, access, and discoverability beyond connected accounts, *id.* § 13-71-202(1)(b), (d), (e), likewise presumptively bans swaths of speech without regard to whether the speech at issue is protected or subject to legitimate regulation, thus regulating substantially more speech than the State may legitimately regulate.

78.    Prohibiting autoplay, infinite scroll, and push notifications would effectively require the most popular social platforms to either ban minor users or create an entirely new version of the application for such users, stripped down to prevent any true ability to learn from or connect with accounts outside their limited communities.

79.    ***Anonymous speech.***  By imposing age verification as a condition of access to social networks, the Act violates the First Amendment rights of all Utahns, minors and adults alike.  To reiterate:  In response to the Act's requirement of an "accuracy rate of at least 95%," Utah Code § 13-71-101(2), many if not most covered websites will request users' proof of age. Many Utahns who do not wish to share their personal information to use social networks will have to choose between open access to information and relinquishing privacy. The Supreme Court and other courts have repeatedly struck down similar identification requirements as unconstitutional. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 667, 673 (2004); *ACLU v. Mukasey*, 534 F.3d 181, 196-98 (3d Cir. 2008).  Zoulek, Cooper, and Snow feel so strongly about protecting their identities and data privacy that they would prefer to accept the Act's severely restricted form of social networks

for minors rather than provide their government ID or biometric data to major corporations.  And Zoulek in particular is deeply concerned regarding the effect the Act will have on the LGBTQ community and individuals seeking mental health resources who rely on anonymity to either fully express themselves or get the help they need without fear of community reprisal or judgment.

80.     ***Strict scrutiny.***  Content-based regulations of speech are presumed unconstitutional and are subject to strict scrutiny. To satisfy this level of First Amendment review, the government must demonstrate that the law is narrowly tailored to address a compelling interest and uses the least restrictive means of doing so.  *Playboy Ent. Grp*., 529 U.S. at 813.

81.     The Act must satisfy strict scrutiny because it imposes a series of content-, viewpoint-, and speaker-based restrictions on speech. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed[,]" if it targets the "message" of "particular subject matter," if it regulates speech "by its function or purpose," or if it "discriminat[es] among viewpoints." *Reed v. Town of Gilbert,* 576 U.S. 155, 163-64, 168-69 (2015). Even a facially neutral law is content-based if it "cannot be justified without reference to the content of the regulated speech." *Id.* at 164 (citation omitted). A law designed to protect minors from potentially harmful content "is the essence of content-based regulation." *Playboy Ent. Grp., Inc*., 529 U.S. at 812.

82.     The Act is content-based because it applies only to specific types of content and discriminates among speakers. The law restricts certain social networks while excluding others based on their content. For instance, the Act excludes "email"; "cloud storage"; or "document viewing, sharing, or collaboration services." Utah Code § 13-71-101(14)(b). Thus, the Act restricts minors from freely expressing themselves on WhatsApp or Instagram, for example, but allows them to do so via email or in the undefined category of "document viewing, sharing, or collaboration services."  Even among platforms that might fall under the State's definition of a "social media company," the Act's restrictions apply only to information "primarily generated by account holders" where the company allows users "to interact socially with each other." Utah Code § 13-71-101(14)(a)(i), (iii). These content and subject-matter based exemptions require strict

scrutiny. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346-47 (2020). The law is also subject to strict scrutiny because it singles out and selectively burdens social network users (Utah Code § 13-71-101(1), (16)) and minors (*id.* §§ 13-71-101(8), (17), 201, 202, 203, 204), and persons not linked to an account through "friending" (*id.* § 13-71-101(3), (5)). These restrictions seek to prevent—and cannot be justified without reference to—supposed content-based harms from "the direct impact of [this] speech on its audience." *Boos v. Barry*, 485 U.S. 312, 321 (1988); *Playboy Ent. Grp.*, 529 U.S. at 811. The Act is also viewpoint-based because it seeks to suppress certain speakers and points of view—specifically, speech conveyed over social networks by and to minors.

