AMBIKA KUMAR*
  ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA  98104
Telephone: (206) 622-3150

ADAM S. SIEFF*
  adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, CA  90017
Telephone: (213) 633-6800

DAVID M. GOSSETT*
  davidgossett@dwt.com
CHELSEA T. KELLY*
  chelseakelly@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC  20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE*
  bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473  Ext. 209

DAVID RUBIN*
  David.Rubin@thefire.org
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
(215) 717-3473  Ext. 283

JEROME H. MOONEY (Utah Bar #2303)
  jerrym@mooneylaw.com
WESTON, GARROU & MOONEY
50 West Broadway, Suite 300
Salt Lake City, UT 84101
Telephone: (310) 442-0072

*Attorneys for Plaintiffs*
*Admitted Pro hac vice*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| HANNAH PAISLEY ZOULEK, a Utah resident; JESSICA CHRISTENSEN, a Utah resident; LU ANN COOPER, a Utah resident; M.C., a Utah resident, by and through her parent, LU ANN COOPER; VAL SNOW, a Utah resident; and UTAH YOUTH ENVIRONMENTAL SOLUTIONS, a Utah association,<br><br>              Plaintiffs,<br><br>v.<br><br>KATIE HASS, in her official capacity as Director of the Utah Division of Consumer Protection; SEAN REYES, in his official capacity as Utah Attorney General,<br><br>              Defendants. | **MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT**<br><br>Case No. 2:24-cv-00031-DAK-DAO<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Daphne A. Oberg |

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Hannah Paisley Zoulek, Jessica Christensen, Lu Ann Cooper, M.C. (a minor), Val Snow, and Utah Youth Environmental Solutions, by and through their counsel, submit this Motion for Preliminary Injunction and Memorandum of Law in Support, along with their declarations, and the declaration of Ambika Kumar and accompanying exhibits.  Plaintiffs seek to preliminarily enjoin enforcement of the Utah Minor Protection in Social Media Act, SB 194, on the grounds that it is invalid under the United States Constitution and preempted.  Plaintiffs are likely to succeed on the merits of their claims, and the other preliminary injunction factors likewise counsel in favor of granting Plaintiffs' motion.

Plaintiffs also respectfully request a hearing on this motion.

Dated: May 31, 2024

/s/ *Ambika Kumar*
Ambika Kumar
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA  98104

Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017

David M. Gossett
Chelsea T. Kelly
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C.  20005

/s/ *Robert Corn-Revere*
Robert Corn-Revere
David Rubin
FOUNDATION FOR INDIVIDUAL RIGHTS
AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003

/s/ *Jerome H. Mooney*
Jerome H. Mooney (Utah Bar #2303)
WESTON, GARROU & MOONEY
50 West Broadway, Suite 300
Salt Lake City, Utah 84101

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT AND GROUNDS FOR RELIEF ........................1

II.     BACKGROUND ....................................................................................................2

       A.     Social Networks Provide Teens and Adults a Forum for Expression and Association and a Source of Valuable Information. ............................2

       B.     Social Networks and Other Companies Provide Tools to Enable Individual Choice in Regulating Online Speech Consumption. .................4

       C.     The State Enacts Legislation to Censor Social Networks, Repeals the Legislation Following Constitutional Challenges, Then Enacts a Measure Designed to Accomplish the Same Result. ...............................5

III.    LEGAL STANDARD................................................................................................8

IV.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS ...........................8

       A.     The Act Violates the First Amendment. ......................................................8

              1.     The Act's age-verification mandate and content-sharing restrictions impose invalid prior restraints......................................9

              2.     The Act is unconstitutionally overbroad.......................................11

              3.     The Act's content-based restrictions fail any level of First Amendment scrutiny.....................................................................15

                      a.     The Act is content-based and subject to strict scrutiny............................................................................. 15

                      b.     The Act fails strict scrutiny............................................... 17

                      c.     The Act fails even intermediate scrutiny. ......................... 20

       B.     The Act Violates the Commerce Clause.....................................................22

V.      THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION.........................................................................................................24

VI.   THE LAW MUST BE ENJOINED IN ITS ENTIRETY .....................................25

VII.  CONCLUSION.....................................................................................................25

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*ACLU v. Johnson,*
    4 F. Supp. 2d 1029 (D.N.M. 1998), *aff'd*, 194 F.3d 1149 (10th Cir. 1999) ....11, 22, 24

*ACLU v. Mukasey,*
    534 F.3d 181 (3d Cir. 2008)..........................................................................10, 13, 15

*Alario v. Knudsen,*
    2023 WL 8270811 (D. Mont. Nov. 30, 2023) ............................................................23

*Alexander v. United States,*
    509 U.S. 544 (1993).....................................................................................................9

*Am. Booksellers Found. v. Dean,*
    342 F.3d 96 (2d Cir. 2003)........................................................................................11

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021)...................................................................................................21

*Animal Legal Def. Fund v. Kelly,*
    9 F.4th 1219 (10th Cir. 2021) ...................................................................................15

*Aptive Env't, LLC v. Town of Castle Rock, Colorado,*
    959 F.3d 961 (10th Cir. 2020) ...................................................................................20

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004).......................................................................................... *passim*

*Ashcroft v. Free Speech Coal.,*
    535 U.S. 234 (2002)...................................................................................................11

*Awad v. Ziriax,*
    670 F.3d 1111 (10th Cir. 2012) .................................................................................24

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963).......................................................................................................9

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
    140 S. Ct. 2335 (2020)...............................................................................................16

*Bigelow v. Virginia,*
    421 U.S. 809 (1975)...................................................................................................23

*Boos v. Barry*,
  485 U.S. 312 (1988) ...........................................................................................16

*Brewer v. City of Albuquerque*,
  18 F.4th 1205 (10th Cir. 2021) .......................................................................20, 21

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) .................................................................................. *passim*

*Bushco v. Shurtleff*,
  729 F.3d 1294 (10th Cir. 2013) ...........................................................................12

*Butler v. Michigan*,
  352 U.S. 380 (1957) ........................................................................................14, 15

*City of Ladue v. Gilleo*,
  512 U.S. 43 (1994) ...............................................................................................9

*Counterman v. Colorado*,
  600 U.S. 66 (2023) .............................................................................................12

*CTS Corp. v. Dynamics Corp. of Am.*,
  481 U.S. 69 (1987) .............................................................................................23

*Dixon v. Kirkpatrick*,
  553 F.3d 1294 (10th Cir. 2009) .........................................................................11

