DAVID N. WOLF (6688)
DOUGLAS CRAPO (13704)
LANCE F. SORENSON (10684)
Assistant Utah Attorneys General
Utah Attorney General
160 East 300 South, 6th Floor
PO Box 140856
Salt Lake City, UT 84114-0856
Telephone: (801) 366-0100
lancesorenson@agutah.gov

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| HANNAH PAISLEY ZOULEK, a Utah resident; JESSICA CHRISTENSEN, a Utah resident; LU ANN COOPER, a Utah resident; M.C., a Utah resident, by and through her parent, LU ANN COOPER; VAL SNOW, a Utah resident; and UTAH YOUTH ENVIRONMENTAL SOLUTIONS, a Utah association,<br><br>                                        Plaintiffs,<br>v.<br><br>SEAN D. REYES, in his official capacity as Attorney General of Utah, and<br><br>KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce,<br><br>                                        Defendants. | **DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (COUNT 3) AND FAILURE TO STATE A CLAIM (COUNTS 3 AND 4), AND MEMORANDUM IN SUPPORT**<br><br>Case No.: 2:24-cv-00031-RJS-CMR<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

## MOTION

Defendants Sean D. Reyes and Katherine Hass (collectively, the "State") move the Court to dismiss counts III and IV of Plaintiffs' First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) & 12(b)(6). Plaintiffs lack standing, under both Article III and the prudential standing doctrine, to allege that Utah's Minor Protection in Social Media Act (the "Act") violates the dormant Commerce Clause because Plaintiffs are not engaged in interstate commerce. They suffer no injury caused by a dormant Commerce Clause violation. Even if the Court exercised jurisdiction to entertain count III, Plaintiffs have failed to allege a claim therein upon which relief could be granted because the law at issue does not discriminate against out-of-state commercial interests to the benefit of in-state interests. Plaintiffs likewise have failed to adequately state a claim for their allegations made in count IV regarding federal preemption. The law at issue does not seek to hold social media companies liable for decisions to host or not host third-party content; therefore, it is not preempted by Section 230 of the Communications Decency Act. The Court should thus dismiss counts III and IV.

## MEMORANDUM

### STANDARD OF REVIEW

The Supreme Court has described standing as "contain[ing] two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement; and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). Article III standing doctrine requires plaintiffs to show the defendant caused them injuries that are redressable by a court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Even if a plaintiff establishes Article III standing, courts may consider whether prudential standing principles nonetheless counsel against hearing the plaintiff's claims. "Even when a case falls within these constitutional boundaries, a plaintiff may still lack standing

under the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated[.]" *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99-100 (1979) (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Here, Plaintiffs fail to allege facts sufficient to establish either Article III standing or prudential standing.

With respect to the merits of Counts III and IV in Plaintiffs' First Amended Complaint, to survive a motion to dismiss under Rule 12(b)(6), "the complaint must allege enough facts to state a claim to relief that is plausible on its face, and any factual allegations must be enough to raise a right to relief above the speculative level." *TDC Lending LLC v. Private Capital Grp., Inc.*, 340 F. Supp. 3d 1218, 1224 (D. Utah 2018) (Shelby, J.) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal quotation marks and alterations omitted). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And "[b]ecause [Plaintiffs'] challenges rest purely on legal interpretation, [this Court] may resolve [them] at the motion-to-dismiss stage." *John K. Maciver Inst. for Pub. Pol'y, Inc. v. Schmitz*, 885 F.3d 1004, 1014 (7th Cir. 2018). *See also S. Furniture Leasing, Inc. v. YRC, Inc.*, 989 F.3d 1141, 1144 (10th Cir. 2021) (affirming the granting of a motion to dismiss while interpreting a federal statute). Plaintiffs' allegations in Count III (that the Act violates the dormant Commerce Clause) and Count IV (that the Act is preempted) are legal conclusions which this Court need not accept as true, and because no fact development will affect the analysis, this Court can and should resolve the matter now and dismiss those counts.

## ARGUMENT

I. **Plaintiffs lack Article III standing to allege a violation of the dormant Commerce Clause**

"[T]he only parties that have standing to bring a dormant Commerce Clause challenge are those who engage in interstate commerce and can show that the [law] at issue has adversely affected their commerce." *Cibolo Waste, Inc. v. City of San Antonio,* 718 F.3d 469, 476 (5th Cir. 2013). Here,

Plaintiffs are *all* Utahns who are *not* engaged in interstate commerce. *See* First Amended Complaint, ECF No. 36, ¶¶ 5, 7, 8, 9, 10, 11, 12. Thus, *none of them* represent out-of-state commercial interests. Like the appellants in *Cibolo*, Plaintiffs "fail entirely" to satisfy or even allege these prerequisites and, as a result, "they lack standing to bring their claim[] in federal court." *Id.* Simply put, because Plaintiffs are not engaged in interstate commerce, they do not suffer an injury of the sort that the dormant Commerce Clause seeks to protect.

