DAVID N. WOLF (6688)
DOUGLAS CRAPO (13704)
LANCE F. SORENSON (10684)
Assistant Utah Attorneys General
Utah Attorney General
160 East 300 South, 6th Floor
PO Box 140856
Salt Lake City, UT 84114-0856
Telephone: (801) 366-0100
lancesorenson@agutah.gov

*Counsel for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| HANNAH PAISLEY ZOULEK, a Utah resident; JESSICA CHRISTENSEN, a Utah resident; LU ANN COOPER, a Utah resident; M.C., a Utah resident, by and through her parent, LU ANN COOPER; VAL SNOW, a Utah resident; and UTAH YOUTH ENVIRONMENTAL SOLUTIONS, a Utah association, | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | Case No.: 2:24-cv-00031-RJS-CMR |
| v. | Judge Robert J. Shelby |
| SEAN D. REYES, in his official capacity as Attorney General of Utah, and | Magistrate Judge Cecilia M. Romero |
| KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce, | |
| Defendants. | |

# Table of Contents

INTRODUCTION ...................................................................................................................1

BACKGROUND ..................................................................................................................3

    THE PROBLEM ...............................................................................................................4

    THE ACT ........................................................................................................................6

    STANDARD OF REVIEW ...............................................................................................10

        A.   The Preliminary Injunction Standard of Review .........................................10

        B.   Constitutional Standard of Review ..............................................................11

DEFENDANTS' STATEMENT OF FACTS.........................................................................12

ARGUMENT......................................................................................................................23

    I.   Plaintiffs cannot meet their burden to demonstrate a substantial likelihood of success on the merits. ...............................................................................................23

        A.   The Act does not violate the First Amendment.............................................23

        B.   The Act does not violate the dormant Commerce Clause.............................37

        C.   47 U.S.C. § 230 does not preempt the Act, expressly or otherwise.............37

    II.  The public interest strongly favors allowing the law to go into effect .................38

    III. The balance of the harms weighs in favor of allowing the law to go into effect..............39

CONCLUSION...................................................................................................................39

# Table of Authorities

**Page(s)**

**Cases**

*Alexander v. United States,*
509 U.S. 544 (1993) ............................................................................................................ 23, 24

*American Civil v. Mukasey,*
534 F.3d 181 (3rd Cir. 2008) ......................................................................................................25

*Ashcroft v. ACLU,*
542 U.S. 656 (2004) ........................................................................................... 12, 25, 33, 34

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963) ..........................................................................................................................24

*Brewer v. City of Albuquerque,*
18 F.4th 1205 (10th Cir. 2021) ...................................................................................................11

*Brown v. Entertainment Merchants Ass'n,*
564 U.S. 786 (2011) .......................................................................................................................35

*Burson v. Freeman,*
504 U.S. 191 (1992) .......................................................................................................................29

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
508 U.S. 520 (1993) .......................................................................................................................29

*City of Austin v. Reagan,*
596 U.S. 61 (2022) ............................................................................................................................1

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994) ...........................................................................................................................25

*Discount Tobacco City & Lottery, Inc., v. U.S.,*
674 F.3d 509 (6th Cir. 2012) .........................................................................................................8

*Eccles v. Peoples Bank of Lakewood Village, Cal.,*
333 U.S. 426 (1948) .......................................................................................................................11

*Eddings v. Oklahoma,*
455 U.S. 104 (1982) ..........................................................................................................................1

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ..................................................................................................................1, 29

*Evans v. Sandy City,*
944 F.3d 847 (10th Cir. 2019) ....................................................................................................12

*Frazier ex rel. Frazier v. Winn,*
535 F.3d 1279 (11th Cir. 2008) .....................................................................................27, 28, 36

*Free Speech Coalition v. Paxton,*
-- S. Ct. --, 2024 WL 1864355 (April 30, 2024) .....................................................................30

*Free Speech Coalition, Inc. v. Paxton,*
95 F. 4th 263 ...........................................................................................................................30, 33

*Gonzales v. Google LLC,*
2 F.4th 871 (9th Cir. 2021) ..........................................................................................................17

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ...................................................................................................................2, 26

*Heideman v. South Salt Lake City,*
348 U.S. 1182 (10th Cir. 2003) ..........................................................................................10, 39

*Interstate Circuit, Inc. v. City of Dallas,*
    390 U.S. 676 (1968) ................................................................................................25

*In re Twitter, Inc. Securities Litigation,*
    2020 WL 13863616, n.1 (N.D. Cal. January 28, 2020) ........................................17

*In re Walker,*
    959 F.2d 894 (10th Cir. 1992) ................................................................................10

*John Doe No. 1 v. Reed,*
    561 U.S. 186 (2010) ......................................................................................... 28, 33

*Klein v. Facebook, Inc.,*
    580 F.Supp.3d 743 (N.D. Cal. 2022) .....................................................................16

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001) ...............................................................................................32

*Maryland v. King,*
    567 U.S. 1301 (2012) ...................................................................................3, 11, 38

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ...............................................................................................10

*Miller v. Alabama,*
    567 U.S. 460 (2012) .................................................................................................1

*Nebraska Press Assn. v. Stuart,*
    427 U.S. 539 (1976) ...............................................................................................24

*New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) ...............................................................................................3

*New York State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ...................................................................................................31

*Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,*
    268 U.S. 510 (1925) ...............................................................................................36

*Powers v. Harris,*
    379 F.3d 1208 (10th Cir. 2004) ..............................................................................32

*Reno v. ACLU,*
    521 U.S. 844 (1997) ............................................................................................. 5, 6

*RoDa Drilling Co. v. Siegal,*
    552 F.3d 1203 (10th Cir. 2009) ..............................................................................10

*Roper v. Simmons,*
    543 U.S. 551 (2005) .....................................................................................1, 17, 18

*TikTok, Inc. v. Trump,*
    490 F.Supp.3d 73 (D.C. 2020) ...............................................................................17

*U.S. v. Rene E,*
    583 F. 3d 8 (1st Cir. 2009) .....................................................................................31

*United Staes v. American Library Assn. Inc.,*
    539 U.S. 194 (2003) ......................................................................................... 28, 33

*Ward v. Rock Against Racism,*
    491 U.S. 781 ..................................................................................................... 23, 36

*Williams-Yulee v. Florida Bar,*
    575 U.S. 422 (2015) ......................................................................................... 28, 29

*Williams-Yulee,*
    575 U.S. ...................................................................................................................29

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................... 3, 10

## Statutes

21 U.S.C. § 387a-1 .................................................................................................8

3, Fla. Stat .............................................................................................................6

47 U.S.C. § 230 ................................................................................................37, 38

Utah Code § 13-71-101 .........................................................................................7

Utah Code § 13-71-102 ........................................................................................20

Utah Code § 13-71-201(1) ...............................................................................26, 33

Utah Code § 32-4-403 ...........................................................................................8

Utah Code § 76-10-114 ..........................................................................................8

Utah Code § 76-10-1206 .........................................................................................8

Utah Code § 76-10-2201 .....................................................................................9, 34

Utah Code § 76-10-5 ..............................................................................................8

Utah Code § 76-10-509 .........................................................................................34

Utah Code § 78B-3-406(6) ................................................................................9, 34

## Regulations

Utah Admin. Code R392-700-5 (2023) ...............................................................9, 34

## INTRODUCTION

The Constitution recognizes that children are different than adults. "[A]s any parent knows and the scientific and sociological studies . . . tend to confirm, a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults[.]" *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (internal quotation and citation omitted); *see also Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982) ("Even the normal 16-year-old customarily lacks the maturity of an adult"). "Our history is replete with laws and judicial recognition that children cannot be viewed simply as miniature adults . . . . [I]t is the odd legal rule that does *not* have some form of exception for children." *Miller v. Alabama*, 567 U.S. 460, 481 (2012) (cleaned up) (emphasis in original).

For these reasons, "It is well-settled that a State . . . can adopt more stringent controls on communicative materials available to youths than on those available to adults." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212 (1975). "The First Amendment rights of minors are not co-extensive with those of adults. A state may permissibly determine that, at least in some precisely delineated areas, a child – like someone in a captive audience – is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Id.* at 214 n.11 (internal citations omitted).

Unlike the law at issue in *Erznoznik*, however, and unlike the laws at issue in virtually all of the cases cited by Plaintiffs, Utah's Minor Protection in Social Media Act (the "Act") (Exhibit A) does not seek to shield children from any particular content – or any content at all. It is "agnostic as to content." *See City of Austin v. Reagan*, 596 U.S. 61, 69 (2022). It does not ban minors from social media or even require parental consent to create social media accounts and establish connections with other accounts. Rather, the Act seeks to do two things: (1) mitigate the immense harms that youth suffer from social media addiction by prohibiting, for minor accounts only, certain addictive

1

additives that, regardless of content, entrap minors in a social media world; and (2) protect, for minor accounts only (like federal law already attempts to do for children under 13), sensitive personal information from wide dissemination by requiring parents to consent to any change to default data privacy settings for children.

The Act is content neutral and is a reasonable time, place, and manner restriction. While the "government has no power to restrict . . . activity because of its message . . . [,] reasonable time, place, and manner regulations may be necessary to further significant governmental interests, and are permitted." *Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972). The Act is appropriately tailored to advance significant government interests under the First Amendment test for reasonable time, place, and manner restrictions. Any incidental burdens on minors or adults' speech are justified by the government's significant, even compelling, interest.

