IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| HANNAH PAISLEY ZOULEK, a Utah resident; JESSICA CHRISTENSEN, a Utah resident; LU ANN COOPER, a Utah resident; M.C., a Utah resident, by and through her parent, LU ANN COOPER; VAL SNOW, a Utah resident; and UTAH YOUTH ENVIRONMENTAL SOLUTIONS, a Utah association,<br><br>Plaintiff,<br><br>v.<br><br>KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce; and SEAN D. REYES, in his official capacity as Attorney General of Utah,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:24-cv-00031-RJS-CMR<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

This case arises out of Plaintiffs Hannah Paisley Zoulek, Jessica Christensen, Lu Ann Cooper, M.C., Val Snow, and Utah Youth Environmental Solutions' challenge to the Utah Minor Protection in Social Media Act (the Act).[1] Among other causes of action in their First Amended Complaint, Plaintiffs claim the Act violates the Commerce Clause of the United States Constitution. Now before the court is Defendants Sean D. Reyes and Katherine Hass' Motion to

---

[1] Utah Code §§ 13-71-101 to 401.

1

Dismiss that claim.[2]  For the reasons explained below, Defendants' Motion is GRANTED.

## BACKGROUND[3]

### A.  The Parties

Plaintiffs are Utah residents and a Utah-based non-profit association who use social media to "communicate, express themselves, associate with peers, and learn."[4]  They contend the Act would restrict their ability "to communicate and access information."[5]

Hannah Paisley Zoulek is a soon-to-be college student who uses social media for educational purposes and to connect with communities of users expressing themselves through creative writing.[6]

Jessica Christensen escaped a polygamous family at age fifteen and is now a prominent advocate for former members of polygamous groups.[7]  Minors and adults seeking help leaving abusive homes frequently contact her through social media.[8]

Lu Ann Cooper is the co-founder and president of Hope After Polygamy, which provides support to individuals, including minors, who are in or have left polygamist communities.[9]  Hope After Polygamy maintains several social media accounts educating teens and adults about its

---

[2] Dkt. 51, *Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Count 3) and Failure to State a Claim (Counts 3 and 4), and Memorandum in Support* (*Motion to Dismiss*).  Plaintiffs' First Amended Complaint also states a claim based on Section 230 of the Communications Decency Act and Defendants' Motion seeks dismissal of that claim.  However, Plaintiffs voluntarily dismissed their Section 230 claim after Defendants filed their Motion.  Dkt. 66, *Notice of Voluntary Dismissal of Count IV of the First Amended Complaint*.  Accordingly, only Defendants' Motion to Dismiss Plaintiffs' Commerce Clause claim remains for decision.

[3] Because this case is before the court on a motion to dismiss, it accepts as true all well-pleaded factual allegations contained in Plaintiffs' First Amended Complaint.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[4] Dkt. 36, *First Amended Complaint for Declaratory and Injunctive Relief* (*FAC*) ¶ 5.

[5] *Id.*

[6] *Id.* ¶ 7.

[7] *Id.* ¶ 8.

[8] *Id.*

[9] *Id.* ¶ 9.

services.[10] Individuals, including minors, contact the organization through its accounts seeking help.[11]

M.C. is Cooper's daughter and a high school student who uses social media to connect with friends, explore creative interests, and obtain information about a range of topics.[12]

Val Snow produces a YouTube channel covering mental health, resilience, and LGBTQ-related issues.[13] Both minors and adults watch his content and contact him through the channel for support.[14]

Utah Youth Environmental Solutions (UYES) is a "youth-led grassroots organization that seeks to educate young people in Utah regarding climate change and environmental issues."[15] It uses social media to advertise advocacy opportunities, promote its resources and information, and communicate with minors interested in the organization.[16]

Defendants are Katherine Hass and Sean D. Reyes, both sued in their official capacity.[17] Hass is Director of the Division of Consumer Protection of the Utah Department of Commerce (the Division).[18] The Act grants enforcement authority to the Division and its Director.[19] Reyes is the Attorney General of Utah.[20] He has authority to "give legal advice to, and act as counsel

---

[10] *Id.*

[11] *Id.*

[12] *Id.* ¶ 10.

