1              IN THE UNITED STATES DISTRICT COURT

2                       DISTRICT OF UTAH

3                       CENTRAL DIVISION

4

5   NETCHOICE, L.L.C.,                )

6            Plaintiff,               )

7   vs.                              )   Case No. 2:23-CV-911RJS

8   SEAN REYES, in his official       )

9   capacity as Attorney General      )

10  of Utah,                          )

11           Defendant.               )

12  _____)

13  HANNAH PAISLEY ZOULEK, et al.,    )

14           Plaintiffs,              )

15  vs.                              )   Case No. 2:24-CV-31RJS

16  KATIE HASS, in her official       )

17  capacity as Director of the Utah)

18  Department of Consumer            )

19  Protection, et al.,               )

20           Defendants.              )

21  _____)

22

            BEFORE THE HONORABLE ROBERT J. SHELBY
23        --------------------------------------

24                     August 14, 2024

25                     Motion Hearing

```
1                    A P P E A R A N C E S

2

3

4    For Plaintiffs:              STEVEN LEHOTSKY
     NetChoice                    200 Massachusetts Avenue, N.W.
                                  Washington, D.C.
5
                                  DAVID REYMANN
6                                 101 South 200 East
                                  Suite 700
7                                 Salt Lake City, Utah

8    For Plaintiffs:              ROBERT CORN-REVERE
     Hannah Zoulek, et al.        700 Pennsylvania Avenue, S.E.
9                                 Suite 340
                                  Washington, D.C.
10
                                  JEROME. H. MOONEY
11                                12121 Wilshire Boulevard
                                  Suite 525
12                                Los Angeles, California

13                                ADAM SIEFF
                                  865 South Figueroa Street
14                                Suite 2400
                                  Los Angeles, California
15

16
     For Defendants:              DAVID N. WOLF
17                                LANCE F. SORENSON
                                  ALEX BUTLER
18                                160 East 300 South
                                  Sixth Floor
19                                Salt Lake City, Utah

20

21

22
     Court Reporter:              Ed Young
23                                351 South West Temple
                                  Room 3.302
24                                Salt Lake City, Utah 84101-2180
                                  801-328-3202
25                                ed_young@utd.uscourts.gov
```

```
 1  August 14, 2024                                  9:30 a.m.

 2                     P R O C E E D I N G S

 3

 4         THE COURT:  Good morning, everyone, and welcome.

 5         We'll go on the record in a joint hearing in two

 6  cases, NetChoice versus Reyes, case number 2:23-CV-911, and

 7  Zoulek, if I am saying that correctly, versus Hass, case

 8  number 2:24-CV-31, both of which, at least for the moment,

 9  are before me based on the parties' request to -- it was

10  framed to consolidate, but we have transferred the Zoulek

11  case for purposes of considering the motion for preliminary

12  injunction.

13         Why don't we take a moment and begin with our

14  appearances, please, beginning with the plaintiffs.  It is

15  the same plaintiffs in both cases.

16         That is not true.  It is the same defendants in

17  both cases.

18         Sorry, Mr. Reymann.  I will get there.

19         MR. REYMANN:  Good morning, Your Honor.  David

20  Reymann from Parr Brown on behalf of the plaintiff

21  NetChoice.

22         MR. LEHOTSKY:  Good morning, Your Honor.  Steven

23  Lehotsky from Lehotsky Keller Cohn on behalf of plaintiff

24  NetChoice.

25         THE COURT:  Thank you.
```

```
1              MR. CORN-REVERE:  Good morning, Your Honor.
2    Robert Corn-Revere from the Foundation For Individual Rights
3    And Expression for Hannah Zoulek and the individual
4    plaintiffs.
5              THE COURT:  Welcome.
6              MR. MOONEY:  Good morning, Your Honor.
7              Jerome Mooney, Weston Garrou & Mooney, on behalf
8    of Zoulek and the plaintiffs in the Zoulek matter.
9              MR. SEIFF:  Good morning, Your Honor.
10             Adam Sieff with Davis Wright Tremaine for Hannah
11   Zoulek and the individual plaintiffs.
12             THE COURT:  Great.  Thank you.
13             MR. SORENSON:  Good morning, Your Honor.
14             I am Lance Sorenson from the attorney general's
15   office on behalf of the defendants in both matters.  With me
16   is David Wolf, also from the attorney general's office.
17   Alex Butler and defendant Katie Hass are also here.
18             THE COURT:  Terrific.  Thank you.
19             I missed one name.  I'm sorry.  At the back table
20   in the far right, on your right I didn't catch your name and
21   I apologize.
22             MR. CORN-REVERE:  Robert Corn-Revere.
23             THE COURT:  Robert Corn-Revere.  There we go.
24   Thank you.
25             I learned, just as I was walking into the
```

1    courtroom, that Alex Butler is here from the attorney

2    general's office.  So I should make a disclosure that Ms.

3    Butler clerked with me two years ago, right?  Right.  Okay.

4              I think that is all I have to say about that.

5              Well, you have given us a lot to chew on.  In

6    preparation for the hearing we have of course carefully

7    reviewed your papers more than once.  We have tried to

8    familiarize ourselves with the controlling legal

9    authorities.  I have lots of questions and I think you have

10   lots of answers.  So I'll be eager to hear from all of you.

11             I think that is all that I have to say at the

12   outset.  Ordinarily I give you some sense at the outset of

13   my preliminary view of the issues based on our review of the

14   papers, but I'm not sure how far I could get us today until

15   we have the benefit of your oral argument.

16             Why don't we begin with NetChoice.  It is your

17   motion.  Mr. Lehotsky.

18             MR. LEHOTSKY:  Good morning, Your Honor.

19             If the Court has questions where you would like to

20   begin, I'm happy to begin with any of your questions.  I'm

21   also happy to start with an affirmative presentation, but --

22             THE COURT:  I'm not shy about questions, but why

23   don't you go ahead and get us started.  You have thought a

24   lot about how to organize this information and material and

25   I'm looking to all of you to teach me today.

1          MR. LEHOTSKY:  Thank you, Your Honor.

2          On behalf of plaintiff NetChoice and my client,

3    Paul Taske from NetChoice is with me at counsel table.

4          We seek a preliminary injunction on behalf of our

5    covered members and only our covered members such as

6    Dreamwidth, Meta, Snap and YouTube, against the enforcement

7    of the Utah Minor Protection in Social Media Act, SB-194,

8    which, otherwise, will take effect on October 1st.  At page

9    10 of the defendant's opposition, the defendants concede

10   that the Act regulates protected speech and that the First

11   Amendment applies.

12         They say that the law is modest and that it

13   restricts only social interaction online.  That is the

14   problem that they are targeting, humans interacting online.

15   At page 42 of their brief they say something --

16         THE COURT:  May I invite you to slow down a little

17   bit?  Mr. Young is trying to keep up and it is a losing

18   cause so far.

19         MR. LEHOTSKY:  Yes, Your Honor.

20         At page 42 of their brief they say something

21   remarkable.  Quote, social media is different than other

22   forms of media due to its interactive nature.  Social media

23   is not just about sharing or viewing content.  It is about

24   interacting in real time with other human beings or

25   artificial intelligence.  Now, we are interacting as human

1    beings right now, just not through the medium of a phone.

2         The attorney general continues:  Those social

3    interactions are fraught with concerns not present when a

4    miner engages with television, radio or streaming platforms.

5    They entail revelations about the minor herself, revelations

6    that are often realtime and permanent.  A minor with an

7    underdeveloped brain probably won't appreciate the potential

8    consequences of sharing many details about herself with the

9    wider world.

10         That is a remarkable admission that they want to

11   regulate speech by minors, interaction, whether it is

12   through your mouth or through your fingertips.  What Utah

13   wants to regulate is minors speaking and receiving speech

14   from the public, the outside world.  We say that that is

15   precisely a First Amendment violation.  That is a First

16   Amendment violation of our members' rights to disseminate

17   and publish speech to minors and from minors and to the

18   world at large.

19         It is not a modest law and we're going to talk a

20   lot about Moody today, I suspect, but this is a fairly

21   straightforward Moody and facial challenge case because our

22   argument against this law is categorical.  There are three

23   aspects of the law that we focus on in our briefing.  Those

24   are the parental consent requirements that limit who minors

25   can interact with, and the attorney general says it limits

1  essentially interaction with strangers, otherwise known as

2  the broader public, anybody outside of the immediate friend

3  network; second, the age assurance provisions which require

4  our members, our covered website members to verify -- they

5  use the word assurance, but it is the exact same as age

6  verification -- all current and future members to determine

7  what their age is; and then, third, the provisions that

8  outright prohibit the use of certain features such as Push

9  Notifications, Autoplay, and what we refer to as

10 Seamless-Pagination but the attorney general refers to as

11 infinite scrolling.

12      All of these are methods and ways that our covered

13 member websites disseminate and publish speech in the world,

14 admittedly to encourage people to use these websites.  That

15 is their entire purpose is to try to connect human beings

16 online with content that they find interesting and that they

17 want to see and watch.  All three of these provisions are

18 content-based and speaker-based.  For that reason alone they

19 are subject to strict scrutiny and we do not think they

20 satisfy it.  That alone is categorically unconstitutional.

21      THE COURT:  What is the best authority do you

22 think, for the proposition that these are speaker-based

23 restrictions?

24      MR. LEHOTSKY:  The best authority that they are

25 speaker-based restrictions -- of course we first have the

1    litany of district court cases in Fitch and Bonta and Yost

2    and Griffin that have all held very similar restrictions are

3    speaker-based restrictions.  Under the Supreme Court

4    precedent, though, I think there are a litany of cases.

5    Give me a moment and I will turn to my speaker-based

6    section.

7              THE COURT:  There is no shortage of cases before

8    us today.  Take your time.

9              MR. LEHOTSKY:  Very true, Your Honor.

10             So I think the NIFLA versus Becerra case is a good

11   case for us.  We also cite the Turner Broadcasting System

12   case.  I know that there is a dispute between us and the

13   attorney general about the meaning and import of that

14   decision, but I think it is also obvious from the attorney

15   general's concessions about what the brief covers, which is

16   that it only covers websites where the content is user

17   generated or, as the statute says, primarily user generated.

18   So it does not apply to a website such as Hulu or Disney

19   Plus that supplies its own content from N.B.C. or Disney

20   A.B.C. as the case may be.

21             That is an obvious speaker-based distinction, that

22   a minor could go to Hulu or Disney Plus and watch for hours

23   and hours and hours.  The attorney general complains about

24   screen time and usage by minors of the internet.  The Act is

25   wildly underinclusive.  It does nothing about that for the

1    litany of websites that have website generated content, but

2    if you are talking about a website such as YouTube or Snap

3    or our member Dreamwidth, where the content is all generated

4    by users and then shared with the broader world, those

5    websites are subject to the litany of restrictions and

6    verbiage such as age verification and parental consent for

7    speaking to the broader public, that we say are

8    categorically unconstitutional.

9           Before I turn to some of the more specific

10   provisions that I have laid out, I want to start with some

11   overarching principles, because I think a lot of our case is

12   dictated by clearly established Supreme Court precedent.

13          First and most notably is the Brown versus

14   Entertainment Merchants Association decision where minors

15   are, quote, entitled to a significant measure of First

16   Amendment protection and the government's power to protect

17   them does not include a free floating power to restrict the

18   ideas to which children may be exposed.

19          I think it is also clearly established under

20   Ashcroft and Reno that you cannot have the types of age

21   assurance and age verification that apply to both adults and

22   minors.  The attorney general makes a lot of argument that

23   social media is different and that the internet has changed.

24   We don't think that is true for a variety of reasons.  We

25   don't think any of the features of social media amount to a

1    constitutional difference, but, in any event, those Supreme

2    Court precedents are still good law and are still binding

3    and in place.

4           Indeed, under more recent decisions such as

5    Packingham from 2017 and Moody from just a couple of weeks

6    ago, we think it is very clear that the principles that were

7    enunciated a generation ago for the internet do not change

8    just because social media is involved.  That has also been

9    the consistent ruling of the other district courts, those

10   other four cases that I mentioned that have sided with

11   NetChoice and granted preliminary injunctions against

12   similar states' laws to Utah's SB-194.

13          I would like to turn now, Your Honor, to our

14   arguments about why this is a content and speaker-based law.

15   So first I think there is no dispute that the Act regulates

16   our covered members, their websites as social media

17   companies and social media services, and that definition of

18   social media company is clearly content-based.  The Southern

19   District of Mississippi in the Fitch case came to the same

20   conclusion that a definition of coverage for a similar law

21   is content-based where it is triggered by social

22   interaction, that is people interacting with each other

23   online through posting, commenting, liking.

24          THE COURT:  Whatever the state of the law was, and

25   this is true as you were briefing the preliminary injunction

1    in this case, didn't it all change with Moody and

2    content-based a few weeks ago, did it not?

3          Does Moody not just settle the question that I

4    think the other district courts were trying to answer, which

5    is is this expressive conduct, conduct by social media

6    platforms, the organization, the editorial decision-making

7    about the form and format and presentation of the

8    information?  That is settled law now, I think, and it

9    wasn't when we started this briefing in this case.

10         MR. LEHOTSKY:  In our favor, yes, I would agree

11   with that.  I think it settles that question in our favor.

12         THE COURT:  Was the Supreme Court saying when it

13   said what it said in Moody about the nature of this

14   expressive conduct, wasn't it saying it was content-based

15   speech?

16         MR. SORENSON:  I'm sorry.  That the restriction --

17         THE COURT:  That the restrictions were --

18         MR. LEHOTSKY:  The restrictions at issue in the

19   Moody and Paxton cases were content-based restrictions of

20   speech, yes, Your Honor.

21         THE COURT:  Right.

22         MR. LEHOTSKY:  Yes, we agree with that.  We think

23   Moody helps our case tremendously and confirms our

24   arguments.  When we initially started briefing, as Your

25   Honor notes, based on, you know, Hurley and Turnillo and the

1    other cases from the nineties and eighties and seventies

2    that the editorial dissemination and publication of our

3    websites is protected First Amendment activity, and state

4    laws that are content-based and speaker-based implicate the

5    First Amendment and must satisfy strict scrutiny.  So we

6    think that Moody confirms and supports our arguments and it

7    does not help the state we think in any respect.

8              So with respect to the content-based argument, as

9    I said, the Fitch decision strongly supports our argument

10   that this is content-based because of the definition of

11   social interaction.  I would say, though, that even if they

12   are right and even if they are correct that social

13   interaction is not a content-based category, that is a vice

14   under the First Amendment and not a virtue.  That does not

15   help them to say that they ban an incredibly broad amount of

16   speech.

17             Imagine if you had laws that regulated all movies

18   and not just comedies or laws that regulated all book sales

19   but not just novels.  That wouldn't make it any better under

20   the First Amendment that it applies to all books or all

21   movies.  The same is true if you're talking about all

22   websites where people interact with one another.  Our

23   argument is whether that is content-based or whether that is

24   something else, it is clearly a First Amendment violation,

25   especially because the attorney general has conceded that

1    our websites deliver speech and that we're dealing with

2    speech here and not other, you know, conduct or anything

3    else that would not be subject to First Amendment scrutiny.

4          THE COURT:  Well, I think the state will tell us

5    this morning that because they are not regulating any of the

6    content itself in all of those books that they might ban,

7    that it is not content-based.  It does not matter if the

8    book is a romance novel or a political novel or if it is a

9    fiction novel so it is not content based.