83.     The Act fails strict scrutiny because Utah has failed to establish a compelling interest to justify these broad restrictions on speech. It is the state's burden to demonstrate that the harms it seeks to address are not merely plausible, but compelling. *Id.* at 816-17. It has not done so. While the Act was adopted based on generalized claims about the harms of "social media," *see* Utah Code § 13-71-102, "[t]he First Amendment requires a more careful assessment and characterization of an evil in order to justify a regulation as sweeping as this." *Playboy Ent. Grp.*, 529 U.S. at 819.

84.     The speech restricted by the Act does not fall into any of the "relatively narrow and well-defined circumstances [where] government [may] bar public dissemination of protected materials to [minors]." *Brown*, 564 U.S. at 794 (citation omitted). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (citation omitted). The State must "specifically identify" how the law directly addresses an "actual problem in need of solving" and that "the curtailment of free speech must be actually necessary to the solution." *Id.* at 799 (citation omitted). But the State has not shown how any of the speech restrictions imposed by the Act relate to any of the asserted problems, nor has it offered any substantiation for the efficacy of the restrictions.

85.     The Act also fails strict scrutiny because it is not the least restrictive means of

addressing the asserted interest. The parental consent option itself does not render the law permissible, as the Supreme Court has flatly rejected the proposition "that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3. Moreover, in adopting the Act, the Legislature ignored the wealth of tools already available to help parents protect their children online; less restrictive policies that enable or encourage users (or their parents) to control their own access to information, whether through user-installed devices and filters or requests to third-party companies; and laws requiring media safety education. Although the legislature purported to find "existing measures employed by social media companies to protect minors have proven insufficient," Utah Code § 13-71-102 (4), (7), this statement lacked any details or analysis about the many features made available by companies to regulate media use, and it was entirely silent on the myriad parental tools made available at the network level, by third-party applications, and by device manufacturers. Where such voluntary solutions exist, "[f]iling the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

86. ***Intermediate scrutiny.*** The Act would be unconstitutional even if subjected to intermediate scrutiny. Under intermediate scrutiny, a law must serve a substantial government interest "unrelated to the suppression of free expression" by alleviating in "a direct and material way" harms that are "not merely conjectural" and (2) be narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662, 664 (1994) (citation omitted); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487, 491 (1995). Utah has done nothing to demonstrate either the existence or magnitude of harm purportedly caused by the services it has chosen to regulate through the Act, or how its chosen solution will help. The State has made no effort to explain or substantiate how the Act's speech restrictions relate to the purported harms, or that the restrictions will have any measurable impact in reducing the harms. The Act's broad speech restrictions are the opposite of narrow tailoring— restricting enormous swathes of speech on social networks on the theory that some speech for some people is potentially harmful.

87.    *Underinclusiveness*. The Act is underinclusive as well as overinclusive. It leaves unregulated myriad websites that offer such features as autoplay, infinite scroll and notifications, Utah Code § 13-71-101(13)-(14), and imposes no restrictions at all on minor's access to websites that do not meet the definition of "social media companies." This excludes news and entertainment websites commonly used by teenagers, such as Buzzfeed or Netflix.[53] These exclusions render the Act "wildly underinclusive when judged against its asserted justification, which … is alone enough to defeat it." *Brown*, 564 U.S. at 802. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id*. And this constitutional rule binds the State even when it is acting for the salutary purpose of protecting children. *Id*. at 794-96.