*Doe v. City of Albuquerque*,
  667 F.3d 1111 (10th Cir. 2012) ...........................................................................8

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) ...........................................................................................22

*Elrod v. Burns*,
  427 U.S. 347 (1976) ...........................................................................................24

*Ent. Software Ass'n v. Swanson*,
  519 F.3d 768 (8th Cir. 2008) .............................................................................18

*Fish v. Kobach*,
  840 F.3d 710 (10th Cir. 2016) ...........................................................................24

*Free Speech Coal., Inc. v. Anderson*,
  685 F. Supp. 3d 1299 (D. Utah 2023),
  *appeal filed*, No. 23-4104 (10th Cir. Aug. 11, 2023)...................................................6

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*,
  916 F.3d 792 (10th Cir. 2019) ...........................................................................24

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
  527 U.S. 173 (1999)......................................................................................21

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) ....................................................................8

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988)........................................................................................14

*Interstate Circuit, Inc. v. City of Dallas*,
  390 U.S. 676 (1968)........................................................................................9

*Leavitt v. Jane L.*,
  518 U.S. 137 (1996)......................................................................................25

*Mahanoy Area Sch. Dist. v. BL*,
  594 U.S. 180 (2021)......................................................................................11

*Matal v. Tam*,
  582 U.S. 218 (2017)......................................................................................20

*McCraw v. City of Oklahoma City*,
  973 F.3d 1057 (10th Cir. 2020) ..............................................................20, 21

*Murphy v. Matheson*,
  742 F.2d 564 (10th Cir. 1984) .....................................................................25

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023)................................................................................22, 23

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976)...................................................................................9, 11

*NetChoice LLC v. Reyes*,
  No. 2:23-cv-00911-RJS-CMR ..........................................................10, 18, 22, 23

*NetChoice, LLC v. Bonta*,
  -- F. Supp. 3d --, 2023 WL 6135551 (N.D. Cal. 2023),
  *appeal filed*, No. 23-2969 (9th Cir. Oct. 23, 2023)....................................11

*NetChoice, LLC v. Griffin*,
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)....................................10, 18

*NetChoice, LLC v. Yost*,
  2024 WL 555904 (S.D. Ohio 2024)...........................................16, 17, 19

*Packingham v. North Carolina*,
  582 U.S. 98 (2017).........................................................................................8

*Pike v. Bruce Church, Inc.,*
397 U.S. 137 (1970)..................................................................................................23

*Playboy Ent. Grp., Inc. v. United States,*
529 U.S. 803 (2000)...............................................................................15, 17, 18, 19

*PSINet, Inc. v. Chapman,*
362 F.3d 227 (4th Cir. 2004) ..................................................................................10

*Reed v. Town of Gilbert, Arizona,*
576 U.S. 155 (2015)............................................................................................15, 16

*Reno v. ACLU,*
521 U.S. 844 (1997)..................................................................................................14

*Sam Francis Found. v. Christies, Inc.,*
784 F.3d 1320 (9th Cir. 2015) (en banc) ...............................................................22

*Snyder v. Phelps,*
562 U.S. 443 (2011)............................................................................................13, 14

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011)....................................................................................................8

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994)............................................................................................16, 20

*United States v. Stevens,*
559 U.S. 460 (2010)............................................................................................12, 14

*Verlo v. Martinez,*
820 F.3d 1113 (10th Cir. 2016) .................................................................................8

*Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021)......................................................................................................6

*Wyo. Gun Owners v. Gray,*
83 F.4th 1224 (10th Cir. 2023) ...............................................................................12

**State Cases**

*Salt Lake City v. Int'l Assn. of Firefighters,*
563 P.2d 786 (Utah 1977)........................................................................................25

**Federal Statutes**

47 U.S.C. § 230............................................................................................................1

**State Statutes**

Utah Code
  § 13-63-101 *et seq.*..................................................................................... *passim*

  § 78B-3-1103 ........................................................................................6

**Constitutional Provisions**

U.S. Constitution, First Amendment......................................................... *passim*

## I.      PRELIMINARY STATEMENT AND GROUNDS FOR RELIEF

The Utah Minor Protection in Social Media Act, SB 194, is the State's latest effort to shield minors from the perceived ills of online speech.  But like its predecessor—which was passed and then challenged and repealed within weeks—the Act is unconstitutional. Unless enjoined, all Utahns, including Plaintiffs, will have to choose between ceding their anonymity and privacy and accepting limits on speech the State deems appropriate for children, some of which, parents themselves cannot override.  Plaintiffs will be unable to express themselves in indisputably beneficial ways, such as to reach at-risk youth, advocate for political causes, and educate themselves; and for those who are parents, will be unable to make decisions about their children suited to their own sensibilities.  The Court should preliminarily enjoin enforcement of the Act.

First, the Act violates the First Amendment.  "No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (citations omitted).  The law is invalid for this reason alone.  And it imposes a prior restraint on access to vast spheres of the internet, so it must satisfy even more demanding scrutiny than strict scrutiny; regulates far beyond the carefully defined categories of speech the Supreme Court has held may be regulated, meaning it is *per se* invalid under the overbreadth doctrine; and imposes a content-based restriction that cannot satisfy intermediate, much less strict, scrutiny.  The State cannot show the Act advances its interests at all, much less in a material, tailored manner, as the Constitution requires.[1]

---

[1] To the extent the Act is invalid as a content-based regulation of speech, it also would be preempted by Section 230 of the Communications Act, 47 U.S.C. § 230, although that is not the focus of Plaintiffs' current motion.  First Am. Compl. (FAC) ¶¶ 98-102.

1

Second, the Act violates the Commerce Clause.  States cannot impose burdens on interstate commerce that exceed a law's putative local benefits and cannot regulate commerce that occurs wholly out of state.  The Act does both.  By presumptively barring other states' residents from communicating with certain Utahns, including Plaintiffs, the Act disproportionately burdens commerce.  By applying to all Utah residents, even those in other states, the Act regulates outside the State's borders.

Plaintiffs have demonstrated the remaining elements required for preliminary injunctive relief: They will suffer immediate and irreparable harm absent an injunction, and the public interest and balance of equities favor the injunction of an unconstitutional law.  An order preliminarily enjoining enforcement of SB 194 is warranted.

## II.    BACKGROUND

### A.    Social Networks Provide Teens and Adults a Forum for Expression and Association and a Source of Valuable Information.