## II. Plaintiffs lack prudential standing to allege a violation of the dormant Commerce Clause

"The key inquiry for prudential standing is whether the injury of which plaintiffs complain is arguably within the zone of interests to be protected by . . . the constitutional guarantee in question[.]" *Cibolo*, 718 F.3d at 474 (quoting *National Solid Waste Management Ass'n v. Pine Belt Regional Solid Waste Management Authority*, 289 F.3d 491, 499 (5th Cir. 2004). Plaintiffs' claims do not fall within the zone of interests protected by the dormant Commerce Clause.

The dormant Commerce Clause "is driven by concern about economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue v. Davis*, 553 U.S. 328, 337-38 (2008). For reasons set forth in Section II below, the Act does not discriminate against out-of-state interests at all. For purposes of prudential standing, however, to determine whether a claim under the dormant Commerce Clause falls within the zone of interests, courts ask whether claimants challenge the law as facially discriminatory against out-of-state economic interests. *See Cibolo*, 718 F.3d at 474-75.[1]

---

[1] The *Cibola* court also indicated that a claimant may satisfy prudential standing by demonstrating standing to challenge whether a law is "excessively burdensome to interstate commerce." *Id.* at 475. However, the Supreme Court's more recent decision in *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023), discussed in Section II, indicates that this alternative basis for prudential standing is no longer sufficient.

3

Plaintiffs have not alleged that the Act is facially discriminatory by authorizing "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* at 475. Plaintiffs cannot so allege, because the Act does no such thing – it applies with equal force to in-state social media platforms as to out-of-state social media platforms. In their First Amended Complaint, Plaintiffs cite to *Pike v. Bruce Church, Inc.*[2] for the proposition that a law may be unconstitutional if it "imposes burdens on interstate commerce that are clearly excessive in relation to the putative local benefits." Plaintiffs First Amended Complaint, ECF No. 36, ¶ 93. However, as set forth in Section II herein, *Nat'l Pork Producers* clarified, if not completely abrogated *Pike*. The test for a dormant Commerce Clause violation no longer entails looking merely for burdens on interstate commerce and comparing them to local benefits (to the extent it ever did). Rather, courts must look to see whether "regulatory measures [are] designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023).

Plaintiffs also point to footnote 1 of *Nat's Pork Producers* for the proposition that a State violates the dormant Commerce Clause if it "directly regulates speech and internet communications wholly outside Utah's borders." Plaintiffs First Amended Complaint, ECF No. 36, ¶ 95. Plaintiffs have mischaracterized footnote 1, which reads in its entirety (with some citations omitted):

> Beyond *Baldwin*, *Brown-Forman*, and *Healy*, petitioners point to *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S. Ct. 2629, 73 L.Ed.2d 269 (1982), as authority for the "almost *per se*" rule they propose. Invoking the dormant Commerce Clause, a plurality in that case declined to enforce an Illinois securities law that "*directly* regulate[d] transactions which [took] place ... wholly outside the State" and involved individuals "having no connection with Illinois." *Id.*, at 641–643, 102 S. Ct. 2629 (emphasis added). Some have questioned whether the state law at issue in *Edgar* posed a dormant Commerce Clause question as much as one testing the territorial limits of state authority under the Constitution's horizontal separation of powers. . . . But either way, the *Edgar* plurality opinion does not support the rule petitioners propose. That decision spoke to a law that *directly* regulated out-of-state transactions by those with *no* connection to the State. Petitioners do not allege those conditions exist here. To the contrary, they acknowledge that Proposition 12 regulates only products that companies choose to sell "within" California.

---

[2] 397 U.S. 137 (1970).

*Nat'l Pork Producers*, 598 U.S. at 376, n.1. *Nat'l Pork Producers* rejected the very test that Plaintiffs claim it stands for. "[N]one of this means . . . that *any* question about the ability of a State to project its power extraterritorially must yield to an 'almost per se' rule under the dormant Commerce Clause. This Court has never before claimed so much 'ground for judicial supremacy under the banner of the dormant Commerce Clause.'" *Id.* at 376 (quoting *United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330, 347 (2007).