There may be little harm from moderate social media use by minors. But, as set forth below, social media use beyond about two hours per day leads to extreme, and sometimes irreparable adverse mental health outcomes in youth, no matter the content. *Erznoznik's* analogy of minors to a captive audience is apt. Minors have an underdeveloped capacity for self-regulation. When they find themselves inside a social media world they have a hard time escaping; they are like gamblers in a dark casino. The Acts helps them find the exit – an escape from the virtual world so that they might participate in other important and essential things, like schoolwork, sleep, exercise, and real-life social relationships. The Act places reasonable guardrails on a product that research shows, and experience confirms, is dangerous when overused by minors regardless of content. The Act is limited and reasonable. It is based in science and common sense. It is content-neutral. It is understandable by a person of reasonable, ordinary intelligence. And it is not preempted by federal statute or the Commerce Clause.

2

For these reasons, Plaintiffs do not and cannot meet their heavy burden to demonstrate that they are substantially likely to succeed on the merits; Plaintiffs' right to relief on the merits is far from clear and unequivocal as required by the preliminary injunction standard, and their request for a preliminary injunction fails on that prong.

And, although the Court need go no further than the substantial likelihood of success prong to deny the injunction, it remains Plaintiffs' burden to prove the other three prongs as well, which they cannot do. Without satisfying all four prongs, the injunction should not issue. *See, e.g.*, *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Here, there is a significant public interest at stake which would be harmed by issuance of the injunction. Further, the balance of harms weighs overwhelmingly in the State's favor. Where a state is prevented from enforcing a statute enacted by its people, it suffers a form of irreparable injury. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (citing *New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)).

Because 1) the Act is a reasonable and constitutional regulation that is appropriately tailored to the State's important and compelling interests, 2) there is a strong public interest to have the Act enforced during the pendency of this lawsuit, and 3) Plaintiffs have failed to meet their burden of establishing a clear and unequivocal right to drastic injunctive relief, Defendants Sean Reyes and Katherine Hass (collectively, the "State") respectfully request the Court deny Plaintiffs' Motion for a Preliminary Injunction ("Pls.' Mot.").

## BACKGROUND

Sean Parker, the first president of Facebook, described the thought process that went into building social media sites. He said:

> [I]t was all about: How do we consume as much of your time and conscious attention as possible? . . . [W]e need to sort of give you a little dopamine hit every once in a while . . . it's a social-validation feedback loop . . . exactly the sort of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology.

3

He concluded: "God only knows what it's doing to our children's brains."[1]

### The Problem

Based on extensive, multiple, longitudinal studies, we now know what excessive social media use does to children's brains. It re-wires them and makes youth susceptible to depression, anxiety, body image problems, self-harm, and suicide. It causes loss of sleep, worse academic performance, and deterioration of real-life relationships. Excessive social media use is the cause of an alarming spike in adverse mental health outcomes among teenagers. *See* Declaration of Dr. Jean Twenge ("Twenge Dec."), Exhibit B, ¶¶ 21-47.

The causal relationship between excessive social media use and adverse mental health outcomes for youth has been established. The real-life experience of parents and teenagers is now supported by extensive and sound academic research: adverse mental outcomes among youth are not just correlated with excessive social media use; they are caused by it. Twenge Dec., Exhibit B, ¶¶ 33-47.

Despite this, and in order to hook new generations of users so that they may mine their personal information for profit, social media companies have laced their products with highly addictive elements that act like nicotine in tobacco. Or, to switch analogies, they act like the design features of casinos, meant to keep gamblers at the slots and tables as long as possible, perhaps forever. These addictive elements have nothing to do with the underlying content that is shared, and everything to do with trapping youth in an endless loop, where their eyeballs are constantly on a screen, unable to focus on anything else.

The addictive elements of social media websites are working as intended, just like the additives to cigarettes and the bells and whistles in casinos. In the last decade, there has been a

---

[1] Sean Parker, Axios interview, cited in Jonathan Haidt and Greg Lukianoff, *The Coddling of the American Mind*, Penguin Press (New York, 2018), p. 147.

dramatic rise in the amount of time adolescents spend on screens, particularly social media. By 2022, teenagers were spending 8-9 hours per day on screens. Of that, the average teenager spends 5 hours per day on social media. For children between the ages of 13-18, 95% use social media, and more than 33% of them say they use it *constantly*. Many American teenagers say they use social media for more than 40 hours per week. Teenage addiction to social media is having disastrous consequences for youth, their families, and societies writ large. Excessive social media use has caused a mental health crisis in teenagers. Twenge Dec., Exhibit B, ¶¶ 16-47.

Parents are crying out for help. Gone are the quaint days when parents could simply shut down the living room desktop as suggested by some caselaw from a bygone era before the invention of the smartphone, before accessible high-speed streaming, and before the proliferation of social media.[2] This is not your grandmother's internet. Now, children carry supercomputers, with all their immersive, interactive, and enticing streaming content, in their pockets and backpacks. They carry them on school buses. They look at them during class, in between classes, at lunch, and while driving. Parents need more tools in the toolkit. Parental and device-based filtering controls are not effective at preventing harm. The ineffectiveness of these tools, at a societal level, is supported by research. Even the most conscientious of parents are in a losing battle against social media companies for the attention and well-being of their own children. *See* Declaration of Tony Allen ("Allen Dec."), Exhibit C, ¶¶ 38-42.

The U.S. Surgeon General wrote in an advisory last year that there are "ample indicators that social media can . . . have a profound risk of harm to the mental health and well-being of children and adolescents." U.S. Surgeon General's Advisory, Social Media and Youth Mental Health, Exhibit

---

[2] *See, e.g., Reno v. ACLU*, 521 U.S. 844, 854, 869 (1997) ("the Internet is not as invasive as radio or television . . . communications over the Internet do not invade an individual's home or appear on one's computer screen unbidden" and "in many cases the user will receive detailed information about a site's content before he or she need take the step to access the document"). What may have been true about the internet more than a quarter century ago, is obviously not true today.

D, p. 4.  The Surgeon General said, "We must . . . urgently take action to create safe and wholesome

digital environments that minimize harm and safeguard children's and adolescents' mental health

and well-being during critical stages of development." *Id.* More recently, the Surgeon General wrote

that

"the mental health crisis among young people is an emergency — and social media has emerged as

an important contributor."[3] He is calling for Congress to heed his warning and require warning

labels on social media, as it does for cigarettes and alcohol.[4]

*The Act*

Many states and countries have recognized the growing and deadly problem, and have

responded to parents' pleas. Last year, the United Kingdom passed an Online Safety Law requiring

social media companies to verify that users are old enough to be on their platforms;[5] Ireland likewise

passed an online Safety and Media Regulation Act in 2022;[6] Italy, France and Australia have similar

laws.[7] France, for example, requires parental consent for youth under 15 to access social media.[8] In

the United States, multiple states have passed laws that place just some of the burden of protecting

kids onto the source of the problem – social media companies.[9]

---

[3] *See* https://www.cnn.com/2024/06/17/media/surgeon-general-social-media-apps-warning-label/index.html.

[4] *Id.*

[5] *See* https://www.gov.uk/government/publications/online-safety-act-explainer.

[6] *See, e.g.,* https://www.thejournal.ie/taking-down-harmful-content-6184208-Oct2023.

[7] *See* https://www.bbc.com/news/world-europe-68004438 and https://www.esafety.gov.au/newsroom/whats-on/online-safety-act. While some of these international laws are aimed at content, Utah's Act is not.

[8] *See* https://www.lemonde.fr/en/france/article/2023/06/29/france-requires-parental-consent-for-under-15s-on-social-media_6039514_7.html.

[9] *See, e.g.,* Florida's H.B. 3, FLA. STAT. § 501.1736, banning minors under 14 from having social media accounts.

In addition to new legislative enactments, and in addition to civil suits brought by private party plaintiffs,[10] many states have brought legal action against social media companies under existing law, for the harms that social media companies are causing to youth. A coalition of 33 states spanning the political spectrum, through their respective Attorneys General, have brought claims against social media behemoth Meta alleging unfair and deceptive practices stemming from the addictive nature of Meta's products, and non-compliance with the Children's Online Privacy Protection Act (COPPA).[11] Nine additional states have brought claims against social media companies in their respective states, meaning that over 40 states are currently taking proactive measures to address the serious problems.[12] Recently, a Utah district court judge denied Meta's motion to dismiss the Division of Consumer Protection's lawsuit against it, rejecting Meta's constitutional arguments, among others.[13] The Federal Trade Commission has also brought several actions against Meta and its subsidiary Facebook, determining that "Facebook has repeatedly violated its privacy promises."[14]

Utah, in line with these other countries and states, recently passed the Act.[15] The Act places modest, yet precise, obligations on social media companies to: (1) determine whether their account holders are under or over the age of 18, (2) remove certain addictive, nicotine-like elements for

---

[10] *See, e.g.*, Ruling on Defendants' Demurrer to Master Complaint, *Social Media Cases*, Case No. JCC 5255 (Sup. Court of Cal., Oct. 13, 2023) (finding that minors' negligence claims against multiple social media companies were not barred by the First Amendment or Section 230). A copy of the Court's ruling in Social Media Cases is attached hereto as Exhibit E.