[13] *Id.* ¶ 11.

[14] *Id.*

[15] *Id.* ¶ 12.

[16] *Id.*

[17] *Id.* ¶¶ 13–14.

[18] *Id.* ¶ 13.

[19] *Id.* (citing Utah Code § 13-71-301).

[20] *Id.* ¶ 14.

for, the [D]ivision in the exercise of the [D]ivision's responsibilities."[21]

## B. The Act

In March 2024, Utah's Governor signed the Act into law.[22] The Act takes effect on October 1, 2024, and partially replaces Utah's Social Media Regulation Act of 2023. The State repealed the 2023 law after Plaintiffs filed a lawsuit challenging its constitutionality.[23]

The Act regulates Utah minors' access to and use of social media by imposing various requirements on covered "social media compan[ies]."[24] Among other things, the Act requires covered websites to "implement an age assurance system"[25] that is "reasonably calculated to enable a social media company to identify whether a current or prospective Utah account holder is a minor with an accuracy rate of at least 95%."[26] It mandates a range of default privacy settings "limiting how and with whom minors may communicate on social networks,"[27] and prohibits websites from allowing minors to modify these settings unless a website first obtains

---

[21] *Id.*; Utah Code § 13-71-301(2).

[22] *FAC* ¶ 43.

[23] *Id.* ¶¶ 41–43; *see also* Dkt. 2, *Complaint for Declaratory and Injunctive Relief*.

[24] *FAC* ¶ 44. The Act defines a "social media company" as any "entity that owns or operates a social media service." Utah Code § 13-71-101(13). A "social media service" is any "public website or application that:"

  (i) displays content that is primarily generated by account holders and not by the social media company;
  (ii) permits an individual to register as an account holder and create a profile that is made visible to the general public or a set of other users defined by the account holder;
  (iii) connects account holders to allow users to interact socially with each other within the website or application;
  (iv) makes available to each account holder a list or lists of other account holders with whom the account holder shares a connection within the system; and
  (v) allows account holders to post content viewable by other users.

*Id.* § 13-71-101(14)(a). The term "[s]ocial media service" excludes "(i) email; (ii) cloud storage; or (iii) document viewing, sharing, or collaboration services." *Id.* § 13-71-101(14)(b).

[25] *FAC* ¶ 47 (quoting Utah Code § 13-71-201).

[26] *Id.* (quoting Utah Code § 13-71-101(2)).

[27] *Id.* ¶¶ 53–59 (citing Utah Code § 13-71-202(1)).

"verifiable parental consent."[28]  Additionally, the Act "limits the way content may be recommended, promoted, or presented to minors by barring autoplay functions, scroll or pagination features 'that load[] additional content as long as the user continues scrolling,' and push notifications."[29]

The Act contains two enforcement mechanisms.[30]  First, the Division Director "may impose an administrative fine of up to $2,500 for each violation" of the Act.[31]  Second, the Division may bring a "court action," and a "court may," among other things: (1) "order disgorgement of any money received in violation of" the Act; (2) "order payment of disgorged money to an injured purchaser or consumer;" (3) "impose a civil penalty of up to $2,500 for each violation;" (4) "award actual damages to an injured purchaser or consumer;" (5) award "reasonable attorney fees," "court costs," and "investigative fees;" and (6) order "any other relief that the court deems reasonable and necessary."[32]  "A person who violates an administrative or court order issued for a violation of [the Act] is subject to a civil penalty of no more than $5,000 for each violation."[33]

### C. Procedural History

Plaintiffs filed their initial Complaint challenging Utah's Social Media Regulation Act of 2023 on January 12, 2024.[34]  After Utah repealed the 2023 law and replaced it with the present Act, the parties agreed Plaintiffs should amend their Complaint and, if necessary, file a new

---

[28] *Id.* ¶ 63 (quoting Utah Code § 13-71-204(1)).

[29] *Id.* ¶ 60 (quoting Utah Code § 13-71-202(5)).

[30] Utah Code § 13-71-301.

[31] *FAC* ¶ 67; Utah Code § 13-71-301(3)(a)(i).

[32] *Id.*; Utah Code § 13-71-301(b)-(c).