10          Your answer to that is what?

11          MR. LEHOTSKY:  Our answer to that is that it is

12    social interaction based.  So, again, the quote that I read

13    from page 42 of the defendant's brief, you know, they are

14    trying to draw a distinction between passive consumption, if

15    you're just a couch potato watching a movie, watching a

16    video or reading something from a reporter on espn.com, that

17    that is totally fine even if it implicates all of the exact

18    same health harms that they say they are trying to address

19    through this law.

20          If, however, you are posting your own video, a

21    video of you playing the guitar, or if you're a high school

22    athlete and you're trying to get attention from college

23    recruiters and college coaches, if you post that video and

24    if somebody else, another minor watches that video on

25    Autoplay, that is restricted.

1          That is admittedly a very broad category, a very

2     product content category because it includes anything and

3     everything.  It certainly could include commentary about

4     religion or news or art or music, but the category that they

5     are dealing with and that they are trying to get at is the

6     exact form of speech and of human interaction just moderated

7     via the internet.

8          THE COURT:  But if the state does not care what

9     the subject matter of the video, is they are going to say it

10    is not content-based.  We don't have to play the video to

11    know whether it is restricted or not and it is not going to

12    turn on what the subject matter of the video is.

13          MR. LEHOTSKY:  So it does not turn on the subject

14    matter of the video, but it does turn on whether that is

15    expression and communication between two people, which I

16    think is a separate form of content regulation.

17          Again, I don't think this really helps them at

18    all.  Even if you were to say I'm going to assume that this

19    is not content-based, it does not help them.  Imagine Brown

20    versus Entertainment Merchants Association and you had a

21    California law that restricted all video games and not just

22    violent video games.  That wouldn't have been any better if

23    you had a state law that regulated minors watching

24    television and not specific television programs whether it

25    is violent or sexual material or whatever it is.

1          That would not help them in terms of the First

2    Amendment.  And the reason why is exactly as Justice Scalia

3    said in the Brown decision:  There is no history or

4    tradition in this country of regulating comic books,

5    television, rock and roll music because of what it might do

6    to minors, because of fears that minors will be exposed or

7    will be harmed in their development by whatever it is that

8    they are viewing.

9          I mean in fact California in the Brown versus

10   Entertainment Merchants case had made a very similar

11   argument to what I read from page 42 about minors'

12   developing brains and their sort of inability and lack of

13   impulse control, all of which are true as a biological

14   matter, but as a First Amendment matter, it does not mean

15   that the state gets to enact a paternalistic law and, again,

16   as Justice Scalia said, impose the state's view about what

17   speech is permissible for minors with a parental override at

18   the back end, that if a parent says, well, it is okay if my

19   kid goes online or plays this video game, that that is not

20   permissible.  That, again, is clearly established Supreme

21   Court precedent.

22         I was going to address the parental consent

23   provision next, but since we have already been talking a

24   little bit about that, and unless Your Honor has questions,

25   I --

1          THE COURT:  I'm eager to hear everything you want

2     to tell me today.

3          MR. LEHOTSKY:  I do think that this provision,

4     which, you know, I would refer to as the you can't talk to

5     stringers law, is the most glaringly unconstitutional part

6     of this Act.  Utah concedes, and this is at page 41 of the

7     defendant's brief, that it is their goal to, quote, shield

8     minors' personal information from strangers.  By strangers

9     they mean the public at large and anybody that is not within

10    their immediate friend group.  But the Act only implicates

11    personal information that minors choose to share with

12    others.  That is speech that posts the likes, the videos,

13    the comments, and that is minors' speech on the internet.

14         THE COURT:  Well, it is broader than that, isn't

15    it?  Doesn't the Act reach information that minors are

16    unknowingly sharing -- or at least not speech related

17    information, what sites they are visiting, where they are,

18    and I don't even know what all of the commercial data is

19    that your clients are collecting and reselling, but that is

20    also covered by the Act, is it not?

21         MR. LEHOTSKY:  So we are not challenging any data

22    privacy regulations.  We are talking about what is made

23    publicly available outside of the friend network.  So if

24    there is information, for instance, that goes to one of the

25    websites about what websites they visited or any of that

1    information that Your Honor just listed, that does not go to

2    the broader public.  That is not the type of restriction

3    that is imposed by this parental consent provision.

4         Now, Utah, if they really wanted to address the

5    privacy of minors, they could have enacted a privacy bill

6    like other states have done.  That is not what they have

7    done here.  They have purported to restrict what minors can

8    post publicly without parental consent.

9         THE COURT:  Does the Act not reach that other

10   information by imposing the presumption of confidentiality

11   and the other provisions of the Act?

12        MR. LEHOTSKY:  With respect to what websites may

13   do with that information that they collect, yes, and we are

14   not challenging that.

15        THE COURT:  Does that create a Moody issue for us?

16        MR. LEHOTSKY:  No, I don't believe so, Your Honor,

17   because Moody is very clear that you are only looking at the

18   applications of the constitutional provisions that are

19   challenged.  There might be all sorts of other provisions in

20   this law that we are not challenging that are perfectly

21   fine, and I think in our briefing we give examples of other

22   laws that are sort of around the periphery of some of these

23   issues.

24        For instance, Utah has long had a law that makes

25   it illegal to disseminate unprotected speech that is

1    obscenity for minors, to minors.  You can't give Playboy to

2    someone under the age of 18.  We are not challenging that.

3    Utah also has a separate law that requires age verification

4    for pornographic websites.  Again, we are not challenging

5    that.  That is not part of this.  There are other aspects of

6    this law that we are not challenging.  We are focused on the

7    content and speaker-based coverage definition and on the

8    three provisions that I identified, parental consent, age

9    assurance, and then the outright prohibitions.  Let's call

10   it that third category.

11           The attorney general's defense of the parental

12   consent provision is that minors do not have a right to

13   speak to strangers online without parental consent.  We

14   know, as I said, from cases like Reno and Moody, that that

15   is just not right when it comes to online speech and the

16   First Amendment.

17           We also know under Brown that minors have, with

18   the exception of speech that is obscene for minors, that is

19   unprotected speech for minors, they have full First

20   Amendment rights when we're talking about the online world

21   and the ability to speak and to receive speech.

22           We give a number of examples in our brief of

23   speech that this provision would prohibit.  I mentioned some

24   of them, the aspiring musicians, the high school athletes,

25   and I would also point out that there is a lot of valuable

1    speech that comes from minors that the rest of the world

2    benefits from.  There may be a lot of disagreement about the

3    views of somebody like Greta Thunberg who is now 21, but

4    when she started speaking in 2018 at the age of 14, even if

5    you disagree with her, she was still saying something that

6    was noteworthy and publically important, that dealt with

7    public issues of the day.

8         There is a lot of speech, as you'll hear from Mr.

9    Corn-Revere, from minors in Utah who are like that and who

10   have something important to say.  Our members have a

11   corresponding mirror image on the other side of the same

12   First Amendment coin to disseminate that speech, that

13   publicly important speech to users around the world.

14        Now, under this theory from the attorney general

15   that the State of Utah can ban minors from speaking to

16   strangers, there is nothing that limits that to the online

17   context.  I know this law is focused on social media, but

18   they could just as easily ban minors from speaking at town

19   halls, participating in public debates, calling in to radio

20   stations or any other public venue.  There is no limiting

21   principle in their First Amendment theory that would prevent

22   the state legislature from going that far.

23        I want to turn briefly to the verification

24   problems because, again, I don't think the attorney general

25   has a satisfactory answer to our evidence, which is that it

1  is very difficult for our covered member websites to

2  determine what parent-child relationship there is.  We don't

3  have access to that information.  It is sort of short of

4  very burdensome document requests and other verification

5  measures, it would be very hard for our covered member

6  websites to determine whether there is actual parental

7  consent, and especially when we're talking about

8  nontraditional families, whether it is families with

9  different last names, foster children, et cetera, and there

10 are all sorts of problems with our website's ability to

11 comply with that requirement.  This will be extraordinarily

12 burdensome for a website like our member Dreamwidth, which

13 is a small website and doesn't have a lot of resources, and

14 for them to try to comply with some of these requirements

15 will be extraordinarily difficult.

16        THE COURT:  Doesn't the state say that that is

17 just not so, that it is a matter of cents on average for a

18 user?

19        MR. LEHOTSKY:  I think that was with respect to

20 the age assurance provision rather than parental consent.

21        THE COURT:  I think that is right.

22        MR. LEHOTSKY:  With respect to age assurance, you

23 are right and they do say that.  I am happy to turn to that

24 next if that is where you would like to go.

25        I think for a small website I don't think that is

1    going to be true and even across, you know, sort of 12 cents

2    per user that still adds up and for a small website with

3    limited resources, as the Paolucci declaration goes into

4    great detail about their limited staffing and resources,

5    that is not easy to deal with.

6            Certainly for some of our members that have a lot

7    more resources -- I don't think we are saying that it is

8    impossible to do age assurance because of cost.  We think

9    there might be other reasons why we can't do age assurance

10   reliably, but our primary argument on age assurance, though,

11   goes to the chilling effect that it has, which is not that

12   it is costly for members such as, you know, YouTube or

13   Facebook or Instagram to implement.  It is that users when

14   confronted with give us your driver's license, do a retinal

15   scan, some other type of personally identifiable

16   information, which the attorney general concedes in his

17   briefs, that is what this would require.  It would require

18   uploading that type of personally identifiable information.

19   A lot of people won't do it and that will then mean less

20   user engagement and fewer users that we are publishing to.

21   It would also mean fewer people who are then going on and

22   speaking and posting videos and comments, et cetera.

23           It also means, you know, that that chilling effect

24   will have a significant First Amendment injury both on us

25   and on our users.  Again, I don't think that the attorney

1   general has any response to any of that evidence that we put

2   in our declarations from Veitch and Davis and Szabo and

3   Paolucci about the substantial chilling effect.  I would

4   also note that both the district court in Griffin and the

5   District Court in Fitch came to that same conclusion,

6   factual conclusion about the chilling effect that the age

7   assurance requirement would have.

8           If I might turn next to the prohibited ways of

9   disseminating and publishing speech, the notifications,

10  Autoplay and Seamless-Pagination, so as Your Honor noted

11  previously we think the Moody decision is incredibly

12  important for this argument because it establishes that our

13  member websites have the right to choose how to disseminate

14  and display speech to their users.  The majority opinion in

15  Moody says, quote, when the platforms use their standards

16  and guidelines to decide which third-party content those

17  feeds will display or how the display will be ordered and

18  organized, they are making expressive choices and because

19  that is true, they receive First Amendment protection.

20          Now, interestingly the state does not contend that

21  they could impose these same limitations on other services

22  such as Hulu.  The attorney general didn't argue that these

23  provisions do not implicate the First Amendment, only that

24  they are time, place and manner restrictions that are

25  justified by the supposedly unique qualities of social

1    media.

2         The attorney general's brief makes a lot of

3    arguments about how social media is a loudspeaker which we

4    think is an entirely inept analogy.  Unlike in the

5    loudspeaker situation where you have a third party who is

6    outside your home, outside a church or a school broadcasting

7    at a high volume and the victims inside of that building

8    have no ability to turn that down, here the user can silence

9    notifications.  They can turn off Autoplay.  They can put

10   down the phone.  Your parents can say no phone in your

11   bedroom.  They can turn off the wifi at a certain time or do

12   other restrictions on internet access in order to use the

13   litany of parental controls that we have identified to turn

14   off these features.  So the time and place and manner

15   argument and the citations to Ward versus Rock Against

16   Racism and others, those cases are totally inapposite.

17        Instead, these restrictions go to the heart of

18   what our members are trying to do, which is to encourage

19   users to engage in speech on our websites.  That is, of

20   course, the exact same thing that the publishers of

21   E.S.P.N., New York Times, all manner of other websites want

22   their users to do too.  They want people to come and view

23   the content that they have on their website.  That is

24   clearly protected by the First Amendment.

25        I want to go through each of these three aspects

1   starring first with push notifications.  As we noted in our

2   briefing, our members use notifications to inform users

3   about other users' content and about their communication

4   with other users.  The attorney general I think admits as

5   much in his briefing at pages 30 and 31.  They acknowledge

6   that these are the types of communications, such as here is

7   a post that you may have missed, here is a video that you

8   might like, and these are clearly speech and restricting

9   speech that says here is something that you might like, here

10  is a comment that you missed, and encouraging people to use

11  the website is clearly a content-based regulation.  Even if

12  you disagree with us on all of the other provisions of the

13  Act, there is no doubt that this is a content-based

14  restriction on speech based on the message that is being

15  expressed, that is, here is something that you like and you

16  might want to go to our website and look at it.

17          With respect to Autoplay and Seamless-Pagination,

18  again, Moody clearly establishes that this is protected

19  under the First Amendment.  Hurley and Tornillo and other

20  cases support that proposition as well.  The New York Times

21  can continue to do Autoplay or Seamless-Pagination, Disney,

22  Spotify and other services can continue to use those

23  mechanisms of publishing but we can't.  Our member websites

24  cannot.  Again, this is a clear speaker and content based

25  restriction.

1          Finally, turning back to age assurance, as I

2     mentioned under Packingham and Moody, these age assurance

3     provisions trigger First Amendment scrutiny, strict First

4     Amendment scrutiny.  Under Section 13-71-201 subsection 1,

5     our members' websites are required to implement an age

6     assurance system for all current and prospective account

7     holders.  That is both adults and minors alike.

8          As I noted, the attorney general admits what this

9     will require, that it will require driver's licenses, et

10    cetera, and it will chill the speech of our users and,

11    again, I would note that the other district courts that have

12    encountered this provision, Griffin, Bonta, Fitch, have all

13    held that the similar age verification, age estimation

14    requirements are unconstitutional.

15         There is one aspect of this age assurance system

16    that I think the attorney general has not responded to,

17    which is the appeal process provision that we noted, which

18    is that the Act envisions that many users will need to

19    submit documentary evidence to establish the account

20    holders' age range as part of the appeal process, you know,

21    in case someone says, hey, I'm actually an adult.  I am not

22    a minor.  That clearly indicates what this process would

23    look like and that it really would operate as age

24    verification.

25         Again, we think all of these provisions fail any

1    level of heightened scrutiny.  Under Brown we think that the

2    age verification and parental consent requirements are

3    categorically unconstitutional.

4            We think that the state, although it has

5    undeniably an admirable goal of trying to protect children

6    in Utah and trying to help parents with managing their

7    childrens' usage of social media, it lacks a sufficient

8    interest and lacks a legitimate interest in regulating

9    speech in this way.  Again, that is clear under Brown that

10   the state must identify an actual problem in need of solving

11   by the government, and parents have a wealth of options at

12   their disposal and a wealth of parental controls to be able

13   to limit their minor childrens' use of social media.

14           It is not just the social media websites.  There

15   are also all of the other domain level and network level and

16   computer level controls that are at the parents' disposal.

17   So we think that just given that alone, there is no way that

18   they can satisfy strict scrutiny.

19           Yes, Your Honor?

20           THE COURT:  Go ahead.

21           MR. LEHOTSKY:  I would also note that they are not

22   going to satisfy the least restrictive means requirement

23   either because there are all sorts of things that Utah could

24   have done in order to prompt greater use of parental

25   controls, such as information campaigns about public

1    controls, public education, use the state's own speech to

2    make available software and more easily accessible perhaps

3    for parents.  Even if you don't think strict scrutiny

4    applies, we think they fail intermediate scrutiny because

5    the Act, as I have noted a couple of times already, is

6    massively underinclusive and the websites that it does not

7    regulate that use many of the same features to encourage, as

8    the state says pejoratively sort of eyes on screens, and it

9    is also massively overinclusive because adults who the state

10   has no interest that they have asserted here, but adults

11   will have their access to speech chilled and limited and

12   there is no justification for that that can satisfy

13   heightened scrutiny.