## COUNT TWO

## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT AND THE FIRST AMENDMENT (VOID FOR VAGUENESS)

88.    Plaintiffs incorporate all prior paragraphs of this First Amended Complaint.

89.    The Act fails to provide ordinary persons with fair notice of the proscribed conduct. The Act is so dependent on inherently subjective, undefined standards that it practically mandates arbitrary or discriminatory enforcement against disfavored content, viewpoints, and speakers. "It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Circuit*, 390 U.S. at 686, 689 (citation omitted) (striking down city ordinance making it a misdemeanor to show films "unsuitable" for minors as impermissibly vague). Vagueness in a law that regulates expression "raise[s] special First Amendment concerns because of its obvious chilling effect on free speech," *Brown*, 564 U.S. at 807 (quoting *Reno*, 521 U.S. at 871-72), requiring a "more stringent" test, *Holder v.*

---

[53] *See* Buzzfeed, Videos, https://perma.cc/6JHM-H2M4.

*Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (citation omitted).

90.     The Act is void under that test because it fails to define key terms and phrases underpinning its core requirements, giving regulators unbridled discretion to impose massive penalties on a wide range of intermediaries that fail to censor Plaintiffs' speech.  The Act's scope and application, for example, turns on the definition of  "social media service," which requires one to guess how essentially any kind of online service carrying any kind of "content" or "information" (i.e., every such service) is "primarily" used, as well as what it means to be "primarily" used in a particular way. Utah Code § 13-71-101(4), (14). In this instance, the Act regulates only where the primary use is to allow account holders "to interact socially with each other," *id.* § 13-71-101(14)(iii), a term left undefined. The Act's age verification requirement—another essential requirement intertwined with the law's other mandates and prohibitions—does not define what counts as "measures reasonably calculated" to achieve an age assurance rate "of at least 95%." *Id.* § 13-71-101(2). Nor does Section 13-71-101(18) explain what kind of "advance notice" and "confirmation" suffices to establish "verifiable parental consent." Can a minor self-report notice and confirmation? Must a parent submit some kind of identifying information? Is a service required to verify that information? The meaning of a "directly connected" account is equally opaque, particularly as applied to social applications that permit users to "follow" another user without sending a request for permission.  *Id.* § 13-71-101(5). Likewise, the Act fails to explain or define the ways in which covered companies are expected to "restrict the visibility of a Utah minor account holder's account." *Id.* § 13-71-202(1)(a). Because no one can know with reasonable certainty what these terms mean, the "predictable tendency" will be broad censorship of Plaintiffs' speech to "steer 'wide of the unlawful zone.'" *Counterman v. Colorado*, 600 U.S. 66, 77-78 (2023) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)); *see also Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). The law fails to provide constitutionally sufficient notice, and invites arbitrary and discriminatory enforcement against disfavored content, viewpoints, and speakers.

## COUNT THREE

## VIOLATION OF THE COMMERCE CLAUSE

91.     Plaintiffs incorporate all prior paragraphs of the Complaint.

92.     Article I, Section 8 of the U.S. Constitution vests Congress with the power "[t]o regulate Commerce … among the several States." U.S. Const., art. I, § 8, cl. 3. The Commerce Clause bars state laws that unduly restrict interstate commerce.

93.     Under the Commerce Clause, even laws that regulate evenhandedly and do not purport to discriminate against other states are unconstitutional if they impose burdens on interstate commerce that are clearly excessive in relation to the putative local benefits. *See Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970). The Commerce Clause's prohibition on undue restrictions of interstate commerce applies to restrictions on speech transmitted online just as it does to physical goods. *See ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999). It likewise prohibits states from "directly" regulating activity, including speech, which occurs "wholly outside" the regulating state's jurisdiction. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (citing *Edgar v. MITE Corp*., 457 U.S. 624, 641-43 (1982)).

94.     The Act violates the Commerce Clause because the law imposes an unreasonable and undue burden on channels of interstate commerce that would impede the flow of information and online services across state lines in clear excess of any local benefit conferred on the State of Utah. By impeding minors in Utah from accessing an instrument of interstate commerce and communication (*i.e.*, social networks), and by limiting the types of content they may engage with through that instrument, the Act restricts the distribution of information, including commercial information across state lines, and including by Plaintiffs.