About ninety percent of Americans ages 13 to 17 use social media.  Declaration of Ambika Kumar ("Kumar Decl."), Ex. 1 at 2.  Teens use social networks to engage in politics, education, community, and other expression.  Plaintiff and high school student M.C., for example, uses Instagram to research arguments for her high school debate class and find inspiration from other young performers.  Declaration of M.C. ("M.C. Decl.") ¶ 5. Plaintiff Hannah Paisley Zoulek, a recent high school graduate, used the app Discord to coordinate plans and assignments with their school's robotics team.  Declaration of Hannah Paisley Zoulek ("Zoulek Decl.") ¶ 7.  Plaintiff Lu Ann Cooper and her nonprofit, Hope After Polygamy, use Facebook and Instagram to reach youth leaving abusive communities. Declaration of Lu Ann Cooper ("Cooper Decl.") ¶ 5.   And Plaintiff Utah Youth Environmental Solutions (UYES), a youth-led grassroots organization, uses Instagram to

educate young people about climate change and environmental advocacy.  Declaration of Utah Youth Environmental Solutions ("UYES Decl.") ¶ 4.

Social networks enable youth to find opportunities for community, belonging, and personal expression—and increasingly since the pandemic, to connect with peers, access information, express themselves, share experiences, and seek support.  *See* Kumar Decl., Ex. 2.  Plaintiff Val Snow uses YouTube to share his perspectives on mental health, positivity, and the LGBTQ experience.  Declaration of Val Snow ("Snow Decl.") ¶ 7.  UYES's minor members use social networks to encourage participation in the political process and advocate solutions to local environmental issues.  UYES Decl. ¶ 3.  And Zoulek uses Tumblr to find other disabled and neurodivergent individuals.  Zoulek Decl. ¶ 4.  Zoulek testified before the Legislature that preventing teens from using social media to talk about mental health would harm mental health.  *Id*. ¶ 10.

Many vulnerable teens use social networks for support.  For example, kids in certain polygamous communities use them to flee compelled polygamous marriages, forced labor, or both.  Christensen Decl. ¶¶ 6-9.  Plaintiff Jessica Christensen, a social worker and former member of such a community, has helped at least thirty people (including about ten minors) escape abusive polygamous homes after they contacted her through Facebook or Instagram.  She estimates that more than 100 individuals (including about thirty minors) have contacted her for support, information, or resources.  *See id.* ¶ 6.  Christensen has also witnessed situations in which minors' online posts prompted wellness checks.  *Id.* ¶ 21.  Cooper has counseled teens and adults who sometimes find her organization, Hope After Polygamy, through social networks.  Cooper Decl. ¶ 6.

Anonymity can be critical.  Many individuals who contact Christensen and Cooper

do not "friend" or "follow" them, for fear of being discovered.  Christensen Decl. ¶ 12; Cooper Decl. ¶ 15.  Many people would be unable to disclose a government ID to create a social media account.  For example, individuals who flee at-risk homes may change their identities and so may lack access to or fear using ID.  Christensen Decl. ¶ 14.  Others lack access to birth certificates and social security numbers, which families may withhold as a means of control.  *Id.* ¶ 15; *see* Snow Decl. ¶ 10; Cooper Decl. ¶ 16.  These concerns extend to undocumented individuals, domestic violence victims, and those seeking mental health resources.  Christensen Decl. ¶ 14; *see also, e.g.*, Zoulek Decl. ¶ 14 (some LGBTQ community members prefer to use anonymous sites like Tumblr to avoid social backlash).

In addition, social networks are often useful for relaying news, including in emergencies.  M.C. recently used Instagram to obtain information about gun-related incidents at or near her high school.  M.C. Decl. ¶ 8.  Christensen once relied on Facebook to warn her children about a suspicious van in the neighborhood.  Christensen Decl. ¶ 16.

### B.   Social Networks and Other Companies Provide Tools to Enable Individual Choice in Regulating Online Speech Consumption.

According to the U.S. Surgeon General, "different children and adolescents are affected by social media in different ways."  Kumar Decl., Ex. 3 at 5.  To account for this, companies provide tools to monitor and structure children's internet use—such as to set time limits, restrict use to particular times, or view a child's friends or followers.  *See* Kumar Decl. Ex. 4; *see also, e.g., id.*, Ex. 5; Ex. 6; Ex. 7.  Parents can also download applications to limit screen time; see messages; filter, block, and monitor access to services; set location alerts; and pause internet access.  *Id.*, Ex. 8a, Ex. 8b, Ex. 8c.

Plaintiffs use these alternatives.  Cooper allows her children to use "Messenger Kids," which connects kids with family and friends under supervision.  Cooper Decl. ¶ 9.

Christensen's children use an app that requires them to power down their phones at a designated time.  Christensen Decl. ¶ 17.  Both mothers see social media and internet use as a necessary part of their children's development—and believe parents should decide how to regulate their children's activities.  *See id.* ¶ 20; Cooper Decl. ¶ 11.

> ### C. The State Enacts Legislation to Censor Social Networks, Repeals the Legislation Following Constitutional Challenges, Then Enacts a Measure Designed to Accomplish the Same Result.

On March 23, 2023, Governor Cox signed SB 152 and HB 311, which formed the Social Media Act.  That law, scheduled to take effect March 1, 2024, included sweeping restrictions, including (1) requiring age verification before providing any Utahn a social media account; (2) requiring parental consent before providing a minor such an account; (3) requiring parental access to minors' social media content; (4) imposing a social media curfew for minors; (5) prohibiting direct messaging between minors and individuals whose accounts are not connected (*i.e.*, directly linked); (6) prohibiting covered companies from showing minors' accounts in results of searches by non-connected accounts; and (7) prohibiting the display of advertising or "targeted or suggested" content to minors.  *See* Utah Code § 13-63-101 *et seq*. The law also would have prohibited covered companies from using a "practice, design, or feature" that they knew or should have known would cause a minor "to have an addiction to the social media platform."  *Id.* § 13-63-201(2).

On January 12, 2024, Zoulek, Christensen, Cooper, and Snow filed this lawsuit, seeking a declaration that the law was unconstitutional and an order enjoining its enforcement.  Dkt. No. 2.  Rather than respond, the State postponed the law's effective date so it could replace it with a new one that, in one legislator's words, was "generally very similar."  Kumar Decl., Ex. 9 at 1.  The result was SB 194 and HB 464.

HB 464 provides a private right of action for causing "adverse mental health outcome[s]," Utah Code § 78B-3-1103, but lacks any mechanism for state enforcement, an effort to try to shield that law from pre-enforcement review.  *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 49-50 (2021); *Free Speech Coal., Inc. v. Anderson*, 685 F. Supp. 3d 1299, 1305-06 (D. Utah 2023), *appeal filed*, No. 23-4104 (10th Cir. Aug. 11, 2023).