Even if Plaintiffs' proposed *per se* rule were the test (it is not), Plaintiffs still lack standing to assert the claim for the simple reason that all of them live within Utah and are subject to the State's jurisdiction.

### III. Plaintiffs fail to state a claim upon which relief may be granted under the dormant Commerce Clause.

Plaintiffs have not set forth a legally cognizable dormant Commerce Clause claim because the Act does not benefit in-state economic interests nor discriminate against out-of-state economic interests. The Supreme Court recently clarified how lower courts should analyze dormant Commerce Clause claims in *Nat'l Pork Producers*. There, the Supreme Court stated that "antidiscrimination . . . lies at the very core of our dormant Commerce Clause jurisprudence." *Nat'l Pork Producers*, 598 U.S. at 369.

The dormant Commerce Clause "prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (internal citation omitted). Absent such discrimination, "a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to the interests of its citizens." *Id.*

In *Nat'l Pork*, California enacted a law to prohibit the in-state sale of pork that came from pigs confined in a cruel manner. The law applied equally to in-state pork producers as well as those out-of-state. The petitioners challenged the law under the dormant Commerce Clause and the

5

Supreme Court rejected those arguments. For the same reasons that California may regulate the welfare of pigs destined for slaughter and sold within its state, Utah may regulate how social media is peddled to vulnerable minors in Utah.

In *Nat'l Pork*, the petitioners failed to state a dormant Commerce Clause claim because they did not allege that "California's law seeks to advantage in-state firms or disadvantage out-of-state rivals."[3] Rather, the petitioners conceded that the law "imposes the same burdens on in-state pork producers that it imposes on out-of-state ones."[4]

Plaintiffs' claim here suffers from the same deficiencies. A review of the Act's plain text demonstrates that the law does not advantage Utah commercial entities. Nor does it discriminate against out-of-state competitors. The Act imposes the same liability on in-state commercial entities that it imposes on out-of-state entities. This is fatal to Plaintiffs' dormant Commerce Clause claim.

Plaintiffs raise two arguments in support of their dormant Commerce Clause claim, but the Supreme Court rejected these same arguments in *Nat'l Pork*. First, Plaintiffs contend that the Act violates the Commerce Clause because it regulates conduct outside Utah. Plaintiffs First Amended Complaint, ECF No. 36, ¶ 95. Similarly, petitioners in *Nat'l Pork* asserted that the "extraterritoriality doctrine" suggested an "almost *per se*" rule forbidding enforcement of state laws that have the "practical effect of controlling commerce outside the State," even when those laws do not purposely discriminate against out-of-state economic interests. *Nat'l Pork*, 598 U.S. at 371-72.

The Supreme Court expressly rejected this argument. A state law does not violate the Commerce Clause merely because it may "have the 'practical effect of controlling' extraterritorial behavior." *Id.* The Court explained that when it previously spoke of extraterritorial effects, the challenged statutes in those cases "had a *specific* impermissible" extraterritorial effect of

---

[3] *Id.* at 1153.
[4] *Id.*

discriminating against out-of-state firms. *Id.* at 374. Plaintiffs have not alleged (and cannot show) any such impermissible discrimination here.

Again citing *Pike*, Plaintiffs further contend the Act violates the Commerce Clause by imposing burdens on interstate commerce that are in "clear excess" of any local benefit. Plaintiffs First Amended Complaint, ECF No. 36, ¶ 94. But, the Supreme Court has now clarified that the *Pike* line of cases is congruent to the "antidiscrimination rule that lies at the core of [the Court's] dormant Commerce Clause jurisprudence." *Nat'l Pork*, 598 U.S. at 374. The *Pike* line of cases focuses on whether "a law's practical effects may also disclose the presence of a discriminatory purpose," *id.* at 377, such as an effort to insulate in-state "businesses from out-of-state competition."[5] *Id.* at 378. Applying this doctrine, the Supreme Court affirmed dismissal of the complaint in *Nat'l Pork* because the petitioners did not suggest that the challenged law's practical effects "would disclose purposeful discrimination against out-of-state businesses." *Id.* at 379. The same is true here. Plaintiffs do not assert anywhere in their Complaint that the Act's practical effects demonstrate purposeful discrimination against out-of-state businesses. Accordingly, Plaintiffs' dormant Commerce Clause claim fails as a matter of law.