[11] *See Coalition of 33 States v. Meta, et al*, Case No. 4:23-cv-05448 (N.D. Cal., filed 10/24/2024). A copy of the Complaint in that case is attached hereto as Exhibit F.

[12] Utah's Division of Consumer Protection, for example, has brought suit against TikTok under its Consumer Sales Practices Act in state court. *See Division of Consumer Protection of the State of Utah v. TikTok, Inc.* Case No. 230907634 (3rd Judicial District).

[13] *See* https://www.fox13now.com/news/politics/judge-wont-throw-out-utahs-lawsuit-against-facebook-instagram. The court has not yet entered a written order, but the transcript of the hearing at which the judge ruled from the bench is attached hereto as Exhibit G.

[14] *See, e.g.*, https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-proposes-blanket-prohibition-preventing-facebook-monetizing-youth-data.

[15] *See* UTAH CODE § 13-71-101 *et seq.*

minor accounts; and (3) set data-sharing settings to maximum privacy levels for minors, which settings may be altered with the consent of parents.[16]

That's it. The Act does not ban minors from creating social media accounts, which they may do without parental consent. The Act does not ban minors from establishing direct connections with other users which they may do without parental consent. The Act does not preclude minors from sharing with or receiving from connected accounts any content they wish, which they may do without parental consent. Minors may expand the scope of their audience, to see and be seen by strangers, with parental consent. The Act makes no judgment whatsoever about the content which is shared on social media, expressing no agreement or disagreement with any of it.

The Act is thus an exercise of governmental regulatory authority that is used in a variety of other contexts where the State is concerned about minor welfare. Some products and activities present risks unique to minors due to their immaturity, lack of self-control, and lack of experience. The State may require age assurance for in-person or online tobacco purchases,[17] alcohol purchases,[18] gun purchases (which implicates constitutional rights),[19] and purchases at brick-and-mortar adult bookstores as well as online.[20] States that have casinos restrict minors from entry into gaming areas.[21] The State may also require age assurance and/or parental consent in other contexts where the immature decision-making abilities of minors may have long-term consequences, such as

---

[16] *Id.* at §§ 201, 202(1), & 202(5), respectively.
[17] *See, e.g.*, UTAH CODE § 76-10-114. The federal government also restricts the marketing and sale of tobacco to youth. *See* U.S. Tobacco Control Act, 21 U.S.C. § 387a-1. The Sixth Circuit largely upheld the Tobacco Control Act in *Discount Tobacco City & Lottery, Inc., v. U.S.*, 674 F.3d 509 (6th Cir. 2012).
[18] *See, e.g.*, UTAH CODE § 32-4-403.
[19] *See, e.g.*, UTAH CODE § 76-10-5.
[20] *See, e.g.*, UTAH CODE § 76-10-1206.
[21] *See, e.g.*, NEV. RES. STAT. § 463.350.

in tanning salons,[22] tattoo parlors (arguably implicating First Amendment rights),[23] and medical procedure decisions.[24]

The fact is that minors are different. Social media companies, however, wish to treat users as young as 13 (and younger)[25] as if they were miniature adults, capable of weighing the risks and benefits of sharing data online and self-regulating their use of a highly addictive product.

Social media companies are financially incentivized to get and keep children addicted to their products. They are, above all else, data mining companies. They monetize the information provided by users, and not just that given when registering an account. Social media companies keep track of all sorts of information about their users, including what they are interested in, where they are and where they are going, who they associate with, and much more. They glean this information from the user's activity on a social media platform, and then sell it to advertisers. In order to sell it at the highest premium, the social media companies need eyeballs on screens as much as possible.[26] And, like cigarette companies figured out, it's best to get users while they are young, before they go to a competitor. But putting personal information out into the world entails risk – risk that parents often understand far better than their children.

The Act also seeks to protect minors from the extremely harmful consequences of social media addiction by requiring social media companies to remove the addictive elements from their platforms. These addictive elements contribute to the "dopamine hits" that Sean Parker succinctly described which serve to keep minors glued to screens. Social media addiction is a real problem:

---

[22] *See, e.g.,* UTAH ADMIN. CODE R392-700-5 (2023).
[23] *See, e.g.,* UTAH CODE § 76-10-2201.
[24] *See, e.g.,* UTAH CODE § 78B-3-406(6).
[25] Credible claims have been brought by the Federal Trade Commission as well as at least 33 State Attorneys General that Plaintiff member Meta is in violation of COPPA because it deliberately hung onto the personal information of children younger than 13 years of age. *See* Exhibit F.
[26] *See* Defs.' Statement of Facts, p. 15 n. 35, infra.

although it benefits social media companies by keeping young eyeballs on their products and money flowing to their pockets, it is devastatingly harmful to the mental health of children.

Plaintiffs include minors and adults who wish to connect with each other for a variety of purposes, including "to reach at-risk youth." Pls.' Mot, p. 1. However laudable communications between unconnected accounts may be in a particular situation, "[l]egislatures must balance competing interests . . . and it is not [a court's] function to second guess the resulting choice . . . . On the contrary, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular message." *In re Walker*, 959 F.2d 894, 899 (10th Cir. 1992). And, as set forth below, the correct legal test for determining whether the Act is appropriately tailored is whether it leaves open alternative methods of communication. The Act leaves open ample alternative channels of communication for youth who wish, for example, to explore leaving a polygamous community.

### Standard of Review

As the Court considers Pls.' Mot., it must apply two judicial standards of review: (1) the preliminary injunction standard of review; and (2) the appropriate constitutional standard of review for Plaintiffs' First Amendment, Due Process, and Commerce Clause claims.

### A. The Preliminary Injunction Standard of Review

Plaintiffs ask this Court to take the "extraordinary" and "drastic" action of preliminarily enjoining the State from enforcing a duly enacted law that addresses a real and growing problem in a content-neutral way. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary injunction, Plaintiffs have the heavy burden to establish that their right to relief is "clear and unequivocal." *See Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

To obtain a preliminary injunction, the movant must establish all four preliminary injunction factors. *Winter,* 555 U.S. at 20; *see also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209 n.3 (10th Cir. 2009). "[E]specially where governmental action is involved, courts should not intervene unless the

need for equitable relief is clear, not remote or speculative." *Eccles v. Peoples Bank of Lakewood Village, Cal.*, 333 U.S. 426, 431 (1948). This is because "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King*, 567 U.S. at 1303 (internal citation omitted).

About that clear and unequivocal standard: as this Court considers Plaintiffs' request, it must do what courts often do – apply constitutional principles to a new, emerging technology. The Court should look to analogous situations for guidance; the State has already pointed to a few, and will highlight several more in this memorandum. But the Court should also be mindful that social media coupled with portable supercomputers is something new; teenagers face a world unlike anything before. The analogies can take us only so far. If this were a close call (it is not), then the benefit of the doubt goes to leaving the law in place and allowing duly elected officials to act in the interest of the children they seek to protect in the context of this new and emerging technology.

## B.   Constitutional Standard of Review

Although the harmful effects of social media addiction are comparable to (and perhaps much worse than) the harmful effects of other products like tobacco, the State acknowledges that social media platforms contain speech, such that there are First Amendment and Due Process considerations. With the exception of the Act's age assurance provision (for which rational basis review should apply as discussed herein), the Act, as a content-neutral and reasonable time, place, and manner restriction, is subject to intermediate scrutiny (and satisfies that standard).

The narrow tailoring required by intermediate scrutiny differs from that of strict scrutiny in that it does *not* require the State's chosen means to be the least restrictive alternative. *See Brewer v. City of Albuquerque*, 18 F.4th 1205, 1224-25 (10th Cir. 2021) ("[W]hile 'fit matters,' when it comes to content-neutral regulations of speech, such regulations need not be the least restrictive or least intrusive means of serving the government's interests. Rather, the requirement of narrow tailoring is

satisfied so long as the regulation promotes a substantial government interest that would be *achieved less effectively* absent the regulation without burdening substantially more speech than is necessary to further the government's legitimate interests") (cleaned up) (emphasis added). *See also Evans v. Sandy City*, 944 F.3d 847, 856-57 (10ᵗʰ Cir. 2019) ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative"). However, here, the State's means to address its compelling interest are drawn so narrowly, so precisely, that they also satisfy strict scrutiny, if that were the standard. And so the State advances that argument as well.

## **DEFENDANTS' STATEMENT OF FACTS**

### *Social Media Companies' constant access to children*

Internet connectivity arrived in two waves in the United States. First, the 1990s saw an increase in the paired technologies of personal computers and internet access via modem, both of which could be found in most homes by 2001. The second wave was the rapid increase in the paired technologies of social media and smartphones, beginning around 2007 when the first smartphone was released, and reaching a majority of homes by 2012 or 2013.[27]

Forty-three percent of 8- to 12-year-olds and ninety-five percent of 13- to 17-year-olds in the United States have a smartphone. Smartphones are portable supercomputers that allow 24-hour access to immersive, interactive content accessed through high-speed streaming. Teenagers also access the internet through other high-speed streaming devices, such as school-issued devices. By

---

[27] Twenge Dec., Exhibit B, ¶¶ 9-11. As discussed herein, many of the precedents Plaintiffs rely on were announced two decades ago, during this first wave. Those precedents anticipated further technological changes that would alter legal analysis. *See, e.g., Ashcroft v. ACLU*, 542 U.S. 656, 671 (2004) ("[T]he factual record does not reflect current technological reality – a serious flaw in any case involving the Internet. The technology of the Internet evolves at a rapid pace. Since [the district court entered its findings], certain facts about the Internet are known to have changed[.]").