[33] *Id.*; Utah Code § 13-71-301(4)(a).

[34] *Complaint for Declaratory and Injunctive Relief*.

motion for preliminary injunction.[35] Plaintiffs filed their now-operative First Amended Complaint (FAC) on May 31, 2024.[36]

Plaintiffs' FAC broadly contends the Act violates the Commerce Clause, the First Amendment, and the Fourteenth Amendment.[37] Relevant here, Count Three asserts the Act "violates the Commerce Clause" by imposing "an unreasonable and undue burden on channels of interstate commerce" that exceeds "any local benefit conferred on the State of Utah," and by "directly regulat[ing] speech and internet communications wholly outside Utah's borders."[38] Plaintiffs seek both declaratory and injunctive relief.[39]

On June 28, 2024, Defendants filed a Motion to Dismiss Count Three of Plaintiffs' FAC.[40] Defendants argue Plaintiffs' Commerce Clause claim should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of standing or, alternatively, Rule 12(b)(6) for failure to state a claim.[41]

The Motion is ripe for review[42] and the court is prepared to issue a decision.[43]

---

[35] Dkt. 30, *Joint Notice and Proposed Amended Scheduling Order*; Dkt. 31, *Docket Text Order* (granting *Joint Notice and Proposed Amended Scheduling Order*).

[36] *FAC*.

[37] *Id.* ¶ 6.

[38] *Id.* ¶¶ 91–97 (internal quotations omitted).

[39] *Id.* ¶ 103.

[40] *Motion to Dismiss*.

[41] *Id.* at 1.

[42] Defendants have not yet filed a Reply in support of their Motion to Dismiss. However, the court's "first duty . . . , even if not moved to it by either party, is to ensure sua sponte that [it] [does] not 'use the judicial power of the United States in a case to which the Constitution and laws of the United States have not extended that power.'" *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1164 (10th Cir. 2004) (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 384 (1884)). Because the court determines it does not have jurisdiction under Article III to hear Plaintiffs' claim, it is appropriate to rule on Defendants' Motion prior to the filing of Defendants' Reply brief.

[43] Having carefully reviewed the parties' briefs, the court determines oral argument would not be materially helpful and is now prepared to rule on Defendants' Motion. *See* DUCivR 7-1(g).

**LEGAL STANDARD**

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to move to dismiss a claim for "lack of subject-matter jurisdiction."[44] A "fundamental principle of [the court's] subject-matter jurisdiction is the 'constitutional limitation of federal-court jurisdiction to actual cases of controversies.'"[45] And one element of the "bedrock" Article III case or controversy requirement "is that a litigant must 'have standing to challenge the action sought to be adjudicated in the lawsuit.'"[46] To demonstrate Article III standing, "a plaintiff must establish three things: (1) he suffered an 'injury in fact'—'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical'; (2) the injury is 'fairly traceable to the challenged action of the defendant'; and (3) it is likely the injury will be 'redressed by a favorable decision.'"[47] This "irreducible constitutional minimum"[48] ensures "the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant [her] invocation of federal-court jurisdiction.'"[49]

**ANALYSIS**

Plaintiffs argue the Act violates the Commerce Clause because it imposes "an unreasonable burden on channels of interstate commerce . . . in clear excess of any local benefit

---

[44] Fed. R. Civ. P. 12(b)(1).

[45] *Shields Law Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1279 (10th Cir. 2024) (quoting *Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016)).

[46] *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024) (quoting *Valley Forge Christian Coll. V. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982)).

[47] *Kerr v. Polis*, 20 F.4th 686, 692 (10th Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)) (holding plaintiffs must establish for each claim asserted that they have suffered, "or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling'").

[48] *Speech First*, 92 F.4th at 949 (quoting *Lujan*, 504 U.S. at 560).