14          I'm happy to discuss some of the vagueness issues

15   with the law.  I'll also happy to talk about some of the

16   issues with respect to Moody that Your Honor raised in the

17   supplemental briefing.

18          THE COURT:  I did want to ask about what is the

19   implication with respect to the vagueness issues and the due

20   process arguments that you're making, what is the

21   implication of the state implementing the law before it has

22   promulgated rules that presumably will be forthcoming to

23   define more clearly some of the practices and constraints?

24          MR. LEHOTSKY:  So we have not seen those rules.

25   Under the statute those rules cannot take effect until the

1    statute takes effect, which is something of a dilemma for

2    our members.  They don't know what the rules are, and even

3    if those rules are helpful, they are not going to help us

4    until the law takes effect.

5           More fundamentally, we don't think that those

6    regulations will cure any of the defects in the law which,

7    again, we think are categorical and are baked into the law.

8    It does not matter what the age assurance or parental

9    consent requirements look like, because in terms of the

10   regulations those are categorically unconstitutional.  We

11   think the same is true with respect to the prohibitions on

12   the modes of disseminating content on our websites.  Again,

13   the regulations don't have any effect on any of those

14   provisions.

15          THE COURT:  This seems like a good place to pull

16   up for now.  We'll circle back and I think there may be more

17   to talk about after we have heard from everybody in the

18   room.

19          Thank you.

20          MR. LEHOTSKY:  Thank you, Your Honor.

21          THE COURT:  Mr. Corn-Revere.

22          My first question for you is do your clients have

23   a redressability problem?

24          Thinking in the context of standing, which I am

25   required I think to independently assess, don't your clients

1    stand in a difficult position, and at least on the pleadings

2    that we have today I think I'm required to evaluate what you

3    have pled at this stage and any evidence that you have

4    submitted, and I think you might tell me that it is

5    commonsensical and maybe it is, but if it is not in the

6    record, I'm wondering what I am to do with the question

7    about -- doesn't the law place into focus this question for

8    you:  What is to say that the NetChoice members might not

9    just enact these restrictions themselves or some of them?

10            MR. CORN-REVERE:  Well, that is certainly

11   possible.  First of all, let me address the standing

12   question that the state has asserted in a couple of places

13   that then leads to a more direct answer to your question,

14   and that is our plaintiffs are not the ones who are being

15   regulated by the law and so why are they able to challenge

16   it?  That is the issue that the Supreme Court dealt with in

17   Virginia State Pharmacy Board versus Virginia Citizens

18   Consumer Council, where you had a state regulation that

19   prohibited the advertising of prescription drug prices.

20   Nothing about the law regulated the consumers.  They simply

21   had an interest in seeing competitive drug prices being

22   advertised, but the Supreme Court held that they were proper

23   plaintiffs to bring the claim, and basically said that the

24   freedom of speech presumes a willing speaker, and ruled that

25   where a speaker exists, as is the case here, the protection

1    is afforded to the communication and the source and

2    recipients both, and that the consumers who are not

3    regulated could challenge it.

4         The same is true here.  Social media platforms

5    have all kinds of different policies and those private

6    policies don't affect the fact that the state does not have

7    the constitutional ability to impose restrictions that then

8    affect the consumers.  That is precisely what is going on

9    here.

10        As a matter of fact -- I'm sorry, Your Honor.

11        THE COURT:  Go ahead.  I'm listening.

12        MR. CORN-REVERE:  The same is true under the

13   Supreme Court's holding in Packingman versus North Carolina,

14   where the Supreme Court invalidated a restriction on

15   providing social media accounts to convicted sex offenders.

16   The court held that that was unconstitutional on its face,

17   and it may well be that social media platforms would adopt

18   their own policy not wanting to do business with convicted

19   sex offenders, but, nonetheless, the application of state

20   power to enforce that is unconstitutional.

21        THE COURT:  I guess I don't have in mind the

22   procedural posture of those cases when they were decided and

23   I don't have clearly in mind what the record evidence was in

24   those cases, but tell me if you think this is correct.  You

25   agree that as an element of standing, a plaintiff has to

1    establish that the relief you're seeking -- let's see.  That

2    the injury is fairly traceable to a challenged action and

3    that it is likely as opposed to merely speculative that the

4    injury would be redressed by a favorable decision of the

5    court.

6              You agree with that?

7              MR. CORN-REVERE:  I do.

8              THE COURT:  I think it is pretty clearly

9    established that when a plaintiff's asserted injury arises

10   from the government's alleged unlawful regulation of someone

11   else, and I think that is the position in which your

12   plaintiffs find themselves --

13             MR. CORN-REVERE:  Exactly.

14             THE COURT:  -- that that is a more difficult thing

15   to establish, the redressability.  In those instances I

16   think a plaintiff is required to adduce facts showing that

17   the third-party choices have been or will be made in such a

18   manner as to permit redressability.  Doesn't that require

19   some affirmative pleading, statement, evidence, something in

20   this case that the NetChoice members won't otherwise

21   voluntarily adopt some of the measures here that you're

22   complaining about?

23             MR. CORN-REVERE:  No, Your Honor, I don't think it

24   requires that.  I think there are certain cases that speak

25   to that issue of redressability where you are dealing with

1   pressure being imposed on third parties, one of which is

2   Backpage.com versus Dart, where the pressure was being

3   imposed by the county sheriff on credit card companies, and

4   the government argued in response that we don't know that

5   there is anything showing that the credit card companies are

6   going to do business with Backpage.com if you take away the

7   government interest.  Judge Pozner in the opinion said that

8   that didn't matter, that once you removed the

9   unconstitutional government action, then you can presume

10  that it is redressable.

11       I think the very fact that NetChoice and its

12  members are challenging these regulations is ample

13  indication that if you remove the unconstitutional

14  government action that you will eliminate the problem.

15       THE COURT:  You think we can presume

16  redressability?  Is that what you just said that Judge

17  Pozner said?

18       MR. CORN-REVERE:  I'm saying if you take away the

19  unconstitutional government action, that that is sufficient

20  and that was what Judge Pozner held in Backpage.com.  So far

21  the courts in Arkansas, Mississippi and Ohio have applied

22  established law under Packingham and others to enjoin the

23  various state limits on minors' access to social media.

24       In California the court enjoined the Age

25  Appropriate Design Code Act and its age justification

1    requirements for the same reasons and this Court should do

2    the same.

3          In the other cases the states tried to claim that

4    they were not regulating speech at all.  In California and

5    Mississippi, for example, the states indicated that they

6    were regulating nothing but conduct.  In Ohio the state

7    tried to frame it as a regulation of commercial contracts,

8    but in each of those cases courts saw through these efforts

9    to try and evade constitutional review.  Utah, at least to

10   their credit, recognizes that what they are doing is

11   attempting to regulate protected speech, but it asserts that

12   it has the authority to do so because it says that children

13   are different.

14         This fundamentally misstates the way the law

15   works.  As Mr. Lehotsky pointed out, the state quotes a half

16   a sentence from Erznoznik versus City of Jacksonville to try

17   and justify this position that minors only possess limited

18   First Amendment rights, but they admit that the rest of that

19   sentence that goes on to say that minors are entitled to a

20   significant measure of First Amendment protection, and only

21   in relatively narrow and well-defined circumstances may the

22   government bar the public dissemination of protected

23   material to minors.

24         The state does not effectively distinguish the

25   court's more recent holding in Brown versus Entertainment

1    Marketing Association, which said that the government has no

2    free-floating right to regulate speech directed to minors,

3    nor does it cite any authority suggesting that it would

4    justify impeding adults' access to protected speech in the

5    name of protecting children.

6           Now, following Mr. Lehotsky's very impressive

7    presentation I am not sure how much I have to add.  I will

8    just invoke the old joke, stop me if you have heard this

9    before, but I will try to go through some of the things and

10   supplement, where possible, the points that Mr. Lehotsky

11   made.

12          As I indicated, the entire defense of the state's

13   law is based on the false premise that the state has the

14   heightened ability to regulate speech that involves minors.

15   On a more basic level, with First Amendment law the state

16   fails to meet its obligation to justify the law under any

17   level of scrutiny, under strict scrutiny and under

18   intermediate scrutiny.  All of those tests are beyond what

19   the state has been able to show.

20          There is the question of whether or not you can

21   bring a facial challenge in this case, and Mr. Lehotsky

22   again addressed the Moody questions, and I would agree with

23   Your Honor that Moody operates very much in our favor.

24   First of all, it confirms that in the First Amendment area

25   you can bring a facial pre-enforcement challenge where you

1    can show that the law largely regulates protected speech

2    and --

3            THE COURT:  Mr. Corn-Revere, I apologize.  You are

4    really flying and I can see our court reporter struggling to

5    keep up.

6            MR. CORN-REVERE:  I am sorry.  I will make best

7    efforts to slow down.

8            The second thing about Moody is it settles the

9    question that when you're dealing with social media, the

10   First Amendment does not go to sleep and that it applies

11   with full force to these new technologies and particularly

12   to interactive technologies.  The difference in the Moody

13   case from this case is that the challenge in that case went

14   to various aspects of social media platforms that may or may

15   not implicate First Amendment issues.

16           For example, in both oral argument and in the

17   opinion the Supreme Court talked about how certain features

18   of platforms like ride sharing applications or online

19   marketplaces, Uber and Etsy might not have the same kinds of

20   editorial interests as news feeds and other things and sent

21   the decision back for the evaluation of those qualities of

22   social media platforms.

23           That is not the issue here.  Here the entire

24   function and the entire purpose that the state has put

25   forward is to limit the ability to interact on social media.

1    So the challenged portions of this law all speak directly to

2    various ways of communicating.  That includes the age

3    assurance mandate, the content sharing restrictions, the

4    content presentation restrictions.  All of them are directly

5    regulating the ability of our clients and for the platforms

6    to provide these services for interactive communication.

7         As I mentioned, Packingham is relevant here and I

8    think it speaks to this issue, because what we're talking

9    about again is limiting access in various ways to social

10   media platforms.  Packingham says at page 107 that the court

11   need not decide the precise scope of the statute.  It is

12   enough to assume that the law applies as the state concedes

13   it does to social networking sites as commonly understood.

14   That is websites like Facebook, LinkedIn and Twitter, which

15   is precisely what the Utah law targets.

16        There are certain provisions, as Your Honor had

17   asked about earlier, that are not challenged and asked

18   whether or not this might present a problem under Moody.

19   The answer is that it does not.  Moody does not change the

20   basic law governing how pre-enforcement facial challenges

21   operate in the First Amendment area.  If you compare those

22   to a case like Reno versus A.C.L.U., we see that what the

23   court looked at in reaching its ultimate decision was

24   whether or not the provisions challenged were overbroad.

25        The C.D.A. was part of a much larger law, the

1    Telecommunications Act of 1996, and even within the portion

2    of the law that dealt with the C.D.A. you had various

3    provisions that were not challenged.

4         There was not a challenge, for example, to the

5    obscenity prohibitions in the C.D.A.  There was no challenge

6    to Section 230 which provides immunity for online platforms,

7    but that didn't undermine the ability of the court to make a

8    decision on the facial validity of the C.D.A. as being

9    overly broad and vague.

10        Again, without trying to repeat too much of what

11   Mr. Lehotsky was talking about, I think the record is quite

12   clear that each of our plaintiffs are affected in adverse

13   ways by the application of each of these specific

14   provisions, the assurance provisions, the content

15   communications provisions as well as the presentation

16   restrictions on platforms.  All of those affect the ability

17   of the plaintiffs to communicate over social media.  That

18   really hasn't been questioned at all.  As Mr. Lehotsky

19   mentioned, each of the provisions violates the First

20   Amendment in different ways.

21        I'm trying to skip through this and not repeat

22   things that he has already covered and I think covered very

23   adequately.  Let me just try and identify a few of the

24   things in the record that speak specifically to those

25   questions.

1          First of all, age verification.  Mr. Lehotsky did

2     indicate that this has a chilling effect and this is amply

3     supported by the record.  For example, in Exhibit 13, the

4     Warren declaration, we cite the Utah State University study

5     that says that two-thirds of adults don't want to provide

6     their I.D. to get access online, and 70 percent don't want

7     to provide documents about their kids.  This was relied on

8     by the court in Free Speech Coalition versus Rokita and it

9     provides an independent reason why an age verification

10    requirement is unconstitutional.

11         This, by the way, has been a consistent holding

12    ever since Reno and in A.C.L.U. versus Ashcroft and A.C.L.U

13    versus Mukasey, that these kind of age verification

14    requirements all violate the First Amendment.

15         The content sharing restrictions of Section 202

16    are also unconstitutional.  We have indicated again how each

17    of our plaintiffs are affected by these content sharing

18    restrictions.  In Yost, a very similar law in Ohio, it made

19    clear that laws that require parental consent for children

20    to access constitutionally protected and not obscene content

21    are subject to strict scrutiny.

22         Again, a similar argument was made in Packingham,

23    that the state could restrict the ability to share content

24    and that was found to be unconstitutional.  Content

25    presentation restrictions, as Your Honor pointed out is now

1    settled by Moody.  If you're determining how content might

2    be presented, whether it is in the form of continuous scroll

3    or notifications, all of those are protected First Amendment

4    decisions, and we have indicated through our plaintiffs'

5    declarations how those particular methods of communication

6    are important to each of the plaintiffs.

7         As I mentioned earlier, this law is invalid

8    regardless of what level of scrutiny the Court applies.  We

9    think that strict scrutiny is the appropriate standard.  I

10   will just supplement what Mr. Lehotsky said in a couple of

11   ways.  He indicated that the various district courts that

12   have looked at these kind of restrictions have all held that

13   they are subject to strict scrutiny.  I would also note that

14   the Supreme Court in Playboy said that you look at not just

15   the language of the law, but you look at the purpose for

16   which the law was adopted.  So you look at whether or not

17   the law is trying to prevent the direct impact of speech on

18   the audience, and that is what the Supreme Court described

19   as the essence of content-based regulations, and that is

20   what the court elaborated on in Reed versus Town of Gilbert

21   when it said that facially content neutral appearing laws

22   may be content based if their justification is based on the

23   impact of the content, and that is the holding in Playboy.

24        It is worth noting that in this case the state has

25   made no pretense of suggesting that this law can satisfy

1    strict scrutiny.  They argue that there is a compelling

2    interest, and I can talk a little bit more about that, but

3    they have not made any effort to show that this is the least

4    restrictive means.  So I think if the Court agrees that this

5    is a direct content based regulation of speech, I think at

6    that point the case is really over.

7          This is also true under intermediate scrutiny, and

8    various courts have made the point that it really does not

9    matter if the court really determines which level applies,

10   that regulations of this type are unconstitutional either

11   way.

12         For example, sort of as a threshold question there

13   is whether or not the state's purpose is to restrict speech,

14   and here there is a content restrictive or a speech

15   restrictive interest, and as the Court points out, they're

16   seeking to limit the ability to interact on social media.

17   That was the admission that Mr. Lehotsky started with and I

18   think it is dispositive here, whether or not the Court could

19   find that intermediate scrutiny has been met.