95.     The Act further violates the Commerce Clause because it directly regulates speech and internet communications "wholly outside" Utah's borders. *Ross*, 598 U.S. at 376 n.1. Because the internet is accessible globally, a state cannot block internet content from its own citizens without affecting citizens of other states. *See Johnson*, 194 F.3d at 1162. The Act also restricts the speech of any person who is a Utah resident, as a legal category, whether or not they are physically

located in Utah.

96.    The State has not identified any local interest (as opposed to an abstract interest in the wellbeing of minors generally), and certainly no local interest actually advanced by the Act, sufficient to justify its obstruction of interstate commerce.

97.    Unless declared invalid and enjoined, the Act will unconstitutionally burden interstate commerce in violation of the Commerce Clause.

**COUNT FOUR**

**SECTION 230 PREEMPTION, 47 U.S.C. § 230**

98.    Plaintiffs incorporate all prior paragraphs of the Complaint.

99.    Congress adopted Section 230 of the Communications Decency Act to preserve and reinforce First Amendment protections for online services in light of the unique challenges of the medium. Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). An "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server[.]" *Id.* § 230(f)(2). The "provider" of such a service includes those who own or operate websites and therefore includes the social network services that are subject to the Act.

100.    With limited exceptions, Section 230(c)(1) bars imposing liability on a website for claims stemming from the publication of information provided by a third party. Publication includes not just determining whether to publish, continue to publish, or withdraw third-party content, but also reviewing, editing, and prioritizing such content. Section 230 expressly preempts inconsistent state laws. 47 U.S.C. § 230(e)(3).

101.    Section 230(c)(1) preempts Utah Code §§ 13-71-202(1), 13-71-202(5), and 13-71-101(18) because they treat social networks as the publishers or speakers of information provided by other information content providers. Section 13-71-202(1) would render social networks liable for publishing information from non-connected accounts, including direct messages, or for publishing minor's profiles in search results; Section 13-71-202(5) for publishing autoplay videos,

37

continuous pagination, or push notifications; and Section 13-71-101(18) for publishing content to minors without "advance notice," an undefined term.

102.    Plaintiffs suffer injuries from these preempted provisions because they compel social networks to block (collaterally censor) Plaintiffs' speech and access to speech, the precise evil Congress sought to avert by enacting Section 230. Sections 13-71-202(1), 13-71-202(5), and 13-71-101(18) are thus inconsistent with and preempted by Section 230. *See* 47 U.S.C. § 230(e)(3).

## VI.    PRAYER FOR RELIEF

103.    WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Declare that Utah Code §§ 13-71-101, 13-71-201, 13-71-202, 13-71-204, 13-71-301, and 13-71-302 are unconstitutional under the First and Fourteenth Amendments and Commerce Clause of the United States Constitution, and otherwise preempted by federal law, including Section 230 of the Communications Decency Act;

b.    Declare that Utah Code §§ 13-71-101 to -302 are void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution;

c.    Declare that Utah Code §§ 13-71-101(18), 13-71-202(1), and 13-71-202(5) are preempted by the Section 230.

d.    Preliminarily and permanently enjoin Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act;

e.    Enter judgment in favor of Plaintiffs;

f.    Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action, under 42 U.S.C. § 1988; and

       g.  Award Plaintiffs all other relief as the Court deems just and proper.

Dated: May 31, 2024

<u>/s/ *Ambika Kumar*</u>
Ambika Kumar
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington  98104

Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017

David M. Gossett
Chelsea T. Kelly
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C.  20005

<u>/s/ *Robert Corn-Revere*</u>
Robert Corn-Revere
David Rubin
FOUNDATION FOR INDIVIDUAL RIGHTS
AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003

Jerome H. Mooney (Utah Bar #2303)
WESTON, GARROU & MOONEY
50 West Broadway, Suite 300
Salt Lake City, Utah 84101

*Attorneys for Plaintiffs*