SB 194 (the "Act")—the subject of this lawsuit—includes components of its repealed predecessor and is in some ways even broader.  *See* Kumar Decl., Ex. 10.

*Scope.*  The Act applies to any "social media company" that "owns or operates a social media service."  Utah Code § 13-71-101(13).  A "social media service" is any "public website or application" that (1) "displays content that is primarily generated by" users; (2) "permits an individual to register as an account holder and create a profile… visible" to others; (3) "connects account holders to users to interact socially … within the website or application"; (4) "makes available to each account holder a list or lists of other account holders with whom the account holder shares a connection within the system"; and (5) "allows account holders to post content viewable by other users."  *Id.* § 13-71-101(14)(a).  "Content" includes "any information, visual depictions, tools, features, links, software, or other materials that appear on or are available or enabled through a social media service."  *Id.* § 13-71-101(4).

*Age-verification requirement.*  Section 13-71-201 requires covered companies to "implement an age assurance system" "reasonably calculated to enable a social media company to identify whether a[n] … account holder is a minor with an accuracy rate of at least 95%."  *Id.* §§ 13-71-201(1), 13-71-101(2).

*Content-sharing restrictions.*  Section 13-71-202(1)(a)-(b) mandates that minors'

accounts be visible to and able to share content with only connected accounts.   A "connected account" is one directly connected to" "the minor account holder's account"; or "an account that is directly connected to an account directly connected to the minor account holder's account."  *Id.* § 13-71-101(3).  Section 13-71-202(1)(d) requires covered companies to "disable search engine indexing of Utah minor account holder profiles." Section 13-71-202(1)(e) requires companies to allow Utah minor account holders to "direct messag[e]" only connected accounts.

Section 13-71-202(5) limits the way content may be recommended, promoted, or presented to minors, prohibiting autoplay functions—functions that provide access to content beyond a single webpage or screen as the user scrolls—and push notifications (a term defined vaguely itself) suggesting or transmitting content.  *See also id.* § 13-71-101(11).  Parents cannot opt their children out of these prohibitions.

*Parental consent requirements.*  The Act requires "verifiable parental consent" to change any other default content restrictions.  *Id.* § 13-71-204(1).   This requires that "(a) the social media service [] provide advance notice to the parent describing information practices related to the minor['s]… information; and (b) the social media service … receive confirmation that the parent received the notice."  *Id.* § 13-71-101(18).  The statute does not define "information practices," nor explain how to identify a user's parents, or what constitutes sufficient notice or consent.   Under the Division of Consumer Protection's proposed rule for SB 194's predecessor, consent would have required a parent to give permission and submit "a written attestation from the parent or guardian that they are the minor's legal guardian."  Kumar Decl., Ex. 11 at 18.

*Penalties for violations.*  The Act imposes "an administrative fine of up to $2,500

for each violation"; a "civil penalty of up to $2,500 for each violation"; and mandatory fees and costs.  Utah Code § 13-71-301(3)(a)(i), (b)(v), (c).  Companies can also be liable for disgorgement, actual damages, and declaratory and injunctive relief.  *Id.* § 13-71-301(3)(b)(i)-(iii), (vi).  Violating an administrative or court order regarding a violation may result in a civil penalty of up to $5,000 per violation.  *Id.* § 13-71-301(4)(a).

## III.   LEGAL STANDARD

A party moving for a preliminary injunction "must show:  (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013).  "In the First Amendment context, 'the likelihood of success on the merits will often be the determinative factor' because of the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Hobby Lobby*, 723 F.3d at 1145).  An injunction is warranted here.

## IV.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A.   The Act Violates the First Amendment.

The Act violates the First Amendment, which protects "access to social media." *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017).  The Act regulates speech because it restricts that access and restrains the way information may be disseminated online. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567-68 (2011); *see also Doe v. City of Albuquerque*, 667 F.3d 1111, 1118-19 (10th Cir. 2012) (First Amendment protects right to receive information as well as to speak) (collecting cases).

The Act is invalid under the First Amendment because it (1) imposes a series of unlawful prior restraints, (2) is vastly overbroad, and (3) regulates speech based on its content and speaker, without being sufficiently tailored to its goals.

> **1.  The Act's age-verification mandate and content-sharing restrictions impose invalid prior restraints.**

A prior restraint, which forbids communications, *Alexander v. United States*, 509 U.S. 544, 550 (1993), present "the most serious and the least tolerable infringement on First Amendment rights," and bear a "heavy presumption" of invalidity, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976).  They include any government action that in substance prevents or deters speech without a prior judicial determination "that such publications may lawfully be banned." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70-71 (1963); *see Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 678-79, 682-84 (1968) (requirement that exhibitors report whether a film was "suitable for young persons" created prior restraint).

The Act establishes prior restraints through its age-verification requirement and content-sharing restrictions.

*Age Verification Mandate.*  Before *any* Utahn may communicate through a social network (defined to include far more than typical "social media" services), she must clear a government-mandated "age assurance system."  Utah Code §§ 13-71-201(1), 13-71-101(2).  "[T]here is currently no privacy-protective way to determine whether a consumer is a child." Kumar Decl., Ex. 12 at 5.  Accordingly, mandating age verification to engage in speech shuts the door to "an entire medium of expression," *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994), unless a speaker or listener—even an adult—is willing to forgo anonymity and supply sensitive identifying information such as a government ID, credit

card, or even biometric data.  *See NetChoice LLC v. Reyes*, No. 2:23-cv-00911-RJS-CMR, Dkt. 52-5 (Paolucci Decl. ¶ 8) (95% accuracy mandate would require such measures).  Case in point: the Act's predecessor would have required methods like "facial characterization" that "match[es] a [user's] verified government-issued identification" to the user's face, or "checking a [user's] social security number's last four digits against a third-party database."  Kumar Decl., Ex. 11 at 18.

Many Utahns, including Plaintiffs, would stop using social networks rather than provide ID.  *See* Kumar Decl., Ex. 13; *see* Zoulek Decl. ¶ 12; Snow Decl. ¶ 8; Cooper Decl. ¶ 18.  Others may lack identification.  *See* Kumar Decl., Ex. 14 at 15 (age assurance "may produce discriminatory outcomes" because it "depends on the user having ready access to official documentation").  Snow, for example, did not have his social security card when he left his community.  Snow Decl. ¶ 11.  Cooper's escape was threatened after a family member stole her IDs.  Cooper Decl. ¶ 16.