**IV. Plaintiffs' allegation that the Act is preempted by Section 230 fails to state a claim upon which relief may be granted.**

**A. The Act does not impose liability for a social media platform's decision to host or not host third party content.**

Section 230 of the Communications Decency Act forbids treating interactive computer services as "the publisher[s] or speaker[s] of any information provided by *another* information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). By its plain terms, this provision forbids suits against service providers based on content made by someone else. Interactive service providers can allow the content to be on their service without fear of liability.

---

[5] *Id.* at 1158.

7

Section 230 also forbids imposing civil liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected," or "any action taken to enable or make available to information content providers or others the technical means to restrict access to [such] material[.]" *Id.* (c)(2). By its plain terms, this provision allows service providers to (1) remove content from their services based on the enumerated categories and (2) provide tools to users to restrict their own access to such material without fear of liability. Section 230, in its essence, allows interactive computer services to both host and remove third-party content without fear of liability.

Plaintiffs allege that Section 230 preempts the Act because the Act, on their theory, treats "social networks as the publishers or speakers of information provided by other information content providers." Plaintiffs First Amended Complaint, ECF No. 36, ¶ 101. According to Plaintiffs, the State may not prohibit social media companies from "publishing minor's profiles in search results" because Section 230 specifically immunizes social media companies from liability for exposing children's personal information to strangers.

Section 230 does no such thing. And Plaintiffs accordingly have not stated a claim for preemption. Section 230 says nothing about the imposition of liability on social media companies for their own behavior. Yet that is what the Act does. It places responsibility on social media companies to: (1) remove addictive design features that they themselves have added to the product; and (2) take steps to protect children's personal information (and children themselves) from global exposure on their platforms without parental consent. There is no preemption because the Act does not seek to hold social media companies liable for decisions to host or not host third-party content.

8

B. **Plaintiffs have not precisely stated which strain of preemption they believe applies, but they are entitled to relief under none of them.**

Federal preemption has two strains: express and implied. Implied preemption has three sub-strains: field, conflict (or impossibility), and obstacle (or frustration). The nature of Plaintiffs' preemption argument is unstated, but it appears to be one of express preemption.[6] Yet however the argument is construed, it fails because there is nothing in the Act that is inconsistent with Section 230, Congress has not occupied the field of social media regulation, it is not impossible for social media companies to comply with both laws, and the Act does not frustrate Congress's objectives in Section 230 (in fact, it complements them). Thus, Defendants' motion to dismiss Count IV should be granted.

C. **Section 230 does not expressly preempt the Act because it has an anti-preemption provision and leaves space for state regulation consistent with it; the Act is consistent with Section 230 because it is possible to comply with both.**

Express preemption exists where preemption "is explicitly state[d] in the statute's language." *See Gade v. National Solid Wastes Management Association*, 505 U.S. 88, 98 (1992). To begin with, Section 230 has an *anti-preemption* provision: "[n]othing in [it] shall be construed to prevent any State from enforcing any State law that is consistent with [it]." 47 U.S.C. § 230(e)(3). And its plain terms merely protect covered sites from liability for presenting or censoring others' speech, and identify under what circumstances publisher-like functions are protected. This is a far cry from expressly forbidding States from imposing any design regulations at issue in the Act. The Act is "agnostic as to content." *City of Austin v. Reagan*, 596 U.S. 61, 69 (2022). This indifference includes third-party content.

Plaintiffs contend the Act treats "social networks as the publishers or speakers of information provided by other information content providers" because it would render them liable for "publishing" information from non-connected accounts, from "publishing" autoplay videos,

---

[6] Plaintiffs do not advance their preemption argument in their Motion for Preliminary Injunction.

9

infinite scroll, and push notifications, and for allowing minors to connect with strangers absent parental consent. Plaintiffs' First Amended Complaint, ECF No. 36, ¶ 101. However, the Act does not impose liability for doing what Section 230 allows—restricting, or enabling others to restrict, objectionable content. Rather, the Act makes separate demands on these companies regarding how they present content and how minors can share or access content. There is thus nothing inconsistent here.

What Plaintiffs characterize as preemption is merely the State imposing liability for entirely different obligations. Under the Act, Social media companies remain free from liability for the speech of their users. They are still free under Section 230, to restrict—or enable users to restrict—objectionable content. There is no liability for doing so under the Act. Nor is there anything inconsistent between the Act and Section 230's obligation to let parents know about commercial parental controls. If anything, the two laws complement each other on this point. Thus, there is no express preemption here.

### D. Section 230 does not impliedly preempt the Act.

Nor is the Act preempted under the implied doctrines of field, conflict (or impossibility), or obstacle (or frustration) preemption.