2022, teenagers spent 8-9 hours *per day* on screens and 46% of teens reported being online *almost all of the time*. The average teenager spends five hours *per day* on social media, far more than they are spending on other activities, such as homework, sports, reading, other hobbies, or being outside. Studies demonstrate that the number of teenagers on social media and the amount of time that teenagers spend on social media increased dramatically between 2010 and 2015. In 2009, about 50% of American high school seniors were using social media every day. In 2011, about 75% of American high school seniors were using social media every day. By 2015, 15% of American high school girls were using social media for more than 40 hours per week. For children between the ages of 13-18, 95% use social media, and more than 33% of them say they are using almost constantly.[28]

### Social media's extremely harmful effects on children

There has been a drastic increase in teen mental illness since 2010. Rates of major depressive disorders have more than doubled for both boys and girls since 2010. Major depression for boys has increased 161% and major depression for girls has increased 145% since 2010. By 2021, about 1/3 of American girls report experiencing major depression. There has been a sharp and sudden increase since about 2010 in hospital admissions for teenagers who had intentionally harmed themselves. The rate of nonfatal self-harm for 10–14-year-old boys has increased 96% since 2010. The rate of nonfatal self-harm for 10-14-year-old girls has increased an astounding 281% since 2010. Suicide rates among girls born after 1995 are higher today than any previous time period for which we have data for the UK, Canada, United Staes, Australia, and New Zealand. Suicide rates among 10- to 14-year-old girls in the U.S. have doubled since 2010. The adolescent mental health crisis is not limited to the United States; like the reach of social media--it is global.[29]

---

[28] *Id.* at ¶¶ 12-20.
[29] *Id.* at ¶¶ 21- 29.

The collapse in mental health among teens occurred precisely at the time most Americans owned a smartphone and more than 70% of high school students used social media every day. Correlational studies have consistently shown a link between heavy social media use and mood disorders. Social media use among adolescents is correlated to cyberbullying-related depression, body image and eating disorders, poor sleep, online harassment, low self-esteem, and higher depressive symptoms.[30]

Now, research demonstrates causation, not just correlation. Studies show that the more time teens spend on social media per day beyond 1 or 2 hours, the more depressed they are. A United Kingdom study found that in 2015, girls who used social media 5 or more hours a day were three times more likely to meet clinical criteria for depression than non-users. Among boys, they were twice as likely. A Gallup study from 2023 found that 37% of adolescents who spend more than 3 hours per day on social media report poor mental health, compared with 23% who spend less than 3 hours pers day. These studies are consistent with a 2022 meta-analysis finding a strong connection between social media use and depression/anxiety. The meta-analytic study found that there is a 13% increase in depression for each additional hour spent on social media per day. A longitudinal cohort study of U.S. adolescents aged 12-15 found that adolescents who spent more than 3 hours per day on social media faced double the risk of experiencing poor mental health outcomes including symptoms of depression and anxiety. In a unique natural experiment that leveraged the staggered introduction of a social media platform across U.S. colleges, the roll-out of the platform was associated with an increase in depression (9%) and anxiety (12%) among college-aged youth. The introduction of just one social media platform may have contributed to more than 300,000 new cases of depression.[31]

---

[30] *Id.* at ¶¶ 30-31.
[31] *Id.* at ¶¶ 32-36.

Excessive and problematic social media use, such as compulsive or uncontrollable use, has been linked to sleep problems, attention problems, and feelings of exclusion among adolescents. Sleep is essential for the healthy development of adolescents. A systematic review of 55 studies on the effects of excessive social media use found a consistent relationship between social media use and poor sleep quality, reduced sleep duration, sleep difficulties, and depression among youth. Social media, more than TV or gaming, is linked to shorter sleep, more mid-sleep awakenings, and longer time to fall asleep. Poor sleep has been linked to altered neurological development in adolescent brains, depressive symptoms, and suicidal thoughts and behaviors. On a typical weekday, nearly 1-in-3 adolescents report using screen media until midnight or later. While screen media use encompasses various digital activities, social media applications are the most commonly used applications by adolescents.[32]

A longitudinal prospective study of adolescents without ADHD symptoms at the beginning of the study found that, over a 2-year follow-up, high-frequency use of digital media, with social media as one of the most common activities, was associated with a modest yet statistically significant increased odds of developing ADHD symptoms. Additionally, social media-induced fear of missing out, or "the pervasive apprehension that others might be having rewarding experiences from which one is absent," has been associated with depression, anxiety, and neuroticism.[33]

Studies have shown that people with frequent and problematic social media use can experience changes in brain structure similar to changes seen in individuals with substance use or gambling addictions.[34] Even the *social media companies themselves*, as exposed by Facebook

---

[32] *Id.* at ¶¶ 37-41.
[33] *Id.* at ¶¶ 42-43.
[34] *Id.* at ¶ 46.

whistleblower Frances Haugen, have internal research establishing the causal link between their product and poor mental health outcomes for youth.[35]

There are now many experimental studies showing that cutting back or giving up social media causes better mental health. Limits on the use of social media have resulted in mental health benefits for young adults and adults. A small, randomized controlled trial in college-aged youth found that limiting social media use to 30 minutes daily over three weeks led to significant improvements in depression severity. Other studies show improvement in mental health outcomes when social media is restricted. For example, researcher Hunt Alcott conducted an experiment in which he paid people money to try to get off social media, and reported that a reduction in social media use increased general happiness. A random assignment experiment found that reducing social media use to one hour a day improved youths' confidence in their appearance. Another experiment randomly assigned college students to engage in common activities. Walking and studying increased positive mood, while using social media decreased positive mood.[36]

### *Social media companies seek to trap adolescents*

Use of social media platforms is generally not subscription-based. Social media companies make money primarily by selling advertising space.[37] Marketers covet such space because social media companies possess vast amounts of data about their users. This enables them to target

---

[35] *Id.* at ¶ 47.
[36] *Id.* at ¶¶ 48-53.
[37] *See, e.g., Klein v. Facebook, Inc.*, 580 F.Supp.3d 743, 774 (N.D. Cal. 2022) ("whereas social media services make money by showing users advertisements, online entertainment services like Hulu typically collect from users a per-use monetary fee").

advertisements to specific audiences.[38] Given this business model, profits from these platforms are highly dependent on the number of users, the amount of time each user spends on the platform, and the amount of information a user provides, directly or indirectly, to the platform about themselves.[39] Social media companies are financially incentivized to keep eyeballs on screens.[40] Social media companies are also financially incentivized to learn as much as they can about their users so they can sell that information to advertisers.[41] Social media companies compete with each other for users.[42] Social media companies, like cigarette companies, are financially incentivized to target adolescents as their new users because once an individual registers for a social media platform and becomes addicted to it, they are less likely to switch platforms.[43]

Adolescents do not weigh the risks and rewards of providing personal information to social media companies in the same way that adults do.[44] Like casinos that are specifically designed to keep gamblers at the slots and tables, social media sites have added design elements that foster addiction,

---

[38] *See, e.g., In re Twitter, Inc. Securities Litigation*, 2020 WL 13863616, at *1, n.1 (N.D. Cal. January 28, 2020) ("Twitter uses three principal metrics to measure its financial health and growth prospects: (1) monthly active users . . (2) those users daily activity (user engagement) and (3) . . . the ability of the Company to turn user activity into advertising revenue") (cleaned up); *see also Gonzales v. Google LLC*, 2 F.4th 871, 933 (9th Cir. 2021) (J. Gould, concurring in part and dissenting in part) ("As I see it, the conduct of Google, Twitter, and Facebook as related to the risks of terrorists attacks . . . is either recklessly indifferent or willfully blind, as they enjoy increased advertising revenue associated with eyeballs on videos") (vacated and remanded on grounds that plaintiffs did not sufficiently allege that operators of social media platforms "consciously and culpably" participated in terrorist attack).
[39] *Id.*
[40] *Id.*
[41] *See Monetizing Attention: How Facebook Revolutionized Social Media Advertising*, Columbia Business Law Review, 2018 Colum. Bus. Law R. 994 ("Facebook also provided advertisers with a startling amount of customizability in selecting their target demographic – today, advertisers can select up to ninety-eight personal data points such as location, age, generation, gender [etc.]").
[42] *Id.*
[43] *See TikTok, Inc. v. Trump*, 490 F.Supp.3d 73, 84 (D.C. 2020) ("The nature of social media is . . such that users are unlikely to return to platforms they have abandoned").
[44] *Roper,* 543 U.S. at 569.

regardless of the content that is viewed.[45] Among these design elements are infinite scroll (by which

a user will never see a page break in their social media feed), autoplay features (through which the

next video automatically begins playing without any user activity), and push notifications (which

"ping" users regarding any number of activities happening on their social media feeds).[46] Push

notifications, autoplay, and infinite scroll are designed to encourage over-indulgence and contribute

to user addiction to social media, regardless of the content.[47]

      According to one recent model, nearly a third (31%) of social media use may be attributable

to self-control challenges magnified by habit formation.[48] In a nationally representative survey of

girls aged 11–15, one-third or more say they feel "addicted" to a social media platform.[49] Nearly 3-

in-4 teenagers believe that technology companies manipulate users to spend more time on their

devices.[50] The average number of notifications on young people's phones from top social and

communication apps amount to 192 alerts per day.[51] The average teen gets about 11 notifications

per waking hour, or one every five minutes.[52] For older teen girls, the average interruption is once

every minute.[53] Over half of teens use their phones overnight, primarily for social media (including