[49] *Murthy*, 144 S. Ct. at 1986 (alteration in original) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

conferred on the State of Utah" and "because it directly regulates speech and internet communications 'wholly outside' Utah's borders."[50] Defendants contend Plaintiffs lack both Article III and prudential standing to bring this challenge because they "are not engaged in interstate commerce" and thus "suffer no injury caused by a dormant Commerce Clause violation."[51] As explained below, the court concludes Plaintiffs fail to establish injury in fact and do not have standing to bring their Commerce Clause claim.[52]

### A. Dormant Commerce Clause

The court begins its analysis with a review of Plaintiffs' Commerce Clause claim,[53] which invokes a line of jurisprudence known as the dormant Commerce Clause. Although "[t]he Constitution does not contain a provision called the dormant Commerce Clause," courts have interpreted the Commerce Clause's positive grant of Congressional power to contain certain negative implications.[54] "Reading between the Constitution's lines," the dormant Commerce Clause "effectively forbid[s] the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'"[55] At its "very core," the dormant Commerce Clause rests on an "antidiscrimination principle" which "prohibits the enforcement of state laws

---

[50] *FAC* ¶¶ 94–95.

[51] *Motion to Dismiss* at 1. Challenges under Rule 12(b)(1) come in two forms—facial and factual attacks. A facial attack challenges the court's jurisdiction based only on factual allegations in the complaint. *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010). While the parties do not address which form Defendants' challenge takes, the court understands it to be a facial attack and "presume[s] all of the allegations contained in the [FAC] to be true." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002) (citation omitted).

[52] Because the court determines Plaintiffs' lack of standing deprives it of jurisdiction to make any determination on the merits of Plaintiffs' claim, it does not decide Defendants' Rule 12(b)(6) argument. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1217 (10th Cir. 2006) (citation omitted) ("[O]nce a court determines it lacks jurisdiction over a claim, it perforce lacks jurisdiction to make any determination of the merits of the underlying claim.").

[53] U.S. Const. Art. 1, § 8, cl. 3 ("Congress shall have [the] power . . . [t]o regulate commerce . . . among the several States.").

[54] *Direct Mktg. Ass'n v. Brohl*, 814 F.3d 1129, 1135 (10th Cir. 2016).

[55] *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)).

'driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'"[56] And of course, as the name implies, the Commerce Clause—dormant or otherwise—pertains only to commerce.[57]

### B. Standing Analysis

With that background in mind, the court turns to Defendants' argument that Plaintiffs lack standing to bring their dormant Commerce Clause claim because they "are all Utahns who are not engaged in interstate commerce."[58] Quoting a Fifth Circuit case, Defendants assert the "only parties that have standing to bring a dormant Commerce Clause challenge are those who engage in interstate commerce and can show that the [law] at issue has adversely affected their commerce."[59] As "Plaintiffs are not engaged in interstate commerce," Defendants conclude "they do not suffer an injury of the sort that the dormant Commerce Clause seeks to protect."[60] Defendants also argue Plaintiffs lack prudential standing because their claims "do not fall within the zone of interests protected by the dormant Commerce Clause."[61]

For their part, Plaintiffs seem to take their standing for granted. Their FAC is silent on the issue and their Opposition to Defendants' Motion to Dismiss focuses on Defendants'

---

[56] *Nat'l Pork Producers*, 598 U.S. at 369 (quoting *Dept. of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)) (internal quotations omitted); *see also Brohl*, 814 F.3d at 1135 (explaining "[t]he primary concern [of the dormant Commerce Clause] is economic protectionism").

[57] *See, e.g., United States v. Lopez*, 514 U.S. 549, 561 (1995) (invalidating federal legislation enacted under Congress's Commerce Clause authority because the statute had "nothing to do with 'commerce' or any sort of economic enterprise"); *United States v. Morrison*, 529 U.S. 598, 613 (2000) (explaining the Commerce Clause only permits regulation of activity that "is economic in nature"). The court's survey of dormant Commerce Clause caselaw finds no examples of challenges brought by plaintiffs uninvolved in the economic activity regulated by the challenged state law. Under its Commerce Clause authority, Congress may only regulate activity that is economic in nature. It stands to reason the inverse would be true of the dormant Commerce Clause—only those private plaintiffs involved in regulated economic activity may use the Commerce Clause to strike down state legislation.

[58] *Motion to Dismiss* at 2–3.

[59] *Id.* at 2 (quoting *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 476 (5th Cir. 2013)).

[60] *Id.* at 3.