20         Secondly, the state has an obligation to show that

21   the interests that it is purporting to serve are not

22   speculative.  Here, while the state puts forward the

23   declaration of Jean Twenge, again, I think a fuller

24   examination of the evidence that the state has put forward

25   shows that it is rather speculative.  Even the surgeon

1    general's advisory, on which much of the state's argument is

2    based, says that it is impossible to generalize over the

3    impact of social media on youth and that it is equally as

4    beneficial or beneficial to many, and certainly to our

5    plaintiffs, than it is to the allegations that there are

6    harms and that there simply isn't conclusive evidence on

7    that point.

8          I think that was made abundantly clear by the

9    declaration of Professor Ferguson that we submitted that

10   examined the data on which the state purports to rely on.

11   It is based on overgeneralized conclusions and the Twenge

12   declaration omitted looking at any contrary evidence, of

13   which we have provided and, more importantly, Dr. Twenge

14   contradicts herself on potential solutions.  She has written

15   publicly about how smart phones are the problem, but if that

16   is so, this law does absolutely nothing to curb the use of

17   smart phones.  As a general proposition, if kids are going

18   to take their smart phones in their bedrooms at night with

19   them, they are going to be up looking at streaming media and

20   other things online.

21         Secondly, under intermediate scrutiny and beyond

22   the state's inability to show a substantial interest, they

23   have not demonstrated in any way that this law would benefit

24   minors in a direct and material way.  This is critical.

25   This may be one of the biggest admissions that the state

1    makes.  In trying to argue against the fact that this law

2    does restrict speech, they have tried to make the point in

3    their opposition of how much minors still can do online.

4    They can still sign up for social media accounts, just not

5    full service ones, and they can still go to various websites

6    and all of these other things.  If all of those things are

7    true, then there is no demonstration whatsoever that this

8    law will have any effect.  The problem is that kids are

9    spending too much time online.  As a consequence, there has

10    never been a demonstration that this meets even intermediate

11    scrutiny, let alone strict scrutiny.

12          Finally, the Act is not narrowly tailored.  It is

13    no answer to say, again, that they are only limiting social

14    media and that people can use other means of communication.

15    That argument was specifically rejected in Packingham when

16    the state of North Carolina tried to make the point that in

17    Packingham the only thing that was being restricted for the

18    class of people covered by it was social media and not other

19    things online.  The court rejected that very premise saying

20    that, because as the state has said in its own papers,

21    social media is different and unique and it is interactive,

22    and all of that is a reason why this is not an answer to why

23    the Act is not narrowly tailored.

24          Finally, and I will end on this just because I

25    think Mr. Lehotsky really covered the waterfront here, and

1    that is that the Act is not narrowly tailored because of the

2    ability to exert independent individual control over the use

3    of social media.  This has been a finding of all of the

4    courts that have looked at the various efforts to regulate

5    the access to social media.  The fact is that controls

6    exist, and this is demonstrated in the record, at the

7    service level, at the network level, at the device level and

8    people can use apps.  This is sort of a common feature of

9    social media.  If social media is unique it is because now

10   there is the ability for more individualized control than at

11   any time in history.  In the old days when people were

12   talking about protecting kids from radio or television there

13   was the on/off switch and then later they developed a device

14   called the V-chip.

15        When the internet came along there were various

16   kinds of content filtering, but methods of individualized

17   control have evolved along with the rest of the technology

18   making it more possible for people to use these controls in

19   a way that is superior to anything in the past.  The only

20   argument that the state makes is they use the testimony of

21   Mr. Allen to say that only 50 percent of people use it and

22   that they might not know how to use it.  Those are problems

23   that are easily addressed through less restrictive measures.

24   You don't have to restrict speech in order to improve

25   people's awareness of or knowledge of the use of individual

1    tools.  That was the holding in A.C.L.U. versus Mukasey,

2    which compared the effect of the law and imposing a one size

3    fits all solution as opposed to individualized controls.

4         Admittedly, that case was decided in 2008 and it

5    is entirely possible that technology has changed, but as I

6    have indicated, the change in technology has all been in

7    favor of greater individualized control, and what the court

8    concluded in Mukasey was that that nuanced control tailored

9    to the individual household is always going to be superior

10    to a state imposed top-down solution.

11         There is only one final point I would make, and

12    this I would say is probably the only point on which

13    Mr. Lehotsky and I diverge, and that is when he said we

14    don't have a history in this country of regulating things

15    like comic books or television or rock music.  Well, the

16    fact is we do have a long tradition of government attempts

17    to regulate all of those media and, as here, all in the name

18    of protecting young people.  Because of those various

19    attempts through the years, a body of law developed saying

20    that the government does not have this kind of authority to

21    impose wholesale restrictions on young people and, more to

22    the point, it does not have the ability to use that as a

23    justification to restrict speech that is perfectly

24    appropriate for adults.  This is another attempt that

25    violates not just that body of law developed over decades,

1    but violates the more recent incarnations and all of the

2    various other states' attempts to regulate social media in

3    the name of protecting youth.

4           THE COURT:  Thank you.

5           I think this is a good time, and we have gone

6    almost an hour and a half, and at Mr. Corn-Revere's pace

7    maybe two hours, so we'll take a short recess and let Mr.

8    Young stretch his fingers.

9           Let's take about ten minutes and we'll take up the

10   state's position.  Thank you.

11          (Recess)

12          THE COURT:  Mr. Sorenson.

13          MR. SORENSON:  Thank you, Your Honor.

14          It seems to me that an important part of this case

15   is getting to the right level of scrutiny.  I wanted to

16   review three standards of review that are nested within each

17   other in this procedural context.  So the first is the

18   preliminary injunction standard of review.  I know the Court

19   knows these, but I think it is worth reviewing these just to

20   frame where we are in this case.

21          The Supreme Court has described a preliminary

22   injunction as an extraordinary and drastic remedy.  The

23   Supreme Court has also said that the need for preliminary

24   relief must be clear and not remote or speculative.  The

25   Tenth Circuit has said that the movants have a heavy burden

1    to establish that their right to relief is clear and

2    unequivocal and that the burden is on the movant to meet all

3    four prongs and not just one or two.

4          So the second standard of review that I think is

5    helpful to review is the facial challenge standard.  The

6    plaintiffs have all brought facial challenges and they seek

7    to categorically enjoin the law in all of its applications.

8    I think Moody is important and there are a couple of things

9    going on in Moody and I want to talk about both in turn.

10          Here is a quote from Moody.  Even in the First

11    Amendment context, facial challenges are disfavored and

12    neither parties nor courts can disregard the requisite

13    inquiry into how a law works in all of its applications.  So

14    on remand each court must evaluate the full scope of the

15    law's coverage, and it must then decide which of the law's

16    applications are constitutionally permissible and which are

17    not and, finally, weigh the one against the other.  This is

18    still in Moody.  The need for NetChoice to carry its burden

19    on those issues is the price of its decision to challenge

20    the law as a whole.

21          Justice Barrett, who was in the majority, wrote

22    separately in her concurrence, and that was in the social

23    media context, where there is just so much out there that it

24    is a daunting if not impossible task to succeed in a facial

25    challenge.  First, the test is to determine what the full

1    scope of the law is and then weigh the allegedly

2    unconstitutional applications against its plainly legitimate

3    sweep, and without doing this, work the court is simply not

4    in a position to determine whether a facial challenge can

5    succeed and is not in a position to facially enjoin the law.

6    That is why the Supreme Court vacated two courts of appeal

7    and sent those cases back so that that daunting task could

8    be performed.

9            The plaintiffs here have not come close to doing

10   that work.  It is not enough for plaintiffs who have the

11   burden in this preliminary injunction context to show that

12   their right to relief is clear and unequivocal to simply

13   assume that the Act lacks a plain and legitimate sweep.

14   That is not the burden of proof here.  They have to do much

15   more.

16           They have to speak not only to themselves but to

17   all social media platforms, including the ones that are,

18   quote, dumb pipes, including the ones that have vast amounts

19   of unprotected speech such as probably NetChoice member X,

20   and including the many social media companies who are not

21   members as I mentioned.

22           There is a second thing going on in Moody that

23   Your Honor got into with my opposing counsel, which is

24   doesn't Moody answer the question about what the state can

25   do with respect to social media companies?  I don't read

1  Moody to say that every single thing a social media company

2  does is content-based speech or even speech.  The law at

3  issue in Moody had to deal with compelled speech, so it had

4  requirements that social media companies put speech on their

5  platforms that they did not want to do.  Utah's law is far

6  different than that.  Under Utah's law social media

7  companies can choose whatever content goes on the platform

8  and they can order it however they want.  There is no limit

9  to how much goes on.  This is a different law than that at

10  issue in Moody.

11        Again, with respect to the facial challenge --

12        THE COURT:  On the second point and before you

13  move off of that, and I am reading from Justice Kagan's

14  opinion at page -- let's see.  Well, this is paragraph 18.

15  Deciding on the third-party speech that will be included in

16  or excluded from a compilation, and then organizing and

17  presenting the included items is expressive activity of its

18  own, and that activity results in a distinctive expressive

19  product.  When the government interferes with such editorial

20  choices, say by ordering the excluded to be included, it

21  alters the content of the compilation.

22        Am I misreading that to say the organizing and

23  presenting are editorial speech decisions?

24        MR. SORENSON:  They are and they are allowed under

25  Utah's law.  They can organize it and they can present it.

1    So for minor accounts only, and this brings me to my next

2    point and to go through the law and what it does and what it

3    does not do, for minor accounts only it would require

4    additional de minimus action to say access the next

5    presented speech instead of going through an infinite

6    scroll, say clicking a button, but the information is still

7    there.  The platform gets to choose what is there and what

8    comes next.  They can use the same curation that they

9    currently do.

10          What it does, though, is it gives minors only a

11   chance to check out for just a second, which is what the

12   research shows helps.  It does help to be able to say, wait,

13   I have to click a button.  Maybe now is time for a break.

14   But the organization and the presenting is still there and

15   it is still allowed under this Act, and the second part of

16   what you read from Justice Kagan said something that goes to

17   the compelled speech -- sorry, Your Honor.

18          THE COURT:  I am not sure I agree with you yet so

19   let's keep going.  I don't want to jump over it.  If the

20   state says you have to put in a page break here, that is not

21   interfering with the organizational decision of the social

22   media company?

23          MR. SORENSON:  What the law does is it says --

24   we're talking about infinite scroll --

25          THE COURT:  Sure.

1           MR. SORENSON:  The state is saying for minor

2    accounts only, yes, insert something that will load new

3    content other than merely scrolling with a finger or a

4    mouse.  I don't think, Your Honor, that that is

5    organization, because the next content that is coming is

6    going to be the same, with or without, and the presentation

7    ends up being in the same order and the same amount and it

8    is the same content.

9           THE COURT:  Is this not like telling The New York

10   Times that you can only have this many words on each page

11   and then you need to turn to the next page?

12          MR. SORENSON:  Under this law any amount is

13   allowed.  What is not allowed is loading new content.

14   Right?  On the New York Times' website I don't know exactly

15   how it works and you may be downloading an entire article,

16   and if you have to scroll to see the rest of the article it

17   is there, but the articles are finite in The New York Times.

18          Social media is infinite.  So long as the minor

19   keeps scrolling, it never ends.  I think that is the

20   distinction between social media and The New York Times, and

21   that is the problem that youth are having is checking out

22   from that infinite scroll which you don't have with The New

23   York Times when they get to the end of the article.

24          THE COURT:  I have thought about this.  Can't the

25   amount of content then just be more than you can consume in

1    a day, and now there is a page break, and I'm saying page

2    break, but I mean now you have to press a button to load

3    more content, and the Act does not tell us anything about

4    how much content can be in a scroll before you have to flip

5    to a new --

6        MR. SORENSON:  No, it does not.  The Act does not

7    place a limit on content.  It does not tell them that they

8    have to check out after two hours, and that is why I say it

9    is a modest requirement that the research shows that that is

10   the way the brain works.  When you have to click the button

11   you think, okay, wait.  Maybe it is time for a reset, but it

12   is very minimal.

13       THE COURT:  I guess this is related to a different

14   question, and I want to hear your presentation and you have

15   organized it in a way that you think is going to be most

16   helpful, so I don't want to get us too far afield from it.

17   But a question like the one I just posed -- nobody knows the

18   answer right now under the Act to how much content can you

19   have a user scroll through before they have to take some

20   affirmative act to get more content.

21       So it just raises in my mind this question about

22   the vagueness challenges.  We spoke briefly with Mr.

23   Lehotsky about this and he stepped around it and I think I

24   understand why.  That is not the primary thrust of their

25   argument, but I'm concerned about it and shouldn't anybody

1   be concerned that the state wants to implement an act that

2   has significant penalty provisions before the division

3   promulgates rules that will enable companies who earnestly

4   want to comply with the Act and they won't know how.  They

5   won't know what is permitted and not permitted in an area

6   where speech is involved and the First Amendment, and they

7   are going to have to be conservative if they are going to

8   hope to avoid getting a letter one day from the attorney

9   general's office informing them that they are in violation

10  of a provision that they thought they were complying with,

11  but they don't know because there is no rule.

12          Is that a jeopardy issue that does not seem fair?

13          MR. SORENSON:  The rules can help.  I don't think

14  that the plaintiffs are not on notice of what is going to be

15  required to comply with the infinite scroll.  Whatever it

16  takes to load new content and whatever that process is, that

17  has to be something other than a scroll.

18          When I say load new content, the social media

19  platforms are constantly evaluating what the user is looking

20  at and then tailoring their experience to the personal

21  preferences, so what is coming next is not known up front.

22          By contrast, if you have a Kindle and you download

23  War and Peace and it is all there, that does not implicate

24  the requirement against infinite scrolling.  It is all

25  there.  Whatever the process is for loading something new,

1    it just has to be something other than scrolling.

2        THE COURT:  Where is that explained in the Act so

3    that if I'm a social media company I know what it is that I

4    am prohibited from doing?

5        MR. SORENSON:  I would like to pull up the Act on

6    the screen, if possible, and we can look at some definitions

7    which I think will help, definitions of social media

8    companies and we can look at that one and see if that helps.

9        THE COURT:  Okay.  We don't have to do it now.  Go

10   ahead and let's resume your argument.

11       MR. SORENSON:  Well, I did want to get into,

12   though, what the law does and doesn't do and so I am going

13   to pull it up anyway, which was next in my queue.

14       THE COURT:  Before you do that, let me go back to

15   the first point you made about Moody.  Mr. Lehotsky says

16   that they are not required to engage in that entire exercise

17   here because they are making discrete challenges to only

18   three categories of provisions in the Act.  They are not

19   challenging the entire Act.  While it is a facial challenge,

20   it is only drawn to specific provisions.

21       MR. SORENSON:  But they are asking it to be

22   enjoined as to everybody.  I think I heard today that they

23   want a categorical enjoinment of the challenged provisions.

24   So to the extent that there are platforms out there that

25   have unprotected speech to which the First Amendment does

1    not apply, we have not done the balancing, right?  We have

2    not looked to see does the First Amendment even apply to the

3    content of say X?  It is not here.  As I read Moody, the

4    Supreme Court sends cases back down to do that daunting work

5    and it hasn't been done here.

6              THE COURT:  Okay.

7              MR. SORENSON:  If we can pull up -- Seth, if you

8    have some of the operative provisions of the law.  Can you

9    go to the one I just -- 202.  Okay.