Such state-imposed barriers to speech are a form of prior restraint.  *See Ashcroft v. ACLU*, 542 U.S. 656, 667, 673 (2004); *ACLU v. Mukasey*, 534 F.3d 181, 196-98 (3d Cir. 2008).  Thus, in *Mukasey*, the Third Circuit held invalid a statute that prohibited transmitting "harmful" speech to minors, with an affirmative defense for using age verification measures.  534 F.3d at 196.  The court explained that the law would deter "many users who are not willing to access information non-anonymously" "from accessing the desired information," causing websites to "be deprived of the ability to provide this information to those users."  *Id.* (citation omitted).  An Arkansas federal court enjoined a nearly identical requirement.  *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *18-21 (W.D. Ark. Aug. 31, 2023); s*ee also, e.g.*, *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37

(4th Cir. 2004) (ID rules "may deter adults" from accessing speech); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (same); *ACLU v. Johnson,* 4 F. Supp. 2d 1029, 1033 (D.N.M. 1998), *aff'd*, 194 F.3d 1149 (10th Cir. 1999) (same); *NetChoice, LLC v. Bonta*, -- F. Supp. 3d --, 2023 WL 6135551, at *8 (N.D. Cal. 2023) (plaintiffs likely to prevail on argument that age verification restricts access to speech), *appeal filed*, No. 23-2969 (9th Cir. Oct. 23, 2023) .

**Content-Sharing Restrictions.**  The Act's content-sharing restrictions add layers of prior restraint against even those minors willing to provide ID, as they presumptively bar minors from sharing content or direct messaging with anyone not already "connected" to them, *see* Utah Code § 13-71-202(1)(b), (e), effectively limiting them to communicating with those in their immediate circle.  But the government may not prevent a minor from using an expressive medium to communicate with those it deems unsuitable.  *See Neb. Press Ass'n*, 427 U.S. at 570 (gag orders are prior restraints); *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1308 (10th Cir. 2009) (recognizing same). *Cf. Mahanoy Area Sch. Dist. v. BL*, 594 U.S. 180, 190-94 (2021).  The possibility that a parent may consent to their child's broader ability to communicate via social networks does not save the Act.  *See*, *e.g*., *Brown*, 564 U.S. at 804 ("the Act's purported aid to parental authority is vastly overinclusive").  By censoring minors from communicating with whole classes of individuals, the Act not only abridges minors' speech but effects a prior restraint on it.

## 2.   The Act is unconstitutionally overbroad.

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002).  A law is invalid on its face "if a substantial number of

its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted).  Because the Act restricts speech regardless whether it is unprotected and legitimately regulable, the Act is facially invalid under the overbreadth doctrine.[2]

**Overbreadth as to minors.**  "Minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Brown*, 564 U.S. at 794 (citation omitted).  "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young[.]" *Id.* at 795 (citation omitted).

Without even pretending to regulate only constitutionally unprotected speech, *see Stevens*, 559 U.S. at 468-69, the Act limits access by all minors to a powerful medium for expression merely because (the State believes) access to *some* information by *some* minors may be harmful.  That impermissibly imposes blanket restrictions on minors as a class and treats older and younger minors as alike.  *See Brown*, 564 U.S. at 812 (Alito, J., concurring)

---

[2] The Act's overbreadth is exacerbated by ambiguous provisions that make it susceptible to even broader application.  FAC ¶¶ 74-78, 88-90.  For example, the term "content" is so broadly yet vaguely defined that it seems to encompass any possible engagement with a social network.  *See* Utah Code § 13-71-101(4).  The Act regulates where a service's primary use is to allow account holders "to interact socially with each other," *Id.* § 13-71-101(14)(iii), a term left undefined.  The Act does not explain what counts as "measures reasonably calculated" to achieve an age assurance rate of "at least 95%." *Id.* § 13-71-101(2).  Nor does Section 13-71-101(18) explain what kind of "advance notice" and "confirmation" suffices to establish "verifiable parental consent."  The meaning of a "directly connected" account is equally opaque, particularly as applied to social networks that permit users to "follow" others without asking for permission.  *Id.* § 13-71-101(5).  These uncertainties expand the Act's potential restrictions and lend themselves to arbitrary enforcement.  *See Bushco v. Shurtleff*, 729 F.3d 1294, 1306 (10th Cir. 2013); *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1237 (10th Cir. 2023); *see also Counterman v. Colorado*, 600 U.S. 66, 78 (2023).

(failure to draw "distinction between young children and adolescents who are nearing the age of majority" impermissible); *Mukasey*, 534 F.3d at 206 (same).

The Act restricts a high school student, like M.C., from sharing her art—expression unquestionably protected by the First Amendment, *see* M.C. Decl. ¶¶ 3-4, 9.  *See* Utah Code § 13-71-202(1)(b), (e).  It limits teenagers on the verge of voting age from commenting on non-"connected" public officials' posts.  *Id.*  It bans engagement with fundamental internet features—autoplay, continuous scrolling, and push notifications— that, like the printing press, electric typewriter, and personal computer, make more information available quickly.  *See* Utah Code § 13-71-202(5).  It restricts teenagers from finding and messaging with classmates or youth advocacy organizations like UYES, *id.* § 13-71-202(1)(a), (b), (e), limiting their ability to participate in—or even *learn how* to participate in—fundamental aspects of democracy.  *See* UYES Decl. ¶¶ 7-9.  And it prevents teenagers from engaging in community, such as by participating in a Facebook group for people with disabilities or a Reddit thread about neighborhood safety—as no one would be able to see their comments or questions unless they were already connected.  *See* Zoulek Decl. ¶ 13.

This overbreadth is underscored by the putative harm the Act seeks to address, *i.e.*, to avert "adverse effects" from the "unregulated" exchange of content through social networks.  Utah Code § 13-71-102(6).  But unregulated expression is precisely what the First Amendment secures.  "[S]peech cannot be restricted simply because it is upsetting[.]" *Snyder v. Phelps*, 562 U.S. 443, 450, 458 (2011) (protecting speech that "resulted in severe depression and had exacerbated pre-existing health conditions").  Our constitutional system protects and tolerates speech that could be hurtful because it is necessary to

"provide adequate breathing space to the freedoms protected by the First Amendment." *Id.* at 458 (citations omitted); *e.g.*, *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 55 (1988) (First Amendment protects even the "outrageous" despite "adverse emotional impact"). Virtually *all* the speech suppressed by the Act—not just a substantial amount—will exceed the law's legitimate sweep. *See Stevens*, 559 U.S. at 473.