> **i. Field preemption does not apply for three reasons: (1) Section 230's anti-preemption provision; (2) scant federal regulation in this area; and (3) the lack of historical federal control over these matters.**

Field preemption does not fit here. That sort applies "when the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a State to supplement it." *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010). *See also Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963)(observing field preemption occurs when "either . . . the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."). But there is no field preemption here for at least three reasons. First, as

10

already noted, Section 230 itself leaves the door wide open for state regulation that is consistent with Section 230. *See* 47 USC § 230(e)(3). That means Congress didn't think it had preempted this field. There is no stronger evidence of congressional intent than the plain language of a statute. *See Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1263 (10th Cir. 2014) ("It is our primary task in interpreting statutes to determine congressional intent, using traditional tools of statutory construction. In ascertaining such congressional intent, we begin by examining the statute's plain language, and if the statutory language is clear, our analysis ordinarily ends."). And congressional intent is king in analyzing field preemption, *O'Donnell*, 627 F.3d at 1325 (observing that for field preemption, a court "must . . . evaluate whether Congress intended to occupy the field to the exclusion of the states").

Second, Section 230 regulates just a small part of social media issues, and there is not much other federal regulation in this area—hardly the type of "pervasive" regulation necessary for field preemption. Finally, social media is not "of the nature" that traditionally is deemed to be appropriate for field preemption, such as foreign policy, *see, e.g., American Insurance Assn. v. Garamendi*, 539 U.S. 396 (2003), and immigration, *see Arizona v. United States*, 567 U.S. 387 (2012), where the federal government has been constitutionally entrusted with the subject matter. There is thus no field preemption here. *See also O'Donnell*, 627 F.3d at 1325 (noting that, for field preemption, "the purpose of Congress must be clear as we presume that 'Congress does not cavalierly pre-empt state-law'") (*quoting Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

    ii.    **Conflict preemption does not apply because there is no direct conflict between Section 230 and the Act.**

Conflict preemption is inapplicable. This strain applies where "compliance with both federal and state regulations is a physical impossibility." *Gade*, 505 U.S. at 98. That is not the case here. The only obligation that Section 230 imposes on companies is to notify customers that commercial parental control protections are available and to provide information as to such commercial protections. The Act's obligations are different, and a company can easily comply with both. It is

therefore not a "physical impossibility" for social media companies to follow both federal and state law here.

### iii. Obstacle preemption does not apply because Section 230 and the Act have compatible purposes.

Finally, obstacle preemption fails. This is where a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes or objectives of Congress." *In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*, 960 F.3d 1210, 1230 (10th Cir. 2020)(citation omitted). The opposite is true here. Section 230 is, in part, worried about minors accessing harmful content, and so it protects providers from liability for choosing to censor such content and requires providers to give notice of commercial parental control options. The Act has the same purpose—to protect minors from harm—and so it is not an obstacle to Section 230's purpose but a complement to it. Therefore, there is no obstacle preemption here.

## CONCLUSION

Plaintiffs lack standing to bring a dormant Commerce Clause claim. Even if the Court entertained that claim, it fails as a matter of law, especially in the recently shed light of *Nat'l Pork Producers*. Further, Plaintiffs cannot show that Section 230 preempts the Act under any variant of that doctrine. The two laws can comfortably co-exist. For these reasons, the Court should grant the State's motion to dismiss Counts III and IV from Plaintiffs' First Amended Complaint, with prejudice.

DATED: June 28, 2024

OFFICE OF THE UTAH ATTORNEY GENERAL

/s/ Lance Sorenson
DAVID WOLF
LANCE SORENSON
Assistant Utah Attorneys General
*Counsel for Defendants*

12

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2024, I electronically filed the foregoing, **DEFENDANTS' MOTION TO DISMISS COUNTS 3 AND 4 OF PLAINTIFFS' FIRST AMENDED COMPLAINT** by using the Court's electronic filing system which will send a notice of electronic filing to the following:

**Jerome H. Mooney**
Weston Garrou & Mooney
Jerrym@mooneylaw.com

**Adam Sieff**
**Ambika Kumar**
**Chelsea T. Kelly**
**David M. Gossett**
Davis Wright Tremaine, LLP
adamsieff@dwt.com
ambikakumar@dwt.com
davidgossett@dwt.com

**Kelley Bregenzer**
**Robert Corn-Revere**
Foundation for Individual Rights and Expression
bobcornrevere@dwt.com

*Counsel for Plaintiffs*

UTAH ATTORNEY GENERAL'S OFFICE

/s/ Seth A. Huxford
SETH A. HUXFORD
Legal Secretary

13