---

[45] *See, e.g.,* Griffiths, M.D. (2018). Adolescent social networking: How do social media operations
facilitate habitual use? *Education and Health*, 36(3), 66-69; *see also* "Major psychology group says
infinite scrolling, other social media features are 'particularly risky' to youth mental health," NBC
News, https://www.nbcnews.com/news/us-news/psychology-group-says-infinite-scrolling-social-
media-features-are-par-rcna147876.
[46] *See* U.S. Surgeon General Advisory, "Social Media and Youth Mental Health," Exhibit D, p. 9.
[47] *Id.*
[48] *Id.*
[49] Id.
[50] *Id.* at p. 10.
[51] Jonathan Haidt, The Anxious Generation: How the Great Rewiring of Childhood is Causing an
Epidemic of Mental Illness, p. 126 (2024).
[52] *Id.*
[53] *Id.*

YouTube).[54] Researchers have detected changes in brainwaves generated by smartphone push notifications.[55]

### The ineffectiveness of device filtering / parental supervision

Filtering applied in the home, on the router or on laptops, tablets, and smartphones, is generally managed by parents. Directions on how to circumvent parental controls are easily available on the internet and children are successful at circumventing parental control features. A survey from 2021 found that just 50% of US parents use any kind of controls. Those who do are often in a full-time "technological arms race over parental controls" with their children, and the children are winning. One study has found that 86% of parents support laws restricting children's access to social media.[56] A Pew Research Center found that just 16% of parents use blocking or filtering controls to restrict their teens use of his or her cell phone.[57]

### In addition to causing addiction, social media companies endanger children through data mining

Social media companies target adolescents for data mining in order to maximize profits. Whereas adults, on average, weigh the risks and rewards of providing personal information to social media companies, adolescents, who do not have fully developed brains, often do not understand or appreciate the risks involved in providing personal information to social media companies and other users. Personal data, once given to a social media company or another user, becomes everlasting as it

---

[54] *See* Constant Companion: A week in the life of a young person's smartphone use, (2023) *Common Sense Media.*

[55] *See* Kim *et al* (2016) An analysis of the effects of smartphone push notifications on task performance, Computational Intelligence and Neuroscience, 1-6.

[56] *See* Allen Dec., Exhibit C, ¶¶ 38-42.

[57] *See* https://www.pewresearch.org/internet/2016/01/07/parents-teens-and-digital-monitoring/pi_2016-01-07_parents-teens-digital-monitoring_0-01/ (accessed June 7, 2023).

is shared among advertisers. Social media companies can spread children's worst moments around the world instantly, never to be deleted.[58]

### The Act

To serve the State's significant and compelling interests as set forth in its detailed legislative findings, *see* Utah Code § 13-71-102, the Legislature enacted restrictions on social media accounts held by minors. First, to determine whether a social media account belongs to a minor ("Minor Account") or not, the Act requires the social media companies to "implement an age assurance system to determine whether a current or prospective Utah account holder . . . is a minor." Utah Code § 201(1). A social media company that implements and maintains an age assurance system that complies with rules made by the Division of Consumer Protection (the "Division") is not subject to an enforcement action for violation of the age assurance requirement. *Id.* at § 302(2).

For Minor Accounts, social media companies are required to: (a) set default privacy settings to prioritize maximum privacy; (b) implement and maintain reasonable security measures to protect the confidentiality, security, and integrity of personal information collected from minor accounts; (c) provide a notice that describes any information the social media company collects from the Minor Account and explains how that information is used or disclosed; and (d) delete personal information of the Minor Account upon request and remove any information made publicly available on the Minor Account upon request. *Id.* at § 202.

The Act requires social media companies to maintain the default maximum privacy settings unless it has obtained parental consent to change them and to disable the following features that prolong user engagement: autoplay functions, infinite scrolling, and push notifications. *Id.* at § 204. Further, the Act creates a presumption that a social media company will keep a Minor Account's

---

[58] *See* "Your Data is Forever," Kaveh Waddell, The Atlantic, June 2, 2016. https://www.theatlantic.com/technology/archive/2016/06/your-data-is-forever/485219/.

personal information confidential, which presumption may be overcome if the social media company obtains parental consent to change privacy settings. *Id.* at § 204(2) & (3).

The Act gives enforcement power to the Division and directs the Division to promulgate rules establishing processes for age verification and parental consent, in addition to its general rulemaking authority. *Id.* at § 302(1); *see also* Declaration of Katherine Hass ("Hass Dec."), Exhibit H, ¶¶ 3-4. By statute, rules regarding the Act may not be promulgated until October 1, 2024, when the Act goes into effect. Hass Dec., Exhibit H, ¶ 5. The Division is in the process of drafting rules related to the Act ("Proposed Rule"). *Id.* at ¶ 6. The Proposed Rule will outline methodologies for age assurance, approved by the Division, that a social media company may use to avail itself of the safe harbor provided for in the Act. *Id.* at ¶ 7. The Proposed Rule will implement the process and means by which a social media company may obtain verifiable parental consent that will be similar to those utilized by the Federal Trade Commission under the Children's Online Privacy Protection Act ("COPPA"). *Id.* at ¶ 10. The Proposed Rule will allow a social media company to use third-party vendors to meet the Act's age assurance and the verifiable parental consent requirements, provided that the third-party vendor adheres to the requirements of the Act and the Proposed Rule. *Id.* at ¶ 11.

### *Age Assurance Technology*

"Age Assurance" in the context of the Act is the process by which the provider of internet content ("Content Provider") verifies, estimates or infers that the consumer is age 18 or older. *See* Allen Dec., Exhibit C, ¶ 10. Age Assurance may take the form of: (a) "age estimation" – an age assurance method based on using inherent features or behaviors to estimate the age or age range of an individual; (b) "age inference," – an age assurance method based on confirmed information which indirectly implies that an individual is over or under a certain age or within an age range; or (c)

"age verification," – an age assurance method based on calculating the difference computation between the current date and the confirmed date of birth of an individual. *Id.* at ¶ 11.

Age Verification and Age Inference may be achieved by reference to drivers' licenses, passports, electoral rolls, credit reports, cell phone network records, banking, and credit card records. Users may also choose to create a digital identity, and selectively release just their age attributes. Age Estimation, on the other hand, can be achieved by analyzing facial images, voiceprints or game play. The most advanced of these, facial estimation, is accurate to within +/-1 to 1.5 years mean absolute error. Age Estimation for both Content Providers and consumers does not require consumers to submit any personal information other than a photograph or voiceprint, which is then instantly discarded. Facial age estimation is distinct from facial recognition. Facial age estimation detects and assesses information to give an age estimation; it does not seek to identify who the person in the image or recording is. *Id.* at ¶¶ 12-17.

Although social media companies may perform Age Assurance themselves, they may also contract with third-party companies ("Third-Party Services") to perform the service for a fee. When using a Third-Party Service, a Content Provider directs the consumer to provide information directly to the Third-Party Servicer who performs the age assurance and then informs the Content Provider only of the result of the check – "pass" or "fail." It does not pass on any other information. The Third-Party Servicer does not retain a consumer's personal information other than the date of birth, which can be used to respond to subsequent inquiries about that user's age. The assurance process need only be performed once per user and the verification results for any individual user may be shared with other websites, thereby minimizing the need for multiple age verification checks of the same individual. Age assurance may be performed online from home or anywhere the user has access to the internet and can usually be completed in less than a minute. *Id.* at ¶¶ 18-22. Modern

online age verification systems are inexpensive, costing platforms between 0 and 12 cents per one-time verification that can be used across platforms. *Id.* at ¶¶ 23-25.

## ARGUMENT

**I.   Plaintiffs cannot meet their burden to demonstrate a substantial likelihood of success on the merits.**

### A.   The Act does not violate the First Amendment.

#### 1.   *The Act's age assurance and data privacy requirements are not prior restraints*

Plaintiffs argue that the "Act's age-verification mandate and content-sharing restrictions impose invalid prior restraints" and that "there is currently no privacy-protective way to determine whether a consumer is a child." Pls.' Mot., pp. 9-10. Plaintiffs are wrong on both the law and the facts.

Plaintiffs misunderstand the prior restraint doctrine. Typically, "[t]he term prior restraint is used to describe *administrative* and *judicial* orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States,* 509 U.S. 544, 550 (1993) (citation and internal quotations omitted) (emphasis added). Unlike this case, a prior restraint usually is alleged where a public official has been given discretionary power to deny use of a forum in advance of actual expression. *See Ward v. Rock Against Racism,* 491 U.S. 781, 795 n. 5 (1989) (noting that most prior restraint cases have public officials with the power of pre-approval in common). Plaintiffs are not being forbidden from engaging in any expressive activity in the future; instead social media companies (who did not raise this argument in their challenge to the Act) potentially would be liable *following* their failure to comply with the regulated activity. Because there is a "well-established distinction between prior restraints and subsequent . . . punishments," *Alexander,* 509 U.S. at 548, the Act does not constitute a prior restraint because it only imposes liability for past behavior.