[61] *Id.*

prudential standing arguments.[62] Plaintiffs' only discussion of Article III standing in their brief is a single footnote where they assert Defendants incorrectly articulate the elements of Article III standing and make "no argument as to the actual requirements of Article III standing."[63] Accurate or not, the same is true of Plaintiffs and, as it is Plaintiffs' burden to establish standing, that is fatal to their claim.[64]

The court agrees with Plaintiffs that Defendants' Article III standing argument is not a model of clarity.[65] Indeed, the sole authority Defendants cite in support of their position that Plaintiffs lack Article III standing is a portion of an out-of-circuit opinion discussing prudential standing.[66] But, the court has an "independent obligation to determine whether subject-matter jurisdiction exists," and must ensure Plaintiffs have standing "even in the absence" of a compelling challenge from Defendants.[67]

Upon the court's independent review, it concludes Plaintiffs fail to establish a cognizable injury in fact under the Commerce Clause and thus, lack standing for both forms of relief they seek.[68] The court deciphers two potential arguments from which Plaintiffs might establish standing. First, Plaintiffs' combined Opposition and Reply brief notes that two Plaintiffs use

---

[62] *Opposition* at 31–33.

[63] *Id.* at 31 n.31.

[64] *Murthy*, 144 S. Ct. at 1986 (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)) ("The plaintiff 'bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter.'").

[65] The court further agrees with Plaintiffs that Defendants' prudential standing argument is inadequate. Defendants argue a legal standard that, based on binding Supreme Court and Tenth Circuit authority they do not acknowledge, appears to no longer be good law. However, because the court determines Plaintiffs lack Article III standing, it need not further engage with these issues.

[66] *Motion to Dismiss* at 2–3 (quoting the Fifth Circuit's discussion of prudential standing in *Cibolo Waste*, 718 F.3d at 476).

[67] *Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)); *see also American Humanist Assoc., Inc. v. Douglas Cnty. Sch. Dist. RE-1*, 859 F.3d 1243, 1250 (10th Cir. 2017) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007)) ("Each plaintiff must have standing to seek each form of relief in each claim.").

[68] As suggested above, Plaintiffs do not expressly outline their Commerce Clause standing.

social media for commercial purposes—potentially demonstrating an injury for standing purposes.[69]  Second, Plaintiffs argue the Act violates the Commerce Clause by burdening "how and with whom Plaintiffs may communicate across state lines."[70]  The court understands Plaintiffs to suggest the burden the Act imposes on non-commercial communication constitutes a cognizable injury under the Commerce Clause.[71]  Each of these arguments are insufficient.

### 1. Use of Social Media Platforms to Engage in Commercial Activity

The references in Plaintiffs' combined Opposition and Reply brief to the two Plaintiffs who arguably engage in commercial activity on social media are inadequate to establish Article III standing.  These references, which note that Plaintiff Snow "sells 'products through YouTube and Facebook'" and Plaintiff M.C. "uses Instagram to fundraise for her dance teacher's studio," come from a section of Plaintiffs' combined Opposition and Reply arguing the merits of Plaintiffs' Commerce Clause claim.[72]  Each of these citations are drawn from Declarations submitted in support of Plaintiffs' Motion for Preliminary Injunction.[73]

The court observes neither of these references are raised in Plaintiffs' FAC.  The FAC does not expressly address Commerce Clause standing and the court finds no factual allegations which could be construed to establish Snow or M.C. engage in commerce on social media.  Further, Plaintiffs provide no basis for the court to consider evidence extrinsic to their FAC in deciding Defendants' Rule 12 Motion.  Typically, when jurisdictional questions are "intertwined

---

[69] *Opposition* at 29.

[70] *Opposition* at 32–33.

[71] *FAC* ¶ 94; *Opposition* at 32–33.

[72] *Id.* at 29.  Plaintiffs' Opposition is combined with their Reply in support of Plaintiffs' Motion for Preliminary Injunction.