10             I think it is important with respect to the

11   arguments about the data privacy to be clear about what the

12   law allows.  So a social media company shall for Utah minor

13   account holders -- I'm going to one -- set default privacy

14   setting to prioritize maximum privacy including settings

15   that restrict the visibility of a Utah minor account

16   holder's account only to connected accounts.  Then the next

17   one is limit the Utah minor account holder's ability to

18   share content to only connected accounts.

19             This law is about restricting the visibility of

20   minors from the wide world, but not the opposite direction.

21   So under this law a minor with a social media account, say a

22   Facebook page, can see all of the other Facebook pages and

23   can send friend requests and connection requests and make

24   connections with whoever they want.

25             The one other provision I want to go to, which is

1   the last one, and in our brief I don't know that we pointed

2   this out as clearly as we should have, but the plaintiffs,

3   especially the Zoulek plaintiffs say, well, maybe we don't

4   want our parents to see what our connections are.  So we

5   have a burden and the supervisory tool here in Section 203,

6   and I'm reading from the highlighted part, shall include

7   capabilities for individuals selected by the Utah minor

8   account holder to view a list of connected accounts.  So the

9   minor is in the driver's seat when it comes to what the

10  person selected, and it does not have to be a parent or

11  guardian, what they can see as to their connections.

12          So when I hear words like this, bans minors from

13  speech, this is very narrow, right?  Minors can put out all

14  the speech that they want.  They can send friend requests or

15  connected requests to whomever they want and they can share

16  their page, their identifier with people offline so that

17  they can find them online.

18          NetChoice raised a couple of hypotheticals where

19  you have the aspiring musician or the aspiring athlete who

20  wants to get their videos out to the world.  In a

21  preliminary injunction context, NetChoice has not shown that

22  getting parental consent is actually a burden.  They have

23  not shown that it would be impossible or that it would even

24  be any burden to alter their default privacy settings to get

25  those messages out.

1          THE COURT:  Is that not just self-evident that if

2    a 17-year-old high school football player wants to make

3    public recruiting videos that that athlete needs to be their

4    parents' consent?  What if the parents don't want the

5    athlete to play college football?  That is speech that is

6    prohibited under the Act, is it not?

7          MR. SORENSON:  To share with the wide world you

8    need parental consent.  Again, part of the response is is

9    that actually a burden?  In this preliminary injunction

10   context I am not sure that it is.  As we get into what the

11   right standard of review is, there are also alternative

12   challenges of communications, ample challenges of

13   communication, which is what the intermediate scrutiny test

14   says.  Can the athlete communicate directly with the

15   recruiter?  Yes.  Can he send a friend request and establish

16   a connection?  If they have that connection the recruiter

17   can see everything.  He could send this out to all of the

18   recruiters that he wants to.  He does not need his parents'

19   consent to do that, to establish those direct connections,

20   but what the law does do is restrict the visibility of

21   minors to the broader world in the interest of protecting

22   their data privacy.

23          THE COURT:  Mr. Lehotsky brought up the example of

24   Greta Thunberg, and I don't know if I am saying that

25   correctly, and I know who the person is, and if you're an

1  activist, a climate activist and you're 16 years old, you

2  just can't advocate generally and you can't use the internet

3  as a platform for trying to communicate your messaging?

4          MR. SORENSON:  You can use the internet all you

5  want.  You could set up a website.  We are talking about

6  social media companies.  She can post as much as she wants

7  on her account and it will be seen by all of her connected

8  accounts and she can establish as many connections as she

9  wants.

10         THE COURT:  Why does somebody want to use X to

11  communicate a broad message?

12         MR. SORENSON:  Why does someone want to use X?  I

13  take it they want to go viral sometimes.

14         THE COURT:  You want to reach a very large

15  audience, don't you?  Isn't that why President Biden

16  announced his campaign withdrawal on X?  That is why

17  President Trump uses X.  That is why athletes and

18  entertainers use X among other platforms.  The 16-year-old

19  aspiring climate activist just can't?  There may be reasons

20  for it.  I am just trying to explore it.  That is a

21  meaningful restraint on speech, is it not?

22             If I am Greta Thunberg and I am barred from using

23  the biggest platforms, how do I get my message across?

24         MR. SORENSON:  Again, my first response is is

25  there a burden to getting parental consent?  It is there,

1    yes.  So the hypothetical has to go to the parents

2    disagreeing with the minor seeking this broad audience, and

3    as you just alluded to, there may be reasons for limiting a

4    minor's audience to connected accounts, people that are

5    known and people that the individual minors can trust.

6         THE COURT:  Is there a case that says that a

7    parent can decide -- in fact, doesn't that run counter to

8    Brown?  What is the case you point to for the proposition

9    that the state can place a parent or any adult in between a

10   minor who wishes to speak and the platform for speaking?

11        MR. SORENSON:  We have cited a case from Florida,

12   and this is the Pledge of Allege case where the district had

13   a rule that said that if a minor wants to sit out as a form

14   of protest or speech that they have to have the parents'

15   consent and the court said, yes, that is fine.  There are

16   parental concerns that the state is mindful of as well.  I

17   don't recall the name of the case, Your Honor.  It is in our

18   briefing.

19        THE COURT:  I remember the case.  Okay.

20        MR. SORENSON:  We made an analogy in our brief and

21   I don't think we explored it too much in depth, but

22   NetChoice criticized the state, in its reply brief, a bit

23   for making some analogies to non-expressive activities where

24   we might require age assurance or we might require parental

25   consent like tobacco sales or alcohol sales or age

1   assurance.

2          One that we mentioned is tattoo parlors, which I

3   think is an interesting analogy.  Every state in the union

4   requires age assurance for accessing protected speech of

5   tattoo body art and I believe that most states allow minors

6   to access it with parental consent.  The reason I think it

7   is an interesting analogy is because unlike pornography or

8   strip clubs which are also helpful analogies, this involves

9   protected speech for both adults and minors.  The state has

10  a concern about minors accessing this protected speech,

11  because the delivery mechanism entails some health concerns

12  and a minor might not appreciate them in the way that a

13  parent would.  That is an example where the state regulates

14  a minor's protected speech.

15         I would suggest, Your Honor, that the health

16  concerns involved with social media are far worse than they

17  are for tattoo parlors.

18         THE COURT:  Let's explore that for a moment.  Mr.

19  Corn-Revere addressed that issue here today.  What is your

20  response, and it is in the Zoulek briefing, the concerns

21  about the strength of the state's evidence and the state of

22  the record today on this question about how closely has the

23  state tied these measures to the harm that it has identified

24  and that it wishes to address and how strongly has the state

25  established the harm?

1              MR. SORENSON:  That is why I started with the

2    standard of review.  I don't think in this preliminary

3    injunction context the burden is on the state, but the state

4    has put forth strong evidence that the harm from excessive

5    social media use by minors is devastating.  That is in the

6    declaration of Dr. Twenge.  The correlation is so strong

7    that social media use goes up and adverse mental youth

8    outcomes go up.  Social media use goes down and adverse

9    mental health outcomes go down.  I think the evidence is

10   there.

11              There is plenty of it and there are plenty of

12   studies that are cited.  We have included some other things,

13   the surgeon general's statement, so the state has put forth

14   a lot of evidence to note the harms and also to note that,

15   sure, social media has upsides and the state knows that, but

16   for minors using it beyond about two hours a day is where we

17   see mental health harms.  So these measures are designed to

18   say, hey, here is an opportunity to take a break.

19              THE COURT:  Let me step back to the first thing

20   you said in this exchange which is where the burden is.

21   Let's explore that.  We have spent a lot of time thinking

22   about the burdens as well.  You're right that ordinarily the

23   burden at the Rule 65 stage rests with the movant.  However,

24   the burdens at the preliminary injunction stage track the

25   burdens at trial, and it is the defendants that will bear

1     the burden of proof on the ultimate question concerning the

2     constitutionality of the challenged act.  So why isn't the

3     burden with the state in this context to establish the

4     constitutionality of the statute?

5              MR. SORENSON:  Well, again, I think the state has

6     put forth evidence to say that the law survives the

7     constitutional challenges that have been raised by the

8     plaintiffs.  So, yes, when we get into that substantial

9     likelihood of success on the merits prong, again, as I read

10    all of the case law that is saying that the plaintiffs have

11    to show that they have a substantial likelihood of success,

12    so now we are into the merits and we have a challenge to the

13    law on constitutional grounds.  If it is a close call, Your

14    Honor, and I think all of the evidence and the arguments go

15    in the state's favor pretty clearly, but if it is a close

16    call I think that has to go in the state's favor also in

17    this context, especially with the facial challenge where

18    they are supposed to show that it is unconstitutional in all

19    of its applications.

20             THE COURT:  Okay.

21             MR. SORENSON:  I am reviewing my notes to pick up

22    the thread I had, if that is okay.

23             THE COURT:  Take whatever time you need, please.

24             MR. SORENSON:  When we have a regulation that

25    implicates speech, and this is taking me to that third

1   standard of review, and I think there is a lot of

2   disagreement among the parties on what standard of review to

3   apply, but when we have a regulation that implicates speech,

4   and the state has recognized all along that there are speech

5   concerns at play, the court must determine whether the

6   regulation is content neutral or content based.  If it is

7   content neutral it gets a lower level of review, and if it

8   is content based it gets a higher level of review.

9         The hallmark test and the principal inquiry for

10  determining whether a law is content neutral is whether the

11  state expresses disagreement with any particular message.

12  Throughout all of the extensive briefing that we have had in

13  these two cases so far, none of the plaintiffs in either

14  case has identified any particular message that the state

15  agrees or disagrees with, because there is none.  The law is

16  agnostic as to content, and so the appropriate test for the

17  plaintiffs' claims is intermediate scrutiny.

18        THE COURT:  We have spent a lot of time thinking

19  about this, too, as you can imagine, and I thought two

20  Supreme Court cases set up this question pretty neatly.  It

21  is Reed and the City of Austin.  In the context of Reed

22  where the regulation concerned the content of signs, why

23  isn't the apt analogy here Reed instead of City of Austin if

24  the idea is that instead of regulating signs we are

25  regulating the internet, and instead of having 23 different

1    categories of internet platforms or websites, we are just

2    distinguishing one.  We have selected social media platforms

3    as a different kind of sign than all of the other platforms.

4         Why is that not the correct way of thinking about

5    the application of Reed?

6         MR. SORENSON:  I think the law here -- it cares

7    not about what the content is.  It does not go to any

8    content.  If I go back to the tattoo parlor analogy for the

9    delivery mechanism, you could get the exact same body art

10   through a body painting that you could through a tattoo, but

11   the state regulates the tattoo parlor because the delivery

12   mechanism itself poses the problem regardless of what the

13   content is.

14        I think City of Austin, which is the Reagan case,

15   says even if you have to examine the content to determine

16   whether the law applies or not, that does not make it

17   content based.  Right?  The law can still be content neutral

18   because it is not going to anything that is being said.  If

19   I go back and review the Reed case, and maybe I need to do

20   that, I think the law was making distinctions based on

21   content.

22        THE COURT:  You have said a couple of times that

23   the state is agnostic about the content of the communication

24   that is subject to restriction.  Help me understand how that

25   is compatible with something the state said in its

```
 1    opposition.

 2            I'm reading from page 25 of the opposition and

 3    this is the part of the state's brief where you're talking

 4    about why the Act's definition of social media is speaker

 5    neutral.  It is addressing a different question, but this is

 6    what the state said.  This Act has nothing to do with the

 7    state disagreeing with any particular message or

 8    discriminating on the basis of the identity of the speaker,

 9    and everything to do with the fact, well established now,

10    that teenagers are addicted to platforms where interactive,

11    immersive social interaction is the whole point.

12            Isn't that exactly it?  The state is focused on

13    this kind of content and this kind of message because it

14    thinks that is the one that is so harmful.

15            MR. SORENSON:  The state is focused on the medium

16    of exchange to be sure, and I think this is where maybe the

17    crux of the whole disagreement between the plaintiffs and

18    the defendants is, which is the social interaction, is that

19    content in and of itself, is that a function or purpose?  We

20    submit it is not.  We are not regulating, by the way, social

21    interaction.  We are regulating the platform.

22            I think I have one more slide to throw up, which

23    was the definition back in 101-14.

24            This is how social media service gets defined

25    under the statute.  There are five parts of it and the
```

1    plaintiffs have focused particularly in on subpart three,

2    but when you read all five of these in conjunction you see

3    that the definition of social media service ends up being

4    pretty narrow.  It displays content that is generated by

5    account holders, registered an account, create a profile.

6           I want to jump down to four, which is part of the

7    definition that I think actually excludes a number of

8    entities.  This goes to some of the overinclusive concerns.

9    Makes available to each account holder a list or lists of

10   other account holders whom the account holder shares a

11   connection with in the system.

12          So, again, like I said, I think the crux of the

13   disagreement is, well, interact socially, but that is not

14   what the statute is doing.  It is regulating platforms that

15   allow users to interact socially, and that is in subpart

16   three, and it does not really matter what the content and

17   subject of the interaction is.  It could be anything.  I

18   think we mention that in our brief, talking about the

19   weather or talking about something else, but it regulates

20   the platforms that allow it because, yes, it is the medium

21   that the research shows is the problem in a way that the

22   streaming service is not -- maybe that will change in the

23   future, but that is what the research shows right now and so

24   that is why the state has tailored its law just to social

25   media platforms.

1  THE COURT:  Is the net effect of that then that

2  the 17-year-old fan of the home team can post his or her

3  reflections on the game over the weekend on a message board

4  at E.S.P.N. or on the Utah Jazz message board, but just

5  can't post the same message on X or Facebook?

6  MR. SORENSON:  He can post it on X or Facebook.  I

7  don't see that the law prevents him from doing that.

8  THE COURT:  That is right.  It is just only to

9  people that the connected accounts can see.

10  MR. SORENSON:  Connected accounts could see it,

11  yeah.

12  THE COURT:  I can't share my views with the

13  community on the Salt Lake Tribune website, but I can tell

14  my connected account user friends?

15  MR. SORENSON:  I don't know that the law would

16  prevent you from showing it on the Salt Lake Tribune

17  website.  Are you saying --

18  THE COURT:  I got that wrong, didn't I?  I am

19  sorry.

20  I mean to say that the 17-year-old can post in the

21  forum on the Salt Lake Tribune website or the D News or any

22  other number of places, just I can't share that message

23  beyond my friend network on NetChoice member sites?

24  MR. SORENSON:  On a platform subject to the law

25  unless the parents say you can, sure, and with every single

1    connected account you make and the minor can make those

2    connections with anyone he or she wants to, and as you just

3    mentioned, any number of other platforms are available, and

4    I think that goes straight to the second part of the

5    intermediate scrutiny test, ample alternative channels of

6    communication are available.

7          Again, Your Honor, we are talking about minors and

8    we are talking about people who don't have the same capacity

9    for self-regulation as adults do.  I think a lot of what I

10   hear from plaintiffs is they would like to treat minors as

11   if they are just miniature adults who can make all of the

12   same decisions that adults can, but that is not true.

13         THE COURT:  Well, does this Act treat the

14   17-year-old in the same way that it treats the six-year-old

15   or eight-year-old who might have access to the internet?

16         MR. SORENSON:  Drawing lines for age cutoffs is

17   traditionally something that states have to do.  They have

18   to make those decisions somewhere.  So, yes, the state has

19   drawn the line at under 18.  I know NetChoice has raised

20   that as a bit of an overinclusive argument, but states do

21   this in a number of contexts and we have mentioned a few in

22   our brief.