**Overbreadth as to adults.**  The Act is also overbroad as to adults, who must choose between engaging in protected speech or surrendering their anonymity and personal information—a choice that will deter many thousands of Utahns, including several Plaintiffs, from accessing social networks at all.  *See* Zoulek Decl. ¶ 12; Cooper Decl. ¶ 18; Snow Decl. ¶ 13.  Even adults willing to provide identification will be unable to reach most minors.  Christensen Decl. ¶¶ 15-16; Cooper Decl. ¶ 15.  While it is possible to hypothesize circumstances in which contacts between adults and minors online might be inappropriate, the Act is not tailored to such circumstances, nor does it even attempt to identify them.  Accordingly, a substantial amount of the speech it restricts—such as Christensen's outreach to minors seeking asylum, UYES's outreach to students interested in climate advocacy, Zoulek's promotion of a local Utah community event, or even a college recruiter's or coach's outreach to a high school athlete—*see* Christensen Decl. ¶ 12; UYES Decl. ¶ 8; Zoulek Decl. ¶ 13—is categorically barred by the Act.

The State may not "torch a large segment of the Internet" to protect children.  *Reno v. ACLU*, 521 U.S. 844, 882 (1997).  Doing so "burn[s] the house to roast the pig," *Butler v. Michigan*, 352 U.S. 380, 383 (1957), and the Supreme Court has repeatedly held unconstitutional internet regulations on this exact basis.  *See Reno*, 521 U.S. at 883-85; *Ashcroft v. ACLU*, 542 U.S. at 666-70 ("universal restrictions" to protect minors from

indecency or "harmful" speech); *see also Butler*, 352 U.S. at 383-84 (ban on material "tending to the corruption of the morals of youth"); *Playboy Ent. Grp., Inc. v. United States*, 529 U.S. 803, 812 (2000) (cable TV regulation that applied "regardless of the presence or likely presence of children"); *Mukasey*, 534 F.3d at 207 (law that "effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another").

> ### 3. The Act's content-based restrictions fail any level of First Amendment scrutiny.

The Act is also an unconstitutional content-based regulation. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 163 (2015). Laws are content-based if they target a "message" or a "particular subject matter"; regulate speech "by its function or purpose"; or "discriminate among viewpoints." *Id.* at 163-64, 168-69. "[E]ven a facially content-neutral law is considered content-based if it 'cannot be justified without reference to the content of the regulated speech, or was adopted by the government because of disagreement with the message the speech conveys.'" *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228-29 (10th Cir. 2021) (quoting *Reed*, 576 U.S. at 164).

> #### a. The Act is content-based and subject to strict scrutiny.

That the Act is content based is evident on the law's face.

First, the Act's stated premise—minors must be shielded from speech harmful to their mental health, Utah Code § 13-71-102(6)—is content based. *Ashcroft v. ACLU*, 542 U.S. at 670 (laws "designed to protect minors from viewing harmful materials" are content based); *see Brown*, 564 U.S. at 793-94 (same); *Playboy*, 529 U.S. at 811-12 (same).

It makes no difference that the State has tried to accomplish this goal by restricting *with whom* and *how* minors communicate. *See* Utah Code §§ 13-71-202(1)(a), (b), (d), (e), 13-71-202(5). Such restrictions are content based because they restrict speech on account of the speech's anticipated effect. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (laws enacted to prevent "psychological damage" caused by way message is delivered are content based); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) ("speaker-based laws demand strict scrutiny when they reflect" an "aversion" to the "communicative impact" of "disfavored speakers").

Second, the Act is facially content based because it singles out social networks "for differential treatment" based on the content *just these* providers disseminate. It expressly exempts services like email, cloud storage, or document-editing platforms, *see* Utah Code § 13-71-101(14), reflecting a preference for certain types of communications. It applies only to networks that display information "primarily generated by account holders," and which permit users "to interact socially with each other" and create visible profiles. Utah Code § 13-71-101(14)(a)(i)-(iii), (v); *see Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (law regulating robocalls for some purposes was content-based); *see also Reed*, 576 U.S. at 163-64, 170 ("a law limiting the content of newspapers, but only newspapers" would be content based). Even without evidence of an "illicit governmental motive," restrictions that "discriminate among media" require strict scrutiny because they are "structured in a manner that raise[s] suspicions that their objective [is], in fact, the suppression of certain ideas." *Turner*, 512 U.S. at 659-60.

For example, in *NetChoice, LLC v. Yost*, 2024 WL 555904, at *11 (S.D. Ohio 2024), the court enjoined a law requiring parental consent for minors to create accounts on

certain websites that allowed users "to post, comment, and privately chat—in other words, to connect socially online," finding such functionalities "may very well be conveying a message about 'the type of community the platform seeks to foster."  It held "[t]he features that the Act singles out are inextricable from the content produced by those features," and "the Act's distinction on the basis of these functionalities [is] content based."  *Id.* So too, here, the Act singles out services with content-based features like allowing "account holders to post content viewable by other users," creating a public "profile," and connecting account holders "to interact socially." Utah Code § 13-71-101(14)(a).

### b.  The Act fails strict scrutiny.

A content-based speech regulation is subject to strict scrutiny.  *See Playboy*, 529 U.S. at 813.  The government must show the law is necessary to achieve a compelling interest and uses the least restrictive means of doing so.  *Id.*  A content-based regulation also fails strict scrutiny if it is so underinclusive as to suggest censorship of "a particular speaker of viewpoint."  *Brown*, 564 U.S. at 802.  "It is rare that a regulation restricting speech because of its content will ever be permissible."  *Id.* at 799 (citation omitted).  The Act fails this test.

*First*, the State cannot show the Act is necessary to serve a compelling interest. Although the "well-being and privacy of minors" may present a compelling interest in the abstract, *see* Utah Code § 13-71-102(1), the State "must present more than anecdote and supposition" to show each restriction is necessary to accomplish that objective.  *Playboy*, 529 U.S. at 822; *see also Brown*, 564 U.S. at 799-800 ("predictive judgment" inadequate; direct link required). The legislative record contains no such evidence, comprising conclusory legislative findings.  *See* Utah Code § 13-71-102. "[C]ommonsense[] feelings,"

however, do not amount to "incontrovertible proof of a causal relationship." *Ent. Software Ass'n v. Swanson*, 519 F.3d 768, 772 (8th Cir. 2008).