23

Plaintiffs argue that they cannot engage in online speech before going through the age assurance process, and that this constitutes a prior restraint. Pls.' Mot., ECF No. 37, p. 9. But this is no prior restraint. No user is forbidden under the Act from using social media if the platforms do not assure ages (or even if they do), and the consequences of *not* assuring age flow to the social media companies, not to the users. Plaintiffs also argue that the requirement of parental consent to change default data privacy settings is a prior restraint because it limits minors' ability to be heard by unconnected accounts. Pls.' Mot., ECF No. 37, p. 11. But again, liability for non-compliance with the law runs to social media platforms, not to users. At any rate, age-assurance in this context is a content-neutral restriction justified by the need to protect minors.

Most importantly, the prior restraint doctrine does not apply to statutes such as this – that impose ex post facto liability. All of the cases cited by Plaintiffs are distinguishable and inapplicable on this basis, because they involve either the exercise of administrative or judicial discretion in prohibiting, a priori, protected speech or the granting of almost unlimited discretion to administrative officials to prohibit speech. The Act, on the other hand, does not grant such discretion to officials; rather, it places reasonable, non-content-based "manner" restrictions on social media companies. For example, *Alexander* concerned a court-ordered asset forfeiture, not a statute. *Nebraska Press Ass'n v. Stuart*,[59] likewise, was about a judicial gag order of the press. In *Bantam Books, Inc. v. Sullivan*,[60] the Supreme Court struck down a statutorily-created system in which a Rhode Island Commission had power to stop the circulation of books to youth. The Court's problem with the system was the Commission's discretionary power to sanction, without the procedural safeguards that would be found in an ex-post facto criminal procedure. See *Bantam*, 372 U.S. at 69-79 ("Herein lies the vice of the system . . . In thus obviating the need to employ criminal sanctions, the State has

---

[59] 427 U.S. 539 (1976).
[60] 372 U.S. 58 (1963).

at the same time eliminated the safeguards of the criminal process"). *Interstate Circuit, Inc. v. City of Dallas*[61] concerned a municipality's effort to administratively enjoin a theater from showing a film under a licensing system that required theater (exhibitors) to get pre-approval from an official whose discretion exceeded making reasonable time, place, and manner decisions.

Although Plaintiffs cite *City of Ladue v. Gilleo*[62] in support of its prior restraint argument, that case was not a prior restraint case; the argument was not raised or addressed. Likewise with *ACLU v. Ashcroft*[63] and *ACLU v. Mukasey.*[64] In neither of those cases was the prior restraint doctrine raised or addressed. The reason it was not raised there is simple – those cases, like this one, involved direct challenges to the provisions of a statute and not to administrative or judicial discretionary action. Plaintiffs' prior restraint argument is misplaced.

Plaintiffs assert that "there is currently no privacy-protective way to determine whether a consumer is a child." Pls.' Mot., p. 9. This is false. Age assurance methods have kept pace with other technologies and are light-years ahead of where they used to be in 1994 when *City of Ladue v. Gilleo* was decided, or 2004 when *ACLU v. Ashcroft* was decided, or even 2008, when *ACLU v. Mukasey* was decided. For some unexplained reason, in support of their argument that the Act contains onerous age assurance requirements, Plaintiffs cite not the provisions of the Act, but to the Act's predecessor, which never took effect and, now, never will. *See* Pls.' Mot., p. 10 ("Case in point: the Act's predecessor would have required methods like 'facial characterization' that "match[es] a [user's] verified government-issued identification" to the user's face, or 'checking a [user's] social security number's last four digits against a third-party database"). But we are here to discuss the Act, not some other law not at issue.

---

[61] 390 U.S. 676 (1968).
[62] 512 U.S. 43 (1994).
[63] 542 U.S. 656 (2004).
[64] 534 F.3d 181 (3rd Cir. 2008).

Utah's Act—the one that matters here—does not require personal identifying information to be disclosed. It only requires a social media company to "implement an age assurance system to determine whether [an] account holder . . . is a minor." Utah Code § 13-71-201(1). And, in the year 2024, this can be done in a number of ways that: (1) do not reveal personally identifying information; (2) are quick; and (3) are inexpensive. Allen Dec., Exhibit C, ¶¶ 7-8, 14-22. Age assurance technology is not stuck in 2004.

### 2. *The Act is a content-neutral, reasonable time, place, and manner restriction.*

There is no unfettered right for a speaker or publisher to disseminate speech in any way they choose. Just as a speaker may be prohibited from driving down residential streets at 3:00 am blasting their message through loudspeakers (no matter what that message is), the State may prohibit social media companies from blasting messages (no matter what they are) to teenagers at any and all times of the day or night, as well as keeping them locked onto their already addictive product through nicotine-like additives. The Act's restrictions do not affect either the size or content of private publications. As the Court stated in *Grayned*, "[i]f overamplified loudspeakers assault the citizenry, government may turn them down." 408 U.S. at 116. Push notifications, infinite scroll, and autoplay are today's version of overamplified loudspeakers audially assaulting children.

### 3. *The Act is not overbroad*

Plaintiffs' allegations that the Act is overbroad contain a number of mischaracterizations of the Act. Plaintiffs claim that the Act "limits access by all minors to a powerful medium for expression merely because (the State believes) access to *some* information by *some* minors may be harmful." Pls.' Mot., 12. To the contrary, the Act permits all minors –without parental permission— to establish social media accounts and  connect with other accounts. It also permits minors to see and be seen by strangers with parental permission. The Act hardly "limits" access by all minors to a powerful medium. And though children have a degree of First Amendment rights, parents also have

26

the constitutional right to be involved in and regulate their children's communications. *See Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1284 (11th Cir. 2008) (In determining that Florida could constitutionally require parental consent for children to abstain from the pledge of allegiance, the Eleventh Circuit noted that the "rights of students and the rights of parents . . . are the subject of a legislative balance in the statute before us. The State, in restricting the student's freedom of speech, advances the protection of the constitutional right of parents; an interest which the State may lawfully protect").

Further, while the State elsewhere may prohibit (and has prohibited) the distribution of obscene material or other harmful material to youth, the Act itself does not speak to content at all. The Act is not concerned with content, but with addiction. Contrary to Plaintiffs' claim, the Act expresses no belief whatsoever that any particular information may be harmful to youth.

Plaintiffs press their argument that the Act is somehow about the content of speech. They cite *Snyder v Phelps* for the proposition that "speech cannot be restricted because it is upsetting." Pls.' Mot., p. 13, and suggest that the Act is aimed at speech that might be "hurtful." But the Act is not aimed at any speech in particular, hurtful or not. The Act permits all users, minors included, to share and receive hurtful messages, political messages, . . . anything. Plaintiffs thus attack a straw man.

In support of their argument that the Act is overbroad as to minors, Plaintiffs lay out a number of hypotheticals for which they say the Act prohibits protected speech, such as a student "sharing her art." Pls.' Mot., ECF No. 37, p. 13. But the Act does *not* prevent Plaintiff M.C. from sharing her art. She may post her art on her social media accounts, where it will be seen by connected accounts. The Act also does not prevent her from doing any of the following: sharing her art via email lists, participating in art shows, creating a website with her art on it, submitting it to periodicals, displaying it at school, displaying it in other public places pursuant to reasonable time, place, and manner restrictions, sharing physical copies with anyone she wishes – the possibilities are

numerous. Further, the Act allows her to share her art with unconnected accounts (online strangers); she only needs to get parental permission first. This is reasonable and in line with *Frazier*, 535 F.3d at 1284 ("The State, in restricting the student's freedom of speech, advances the protection of the constitutional right of parents; an interest which the State may lawfully protect").

Similar responses may be made to Plaintiffs other hypotheticals: the Act does not prevent minors from finding and messaging with classmates and youth organizations, which they have been doing since long before the existence of social media. And the Act certainly does not "prevent[] teenagers from engaging in community." Pls.' Mot., ECF No. 37, p. 13. Communities such as the ones cited by Plaintiffs exist beyond social media and may easily be found outside of unconnected social media accounts. Utah Youth Environmental Solutions, for example, has an active website which includes instructions on how to contact it.[65]

Plaintiffs also argue the Act is overbroad with respect to adults and suggest that it requires adults to "surrender[] their anonymity and personal information." Pls.' Mot., p. 14. As set forth above, modern age assurance technology does not require the relinquishment of anonymity on the internet. Even if it did, there is no First Amendment "freewheeling" right to anonymity, *see, e.g., John Doe No. 1 v. Reed*, 561 U.S. 186, 218 n.4 (2010) (Stevens, J. , concurring in part), and "the Constitution does not guarantee the right to acquire information . . . without any risk of embarrassment, *United Staes v. American Library Assn. Inc.*, 539 U.S. 194, 209 (2003).

### 4. *The Act is not underinclusive.*

"It is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech." *Williams-Yulee v. Florida Bar*, 575 U.S. 422, 448 (2015) (emphasis in original). This is because the "First Amendment imposes no freestanding underinclusiveness limitation. . . . A State need not address all aspects of a problem in one fell swoop; policymakers may

---

[65] *See* https://utahyes.org/.

focus on their most pressing concerns." *Id.* at 449. The Supreme Court has "accordingly upheld laws – even under strict scrutiny – that conceivably could have restricted even greater amounts of speech in service of their state interest." *Id.* (citing *Burson v. Freeman*, 504 U.S. 191, 207 (1992)).