[73] Dkt. 41, *Declaration of M.C., a Minor, in Support of Plaintiffs' Motion for Preliminary Injunction* ¶ 5; Dkt. 42, *Declaration of Val Snow in Support of Plaintiffs' Motion for Preliminary Injunction* ¶ 9.

with the merits" and a court "relie[s] on affidavits and other evidentiary material submitted by the parties" outside the pleadings, a motion to dismiss under Rule 12(b)(1) should be "treated as one for summary judgment under Rule 56(c)."[74] Here, however, Plaintiffs do not address whether and how the court should consider evidence outside the pleadings.

Plaintiffs are represented by sophisticated and experienced counsel. The court presumes they are aware of their burden on this threshold issue and further observes that, even if they were not, they were placed on notice of potential jurisdictional defects by Defendants' Motion. Notwithstanding, Plaintiffs did little to meet their burden and the court determines it would be inappropriate to do that work for them by drawing on extrinsic evidence in an attempt to save Plaintiffs' claim.[75]

### 2. Impaired Internet Communication

Plaintiffs' primary argument—that any impediment to an internet users' general interest in the online distribution of information and communication constitutes an injury under the Commerce Clause—is legally unsupported and unpersuasive.[76]

Plaintiffs' highlight *ACLU v. Johnson* for the proposition that the Commerce Clause prohibits undue "restrictions on speech transmitted online just as it does to physical goods."[77] However, the court does not read this Tenth Circuit decision from the nascent days of the

---

[74] *United States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1159–60 (10th Cir. 1999).

[75] The court further observes, even if it considered the statements from Plaintiffs' Declarations, the statements would likely be insufficient to demonstrate an injury establishing standing—absent any allegation that Plaintiffs' economic activity is interstate or that their intrastate economic activity would be substantially burdened by the interstate reach of the Act.

[76] *FAC* ¶ 94.

[77] *FAC* ¶ 93 (citing *ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999)).

internet to support the far-reaching standing theory Plaintiffs marshal it for.[78] The Circuit did not specifically address Commerce Clause standing in the case, and did not offer guidance concerning cognizable injuries at the intersection of internet regulation and the Commerce Clause. Furthermore, distinct from Plaintiffs here, the plaintiffs in *Johnson* were individuals whose particular uses of the internet raised an imminent specter of criminal prosecution under the challenged state law.[79] In contrast, Plaintiffs here are not directly regulated by the Act. They face no liability or threat of enforcement under the Act. And, as alleged, they are not engaged in any commercial or economic activity that would be burdened by the Act.

Plaintiffs' theory of injury in fact based on a burden to their general interest in using the internet "to communicate" is far from "concrete and particularized."[80] Such an expansive conception of injury would provide any plaintiff who uses the internet standing under the Commerce Clause to challenge any state law touching on the internet. But, as the Supreme Court has long held and repeatedly reiterated, standing requires the individual plaintiff suffer some sort of "direct injury."[81] A "generalized grievance" whose "impact on [plaintiff] is plainly undifferentiated and 'common to all members of the public,'" does not constitute an injury in fact sufficient to confer standing under Article III.[82] Plaintiffs' Commerce Clause standing theory rests on this sort of generalized grievance and is not sufficient to invoke the jurisdiction of the federal courts for Article III purposes.

---

[78] It is noteworthy that in the decades since *Johnson* was decided, the court is unable to identify any case supporting the notion that general internet communication—in other words, merely using the internet—constitutes a cognizable interest under the Commerce Clause. In view of the ubiquity of the internet and social media in contemporary society, this silence is telling.

[79] *Johnson*, 194 F.3d at 1153.

[80] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

[81] *Lujan*, 504 U.S. at 575.

[82] *Id.* at 575–76 (alteration in original) (collecting cases).

In sum, while there likely are plaintiffs who could challenge the Act under the Commerce Clause, these Plaintiffs are not them. As alleged, their general interest in use of the internet, devoid of any economic activity, does not amount to an injury in fact sufficient to establish standing to bring their Commerce Clause claim.

## CONCLUSION

For the reasons explained above, Plaintiffs do not have standing to challenge the Act under the Commerce Clause. Accordingly, Defendants' Motion to Dismiss[83] is GRANTED and Count Three of Plaintiffs' FAC is DISMISSED.

So ORDERED this 5th day of August 2024.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[83] Dkt. 51.