23         You mentioned, Your Honor, kind of the

24   speaker-based distinction and we have been talking about

25   content-based laws, and the case law's concern with

1   speaker-based statutes is that they might be used to get to

2   content through the backdoor.  So a law that would allow one

3   political party to speak but not the other on its face is a

4   speaker-based distinction, but in reality it is trying to

5   get at content.

6        Here, however, the Act carefully defines social

7   media and excludes other things like email or streaming

8   services because, again, it is the platform that poses the

9   problem and not the content.  I think the best case to

10  review for this principle is the F.T.C. vs. Turner case.

11  NetChoice has criticized us for our characterization of

12  Turner.

13       Here is what Turner had to say.  I pulled out a

14  paragraph from Turner which I thought would be helpful,

15  because it does recognize speaker-based distinctions.  It is

16  true that the must-carry provisions distinguished between

17  speakers and the television programming market, but they do

18  so based only upon the manner in which speakers transmit

19  their messages to viewers and not upon the messages they

20  carry.  So long as they are not a subtle means of exercising

21  a content preference, speaker distinctions of this nature

22  are not presumed invalid under the First Amendment.

23        Just as in Turner, the state here is allowed to

24  regulate medium and it does not reach the content of the

25  medium.  It is the medium that the research shows that poses

1    the special health problems to youth, just like the medium

2    or the delivery mechanism of tattoo art.

3         I think this speaks also to the plaintiffs'

4    underinclusive argument.  Some of those other online

5    platforms do use some of the same features that are

6    prohibited here for minors, but it is the social media

7    platforms that are linked to the poor mental health and not

8    the others so the state has tailored its law to address that

9    problem.  Turner says this is okay.  If it is speaker-based

10   it is okay and it is certainly not content-based.

11        The other arguments that the plaintiffs make on

12   overinclusiveness, and I think there is a little overlap

13   between the speaker-based argument and overinclusiveness is

14   that the state shouldn't draw distinctions between adults

15   and children.  Quoting from Erznoznik, if I am pronouncing

16   that correctly, it is well settled that a state can adopt

17   more stringent controls on communicative materials available

18   to youth than on those available to adults.  The First

19   Amendment rights of minors are not coextensive with those of

20   adults.  A state may permissibly determine that at least in

21   some precisely delineated areas, a child like someone in a

22   captive audience is not possessed of that full capacity for

23   individual choice which is the presupposition of First

24   Amendment guarantees.

25        I am pushing back on the idea that minors have all

1    of these same First Amendment rights as adults and that is

2    not what Erznoznik says.  Because the Act's provisions

3    regarding the addictive features and childrens' privacy are

4    content neutral, strict scrutiny does not apply.

5           So if I set aside age assurance for just a minute,

6    the remainder of the Act would be subject to intermediate

7    scrutiny.  There is an important and substantial

8    governmental interest and I think other courts have

9    recognized it as compelling.  I'm happy to talk about those,

10   and I think we did already just a little bit, but if the

11   Court does not have any questions on the government's

12   interests here, I would go the tailoring section.

13          THE COURT:  Before you get too far ahead of me,

14   and I am trying to keep up, and I was thinking about what

15   you said about Turner, and I was reminded that the Supreme

16   Court spoke about this as recently as the Moody decision and

17   this is what Justice Kagan said:  For purposes of today's

18   cases the takeaway of Turner is this holding, a private

19   party's collection of third-party content into a single

20   speech product is itself expressive, and intrusion into that

21   activity must be specially justified under the First

22   Amendment.

23          MR. SORENSON:  This law does not permit social

24   media companies from collecting third-party content and

25   putting it into a collection.  It does not prohibit the

1    order in which they lay it out or the amount to which they

2    lay it out.

3          THE COURT:  Well, it does for minors that don't

4    have parental consent, doesn't it?

5          MR. SORENSON:  So if we're talking about the three

6    features, parental consent is actually not involved.

7          THE COURT:  I'm sorry.  I think you were making a

8    slightly different point.  You were talking about whether

9    this is a speaker-based restriction.

10         MR. SORENSON:  Correct.  Right.

11         Turner at its heart is saying, okay, the F.C.C.

12   can regulate cable medium different than public broadcasting

13   mediums because it is not going to content.

14         THE COURT:  What is Justice Kagan saying when she

15   says an intrusion into the activity that we just talked

16   about must be specially justified under the First Amendment?

17         What does that mean?

18         MR. SORENSON:  I think it is important to know

19   what law was at issue in Moody which, as I understand it,

20   was social media platforms would need to carry speech that

21   they disagreed with or maybe they didn't want to for

22   whatever reason and so it is a compelled search case.  You

23   have to put content on there that you would otherwise not

24   put on there.

25         Utah's law does not do that.  Utah's law says do

1    all of the same things you're doing now and organize it how

2    you want, but for minors' accounts, let's provide them an

3    exit sign from being entrapped in kind of the mindless,

4    endless scroll.  All of the content is still there and in

5    the same order it always has been.

6            THE COURT:  I wonder if your focus and the nature

7    of the Texas and Florida laws at issue in these cases was

8    the distinguishing feature?  I will grant you that this is

9    one line out of an opinion that speaks at some length, but

10   when we are detailing the First Amendment jurisprudence that

11   gives us the guideposts for this, but here Justice Kagan is

12   specifically talking about not compelled speech and she is

13   talking about social media networks, a private party's

14   collection of third-party content into a single speech

15   product, which she calls the repertoire of programming, is

16   itself expressive and intrusive.  Government intrusion into

17   that activity must be specially justified.  So it is not the

18   compelled speech component of the statute that has to be

19   specially justified, it is the intrusion into this

20   expressive conduct that has to be specially justified.  I

21   just don't know what you think she means by specially

22   justified.

23           MR. SORENSON:  I believe you said, and I am sorry,

24   I don't have Moody pulled up in front of me, that she said a

25   private party's collection of third-party content.  The Act

1  simply does not prohibit social media platforms from

2  collecting third-party content.

3          THE COURT:  I guess I'm thinking when she is

4  talking about the third-party content it is a call back to

5  commentary elsewhere in Moody where she is describing the

6  interests that social media companies have in the collection

7  and presentation of the third-party content as protected

8  expressive speech, but I think I have run us in a different

9  direction than you were moving in.

10         MR. SORENSON:  I am happy to talk about this.  If

11  the Court has concerns, I would like to address any

12  questions as best I can.

13         THE COURT:  It is later, not earlier, in the

14  opinion where she talks about the organizing and presenting

15  of the information and the manner chosen by the social media

16  company is expressive speech.  So if there is an intrusion

17  into it, and this Act is in some fashion, surely, then it

18  has to be specially justified.

19         To you that is intermediate scrutiny?

20         MR. SORENSON:  I don't think Moody answers the

21  question for each and every law so, sure, for the Texas law,

22  which to me I think is compelled speech that speaks to

23  strict scrutiny, so does our law need to be specially

24  justified?  That is why we are here today.  We have conceded

25  all along that there is speech involved.  We think it is

 1    justified under intermediate scrutiny.  I think that is how

 2    you resolve what Justice Kagan is saying there.

 3          All these laws that regulate social media are not

 4    created equal and they are not the same.  We have talked

 5    about the distinguishing features of Texas and Florida and

 6    both plaintiffs' counsel spoke to some other cases involving

 7    NetChoice, Yost, Bonta and Griffin, and those laws are a lot

 8    different than this law too and they essentially prohibited

 9    minors from having social media at all or maybe in some

10    cases with parental consent.

11          Utah's law allows minors to establish social media

12    accounts, set up their profiles, share it with their

13    connections, post anything they want and look at anything

14    they want, and that is a lot of speech going on and we're

15    talking about a very minor part of the regulation when it

16    comes to the addictive features.  We're talking also I think

17    about a pretty narrow application of the law when it comes

18    to data privacy, which is restricting the visibility of

19    minors but not restricting the visibility of the broader

20    world to them.  They can see all this stuff and they have

21    access to that speech.

22          THE COURT:  You were just proposing that we get

23    into a discussion about the state's showing about whether it

24    is a compelling interest or a substantial interest.  We

25    started into this and then got sidetracked on the standard

1    or the burden and who has the burden in the case at this

2    stage.  Let's talk about the substance of the state's

3    showing about the nature of that interest.

4            What is your response to the Zoulek plaintiffs'

5    criticism of the nature of the record that the state has

6    provided?

7            MR. SORENSON:  I think our record is strong.  I

8    think we have the foremost expert on social media harms to

9    youth who has testified of the extremely strong correlation,

10   and I think you could go so far and say causation, and

11   numerous studies showing the harms.  Other courts have

12   recognized a compelling interest here.

13           THE COURT:  Have you shown causation?  That seems

14   like an important question in view of Brown.

15           MR. SORENSON:  Certainly.

16           If we go into the studies that are cited there,

17   and I think we have a number of them that are showing -- you

18   get to such a strong correlation, and it is a scale, right,

19   but if you get to 85, 90 percent, you are there.  There are

20   studies that we have cited, and I don't have them pulled up

21   right now, Your Honor, but they would be referenced in the

22   Twenge declaration, showing that when social media use goes

23   up by minors, adverse mental health outcomes go up and that

24   the opposite is true also.  When social media use goes down,

25   mental health improves.  The evidence is there.

1          We are in a preliminary injunction context and we

2    have a facial standard and I think the state has put forth

3    its evidence, and the appropriate thing to do here would be

4    to deny the motion enjoining the law and let us get into

5    full discovery, but let the law go into effect so that the

6    state can address these real immediate harms.

7          Do you have further questions on that?

8          THE COURT:  Give me just a moment, please.

9          Here is some language from Brown and I would

10   appreciate it if you would favor me with your thoughts about

11   this.  There is a passage that begins -- it is in Roman

12   numeral three of the opinion, paragraphs 13 and 14 and 15.

13   Justice Scalia is talking about the strength of California's

14   evidence and he starts by framing the question, and I really

15   appreciate that this is where you started today with the

16   standard and I think the standard matters.  So Justice

17   Scalia says because the Act -- at issue there of course was

18   the video game restriction -- imposes a restriction on the

19   content of protected speech, and that will be one of the

20   things that we'll have to answer here, because of that it is

21   invalid unless California can demonstrate that it passes

22   strict scrutiny, and so if we get to that point here -- he

23   goes on to say that unless California can show that the

24   restriction is justified by a compelling government interest

25   and narrowly drawn to serve that interest, and he goes on to

1   say that the state must specifically identify an actual

2   problem in need of solving and curtailment of free speech

3   must be actually necessary to the solution.  He is citing

4   Playboy and R.I.V. along the way.

5        He goes on to say in discussing California's

6   research that California failed to meet that standard and

7   that California acknowledged that it cannot show a direct

8   causal link between violent video games and harm to minors

9   and, instead, was relying on the Supreme Court's treatment

10  in Turner Broadcasting, and Scalia goes on to say that, of

11  course, that was an intermediate scrutiny case because it

12  was a content neutral regulation and here the burden is

13  higher.

14       If I find that this is a content-based restriction

15  and that strict scrutiny applies, how do we distinguish the

16  state's showing here from what was an inadequate showing in

17  Brown?

18       MR. SORENSON:  I think, Your Honor, that the

19  evidence is there.  I take Brown saying, as you read, that

20  the state would need to show a direct causal link if we are

21  in a strict scrutiny world.  I don't take Brown to be saying

22  that the state needs to wait for like a 50-year longitudinal

23  study, right, before it can take action to address real

24  harms.  It does need to show a causal link.  I would refer

25  you back to the Twenge declaration.

1           THE COURT:  Isn't that flipping the standard on

2     its head?  In an instance where strict scrutiny applies we

3     know that the government is imposing a restriction on a

4     First Amendment right, so the question is not how long do we

5     need to wait for the state to get evidence to show that

6     there is a link.  The question is is that restriction

7     justified?  Can the state show that they are specifically

8     identifying an actual problem in need of solving and the

9     curtailment of free speech must be actually necessary to the

10    solution, so it is going to require I think a pretty robust

11    causal relationship.

12          I know that the state's position is that strict

13    scrutiny does not apply, but I'm just asking if that is

14    where we land, how do we get out from under Brown here?  We

15    have the Twenge declaration, but to be clear she is

16    describing studies that are not in the record before me.

17    She has made statements about things, but our record does

18    not include those sources, does it?

19          MR. SORENSON:  I think you can look at those

20    sources.

21          THE COURT:  Sorry?

22          MR. SORENSON:  I think you can look at those

23    sources and she is citing them, some of which she has done

24    herself.

25          THE COURT:  Are they in the record?

1           MR. SORENSON:  They are in through her

2    declaration, but they are not entered separately, no.

3           I was just pulling up the declaration again and

4    certainly, Your Honor, strict scrutiny is a higher bar and

5    we get that.  I think in this context -- again, we are in a

6    preliminary injunction context where the burden is on them

7    to show a clear and unequivocal right -- we have put plenty

8    of things in front of the Court to say, look, we have

9    serious fact issues to get into and we can do that discovery

10   and we can bolster this on a full record, but there is

11   enough here to say, yeah, the state has shown a link and one

12   that could satisfy even strict scrutiny.

13          THE COURT:  This is a completely different field

14   of inquiry and this is a poor question because the answer is

15   it depends on the specifics of each case, but four district

16   courts in this country have evaluated similar laws, and they

17   are different but they are similar, and all four have upheld

18   injunctions enjoining the implementation of the law at this

19   stage.

20          How would you most strongly distinguish our case

21   from those?  Why should we reach a different result here?

22          MR. SORENSON:  I say they are not that similar.

23   The laws are not that similar.  Those states -- I think

24   Porter recently has said no social media for youth.  That is

25   a different case than ours.  We are saying social media for

1    youth.  We are not even regulating how much time they spend

2    on it, right?  We have put very targeted restrictions on

3    what are shown to be addictive features for minor accounts

4    only.

5            I heard some comments from Zoulek's counsel about

6    how we have now sort of individualized experiences on social

7    media, but the targeting of youth has also become much more

8    individualized, and so these products are addictive and we

9    are just providing a moment for these minors to say, hey,

10   maybe I can check out.  That is a lot different than saying

11   you can't even have social media, which is saying you can't

12   even get to the speech.  They can get to the speech and they

13   can share all they want and they can see all they want and

14   what they share is available to everyone with whom they have

15   a connection.

16           THE COURT:  Is there something more you wanted to

17   cover that you think we have not touched on?

18           MR. SORENSON:  Just a couple of points, if I may?

19           THE COURT:  Please.

20           MR. SORENSON:  We talked about the first part of

21   the intermediate scrutiny test and the second part is the

22   tailoring.  The state does not have to show that this law is

23   the least restrictive means under intermediate scrutiny.  It

24   just has to show that it is sufficiently tailored to allow

25   ample alternative channels of communication and it does

1    that.

2            I don't want to belabor the point too much, but in

3    the briefing the plaintiff raised the hypothetical -- not

4    hypothetical -- raised the account of, say, marginalized

5    minors who want to connect with accounts, and I think I have

6    walked through how the statute works already and that they

7    can do that, right?  The law does not prevent that and that

8    is one of the mischaracterizations of the law that I wanted

9    to address.

10           Give me just one minute, Your Honor.

11           THE COURT:  Yes, of course.

12           MR. SORENSON:  There were some comments made in

13   the argument earlier about the difficulties or supposed

14   difficulties of determining a parent-child relationship in

15   terms of parental consent.  It is true that the rule does

16   not take effect until the statute does and that is part of

17   Utah's statutory scheme, but the rule will follow what the

18   federal government already does with C.O.P.A., so this is

19   not a problem that is new or unique or can't be surmounted.