The lack of evidence in the legislative record is unsurprising, as the U.S. Surgeon General and other experts have concluded that access to social media also provides *benefits* to young people. *See* Kumar Decl., Ex. 3 at 6; *see also id*., Ex. 15 at 3.  This is consistent with Plaintiffs' experiences. *See* Zoulek Decl. ¶¶ 4, 7-8; Christensen Decl. ¶¶ 18-19; Snow Decl. ¶¶ 5-7; Cooper Decl. ¶¶ 7-9; M.C. Decl. ¶¶ 4-8.  As Zoulek testified, preventing teens from talking about mental health using social media could itself harm their mental health. Zoulek Decl. ¶ 10.

*Second*, the State cannot show that significantly restricting *all* Utahns' speech is the "least restrictive" means to eliminate potential harms to some children from some speech. *Playboy*, 529 U.S. at 827; *see also Griffin*, 2023 WL 5660155, at *6–8, 21 (state could not show age-verification requirement is least restrictive means).  Existing tools allow families to structure internet use by children, and a less restrictive law might have focused on informing parents about these tools. *See, e.g.*, *Playboy*, 529 U.S. at 823-26 (educating parents is less restrictive alternative to regulating programming); *Ashcroft v. ACLU*, 542 U.S. at 669. Virtually every social network and smartphone manufacturer provides such tools. *See NetChoice LLC*, *supra*, Dkt. 52-2 (Veitch Decl. ¶¶ 11-18 (YouTube)); Dkt. 52-3 (Davis Decl. ¶¶ 28-46 (Meta)); Dkt. 52-4 (Yadegar Decl. ¶¶ 5-7 (Snap)); Dkt. 52-1 (Szabo Decl. ¶¶ 8-9 (social media services generally)).  Cooper and Christensen rely on them. *See* Christensen Decl. ¶ 17; Cooper Decl. ¶ 10.  Even the Act's provisions *requiring* social networks to provide "supervisory tools," Utah Code § 13-71-203, would be less restrictive than its raft of speech restraints.  The State apparently did not pause to assess

18

these provisions, instead choosing overbroad restrictions that impose "what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 804; *see also Playboy*, 529 U.S. at 816, 825-26; *Ashcroft v. ACLU*, 542 U.S. at 666–70 (both upholding injunctions where the government ignored similar household alternatives).

*Third*, the Act's simultaneous underinclusivity "is alone enough to defeat it." *Brown*, 564 U.S. at 802.  A law that professes to serve broad goals like "the well-being and privacy of minors," Utah Code § 13-71-102, and yet regulates only a slice of potential causes, "raises serious doubts as to whether the government is in fact pursuing the interest in invokes, rather than disfavoring a particular speaker or viewpoint," *Brown*, 564 U.S. at 802 (citing cases).  Here, as in *Brown*, the Act focuses on one type of media—social networks that display content "primarily generated by account holders" and permit account holders to create profiles and interact socially—to the exclusion of other similar causes of potential harm. *Id.* at 801-02.  The Act does not explain why social networks that display content primarily generated by a company (rather than users) or that do not permit profiles cause any less harm.  *Yost*, 2024 WL 555904, at *12 (law not narrowly tailored to protecting children where "parents must only give one-time approval" to create account).

The Act also contains arbitrary carve-outs for services like email, but not text-messaging services.  *See* Utah Code § 13-71-101(14)(b).  The Act would allow M.C. to email strangers but not message them on WhatsApp.  Likewise, Utah minors or non-age-verified accounts will be able to *watch* YouTube videos, but not *post* content on YouTube that is viewable beyond their connections.  And the Act would allow the Utah Legislature to post Zoulek's testimony on social networks—viewable to everyone—but forbid Zoulek from doing so at the time, when they were 16. Utah has failed to explain, much less prove,

19

how the Act's restrictions and exclusions can satisfy First Amendment scrutiny, and its underinclusivity is equally fatal. *Brown*, 564 U.S. at 802.

### c. The Act fails even intermediate scrutiny.

A speech restriction survives intermediate scrutiny only if the government proves the law (1) will "in fact" serve a "substantial" interest "unrelated to the suppression of free expression" in "a direct and material way," and (2) is at least narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner*, 512 U.S. at 662-64. The government must prove a restriction "extend[s] only as far as the interest it serves." *Matal v. Tam*, 582 U.S. 218, 245 (2017) (citation omitted). Applying this test, the Tenth Circuit has held invalid laws restricting how pedestrians may interact with drivers, *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1209, 1257 (10th Cir. 2021), limiting speech within road medians, *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1061, 1080 (10th Cir. 2020), and setting an evening curfew for door-to-door commercial solicitations, *Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 999 (10th Cir. 2020).

The Act fails this test too. Far from serving ends unrelated to suppressing expression, the Act exists to address "unregulated social media use," Utah Code § 13-71-102(6) (discussed *supra* Part IV.A.2). *See Turner*, 512 U.S. at 662. And nothing in the legislative record shows the Act's speech restrictions will have any positive effects on youth "well-being" or mental health. *See Brewer*, 18 F.4th at 1245 (reliance on expert's theoretical opinions, "scattered and factually inapposite anecdotes," and exhortations to common sense insufficient). To the contrary, Plaintiffs' testimony, and much of the scientific literature, indicates restricting minors' access to social media and subjecting them to age verification could harm them. *See supra* at II(A). Where "concrete data …

20

undercuts" the government's evidence, "courts must be cautious before endorsing a governmental claim of danger." *Brewer*, 18 F.4th at 1244.

Nor can the State show that each of the Act's restrictions is narrowly tailored. The age-assurance mandate effectively requires *all* social network users to provide personal information, even adults living in childless households. *See* Utah Code § 13-71-201(1). The content-sharing restrictions apply even where content is educational or otherwise beneficial and prevents contact with those who are not "connected," even if such outreach would save lives. *See* Utah Code § 13-71-202(1), (5); *see also* Christensen Decl. ¶ 11 ("Socia networks are the only way that [some at-risk teens] could have contacted me."). "[E]ven a legitimate and substantial governmental interest cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 597 (2021) (citation omitted).

The Act also fails to leave open ample alternatives, as other forms of communication do not adequately substitute for social networks. *See McCraw*, 973 F.3d at 1079 (law failed intermediate scrutiny where plaintiffs testified that communicating through signs at distance was not as effective as intimate verbal communication) (citing *McCullen v. Coakley*, 573 U.S. 464, 490 (2014)). And again, the Act's underinclusivity "demonstrates at best a loose fit between its means" and the State's stated objectives. *Id.* at 1077; *see also Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 193-96 (1999) (banning private but not tribal casinos from advertising impermissible).