Nevertheless, underinclusivity may be a "red flag" if it suggests that the government is targeting a particular speaker or viewpoint, *see Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993), or if the exemption of other conduct means the government is not actually advancing its interests or doing so in the least restrictive way. *Williams-Yulee*, 575 U.S. at 448-49. Neither concern is present in this case.

Plaintiffs complain that the Act regulates social media companies and not other services such as email. Pls.' Mot., p. 19. But it is addiction to the social media sites, with content generated by users *and* which facilitate social interaction in a way that email does not, that researchers have found cause mental health problems. It is the combination of the addictive design features with social media's user-generated and user-to-user interface that entraps youth in a world they cannot escape from, which is not (presently) true of other communicative modalities. *See* Twenge Dec., Exhibit B, ¶ 39 ("Social media, more than TV or gaming, is linked to shorter sleep, more mid-sleep awakenings, and longer time to fall asleep").[66] The State's targeting of social media is evidence that it is appropriately tailoring its law, not being underinclusive.

### 5.   *The Act's requirement of Age Assurance does not violate the First Amendment.*

"It is well-settled that a State . . . can adopt more stringent controls on communicative materials available to youths than on those available to adults." *Erznoznik*, 422 U.S. at 212. The Supreme Court has recognized that there is a "compelling interest in protecting the physical and

---

[66] *See also* Haidt, *The Anxious Generation*, p. 308 n. 24 ("social media's unique elements such as social validation, frequent reinforcement for behaviors, public displays of followers and likes, and profiles of relatable peers slightly older than the user make it an even more potent force [than streaming platforms like Netflix and Hulu]").

well-being of minors." *Sable Communications*, 492 at 126. There are a number of contexts, discussed below, in which governments require age assurance without running afoul of the Constitution, including settings in which fundamental constitutional rights may be in play, such as First Amendment free speech rights and Second Amendment rights. Courts typically apply rational basis review or intermediate scrutiny for age assurance laws involving constitutional rights.

Notably, the Fifth Circuit Court of Appeals recently applied rational basis review to a Texas law requiring pornographic websites to assure that their visitors were over the age of 18. *See Paxton*, 95 F. 4th 263. The Fifth Circuit reversed a district court's decision to preliminarily enjoin the law, finding that the pornography websites were not likely to prevail on the merits. *Id.* That decision is notable for two reasons.

First, the law at issue in *Paxton* is explicitly content based, unlike the Act at issue in this case. Even with a content-based law, rational basis review is appropriate for age-assurance requirements. A content-neutral law aimed at protecting children should be no different. Perhaps Plaintiffs may argue that *Paxton* involved speech that was unprotected as it pertains to children (pornography) and the Fifth Circuit used rational basis because children do not have a constitutional right to access unprotected speech. But *Paxton* considered the burdens the law would place on *adults* to access speech that *is* protected as to adults. *See Paxton*, 95 F.4th at 283 ("We address here only the application of [the law] to speech deemed . . . not obscene for adults"). Further, "the inclusion of some – or even much – content that is not obscene for minors does not end-run *Ginsberg*[.]" *Id.* at 277. Here, the aspect of social media services that is harmful to minors is not content-based as it is in *Paxton*, but it is harmful to youth nonetheless. Rational basis review is appropriate in this context as well.

Second, the United States Supreme Court refused to reverse the Fifth Circuit when given the opportunity to do so in an emergency setting. *See Free Speech Coalition v. Paxton*, -- S. Ct. --, 2024 WL

1864355 (April 30, 2024). Although the Supreme Court did not issue an opinion explaining why it denied the petition for a stay of the Fifth Circuit, it chose *not* to upset a decision leaving an age assurance law in place, at least preliminarily, that the petitioners argued violated their fundamental First Amendment rights and caused them irreparable harm.

State legislatures and Congress recognize that children are different. From the founding, the people acting through their representatives have determined that some activities that may be appropriate for adults present dangers to children, based upon their immaturity, lack of self-control, and lack of experience. The following are contexts in which governments completely prohibit minor participation, or restrict their participation, and do so by placing a burden on vendors to assure the ages of their customers or users: purchasing pornography (upheld using rational basis review against First Amendment challenge in *Ginsberg* and *Paxton*); possessing firearms (upheld against Second Amendment challenge in *U.S. v. Rene E*, 583 F. 3d 8 (1st Cir. 2009); *see also New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 73 (2022) ("Our decision . . . does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18") (J. Alito, concurring); tattoo parlors; tanning salons; and gambling.

Plaintiffs first say that the Act's premise of protecting minors' mental health is content based because it's about the effect of the speech on minors. Pls.' Mot., ECF No. 37, pp. 15-16. But time-place-manner restrictions can protect mental health (say, by allowing minors to sleep at night and not be kept up by someone shouting on a megaphone at all hours) without regard to content.

Plaintiffs also say that the Act is content-based "because it singles out social networks for differential treatment based on the content that *just these* providers disseminate." Pls.' Mot., ECF No. 37, p. 16. Although it is possible that a government could discriminate among media in a way that shows content-based motives, that is not the case with the Act. There is nothing a minor could talk

about on social media that she couldn't talk about via the exempted forums like email. Thus, there is no content-based restriction.

### a.   The Act's requirement of age assurance satisfies rational basis.

To satisfy the rational basis test, the Act "need only be rationally related to a legitimate government purpose." *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004). The Act easily satisfies that standard. The governmental interests, which are indeed compelling, are certainly legitimate. And restricting minor accounts in the way the Act proposes (turning off push notifications, autoplay, infinite scroll, and requiring parental consent to allow children to interact with strangers) is rationally related to those worthy governmental goals. Minors would be better able to focus on homework, sleep, and real-life relationships without these addictive elements. And they could benefit from parental guidance in a virtual world that poses risk to youth.

### b.   Though not required, the Act's requirement of age assurance satisfies any higher level of scrutiny.

The governmental interests in youth mental health are compelling. *See* Defs.' Statement of Facts. The Act also satisfies the tailoring requirement of both strict and intermediate scrutiny. Age assurance regulations have passed heightened constitutional scrutiny in other contexts. *See, e.g., Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 569-70 (2001) ("Unattended displays of tobacco products present an opportunity for access without the proper age verification required by law . . . It is clear that the regulations leave open ample channels of communication [and] do not significantly impede adult access to tobacco products"). The *Lorillard* Court found that "the means chosen by the State are narrowly tailored to prevent access to tobacco products by minors, are unrelated to expression, and leave open alternative avenues for vendors to convey information." *Id.* at 570. Here, too, the State's methods are narrowly tailored to prevent harmful social media addiction in children, are unrelated to content, and leave open channels of communication among youth and adults alike.

32

Plaintiffs cite *Ashcroft* for the argument that governments may not require social media companies to assure their users are over a certain age, no matter how addictive or harmful their products are to children. Pl.'s Mot., p. 14. However, *Ashcroft* said no such thing. Rather, *Ashcroft* determined that a district court, in 1999, *did not abuse its discretion* when it determined that, based on the evidence before it, an age verification scheme that required those accessing pornographic websites to upload personally identifying information to prove their age (such as a "credit card, debit account, adult access code, or adult personal identification number, [or] digital certificate) was not *at that time* the least restrictive alternative to protect children from pornography. *Ashcroft*, 542 U.S. at 666-67.[67] And, although there is no First Amendment "freewheeling" right to anonymity, *see, e.g., John Doe No. 1 v. Reed*, 561 U.S. 186, 218 n.4 (2010) (J. Steven, concurring in part), and "the Constitution does not guarantee the right to acquire information . . . without any risk of embarrassment, *United Staes v. American Library Assn. Inc.*, 539 U.S. 194, 209 (2003) (plurality opinion), the Court in *Ashcroft* was concerned that requiring personally identifying information to access pornography websites would have a chilling effect. *Ashcroft*, 542 U.S. at 667 ("Under a filtering regime, adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information"). Utah's Act, however, does not require personally identifying information to be disclosed. It only requires a social media company to "implement an age assurance system to determine whether [an] account holder . . . is a minor. Utah Code § 13-71-201(1). And, in the year 2024, this can be done in a number of ways that:

---

[67] The Fifth Circuit has determined that *Ashcroft* did *not* hold that strict scrutiny was the right level of judicial review. Instead, it merely held that if strict scrutiny applied, the Children's Online Protection Act would fall (based on then-existing technology). *Paxton*, 95 F.4th at 274 ("We see only one answer and therefore only one way to read *Ashcroft II* consistently with *Ginsberg*. *Ashcroft II* did not rule on the appropriate tier of scrutiny for COPA. It merely ruled on the issue the parties presented: whether COPA would survive strict scrutiny").

(1) do not reveal personally identifying information; (2) are quick; and (3) are inexpensive. Allen Dec., Exhibit C, ¶¶ 7-8, 14-22.

*Ashcroft* wisely noted that technology would change and specifically invited district courts to consider new evidence about what technologies are effective, and the degree to which they are restrictive. *Ashcroft*, 542 U.S. at 671 ("the factual record does not reflect current technological reality – a serious flaw in any case involving the internet . . . It is reasonable to assume that other technological developments important to the First Amendment analysis have also occurred . . .").

### 6.   *The Act's requirements of parental consent do not violate the First Amendment.*

Minors are different. Their brains are not fully developed. Because of this, they often do not understand the long-term consequences of immediate decisions, especially when those consequences are not readily apparent to them. Minors are thus uniquely susceptible to the enticements of profit-oriented companies who want to make money off them.