20           When it comes to age assurance, a couple of times

21   I heard my opposing counsel say that the state is requiring

22   personal identification to prove age.  I would refer the

23   Court to the declaration of Tony Allen.  The plaintiffs are

24   still living in 2004 when it cams to age verification.  In

25   2024 it can be done with great respect for personal privacy

1    such that people can access content online through an age

2    door.  The state is not asking to verify ages.  It is asking

3    to know whether you are older or younger than 18 and there

4    are ways of doing that that are mindful of the concerns of

5    personal privacy.  Again, I think if you read through the

6    declaration of Tony Allen you will see how that works from a

7    technical standpoint.

8         Your Honor, the state has enacted a content

9    neutral law that serves the public interest that other

10   courts have recognized as significant and even compelling.

11   The Act is understandable to a person of reasonably ordinary

12   intelligence and it has been drawn carefully to leave upon

13   ample alternative channels of communication and we ask that

14   the Court deny the motion.

15        THE COURT:  I got you out of sequence and I

16   apologize.  I think I realized as you were looking at your

17   notes that there is at least one other issue I would like

18   the state's response to and you respond in your papers, but

19   for the benefit of your argument about this.  I didn't hear

20   the plaintiffs talk today in oral argument about the central

21   coverage definition in the Act, but I think a central thrust

22   of the argument in the papers is that that definition is

23   content based because it draws a facial distinction between

24   websites that allow social interaction on the one hand or

25   websites that serve different purposes like shopping or

1    reading the news.  You spent a lot of time in your papers

2    addressing that.

3          Is there something more that you want to add

4    beyond what we have talked about today about content based

5    restriction?

6          MR. SORENSON:  I think we had a little bit of an

7    exchange about this and maybe this goes to the crux of the

8    disagreement, that the law is regulating platforms that

9    allow social interaction, but that interaction is just too

10   high of a level of generality to say that that is common,

11   that is just interaction, right?

12         Again, that is not the only part of the

13   definition.  There are four other parts that help narrow

14   down I think some of those overinclusive arguments.

15         THE COURT:  Got it.  Okay.  Thank you.

16         MR. SORENSON:  Thank you, Your Honor.

17         THE COURT:  Mr. Lehotsky.

18         MR. LEHOTSKY:  Thank you, Your Honor.

19         I am happy to touch on any subject that the state

20   addressed if Your Honor has questions, otherwise I would

21   focus my time on Moody and the issue of the standard.  We

22   agree with you that the standard is important.

23         THE COURT:  We need to talk about both of those

24   things.

25         MR. LEHOTSKY:  Okay.  So first I want to start out

1    by correcting something from Mr. Sorenson.  He said we're

2    seeking an injunction as to everybody, which is not correct.

3    We are seeking an injunction only on behalf of our covered

4    members, just the members of NetChoice that operate websites

5    that are social media companies' social media services.

6         Now, I think it is important to distinguish

7    between the reasoning, the legal reasoning that we are

8    asserting and the scope of our relief.  Our reasoning, as I

9    said in my initial presentation, is categorical.  We think

10   this statute is categorically unconstitutional in several

11   ways under established Supreme Court precedent.  We do not

12   think that that is a fact intensive inquiry.  We do not

13   think that it is anything that requires discovery.  It is

14   obvious on the face of the statutory provisions, which is

15   why the reasoning that we are asserting is very broad.  It

16   might be that there are other people out there in the world

17   who could benefit from that reasoning and they will not be

18   subject to this injunction.

19        It might be that there are other types of speech,

20   such as unprotected speech, again, obscenity for minors that

21   is still regulated by the State of Utah.  If, for instance,

22   X in the future ended up having material that is obscene for

23   minors, they might need to do age assurance, they might need

24   to be subject to those various Utah laws.  Nothing in this

25   injunction would apply to that.  So a lot of the arguments

1    from the state about Moody and the record that needs to be

2    established I think are just totally inapposite for this

3    hearing.

4            Your Honor I think keyed in on some of the key

5    language from Moody quoting from Justice Kagan's opinion and

6    we think that that is exactly right about the substantive

7    standards for the First Amendment.  It is important to note

8    that Moody does not change the substantive standards for

9    facial challenges in First Amendment cases.  Those are the

10   same as they have always been.  They are the same as what

11   the parties have been briefing and what the parties have

12   been litigating, and we don't think that Moody is an

13   opportunity for the attorney general to raise a bunch of

14   issues that it has never raised before, nor does it change

15   the nature of the arguments that we are making.

16           We have two paths to victory for our preliminary

17   injunction against the enforcement of this law to our

18   members.  First, there is no set of circumstances where the

19   Act would be constitutional for covered websites.  We meet

20   that.  It is categorically unconstitutional with respect to

21   the provisions that we are challenging and for which we seek

22   a preliminary injunction.

23           Second, the Act is unconstitutional where a

24   substantial number of the Act's applications are

25   unconstitutional.  That is the Stevens -- the long time

1   overbreadth standard that applies under the First Amendment,

2   and Justice Kagan noted specifically that this different

3   standard for claims involving speech is necessary, quote, to

4   provide breathing room for free expression, end quote.

5          Now, Moody and Paxton as you noted, and I agree

6   with Mr. Sorenson that these were different cases and they

7   concern different statutes and there are differences between

8   the Florida and the Texas statutes, but there are two

9   provisions that were at issue before the court with respect

10  to both laws.

11         One was legislation by Florida and Texas that

12  limited a website's ability to engage in content moderation.

13  So it restricted the ability of websites to curate and

14  disseminate speech in the way that they chose.  That is

15  compelled speech in the sense that it requires them to carry

16  messages and viewpoints that they don't like, but it is

17  primarily in the way that we litigated it in the Supreme

18  Court was as a restriction on the editorial discretion of

19  the websites.

20         The second provision that was at issue, which we

21  think is also a restriction on editorial discretion, were

22  the provisions that required individualized notice and

23  appeal for every time a website moderated content.  Again,

24  you could think of that as compelled speech because you have

25  to tell the user this is why I took down your video, because

1  it promoted Nazism, or you could view that as a restriction

2  on the website's exercise of editorial discretion, because

3  every time they were talking down content as being

4  inappropriate and contrary to their standards and

5  guidelines, they had to explain it and that serves as a

6  burden and an abridgment of their right to exercise

7  editorial discretion.

8          So at that level and talking about restrictions it

9  is very similar, but the distinctions that the attorney

10  general is trying to key on in his supplemental briefing

11  about the application of laws to emails, to direct messaging

12  and to all sorts of other functions that might exist on a

13  website like Etsy or Amazon where you are purchasing

14  products, none of those are really in play here in the sense

15  that it would help the attorney general.  The Utah law here,

16  remember, restricts any social interaction online with

17  respect to Autoplay, Seamless, and Push Notification

18  provisions.  Then with respect to the parental consent

19  provision, that imposes a limit on minors' ability to speak

20  to the public at large unless they have parental consent.

21          If you apply those to direct messaging, there

22  could be no direct messaging with a stranger by a minor.

23  There could be no email by a stranger with a minor.  Now,

24  this law contains express exceptions for email so that is

25  not at issue.

1         Again, it also applies to social interaction only,

2    so it is not dealing with ride hailing services like Uber

3    and it is not dealing with online shopping services like

4    Etsy.  So the need for further discovery and development of

5    the factual record that the attorney general is seeking, it

6    is just totally irrelevant for the nature of our challenge

7    to this restriction on social interaction.

8         The attorney general is proposing further

9    discovery and the need for a massive set of Excel

10   spreadsheets or however you would deliver the information

11   about all of the functions of the various websites.  I think

12   that is totally irrelevant given the nature of our

13   challenge.  It is also totally inappropriate in the First

14   Amendment speech context.  The Supreme Court has said in

15   F.E.C. versus Wisconsin Right To Life in 2007 that First

16   Amendment standards, quote, must entail minimal if any

17   discovery and to allow parties to resolve disputes quickly

18   without chilling speech through the threat of burdensome

19   litigation.

20        That is exactly what the attorney general wants to

21   do.  The attorney general is trying to rely on the

22   concurrence opinion by Justice Alito, which is not the

23   majority opinion, and raising issues about so-called dumb

24   pipes.

25        They also rely on the opinion of Justice Barrett,

1    which is just an opinion from one justice, and it is not the

2    majority opinion saying that the standard is daunting.  That

3    is not what Justice Kagan said.  The attorney general

4    focuses a lot on direct messaging and on other services.

5    Again, I don't think that that helps the attorney general at

6    all.  If anything, that is a greater First Amendment problem

7    and it is yet another way in which the State of Utah is

8    restricting the ability of minors to speak outside of their

9    immediate network and friend group.

10           I think maybe the final thing I want to address

11    with respect to Moody is that the attorney general both

12    today and in supplemental briefing raised the recent

13    development of X allowing pornography and whether that would

14    create an issue.  Again, we have already noted that the

15    state has other regulations for obscenity with minors.  This

16    law does not depend at all on obscenity for minors and does

17    not invoke it in any way, but the state cannot simply

18    regulate all social interaction and then justify it by

19    saying, well, it also sweeps up social interaction that

20    might include obscenity for minors on one of the websites

21    among the members of NetChoice.

22           Put another way, just because there may be

23    pornography on X in the future does not mean that Nextdoor,

24    YouTube, Facebook and everybody else can be required to get

25    parental consent for public dissemination, to do age

1    assurance and to ban Push Notifications, Autoplay and

2    Seamless-Pagination.  That is not the breathing room that

3    Moody highlighted in the majority.

4         I would also note that there is still lots of

5    content on X that is not obscenity for minors.  Your Honor

6    brought up the example of President Biden and the reason why

7    people go to X is so they can have a broad platform.  The

8    reason why Greta Thunberg posts on X is so that she can get

9    her message about climate change out to the broader public.

10        A final point that I would make with respect to

11   Moody is to circle back to the discussion that we had in my

12   opening remarks about only considering the scope of the law

13   with respect to the applications of the statutes that are

14   being challenged.  That is the Patel decision and I think

15   that is also what Moody stands for as well, that you sort of

16   look at what are the challenged provisions and how do they

17   apply and what are their constitutional applications?

18        Again, we submit that there are none with this

19   law.  Under clearly established precedent in Brown, Reno,

20   Ashcroft Two, there is simply no permissible application for

21   a content-based and speaker-based law like this one with

22   respect to these three provisions that we are challenging.

23   Even if you thought there was some application that might be

24   permissible, it is still substantially outweighed by all of

25   the instances in which it is not constitutional and not

1    permissible.

2            If Your Honor does not have any more questions --

3    thank you, Your Honor.

4            THE COURT:  No.  Thank you.

5            Mr. Corn-Revere, anything to add?

6            MR. CORN-REVERE:  Well, with such a comprehensive

7    rebuttal it is not always easy to know what to add, but I

8    will try and pick my points so I am not repeating anything

9    Mr. Lehotsky has said.

10           First I want to start with Your Honor's initial

11   question on redressability and particularly with respect to

12   specific citations in the record where we have made

13   reference to the NetChoice case.  First, starting with the

14   first amended complaint and paragraph 42, and it was

15   referenced that that case has been filed and it is

16   proceeding in tandem with this one, and we also mention it

17   in our briefing in the preliminary injunction motion at

18   pages 10, 18 and 22 to 23 we cite to declarations that were

19   submitted in the NetChoice case.  Finally, in our reply

20   brief, and that is document 62, at page 8, we cite to the

21   declarations again.

22           Now, these are all things that we think the Court

23   can and should take judicial notice of and noting both the

24   way in which the industry has been operating up to this

25   point, but also that they are opposing these kinds of

1    restrictions and want to continue operating as they have,

2    which is why if you remove the legal impediment, then you

3    have redressability for the individual plaintiffs.

4            The Tenth Circuit has addressed the ability to

5    rely on these kinds of references in U.S. versus

6    Rodriguez-Aguirre.  Admittedly, this is not a case that we

7    cited in our papers, but it is reported at 262 Fed 3rd 1195

8    at page 1203, where the court said when considering a facial

9    attack on standing, the court has wide discretion to allow

10   affidavits and other documents to restore disputed

11   jurisdictional facts.  I think those cross-references give

12   the Court full authority to examine the two cases together

13   and conclude that the individual plaintiffs and their claims

14   are redressable as well.

15           THE COURT:  262 F3rd what?

16           MR. CORN-REVERE:  264 F3rd 1195 and the point page

17   is 1203.

18           THE COURT:  Thank you.

19           MR. CORN-REVERE:  Now, I will just make a couple

20   of points about Moody before I get into the few points that

21   I want to make.

22           First of all, I agree with everything that Mr.

23   Lehotsky said about that, but I would just elaborate on a

24   couple of things.  Mr. Sorenson had, again, talked about we

25   have to show that each of the applications are affected by

1   this law and he made reference to the line in the Moody case

2   about dumb pipes.  Again, that was something that was

3   discussed in Moody in the context of that specific

4   challenge.  As Mr. Lehotsky described, that case involved

5   whether or not the moderation of third-party speech by the

6   platforms contributed to their own editorial content or was

7   a reflection of their own editorial content.

8        One of the things that the Court asked about was

9   whether or not direct messaging was somehow affected by the

10   editorial decisions.  That is not the question here.  Here

11   you're talking about dumb pipes or you are talking about

12   direct messaging.  Those are the very services that the

13   plaintiffs what to use that the state's law impedes, which

14   is why their access to these platforms is affected and why

15   the First Amendment is violated.

16       Then the other aspect of Moody, which I think is

17   worth noting, and that goes to the content presentation

18   restrictions, and that is the point that Moody directly

19   responded to as I think Your Honor noted, and that is the

20   method of presentation and how information is presented.

21   Those choices are protected by the First Amendment and they

22   are implicated here.  Actually that is one similarity with

23   Moody where the restriction is on how information is

24   presented and would be affected by this law in the same way

25   that the court focused on in Moody.

1          I think the main takeaway from Mr. Sorenson's

2     presentation, just looking through the remaining points that

3     I want to make, is that the state really does rest, as I

4     mentioned at the outset, on the claim that minors' rights

5     are limited and that the state can exert a great deal of

6     control.  This is directly contrary to the body of law that

7     we have relied on and it is specifically belied by footnote

8     three in Brown versus E.I.A. where Justice Scalia wrote

9     about the state not being able to prevent minors from

10    attending things like political rallies without parental

11    consent and so on.  This is directly the kind of interest or

12    the kind control that the state is attempting to exert in

13    this case.

14         One of the things that we have demonstrated

15    through the declarations of various plaintiffs is the effect

16    of the law on minors' speech.  Your Honor asked about why

17    would someone want to be on X and it is the possibility of

18    going viral itself so that information can be shared with a

19    wide audience.

20         As we have indicated from the declaration of Utah

21    Youth Environmental Services, for example, they use these

22    social media platforms to communicate using impregnable

23    messages and to allow young people ages 14 to 17 to get

24    involved politically.  It is specifically that kind of

25    political involvement that is affected by this law.

1       Similarly, Hannah Zoulek has indicated her

2   involvement politically and testified against the

3   legislation and is using it for personal enrichment and

4   using it to establish community.  All of these interests

5   will be affected.