*      *      *      *

This is hardly the first time government has sought to create a "wholly new category of content-based regulation … for speech directed at children." *Brown*, 564 U.S.

21

at 794.  But "new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated."  *Id.* at 791.  Utah has no more power to censor the internet for minors than California did to ban minors from supposedly dangerous videogames.  *Id.* at 794.  The State's attempt to sanitize this latest form of interactive media is equally unconstitutional.

### B.    The Act Violates the Commerce Clause.

The Act also violates the Dormant Commerce Clause, for at least two reasons.

*First*, a state may not "directly regulate[] transactions which take place … wholly outside the State."  *Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (law would violate "horizontal separation of powers" if practical effect reached activities outside state's borders) (citing *Edgar*, 457 U.S. at 641–43)).  The Act "contains no express limitation confining it to communications which occur wholly within" Utah's borders.  *Johnson*, 194 F.3d at 1161.  It restricts any covered service to Utah *residents*—even if those residents are not present in the State, such as a rising college student like Zoulek.  *See* Utah Code § 13-71-101(16) (no geographic limitation).  This is something a service provider cannot easily ascertain.  *See NetChoice LLC*, *supra*, Dkt. 52-1 (Szabo Decl. ¶ 25 (websites would have to "significantly transform" services to continue serving minors)); Dkt. 52-5 (Paolucci Decl. ¶¶ 9-10 (websites may have to age-verify non-residents given difficulty in determining user residency)); *see also, e.g.*, *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323–25 (9th Cir. 2015) (en banc) (law requiring art sellers to pay resale royalty fees even for out-of-state sale invalid).  These methods will very likely affect all social media users; geolocation information shows only a user's IP address, so to avoid risking liability,

companies will need to collect data from *all* users.  *NetChoice LLC*, *supra*, Dkt. 52-5 (Paolucci Decl. ¶¶ 9-10).

Second, a state law may not impede the flow of commerce if its burdens are "clearly excessive in relation to the[ir] putative local benefits."  *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970); *see Ross*, 598 U.S. at 379 n.2 ("regulations on instrumentalities" of commerce impermissible "when a lack of national uniformity would impede the flow" of commerce) (citation & emphasis omitted).  States cannot, for example, regulate the lengths of railcars or mandate the types of mudflaps for semi-trucks, requiring shippers or passengers to change modalities before crossing borders.  *Id*.

The Act unquestionably burdens commerce, including Plaintiffs' ability to communicate across state lines.  Internet services "are in their nature national" and "admit only of one uniform system, or plan of regulation."  *CTS Corp. v. Dynamics Corp. of Am*., 481 U.S. 69, 88–89 (1987) (citation omitted).  Much like a law that regulates the types of mudflaps on semi-trucks that cross borders, the Act restricts access to speech that travels interstate, subjecting interstate speech to inconsistent and burdensome mandates.  *See Alario v. Knudsen*, 2023 WL 8270811, at *17 (D. Mont. Nov. 30, 2023) (law banning TikTok in Montana would burden commerce by "prohibiting [TikTok users in the state] from conducting business on the app, and it would also burden TikTok by requiring the company to completely change its business to operate in Montana by selling to an owner based in a non-adversarial country").  Beyond that, by requiring users to provide personal information to access social media, and by prohibiting certain speech through its content restrictions, the Act restricts the distribution of information across state lines. *See Bigelow v. Virginia*, 421 U.S. 809, 824-25 (1975) (state "may not, under the guise of exercising

internal police powers, bar a citizen of another State from disseminating information"); *Johnson*, 194 F.3d at 1152 (affirming injunction of law barring "dissemination" of "harmful" materials online).

## V.     THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION

The remaining factors favor preliminary injunctive relief.

First, Plaintiffs will suffer irreparable harm absent an injunction.  The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Johnson*, 194 F.3d at 1163. Here, without an injunction, Plaintiffs' constitutional rights will be infringed, and they will suffer immediate harms.  *See* Christensen Decl. ¶ 21; Cooper Decl. ¶ 15; M.C. Decl. ¶ 9; Snow Decl. ¶ 9; UYES Decl. ¶ 5; Zoulek Decl. ¶ 9.

Second, the balance of equities and the public interest support an injunction.  *See, e.g.*, *Fish v. Kobach*, 840 F.3d 710, 754-56 (10th Cir. 2016).  "When a constitutional right hangs in the balance, … 'even a temporary loss' usually trumps any harm to the defendant." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019).  As in *Johnson*, "the threatened injury to Plaintiffs' constitutionally protected speech" "outweighs whatever damage the preliminary injunction may cause Defendants' inability to enforce what appears to be an unconstitutional statute."  194 F.3d at 1163 (citation omitted); *see also id.* (injunction in public interest because "it will protect the free expression of the millions of Internet users"); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (public has a "profound … interest in upholding an individual's constitutional rights") (citation omitted).

## VI.    THE LAW MUST BE ENJOINED IN ITS ENTIRETY

"[E]ven where a savings clause exists, where the provisions of the statute are interrelated, it is not within the scope of the court's function to select the valid portions of the act and conjecture that they should stand independently of the portions which are invalid." *Leavitt v. Jane L.*, 518 U.S. 137, 140-41 (1996); *see also Salt Lake City v. Int'l Assn. of Firefighters*, 563 P.2d 786, 791 (Utah 1977) (entire statute invalid where challenged provisions were "an integral part of the act, which cannot be severed without interfering with the underlying legislative purpose").  Here, the Act's definition of "social media" and its age-verification scheme are invalid.  These provisions permeate the Act and are "so interwoven with the remainder of the statute" that "other portions of the Act cannot stand alone."  *Murphy v. Matheson*, 742 F.2d 564, 578 (10th Cir. 1984).

## VII.    CONCLUSION

Plaintiffs respectfully request an order preliminarily enjoining enforcement of the Act.

Dated: May 31, 2024

/s/ *Ambika Kumar*
Ambika Kumar
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA  98104

Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017

David M. Gossett
Chelsea T. Kelly
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C.  20005

/s/ *Robert Corn-Revere*
Robert Corn-Revere
David Rubin
FOUNDATION FOR INDIVIDUAL RIGHTS
AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003

/s/ *Jerome H. Mooney*
Jerome H. Mooney (Utah Bar #2303)
WESTON, GARROU & MOONEY
50 West Broadway, Suite 300
Salt Lake City, Utah 84101

*Attorneys for Plaintiffs*