For this reason, governments may require parental consent in a variety of contexts, including many in which constitutional rights may be implicated. The State may require parental consent in tanning salons,[68] tattoo parlors (arguably implicating First Amendment rights),[69] and medical procedure decisions.[70] The State may require parental consent when it comes to a minor's exercise of her constitutional right to use a firearm.[71]

In the context of social media companies, which are data mining companies, minors risk exposing all sorts of information about themselves to the world at large, including financial information, their physical location at any given moment, their likes and dislikes, and just about every other aspect of their lives. The Act does not prevent minors from sharing this information

---

[68] *See, e.g.*, UTAH ADMIN. CODE R392-700-5 (2023).
[69] *See, e.g.*, UTAH CODE § 76-10-2201.
[70] *See, e.g.*, UTAH CODE § 78B-3-406(6).
[71] *See, e.g.*, UTAH CODE § 76-10-509.

with friends without parental consent, and the Act does not require minors to get parental consent when choosing their online friends (although parents may see who their friends are). But the Act does require minors to get parental consent if they wish to alter their default privacy settings to expose their personal lives to strangers. That is reasonable and it does not violate the First Amendment.

Plaintiffs rely primarily on *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) for their argument that the Act's parental consent requirement is unconstitutional. In *Brown*, the Supreme Court applied strict scrutiny to strike down a California law that placed restrictions on the sale of violent video games to minors. The Court determined that the law was content based, meant to protect children from the harmful effects of viewing (and participating in) fantasy violence. *Id.* at 799 ("Because the Act imposes a restriction on the content of protected speech, it is invalid unless California can demonstrate that it passes strict scrutiny").

The Act at issue here is readily distinguishable from the law at issue in *Brown*. First, the Act is content-neutral. And, the minors who California sought to protect in *Brown* were not at risk of exposing every detail of their lives to strangers online, such as personal financial information and current physical location. In social media, however, they are. Simply put, the governmental interests are different. Whereas the government interest in *Brown* was to shield minors from harmful content (violence), the government interest here is to shield minors' personal information from strangers.

Social media globally broadcasts current information about all its users, including minors. Perhaps parents may find that desirable for their youth, such as the aspiring musician who wants to reach a global audience. In such a case, the parent may permit it under the Act. Parents have long been entrusted in other contexts with guiding their children's decisions, such as whether children want to broadcast a message through tattoo art or visit an amusement park. Parents should be entrusted here to do the same and the Act assists them in that responsibility.

Parents have the constitutional right "to direct the upbringing and education of children under their control. . . [Children are] not the mere creature[s] of the state; those who nurture [them] and direct [their] destin[ies] have the right, coupled with the high duty, to recognize and prepare [them] for additional obligations." *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 535 (1925). In determining that Florida could constitutionally require parental consent for children to abstain from the pledge of allegiance, the Eleventh Circuit noted that the "rights of students and the rights of parents . . . are the subject of a legislative balance in the statute before us. The State, in restricting the student's freedom of speech, advances the protection of the constitutional right of parents; an interest which the State may lawfully protect." *Frazier*, 535 F.3d at 1284 (11th Cir. 2008).

Plaintiffs ask the Court to depart from the well-reasoned decisions discussed above, arguing that obtaining parental consent is not an option for them and may even place them at greater risk. But, the Act will satisfy intermediate scrutiny if it leaves "open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791. In the rare circumstance where it may be desirable for a minor to communicate with adults without parental permission, there are ample alternative channels of communication available to that minor. The organization Hope After Polygamy, for example, maintains a publicly available website with a list of resources and a telephone number and email address.[72] The Utah Department of Health and Human Services, Child Protective Services, maintains a website, hotline, and online reporting form. It also contains a list of resources available to anyone seeking support. The Act passes intermediate scrutiny because it leaves open ample alternative methods of communication for those children who cannot safely obtain parental consent to access social media.

---

[72] *See* https://www.hopeafterpolygamy.org/.

Social media is different than other forms of media due to its interactive nature. Social media is not just about sharing or viewing content; it is about interacting, in real time, with other human beings (or artificial intelligence). Those social interactions are fraught with concerns not present when a minor engages with television, radio, or streaming platforms. They entail revelations about the minor herself. Revelations that are often real-time and permanent. A minor, with an undeveloped brain, probably won't appreciate the potential consequences of sharing many details about herself with the wider world. The Act does not prohibit her from doing so, but the Act requires parental involvement in the decision. That parental involvement does not violate the First Amendment.

**B.   The Act does not violate the dormant Commerce Clause**

   *1.   Plaintiffs lack standing to raise a dormant Commerce Clause challenge*

For reasons set forth in the State's Motion to Dismiss, which arguments are incorporated by reference, Plaintiffs lack standing to raise a dormant Commerce Clause challenge.

   *2.   The Act does not violate the dormant Commerce Clause because it does not discriminate against out-of-state economic interests to the benefit of in-state interests*

For reasons set forth in the State's Motion to Dismiss, which arguments are incorporated by reference, the Act does not violate the dormant Commerce Clause.

**C.   47 U.S.C. § 230 does not preempt the Act, expressly or otherwise.**

Plaintiffs assert in their motion, as well as their First Amended Complaint, that the Act is preempted by Section 230 of the Communications Decency Act. *See* Pls.' Mot for Prelim. Inj., ECF No. 37, ECF page no. 2; *see also* Pls.' First Amended Complaint, ECF No. 36, p. 37. However, Plaintiffs do not advance the argument in their memorandum, *see id.*, p. 1, n. 1 (preemption "is not the focus of Plaintiffs' current motion"), so it is waived for present purposes. In any event, the preemption claim fails as a matter of law for reasons set forth in the State's motion to dismiss

Plaintiffs' claims deriving from § 230, filed simultaneously herewith. To the extent necessary, the State hereby incorporates by reference the arguments made in that motion.

## II.        The public interest strongly favors allowing the law to go into effect

The public interest in protecting children and adolescents from the harmful effects of social media has been recognized as important and even compelling. *See, e.g., Griffin* at *16 (an Arkansas social media regulation "clearly serves an important governmental interest") and *Bonta* at *16 (the goal of protecting children from the harms of social media is "compelling and laudable"). Children who become addicted to social media face difficult obstacles that harm not only themselves, but the relationships they have with family, friends, and others. Utah has enacted reasonable regulations to govern how social media is peddled to children, just like Utah and other states regulate the sale and availability of other dangerous products to children. In this case, there is no reason for the Court to tie the State's hands during the pendency of the lawsuit as it attempts to address a major public health crisis affecting the very lives of its children.

Perhaps recognizing the strong public interest in favor of social media regulation, Plaintiffs do not discuss the public interest prong of Rule 65A other than to blithely assert that a preliminary injunction would not "harm the State." However, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. at 1303 (internal citation omitted). The State has set forth ample evidence to show that excessive social media use causes significant harm to children. And the State has set forth evidence that placing all responsibility on parents (to solve a problem that social media companies created) in the modern internet age is ineffective. Even the most conscientious of parents have trouble shielding their children from the cascade of alluring enticements pouring onto their children's devices, which children often access away from home on devices not issued or controlled by parents.

III.   **The balance of the harms weighs in favor of allowing the law to go into effect.**

"To be entitled to a preliminary injunction, the movant has the burden of showing that the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction." *Heideman*, 348 F.3d at 1190. "The ability of a [government] to enact and enforce measures it deems to be in the public interest is . . . an equity to be considered in balancing hardships." *Id.* at 1191.

There is immense harm to many children and their families if they use social media for more than just two hours per day, or at night. They lose sleep. They become subject to cyber-bullying. They develop anxiety. They develop depression. Some even engage in self-harm, including suicide.

This is not a close balancing. The harm to children from social media far outweighs any harm to Plaintiffs. The Court should easily find that the balance of harms favors denying the request for the injunction and allowing the law to remain in effect pending this litigation.

## CONCLUSION

Utah has enacted a very modest, yet precise, law that targets the problem. And Utah has done so in a careful, content-neutral way. A preliminary injunction is extraordinary, drastic relief to be issued only when a movant's right to it is clear and unequivocal. Because Plaintiffs have not clearly and unequivocally demonstrated that they have a right to relief, the State requests that the Court deny their Motion for Preliminary Injunction.

DATED: June 28, 2024

OFFICE OF THE UTAH ATTORNEY GENERAL


 /s/ *Lance Sorenson*
DAVID WOLF
LANCE SORENSON
Assistant Utah Attorneys General
   *Counsel for Defendants*

39

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2024, I electronically filed the foregoing, **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** by using the Court's electronic filing system which will send a notice of electronic filing to the following:

**Jerome H. Mooney**
Weston Garrou & Mooney
Jerrym@mooneylaw.com

**Adam Sieff**
**Ambika Kumar**
**Chelsea T. Kelly**
**David M. Gossett**
Davis Wright Tremaine, LLP
adamsieff@dwt.com
ambikakumar@dwt.com
davidgossett@dwt.com

**Kelley Bregenzer**
**Robert Corn-Revere**
Foundation for Individual Rights and Expression
bobcornrevere@dwt.com

*Counsel for Plaintiffs*

UTAH ATTORNEY GENERAL'S OFFICE

/s/ Seth A. Huxford
SETH A. HUXFORD
Legal Secretary