6       Now, the state maintains that, well, maybe there

7   is a burden but not that great of a burden.  After all, you

8   just have to get parental consent.  That is the problem both

9   in terms of the political message of Youth Environmental

10  Services, which they testified in their declarations that

11  not all parents want their kids to get politically involved

12  or agree with the environmental message, and so parental

13  consent in that instance does present a burden.  It

14  especially presents a burden in the case of the declarations

15  provided by Jessica Christensen and Lu Ann Cooper where they

16  talk about how social media was instrumental in allowing

17  people to escape from fundamentalist communities and from

18  being forced into marriages.  Those kinds of restrictions

19  are a significant burden.

20      Mr. Sorenson said that imposing age verification

21  is not a particular burden and that it can be done cheaply

22  and without violating anyone's significant privacy rights,

23  but that is really not what the Allen declaration says,

24  which he asked the Court to read.  I would ask the Court to

25  read that too, specifically paragraph 12 of the Allen

1   declaration which says that age verification and age

2   inference is done by reference to driver's licenses,

3   passports, electorial rolls, credit reports, self-network

4   records, banking and credit card references.

5          So the state purportedly in the interest of

6   protecting minors' privacy has required the disclosure of a

7   great deal of private information.  If you go on to

8   paragraph 13 of the Allen declaration, he notes that age

9   estimation, which is I guess just another possible solution,

10  is done by analyzing facial images, and goes on to say that

11  the best system and the best technology is accurate to

12  within one to 1.5 years.  Now, is that 95-percent accurate?

13  We don't know.  The state requires 95-percent accuracy but

14  they have not adopted rules, but either way or either

15  method, whether you are disclosing personal information or

16  using biometrics, it is an invasion of privacy, again,

17  ironically in the name of protecting your privacy.

18          I will end with just a couple of other points.

19  One is from the beginning of this litigation the state has

20  constantly tried to compare restrictions on speech to

21  restrictions on alcohol, tobacco or even tattoo parlors.  It

22  is an utterly inept comparison.  First of all, these are

23  obviously not speech related issues.  The court in NetChoice

24  versus Griffin expressly rejected that kind of analogy to be

25  applied to a speech restriction like this.

1          THE COURT:  Tattooing is not a First Amendment

2   activity?

3          MR. LEHOTSKY:  Excuse me?

4          THE COURT:  Tattooing is not a First Amendment

5   activity?

6          MR. CORN-REVERE:  It can be, but because it

7   requires physical changes to a person's body, that is a

8   reason why you could have a parental consent requirement for

9   tattooing but not for speech, as the precedents involving

10  the regulation of minor speech all indicate.

11          But more to the point, and probably because the

12  state relied on this, they cited to Lorillard Tobacco

13  Company, which is a case involving the advertising of

14  cigarettes.  There the court made it clear that if you're

15  talking about actually physically selling tobacco, yes, you

16  can require the clerk to have the cigarettes behind the

17  counter, but you can't ban the advertising even if young

18  people see it at the point of sale.  So even on an

19  intermediate scrutiny basis, that comparison simply does not

20  hold up and the state's citation to Lorillard Tobacco

21  actually undermines their case.

22          Finally, I will address the references that the

23  state has made to the state of the evidence and in

24  particular the Twenge declaration, which is the sole support

25  for the state's claims that this is a compelling interest.

1        Again, this is exactly the kind of compelling

2   interest that states had but forward in Brown, and in a

3   number of states before the California restriction, that the

4   courts uniformily rejected and the Supreme Court rejected in

5   Brown.

6        Here we have indicated through the Ferguson

7   declaration that the actual state of the evidence here is

8   really not as definitive as the state has tried to suggest.

9   First, with respect to the Twenge declaration, she

10  overstates the studies that she does cite.  Professor

11  Ferguson at paragraphs 35 and 28 of his declaration say that

12  the studies that she relied on to say that the relationship

13  between social media and health effects is strong, actually

14  had findings at the level of what he calls statistical

15  noise.

16       The more important issue with the Twenge

17  declaration is that she omits any studies that disagree with

18  her.  She simply makes no reference to studies that, by the

19  way, are in the record to answer Your Honor's earlier

20  question.  For example, Candice Odgers is a researcher that

21  has conducted extensive research, including the longest

22  long-term study of adolescent brain development in the

23  United States, and she found no changes due to digital

24  technology use.  She called it one of the least influential

25  factors.  These studies can be found at Exhibits 1, 2 and 5

1    of the Sieff declaration.

2            Another study that is in the record is Sieff

3    Exhibit Number 3 and that is the Warr study, which is the

4    largest study of social media ever, and it looked at the

5    introductory of Facebook in 70 countries and found no

6    evidence to support that Facebook's adoption led to negative

7    effects.  It is the largest independent study ever conducted

8    published by Oxford University.

9            None of those are even mentioned in the Twenge

10   declaration.  She simply cherrypicked those studies that she

11   thought supported the premise and then overstated the

12   results of those.

13           Finally, in terms of the evidence in the record,

14   Dr. Twenge also has said that the problem is smart phones

15   and that so long as they exist the changes enacted by the

16   Utah law are not going to have any kind of beneficial

17   effect.

18           We also cite her Atlantic article.  That is

19   Exhibit 4 to the Sieff declaration, essentially confirming

20   in the words of their own expert that there are other

21   problems.  In the overall scheme of things it is important

22   to note that the Ferguson declaration also indicates that

23   the youth mental health issues that we're all concerned

24   about have a variety of explanations.  As the surgeon

25   general's advisory concluded, the research is inconclusive

1    and that the effects can go both ways, but there are other

2    explanations and these are found at paragraphs 9 and 10 and

3    20 of the Ferguson declaration.  He notes that there have

4    been changes in reporting standards, that there has been a

5    growth of the therapeutic industry in the twelve grades

6    that, again, fuels that excessive reporting.

7          And then also a factor that both Professor Twenge

8    and Jonathan Haidt note is the decline in outside child

9    activities for this cohort of youth is a strong driver of

10   different mental health outcomes.  So combined with these

11   different explanations for what is going on with kids today,

12   plus the fact that overall the research does not support the

13   state's statement of interest and, finally, the fact that

14   the state has no evidence that the measures they are

15   adopting are going to have any positive effects, and all of

16   those lead to the inevitable conclusion that the state has

17   not supported even under intermediate scrutiny a substantial

18   interest or has shown that this law would have a substantial

19   material effect.

20          Thank you.

21          THE COURT:  Don't surrender the podium yet.

22          MR. CORN-REVERE:  Okay.

23          THE COURT:  I have two related questions.  I

24   suppose it should be self-evident to me, but I would like to

25   hear you characterize what you think it means that we're

1    having a discussion like the one that you just had and the

2    argument you just made about the relative competence of the

3    evidence put forward by different declarants surveying

4    different science and the relevance of that in the context

5    of this motion for a preliminary injunction.  And then the

6    related question is, and this is the second time I think I

7    have heard you criticize the Twenge declaration for failing

8    to identify and address contrary evidence, and I am curious

9    what authority you would point to for the proposition that

10    the state is required to do that as a part of its showing at

11    this procedural stage.

12         MR. CORN-REVERE:  Well, I would say that the later

13    point -- that that was simply a commentary on the evidence

14    that the state has put forth and the Ferguson declaration

15    specifically focused on the Twenge declaration to identify

16    those areas where it fell short.

17         Secondly, in the scheme of things and in a

18    preliminary injunction motion, I would say that the

19    relevance is the same as it has been in all of the cases,

20    and particularly in the video game cases where all of them

21    were subject to preliminary injunction motions that were

22    granted and there was a strong debate over whether or not

23    the state had made its case.

24         As Your Honor pointed out, it is the state's

25    burden, once we show that there has been an effect on

1    protected speech, to establish that the state has met the

2    necessary constitutional standard.  That is definitely true

3    in Brown, where the passage from Justice Scalia's opinion

4    that you read focuses on that, but it is also true even if

5    you apply intermediate scrutiny.

6        We cited in the papers, for example, Brewer versus

7    City of Albuquerque, not a social media case but it is one

8    that applies intermediate scrutiny if you look at it in the

9    First Amendment context, and even under intermediate

10   scrutiny the state still has the burden to establish that it

11   is dealing with a real and not an imagined problem and that

12   the solution that it has proposed is going to have a direct

13   and material effect in reducing the problem.  In situations

14   where it hasn't, as here, then a preliminary injunction is

15   warranted.

16       THE COURT:  Is this a level of generality problem

17   and if we're talking about the mental health of children in

18   the State of Utah, everyone in this courtroom and in the

19   state agrees that there is a compelling interest, but it is

20   a definitional problem.  We need to define the problem more

21   specifically than just that if we're going to infringe on

22   First Amendment rights.

23       Is that what you're saying?

24       MR. CORN-REVERE:  Well, that is right.  That is

25   what the Supreme Court said in U.S. versus Playboy

1   Entertainment Group, that you can agree that protecting

2   children is a compelling interest, but it is still the

3   obligation in a First Amendment case for the government to

4   demonstrate specifically what the problem was and provide

5   evidence to support it.  In Playboy, ultimately the court

6   held that the government had fallen short in demonstrating

7   the problem in that case.  The same has been true in all of

8   the video game cases.

9         The similarities are striking where you have very

10  strong opinions by some that video games are very harmful,

11  but when proceeding in a case like this, the state does not

12  get the benefit of the doubt, which Utah in this case has

13  expressly asked for.  They have said why don't we impose the

14  regulations and then have discovery and worry about the

15  First Amendment niceties later, but that is not the way the

16  First Amendment works.  You don't allow a law that on its

17  face restricts protected speech to go into effect and then

18  search around to see if you can justify it.

19        Here what the state has done is adopt these

20  restrictions that they have acknowledged regulate protected

21  speech and then say, well, if there is any doubt about

22  whether or not there is a good reason for it, let's conduct

23  discovery.

24        Again, that is not how the First Amendment works.

25        THE COURT:  Thank you.

1          Mr. Lehotsky, one question for you that I meant to

2   ask and then I knew there was something that I forgot.  I

3   think in your introductory comments before your rebuttal you

4   mentioned that there were two things we would talk about and

5   one was Moody and then I think you mentioned standards and I

6   don't know what your meant, but I would like to follow up

7   with you on the discussion that I had with Mr. Sorenson

8   before I close with the state.

9          Who do you think has the burden today and what is

10   the burden?  What is the standard?

11          MR. LEHOTSKY:  I agree as the movant seeking a

12   preliminary injunction we have the burden to establish a

13   likelihood of success and irreparable injury and that the

14   public interest favors an injunction and that the balance of

15   the equities also favors an injunction.  That is our burden.

16          I have cited cases saying that it is extraordinary

17   and it is demanding, yet there are four instances where

18   district courts have imposed preliminary injunctions against

19   very similar laws.  We think we have to show by a

20   preponderance of the evidence that we are likely to succeed

21   and that the irreparable injury is on our side and the other

22   two factors as well.

23          I agree with Mr. Corn-Revere that when it comes to

24   questions about tailoring, whether it is either strict

25   scrutiny or heightened intermediate scrutiny, we have

 1   established that this regulates speech and the state has

 2   conceded that.  Their entire argument is about restricting

 3   social interaction among minors in Utah, and we think also

 4   inadvertently burdening the speech of adults in Utah as

 5   well.

 6          Having established that, it is their burden to

 7   demonstrate that they satisfy strict scrutiny, heightened

 8   scrutiny, whatever standard you apply.  I will note that in

 9   Griffin the court there just assumed for the sake of

10   argument that it was content neutral but, nevertheless,

11   rejected all of the evidence that the state is relying on.

12   It was the same experts, whether it is Dr. Twenge, Tony

13   Allen, found all of that evidence wanting and the courts in

14   Fitch and Yost likewise agreed.

15          THE COURT:  Am I viewing the sufficiency of the

16   government's showing on whether it is strict scrutiny or

17   intermediate scrutiny, whatever the elements are, by a

18   preponderance of the evidence?  They have to make that

19   showing by what measure?

20          MR. LEHOTSKY:  Yes.  I think that is correct.  I

21   have to admit I am not aware of a case off the top of my

22   head on that point.

23          THE COURT:  I can't remember reading it anywhere.

24          MR. LEHOTSKY:  That sounds plausible to me.

25          I do think, and this is also a point I made in my

1   opening presentation, but we do think that under Brown it is

2   just categorically unconstitutional and you cannot have

3   these types of restrictions on minors' ability to access

4   speech.

5          THE COURT:  Except if that is true then there was

6   no reason for Justice Scalia to write two-thirds of that

7   decision.

8          MR. LEHOTSKY:  Well, it is always necessary on a

9   court with multiple members to make sure that you get a

10  majority.  Fair enough.  You don't have to agree with us on

11  that point but, again, we think if you just assume it is

12  content neutral, then the preliminary injunction is still

13  warranted, even under intermediate scrutiny.

14         THE COURT:  Thank you.

15         Mr. Sorenson, any last words or have we had it out

16  over what we needed to hear?

17         MR. SORENSON:  It is lunchtime, Your Honor.

18         THE COURT:  We don't eat lunch.

19         MR. SORENSON:  Just a couple of minor points.

20  Well, maybe not minor but a couple of points.

21         Yes, read the Allen declaration and read the whole

22  declaration.  Facial estimation is one of the primary ways

23  of determining whether someone is older or younger than 18.

24  It is not invasive.  Social media companies can use

25  third-party vendors and never see personal identifying

1    information from their users.  Third-party vendors don't

2    keep that information.  If a user needs to appeal, there are

3    ways of appealing where you don't have to upload personal

4    identifying information.  The technology is so much

5    different than when some of the precedent came out.

6             There is a Ninth Circuit decision, Anderson versus

7    City of Hermosa Beach, that holds that tattoo art is

8    protected speech.

9             I wanted to say with respect to this age assurance

10   that it is allowed in a variety of offline contexts that

11   involve expressive activity or other constitutional rights,

12   and we have already talked about tattoo parlors and we

13   talked about adult bookstores and things, and it seems to me

14   it would be an odd rule to say that the state is allowed to

15   age gate expressive activity offline but there is some sort

16   of categorical rule that says it can't do it online.  That

17   is where the harms to minors are largely today.  They are

18   online.

19            One last point about the standard of review.  We

20   had a discussion about whether the presentation and

21   organization of the social media platform sites, whether

22   that is content based or not.  One of the analogies that

23   NetChoice brought up in its initial brief was sort of the

24   newspaper boy shouting extra, extra, and that is speech

25   also, but when the state enacts a reasonable time, place and

1    manner restriction on that saying you can't shout it at 2:00

2    a.m. in the morning, that is a content neutral restriction

3    and it is reviewed under a lesser burden.

4            A Push Notification, for example, is like that.

5    It is shouting and the state allows those notifications.  I

6    should say the law allows those notifications to be sent

7    when the minor is already on social media.  All the

8    notifications can be sent that the social media company

9    wants, but it is like saying not all the time, just like the

10   news boy can't shout at 2:00 a.m. in the morning.

11           Thank you, Your Honor.

12           THE COURT:  Thank you.

13           Thanks to all of you for your argument today.  It

14   has been helpful.  I am mindful, of course, of the time

15   lines under which we're working.  I hope you can see that

16   this case has been drawing our attention and we have been

17   tackling the issues as we could and as we could work through

18   them and trying to narrow the scope of what was left.

19           I just assume, and I'm not asking any of you to

20   comment, but I am just assuming that whichever way I rule

21   there is a likelihood of an appeal and I know that our time

22   line is not for me to issue a decision on September 30th or

23   something before then, and we'll do the best we can to get

24   our decision to you as promptly as we can.

25           I appreciate your time and energy today and I hope

1    you remain safe.

2              We'll be in recess.  Thank you.

3              (Proceedings concluded.)